IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA

TERESA VALENCIA (PRO SE)                    )
                                            )
        Plaintiff,                          )
                                            )
                                            ) CIVIL ACTION NO:.
                                            ) **3:08-cv-069-WKW**
                                            ) TERRY F. MOORER
                                            ) UNITED STATES MAGISTRATE
JUDGE
DEPARTMENT OF INTERIOR,                      )
WASHINGTON, D.C.,                            )
CATHERINE FARMER LIGHT,                      )
SUPERINTENDENT, IN HER                       )
INDIVIDUAL CAPACITY                          )
AND HER OFFICIAL CAPACITY; AND               )
HERBERT TYRONE BRANDYBURG,                   )
SUPERINTENDENT, IN HIS                       )
INDIVIDUAL CAPACITY AND                      )
OFFICIAL CAPACITY                            )
                                             )
        Defendants.                          )

## Motion for Judgement on the Pleadings Pursuant to FED. Rules. Of . Civil Procedure; Rule 11 ( C)

Comes now, Teresa Valencia, in want of counsel and submits the Motion for Judgement on the Pleadings Pursuant to FED.R.Civ.Pro. Rule 11( c ) and states the Attorney of Records have submitted the motion for dismissal in bad-faith pursuant amongst - other things, Under Rule 12 (b)1, Rule 12 (b)6. The Plaintiff ("Teresa") states the court has jurisdiction over the subject matter, due to the "federal forum" has jurisdiction over the "Persons" who are named in the 42 U.S.C. §1983. Chavez vs Illinois State police, 251F.3d 612, 648 (7th Cir. 2001), 194 F. 3d 850, 854 (7th cir 1999).

Title 42 U.S.C. §1983 investes jurisdiction to the "federal forum" when any persons rights have been violated by federal statute or state statute, or an individuals rights have been violated under the United States Constitution. See: Alexander vs. City of South Bend, 256 F.Supp.2d 865, Heard vs Sheahan, 253 F. 3d 316, 317-318 (7th Cir. 2001). A §1983 claim accrues when a "plaintiff" knows or has reason to know of injury which is the basis of the plaintiff's action. Honda, inc vs. Sterling, 21 F. 3d 775, 778 (7th cir. 1994).

The plaintiff ("Teresa") brought forth the Title 42 U.S.C. §1983, §1986, claims against the two defendants in their individual capacity for violating her Constitutional Rights under, and for violating color of Federal law, the §1983 statute grant citizens and non-citizens the Right to Sue any person for violating a citizen (persons) Constitutional

Rights, Under the United States Constitution, this was pleaded in the Plaintiff ("Teresa") complaint, and raises federally pursuant to §1983, §1986.

Section §1983 creates a cause of action based upon personal liability and predicated upon fault. An individual cannot be held liable in a §1983 action unless he caused or participated in an alleged constitution deprivation. Plaintiff ("Teresa") Brought her claims against two Superintendents, so the "Respondent Superior" claims is pleaded in the 42 U.S.C. §1983 Civil Right suit automatically; see: Rizzo vs Goode, 424 U.S. 363, 371, 96 s.ct. 598, 604, 46 L.Ed.2d 561 (1976).

Due to the Defendants acting in their individual capacity & violating the Plaintiff ("Teresa") Federal Constitutional Rights under the 8th & 14th amendment and for violating color of Federal law, the Plaintiff ("Teresa") has met the standard requirements of clearly established law, and due to the official capacity being raised, the suit is against the United States, due to the Defendants acting as agents, because of their status as employers of the "Department of Interior", the Plaintiff ("Teresa") states the defendant violated the Plaintiff's Constitutional Rights & violated color of Federal law, and due to these requirements, the Plaintiff ("Teresa") suffered injuries, because of the Defendants neglecting of their duties to seriously pay attention to the plaintiff ("Teresa") administrative complaints to ("Department of Interior"). See: Exhibits attached to the Motion.

Plaintiff ("Teresa") states the §1983 creates a remedy for damages against the Defendants in both capacities, individual & official pursuant to Monell, Supra, 436 U.S. 658, 690 N.55 s.ct.2018, 2035 N. 55, 56 L.ed.2d 611 (1978); Familias Unidas vs. Brisoe, 619 F2d. 391, 403 (5th cir. 1980); damages may be awarded against a defendant in his official capacity only if they would be recoverable against the government entity, Monell , Supra; Hughes vs. Blankenship, 672 F 2d 403, 406 (4th cir. 1982); the law clearly established that a governmental entity, such as the "Department of Interior," will be liable when through the execution of a Government's Policy or Custom, whether made by its law-makers or by those whose edicts or acts may fairly be said to represent official policy, which when Defendants were sent the Administrative Complaint, which the Superintendents; Catherine Farmer Light, Herbert Tyrone Brandyburg were negligent in their duties as ("Superintendents") of the "Department of Interior."

Plaintiff States the Certification of Scope of Employment acted contrary to the custom, policies, and regulations, which the institution "Department of Interior" regulates, and the United States Attorney for the Middle District of Alabama, United States Department of Justice acting pursuant to the provision of 28 U.S.C. §2679 and by virtue of the authority vested in him by 28 U.S.T.R. §15.3, but nowhere is there anything where Leura G. Canary swears under the Penalty of Perjury Attested to, for the purpose of Perjury on his or her signature. See Exhibit 1.

As a Preliminary matter, this court should review Plaintiff's Tort and other State-law claims against Defendants Light and Brandyburg and the Department of Interior. The Defendants Light and Brandyburg absolute immunity fails as a matter under the Westfall

Act, 28 U.S.C. §2679, because the Defendants Light and Brandyburg violated Plaintiff ("Teresa") Federal Constitutional Rights and violated the color of Federal Law, and the Plaintiff ("Teresa") was injured by the negligence of the Defendants, Light and Brandyburg's conduct.

Plaintiff ("Teresa") stated the purpose of the Westfall Act is "to protect federal employees from personal liability for common law torts committed within the scope of their employment," while also providing an appropriate remedy against the United State under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§1346 (b) & 2671-2680 see behtinen, 913 F.2d at 1540. Pursuant to the Westfall Act, the United States Attorney has certified that Defendants Light and Brandyburg were acting within the scope of their federal employment at the time of the incidents given the Plaintiffs claim, (see Scope of Employment Certification, Exhibit 1 to Notice of Substitution).

Plaintiff ("Teresa") states the Defendants was sued in their official capacity due to the standard prones of the common law §1983, the Plaintiff ("Teresa") has only to show (1) a Federal Constitutional Right was violated, (2) Defendants were acting under color of Federal Law, and (3) the Defendants injured the Plaintiff.

The Plaintiff ("Teresa") states the Attorney General's scope-of-employment certification has only been certified after the fact, and the "retroactive clause" shouldn't be granted, because of the Defendant's knowingly violated the Plaintiff ("Teresa") Federal Constitutional Rights, and violated the color of Federal Law, and the plaintiff was injured by the Defendant's actions.

The Plaintiff states "absolute immunity" can-not stand, but "qualified immunity," the test of qualified immunity for Federal employees sued under 42 U.S.C. §1983 is whether in performing discretionary functions, they have engaged in conduct that violates clearly established Constitutional Rights of which reason person would have known; immunity may thus be established either on basis that right allegedly (or actually) violated was not at time one "clearly established" or that, though "clearly established" (and violated), it was one that "reasonable" person in officer's position could have failed to appreciate would be violated by his conduct 42 U.S.C. §1983, see: Pritchett vs. Alford, 973 F. 2d 307, see: Carlos Manuel Vazquez Night & Day; Coeur d'Alene, Beeard on the unraveling of the prospective - retrospective distinction in Eleventh Amendment Doctrine 87 Geo L.J. 1(1998); professor Barry Friedman of N.Y.U. Law Schools (Note Admitted) see: complaint 42 U.S.C. §1983, 1986, Notice of Unsafe or Unhealthful Working Conditions-Occupational Safety and Health Administration cited with 6 serious violations.

Plaintiff cites though Tuskegee Institute National Historic Site was cited with 6 serious violations park management still showed a lack of concern for employee safety. On Augeust 15, 2007, the facility manager Andrew Callens contracted the stripping/sealing of the floor tiles in the Carver Museum bathrooms. The park did not assign a properly trained contracting officer (COTR) to ensure that the contractors were in compliance with federal material safety data sheets (MSDS) for the chemicals (muriactic acid) being used

were not posted, and the ventilation was inadequate causing both breathing and eye irritation to both visitors and staff. Because I was running late for a doctors appointment I asked Interpretive Park Ranger Shirley Baxter to notify Administrative Officer Shirley Streeter about the safety issue, since Shirley Streeter was currently the Acting Superintendent. Upon notification of the safety concern Mr. Herbert Tyrone Brandyburg confiscated the (Muriatic Acid) and posted Material Safety Data Sheets for Mex Seal Topical Sealer and Stone Glamor Penetrant/Topical Sealer. Park Gardener Edward Wilson pointed out the container of Muriatic Acid.

August 17, 2007, I was verbally reprimanded by Facility Manager Andrew Callens for having pointed out several safety and health issues (i.e., mold spores growing on vents, water leaks from ceiling, lack of suitable screening for vermin prevention on exterior of Carver Museum) that the maintenance crew had overlooked when inspectors from Carter/Burgess out of Denver, Colorado, were conducting a building inspection.

Plaintiff states she went through Administrative Program Officer to "her", and attached to this "Motion" is the exhibits which are numerous in the amount, which show that Plaintiff claims have grounds and merits to stand, and Plaintiff ("Teresa") states Defendant's Attorney should be sanctioned in pursuant to Rule 11 ( c ) for submitting a motion which was filed in bad-faith and for the purpose to waste the courts times. See: U.S. Department of Labor 5/04/2007 - 05/07/2007 (inspection date(s); inspection number) 310772330, (Issuance Date) 07/20/2007; the proper documents were filed to the Administrative Department, and the materials, which caused the Plaintiff ("Teresa") medical conditions were found in the work site.

The Plaintiff ("Teresa") states her 14th Amendment Right to procedure to due process "compensatory damages" and "loss of enjoyment of life and suffering of mental anguish," appear to provide more factual allegations relating to Plaintiff's alleged exposure to hazardous working conditions and her requests to take sick leave. (Amended Comp., Counts III-VI) As a Matter of Law and facts the Plaintiff seeks to be awarded damages as the court seeks they could be granted by the counts III-VI).

The Plaintiff ("Teresa") states due to the numerous complaints, and Defendants had knowledge of the conditions of the workplace, and the (muriactic acid)and other materials being in the environment, but placed the plaintiff in another environment which had more dangerous materials, which caused the Plaintiff ("Teresa") to suffer continuous harm.

Plaintiff states Federal Tort Claims Act ("FTCA") 28 U.S.C. §1346 (b) & 2671-2680 Plaintiff did exhaustion requirement, see: Wendell J. Echols sworn affidavit he swears under the penalty of perjury that Ms. Valencia filed a complaint with OSHA, and other agencies, which investigated the matter, and found the Department of Interior facility weren't kept up in accordance with Federal mandates. The United States has waived such immunity when representing the Defendant's in their individual capacity, and due to this, the Government has taken up the (count III - VI), and the damages are on the government, see Common Law Torts, 28 U.S. C. §1346 (b).

Plaintiff states Federal Employees Compensation Act, 5 U.S.C. §8101 et.seq. is true, but Plaintiff went through procedures to request for compensation and nothing was happening and this caused the Plaintiff ("Teresa") to into debt so, due to this plaintiff (Teresa) was left with no other remedy but §1983, which gives standing (for any person who has been injured by an individual to bring an action, whether it be a statutory violation or federal constitutional violation, this gives the Federal court jurisdiction over the subject matter and jurisdiction over the person).

Plaintiff ("Teresa") states FTCA Requirements were met by the inquiry sent to the Department of Interior; OSHA; The FTCA provides, in pertinent part, that:

An action shall not be instituted upon a claim against the United States for money damages or lost property ... caused by the negligent or wrongful act ... of an employee of the government while acting with the scope of his ... employment unless the claimant shall have first presented the claim to the appropriate federal agency and his claim shall been finally denied by the agency in writing...

Plaintiff submit's the inquiries to the court in full and in part, which show the court she submitted administrative complaints to the agency, see: Mc.Neil 508 U.S.at 111-113; see: Notice of Alleged Safety or Health Hazards U.S. Department of Labor; 4-24-07.

Plaintiff ("Teresa") states due to Defendants were given notice by the investigators that the site was hazardous, and contained lead exposure, arsenic and mold spores, and this caused the plaintiff to suffer syncope, carpal tunnel syndrome, yes they are on the job injuries, but the Plaintiff went through the administrative a grievance procedure, and the Defendants turned their heads away from the Plaintiff ("Teresa"), and this caused for 1986 Neglect to stop a conspiracy, due to Plaintiff ("Teresa") going to Washington, D.C. offices, and reporting the Defendant's they became mad, and layed the Plaintiff ("Teresa") off without pay, and this was done in bad-faith for the purpose to harass the Plaintiff.

28 U.S.C. §1503 Can be seen on behalf of the Defendant obstruction of justice charges, because Defendants tried to stop Plaintiff from reporting Hazardous conditions to the Department of Interior; OSHA; because of the lack of properly and effectively keeping a safe environment for the workers at the Department of Interior, this constitutes lack of training procedures of the Department of Interior, so the United States Government would be responsible for the conduct of their agents, only when one (1) Federal Constitutional Right was violated, (2) Defendants violated color of Federal Law, and (3) Plaintiff was injured, in the official capacity under common law torts would be against the "Federal Actor." See: John C. Jeffries, Jr, Pamela S. Karlon, Peter W. Law & George A Ruther Glen, Civil Rights Action: Enforcing the constitution II (2000); See: id at 62-68, in conversation, John Jefferies has noted that constitutional violations are far more likely than statutory violations to sound in tort and thus to be amenable to enforcement through officer - liability suit under §1983; See Professor Barry Friedman of N.Y.U. Law school has suggested that this distinction simply make no sense:

[The] Plaintiff was hurt because something the official did. [M]aybe it was the Federal's or State's duty but the official's dereliction caused the damages, be they tort or contract ... [T]he state only can act through officers, and in Alden and other cases some (combination) of state or federal officers acted wrongly (albeit on behalf of the Government, state or federal, but they made the decision and they executed it) and should have to pay.

Plaintiff states in Dwyer vs. Regan, 777 F.2d 825 (2d cir. 1985); the court stated as following (By contrast, Dwyer's requesting for compensatory and punitive damages was not barred while the court was; aware of no theory that would render Regan individually liable for Dwyer's back pay, such is not the case with respect to the claim for damages. While Regan had no duty in his individual capacity to pay Dwyer's salary, he did have a duty not to deny Dwyer's his federally protected right to due process. Thus, if Dwyer can establish that he requested and was denied predetermination hearing into his claim that the announced elimination of his position was a sham, there is no Eleventh Amendment impediment to his recovering damages for that denial from Regan. Similarly, if Dwyer were to establish that he timely requested and was denied a post termination hearing, there would be no Eleventh Amendment impediment to his being awarded damages for that denial, ID a 836-37.

## Conclusion

Plaintiff ("Teresa") states she's not, an Attorney, and is in want of counsel, due to her status as being a I.F.P. Pro 'Se litigant. She pray's that the courts would look at substance over form in the complaint, and apply the correct standards of the language of the 42 U.S.C. 1983, 1986. Plaintiff submit's the exhibits to the court for the purpose to support her Motion for Judgment on the Pleadings, pursuant to FED. Rules of Civil Procedure; Rule 12 ( c ).

## Relief Sought

Plaintiff ("Teresa") States she would like to be rewarded the fee's which the court sees fit on the Laws & Facts, and on the merits of the 42 U.S.C. 1983 from the named Defendants in their individual capacity & official capacity for amongst other things federal statutory violations, and constitutional violations.

Date                                                    Respectfully Submitted

June 10, 2008                                           Teresa Valencia

**In the District Court of the**
**United States for the Middle District**
**of Alabama**
**Eastern Division**

Teresa Valencia vs. Department of Interior, Washington D.C.

Civil No:

3:08-cv-069-WKW

**Certificate of Services**

Please take Notice Teresa Valencia in want of counsel, and cause the following to be served on the clerk & Defendants Attorney at the Address:

James J. DuBois
Assistant U.S. Attorney
Georgia Bar No. 231445
U.S. Attorney's Office
P.O. Box 197
Montgomery, Alabama 36101-0197

Date                                                                    Respectfully Submitted

June 10, 2008                                                    Teresa Valencia

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| TERESA VALENCIA | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. 1:01-CV-0600 |
| | : | |
| U.S. DEPARTMENT OF THE INTERIOR, | : | |
| Defendant. | : | |

## DECLARATION OF MARCELLA GIBSON

I, Marcella Gibson, state as follows:

1.  I am the Regional Tort Claims Officer for the National Park Service, a bureau within the Department of the Interior, duty stationed in Atlanta, Georgia. The National Park Service includes the Southeastern United States.

2.  As a part of my duties as the Regional Tort Claims Officer for the National Park Service, I am responsible for the processing of all administrative tort claims arising out of the National Park Service activities within the Southeast.

3.  As of the date of this Declaration, Teresa Valencia has not filed an administrative claim in accordance with the Federal Tort Claims Act, with the National Park Service.

I declare under penalty of perjury pursuant to 28 U.S.C. section 1746, that the foregoing is true and correct. Executed this 22 day of April, 2008.

_Marcella Gibson_
Marcella Gibson

**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA**

TERESA VALENCIA (PRO SE)               )
                                       )
        Plaintiff,                     )
                                       )
                                       ) CIVIL ACTION NO:.
        v.                             ) **3:08-cv-069-WKW**
                                       ) TERRY F. MOORER
                                       ) UNITED STATES MAGISTRATE JUDGE
DEPARTMENT OF INTERIOR,                )
WASHINGTON, D.C.,                      )
CATHERINE FARMER LIGHT,                )
SUPERINTENDENT, IN HER                 )
INDIVIDUAL CAPACITY                    )
AND HER OFFICIAL CAPACITY; AND         )
HERBERT TYRONE BRANDYBURG,             )
SUPERINTENDENT, IN HIS                 )
INDIVIDUAL CAPACITY AND                )
OFFICIAL CAPACITY                      )
                                       )
        Defendants.                    )

## MOTION FOR LEAVE TO FILE EVIDENTUARY SUBMISSION IN SUPPORT OF AMMENDED COMPLAINT

These documents are being submitted to substantiate my claim that Herbert Tyrone Brandyburg and Catherine Farmer Light systematically impeded my ability to file for medical leave and compensation through normal protocol

Enclosed you will see email after email of denials, request upon request for previously submitted documentation that was continuously declined.

Respectfully yours,


Teresa Valencia
111. W. Orangewood Ave. J3
Anaheim, California 92802
(334)868-0901

### IN THE DISTRICT COURT OF THE UNITED STATES
### FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| TERESA VALENCIA (PRO SE) | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) CIVIL ACTION NO:. |
| v. | ) 3:08-cv-069-WKW |
| | ) TERRY F. MOORER |
| | ) UNITED STATES MAGISTRATE JUDGE |
| DEPARTMENT OF INTERIOR, | ) |
| WASHINGTON, D.C., | ) |
| CATHERINE FARMER LIGHT, | ) |
| SUPERINTENDENT, IN HER | ) |
| INDIVIDUAL CAPACITY | ) |
| AND HER OFFICIAL CAPACITY; AND | ) |
| HERBERT TYRONE BRANDYBURG, | ) |
| SUPERINTENDENT, IN HIS | ) |
| INDIVIDUAL CAPACITY AND | ) |
| OFFICIAL CAPACITY | ) |
| | ) |
| Defendants. | ) |

### MOTION FOR LEAVE TO FILE EVIDENTUARY SUBMISSION IN SUPPORT OF AMMENDED COMPLAINT

These documents are being submitted to substantiate my claim that Herbert Tyrone Brandyburg and Catherine Farmer Light systematically impeded my ability to file for medical leave and compensation *through normal protocol*

Enclosed you will see email after email of denials, request upon request for previously submitted documentation that was continuously declined.

Respectfully yours,


Teresa Valencia
111. W. Orangewood Ave. J3
Anaheim, California 92802
(334)868-0901

Case: 3:08cv69

Teresa Valencia
111 W Orangewood Avenue, &#035;J3
Anahiem, CA 92802

------------------------------------------------------------

TO ATTORNEYS OF RECORD:    Electronic Noticing is MANDATORY in the
District Court for the Middle District of Alabama.

By order of the court (General order 04-3164) Electronic Noticing is
mandatory for all attorneys who wish to practice in this district.

ATTORNEYS, If you have received this notice by mail, you have not yet
complied with this order, according to our records. Please register
IMMEDIATELY!

The mandatory registration form for attorneys can be accessed through our
 ›b site (www.almd.uscourts.gov, click on the CM/ECF icon.  At the CM/ECF
  lcome page, click on the Registration button).  The form can be completed
and submitted on-line

If you have any questions or need help with our Case Management/Electronic
Case Files (CM/ECF) system, please call our help desk.

ATTORNEYS CALL  334.954.3935
ALL OTHERS CALL 334.954.3600

MIME-Version:1.0 From:efile_notice@almd.uscourts.gov To:almd_mailout@almd.uscourts.gov Bcc:
Message-Id:<942890@almd.uscourts.gov>Subject:Activity in Case 3:08-cv-00069-WKW-TFM Valencia
v. Department of Interior, Washington, DC et al (MAG+) Order Content-Type: text/html

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy
permits attorneys of record and parties in a case (including pro se litigants) to receive one free
electronic copy of all documents filed electronically, if receipt is required by law or directed by the
filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each
document during this first viewing. However, if the referenced document is a transcript, the free
copy and 30 page limit do not apply.'**

<div align="center">

**U.S. District Court**

**Alabama Middle District**

</div>

**Notice of Electronic Filing**
The following transaction was entered on 5/22/2008 at 3:40 PM CDT and filed on 5/22/2008

| | |
|---|---|
| **Case Name:** | Valencia v. Department of Interior, Washington, DC et al (MAG+) |
| **Case Number:** | 3:08-cv-69 |
| **Filer:** | |
| **Document Number:** | 26 |

**Docket Text:**
**ORDER granting [25] MOTION for Extension of Deadline of time filed by Teresa Valencia.
Response to Motion to dismiss due by 6/10/2008. Reply Brief due by 6/17/2008. Signed by Honorable
Terry F. Moorer on 5/22/08. (vma, )**

**3:08-cv-69 Notice has been electronically mailed to:**
James Joseph DuBois    james.dubois2@usdoj.gov, annie.williams@usdoj.gov,
DeeDee.Calhoon@usdoj.gov
**3:08-cv-69 Notice has been delivered by other means to:**
Teresa Valencia
111 W Orangewood Avenue, #J3
Anahiem, CA 92802

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1053018227 [Date=5/22/2008] [FileNumber=942888-0]
[1a7cf90ea07f24129b556274cb9b20f182feda06c24137baf97db81e9a85096ce3a1
be9bd8778686cb363f02e515593ec380931506a35c7230c6eba5e9548050]]

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| TERESA VALENCIA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:08-cv-069-WKW |
| | ) | |
| DEPARTMENT OF INTERIOR, | ) | |
| WASHINGTON, DC, *et al.*, | ) | |
| Defendants. | ) | |

## **ORDER**

Pending before the Court is Defendant's *Motion for Extension of Time* (Doc. 25, filed

May 22, 2008). For good cause, it is **ORDERED** that the motion is **GRANTED.** To the

extent Plaintiff requests a 21 day extension the motion is granted from the date the response

was due. As such, the response to the motion to dismiss is now due **June 10, 2008**.

Defendant's reply deadline is also extended to **June 17, 2008**.

DONE this 22nd day of May, 2008.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE

Case: 3:08cv69

Teresa  Valencia
6730 Pamela Court
Montgomery, AL 36116

----------------------------------------------------------------

TO ATTORNEYS OF RECORD:    Electronic Noticing is MANDATORY in the
District Court for the Middle District of Alabama.

By order of the court (General order 04-3164) Electronic Noticing is
mandatory for all attorneys who wish to practice in this district.

ATTORNEYS, If you have received this notice by mail, you have not yet
complied with this order, according to our records. Please register
IMMEDIATELY!

The mandatory registration form for attorneys can be accessed through our
web site (www.almd.uscourts.gov, click on the CM/ECF icon.  At the CM/ECF
welcome page, click on the Registration button).  The form can be completed
and submitted on-line

If you have any questions or need help with our Case Management/Electronic
Case Files (CM/ECF) system, please call our help desk.

ATTORNEYS CALL  334.954.3935
ALL OTHERS CALL 334.954.3600

MIME-Version:1.0 From:efile_notice@almd.uscourts.gov To:almd_mailout@almd.uscourts.gov Bcc: Message-Id:<933045@almd.uscourts.gov>Subject:Activity in Case 3:08-cv-00069-WKW-TFM Valencia v. Department of Interior, Washington, DC et al (MAG+) Order Content-Type: text/html

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### Alabama Middle District

**Notice of Electronic Filing**
The following transaction was entered on 5/5/2008 at 9:47 AM CDT and filed on 5/5/2008

| | |
|---|---|
| **Case Name:** | Valencia v. Department of Interior, Washington, DC et al (MAG+) |
| **Case Number:** | 3:08-cv-69 |
| **Filer:** | |
| **Document Number:** | 20 |

**Docket Text:**
**ORDER re [18] MOTION to Dismiss filed by Herbert Tyrone Brandyburg, Catherine Farmer Light, Department of Interior, Washington, DC; Motion Submission Deadline set for 5/27/2008; Response to Motion due by 5/20/2008. Reply Brief due by 5/27/2008. Signed by Judge Honorable Terry F. Moorer on 5/5/08. (vma, )**

**3:08-cv-69 Notice has been electronically mailed to:**
James Joseph DuBois    james.dubois2@usdoj.gov, annie.williams@usdoj.gov, DeeDee.Calhoon@usdoj.gov
**3:08-cv-69 Notice has been delivered by other means to:**
Teresa Valencia
6730 Pamela Court
Montgomery, AL 36116

*The following document(s) are associated with this transaction:*

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1053018227 [Date=5/5/2008] [FileNumber=933043-0] [7a93a61cbe5f605fe937a998aa5511ac4e5fdca06ee867a82e6f761005d04d556c432 d82e960accb54014945626bb3f9d3a78b4691adb58a903a17323bca4f89]]

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| TERESA VALENCIA | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CASE NO. 3:08-cv-069-WKW |
| | ) |
| DEPARTMENT OF INTERIOR, | ) |
| WASHINGTON, DC, *et al.*, | ) |
| Defendants. | ) |

## ORDER

Pending before the Court is *Defendants' Motion to Dismiss* (Doc. 18, filed April 29, 2008). For good cause, it is hereby **ORDERED** that the motion be submitted without oral argument on **May 27, 2008.**

It is further **ORDERED** that Plaintiff file a response which shall include a brief and evidentiary materials on or before **May 20, 2008**. Defendants may file a reply brief on or before **May 27, 2008**.

The parties are further advised that they are required to submit a paper courtesy copy of briefs and supporting evidence to the Chambers of the undersigned. For those submissions (including briefs and evidentiary materials) that exceed twenty-five (25) pages, the courtesy copy shall be bound in a three-ring binder and tabbed.

**IN DEFERENCE TO THE PLAINTIFF'S STATUS AS A NON-LAWYER, PRO-SE LITIGANT, THE COURT ADVISES:**

1. The *pro se* Plaintiff is advised that if she fails to file *any* response, the court will

proceed to decide on the merits of Defendants' motion without the benefit of her response.

2. Failure to follow the requirements of this Order in responding to the Defendants' motion may result in the entry of a final judgment in Defendants' favor without any trial.

DONE this 5th day of May, 2008.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| TERESA VALENCIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: |
| | ) | 3:08-CV-069-WKW |
| | ) | |
| DEPARTMENT OF INTERIOR, | ) | |
| WASHINGTON, D.C.; | ) | |
| CATHERINE FARMER LIGHT, | ) | |
| SUPERINTENDENT, IN HER | ) | |
| INDIVIDUAL CAPACITY | ) | |
| AND OFFICIAL CAPACITY; AND | ) | |
| HERBERT TYRONE BRANDYBURG, | ) | |
| SUPERINTENDENT, IN HIS | ) | |
| INDIVIDUAL CAPACITY AND | ) | |
| OFFICIAL CAPACITY, | ) | |
| | ) | |
| Defendants. | ) | |

## CORPORATE/CONFLICT DISCLOSURE STATEMENT

COME NOW the Federal Defendants, in accordance with the order of this Court,

making the following disclosure concerning parent companies, subsidiaries, partners,

limited liability entity members and managers, trustees (but not trust beneficiaries),

affiliates, or similar entities reportable under the provisions of the Middle District of

Alabama's General Order No. 3047:

      □     This party is an individual, or

      ☒     These parties are governmental entities,

      □     There are no entities to be reported, or

      □     The following entities and their relationship to the party are hereby
                reported: None.

Dated this the 29th day of April, 2008.

LEURA G. CANARY
United States Attorney

By: s/James J. DuBois
JAMES J. DUBOIS
Assistant United States Attorney
GA Bar Number: 231445
Post Office Box 197
Montgomery, AL 36101-0197
Telephone No.: (334) 223-7280
Facsimile No.: (334) 223-7418
E-mail: **James.DuBois2@usdoj.gov**

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2008, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, and I hereby certify that I have mailed, by

United States Postal Service, a copy of same to the following non-CM/ECF participant(s):

Teresa Valencia
6730 Pamela Court
Montgomery, AL 36116

s/James J. DuBois
Assistant United States Attorney

*IN THE DISTRICT COURT OF THE UNITED STATES*
*FOR THE MIDDLE DISTRICT OF ALABAMA*
*EASTERN DIVISION*

| | | |
|---|---|---|
| TERESA VALENCIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: |
| | ) | 3:08-CV-069-WKW |
| | ) | |
| DEPARTMENT OF INTERIOR, | ) | |
| WASHINGTON, D.C.; | ) | |
| CATHERINE FARMER LIGHT, | ) | |
| SUPERINTENDENT, IN HER | ) | |
| INDIVIDUAL CAPACITY | ) | |
| AND OFFICIAL CAPACITY; AND | ) | |
| HERBERT TYRONE BRANDYBURG, | ) | |
| SUPERINTENDENT, IN HIS | ) | |
| INDIVIDUAL CAPACITY AND | ) | |
| OFFICIAL CAPACITY, | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF SUBSTITUTION

PLEASE TAKE NOTICE that pursuant to 28 U.S.C. § 2679 (d) (1) the United States is substituted as party defendant for Catherine Farmer Light and Herbert Tyrlone Brandyburg in relation to Plaintiff's negligence claims. In support of this Notice, the United States, by and through Leura G. Canary, United States Attorney for the Middle District of Alabama, respectfully states that:

1. Catherine Farmer Light and Herbert Tyrone Brandyburg are Defendants in this case. The Complaint alleges, among other things, that Ms. Light and Mr. Brandybury negligently exposed Plaintiff to lead artifacts and mold spores while she was working as a Museum Specialist at the Tuskegee National Historic Site. (Amended Complaint, ¶¶ 5-11). She also asserts that Mr. Brandyburg caused her to suffer carpel tunnel syndrome by not helping her set up an exhibit. (Amended Complaint, ¶ 17).

2. Ms. Light is the Superintendent for the Tuskegee National Historic Site, United States Department of the Interior. Mr. Brandyburg is the Superintendent of the Moores Creek National Battlefield, United States Department of Interior, and during the relevant times at issue in Plaintiff's Amended Complaint was the Chief of Interpretation and Education at the Tuskegee Institute National Historic Site. Pursuant to 28 U.S.C. § 2679 (d)(1), the United States Attorney for the Middle District of Alabama has certified that Ms. Light and Mr. Brandyburg were acting within the scope of their federal offices or employment at the time of the incident out of which plaintiff's claims arise. *See* 28 C.F.R. § 15.3 (2003) (delegating the Attorney General's certification authority to the United States Attorneys). A copy of the Attorney General's scope-of-employment certification is filed with this Notice as Exhibit 1.

3. Substitution of the United States as party defendant for Ms. Light and Mr. Brandyburg.has occurred by operation of law, and Plaintiff's wanton conversion claims shall proceed as claims solely against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-2680. 28 U.S.C. § 2679 (d)(1).

WHEREFORE, pursuant to 28 U.S.C. § 2679 (d) (1), the United States has been substituted as party defendant for Ms. Light and Mr. Brandyburg in relation to Plaintiff's tort and other State-law claims.

Respectfully submitted this 29th day of April, 2008.

2

LEURA G. CANARY
United States Attorney

By:    s/James J. DuBois _____
JAMES J. DUBOIS
Assistant United States Attorney
Georgia Bar No. 231445
United States Attorney's Office
Post Office Box 197
Montgomery, AL 36101-0197
Telephone: (334) 223-7280
Facsimile: (334) 223-7418
E-mail:  james.dubois2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2008, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system, and I hereby certify that I have mailed, by United States Postal

Service, a copy of same to the following non-CM/ECF participant(s):

Teresa Valencia
6730 Pamela Court
Montgomery, AL 36116

s/James J. DuBois _____
Assistant United States Attorney

3

# EXHIBIT 1

## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **TERESA VALENCIA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO.:** |
| | ) | **3:08-CV-069-WKW** |
| | ) | |
| **DEPARTMENT OF INTERIOR,** | ) | |
| **WASHINGTON, D.C.;** | ) | |
| **CATHERINE FARMER LIGHT,** | ) | |
| **SUPERINTENDENT, IN HER** | ) | |
| **INDIVIDUAL CAPACITY** | ) | |
| **AND OFFICIAL CAPACITY; AND** | ) | |
| **HERBERT TYRONE BRANDYBURG,** | ) | |
| **SUPERINTENDENT, IN HIS** | ) | |
| **INDIVIDUAL CAPACITY AND** | ) | |
| **OFFICIAL CAPACITY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### CERTIFICATION OF SCOPE OF EMPLOYMENT

I, Leura G. Canary, United States Attorney for the Middle District of Alabama, United States

Department of Justice, acting pursuant to the provisions of 28 U.S.C. § 2679, and by virtue of the

authority vested in me by 28 C.F.R. § 15.3, hereby certify that defendant Catherine Farmer Light was

acting within the scope of her federal office or employment as Superintendent of the Tuskegee

Institute National Historic Site, and defendant Herbert Tyrone Brandyburg was acting within the

scope of his federal office or employment as Chief of Interpretation and Education at the Tuskegee

Institute National Historic Site, at the time of the incident out of which this claim arises. I have been

apprised of the facts giving rise to this action and make this certification on the basis of the

information now available to me with respect to the incident referred to in the complaint.

Dated this 23 rd th day of April, 2008.

LEURA G. CANARY
United States Attorney
SJIS #GAR030

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| TERESA VALENCIA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO.: |
| | ) 3:08-CV-069-WKW |
| | ) |
| DEPARTMENT OF INTERIOR, | ) |
| WASHINGTON, D.C.; | ) |
| CATHERINE FARMER LIGHT, | ) |
| SUPERINTENDENT, IN HER | ) |
| INDIVIDUAL CAPACITY | ) |
| AND OFFICIAL CAPACITY; AND | ) |
| HERBERT TYRONE BRANDYBURG, | ) |
| SUPERINTENDENT, IN HIS | ) |
| INDIVIDUAL CAPACITY AND | ) |
| OFFICIAL CAPACITY, | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' MOTION TO DISMISS

COME NOW Defendants, by and through Leura G. Canary, United States Attorney for the

Middle District of Alabama, and move to dismiss this lawsuit pursuant to Rules 12(b)(1) and

12(b)(6) of the Federal Rules of Civil Procedure. In support of this Motion, Defendants show that

Plaintiff's claims must be dismissed because the Defendants are protected by sovereign immunity,

this Court lacks subject matter jurisdiction, and she has failed to state claims upon which relief can

be granted.

A memorandum brief is being filed contemporaneously herewith.

**WHEREFORE**, Defendants' Motion is due to be and should be granted, this matter should

be dismissed, and the costs of this litigation taxed to Plaintiff.

Respectfully submitted this 29th day of April, 2008.

> LEURA G. CANARY
> United States Attorney

> By: s/James J. DuBois
> JAMES J. DUBOIS
> Assistant United States Attorney
> Georgia Bar No. 231445
> United States Attorney's Office
> Post Office Box 197
> Montgomery, AL 36101-0197
> Telephone: (334) 223-7280
> Facsimile: (334) 223-7418
> E-mail: james.dubois2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2008, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system, and I hereby certify that I have mailed, by United States Postal

Service, a copy of same to the following non-CM/ECF participant(s):

Teresa Valencia
6730 Pamela Court
Montgomery, AL 36116

> s/James J. DuBois
> Assistant United States Attorney

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| TERESA VALENCIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: |
| | ) | 3:08-CV-069-WKW |
| | ) | |
| DEPARTMENT OF INTERIOR, | ) | |
| WASHINGTON, D.C.; | ) | |
| CATHERINE FARMER LIGHT, | ) | |
| SUPERINTENDENT, IN HER | ) | |
| INDIVIDUAL CAPACITY | ) | |
| AND OFFICIAL CAPACITY; AND | ) | |
| HERBERT TYRONE BRANDYBURG, | ) | |
| SUPERINTENDENT, IN HIS | ) | |
| INDIVIDUAL CAPACITY AND | ) | |
| OFFICIAL CAPACITY, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT
## OF MOTION TO DISMISS

**COME NOW** Defendants, by and through Leura G. Canary, United States

Attorney for the Middle District of Alabama, and submit this Memorandum in Support of

their Motion to Dismiss Plaintiff's claims against them pursuant to Rules 12(b)(1) and

12(b)(6) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction

and failure to state a claim upon which relief may be granted.

## STATEMENT OF THE CASE

Plaintiff, an employee of the United States Department of Interior ("DOI"), has

filed this lawsuit pro se and seeks to recover seven million dollars in damages for

allegedly being exposed to hazardous work conditions during the course of her

employment, being subjected to undefined "disparate treatment," and having her requests

for sick leave denied by her supervisors. (Docket No. 6, Amended Complaint, ¶¶ 5-11, 12-16, Relief Sought). Although not entirely clear, she appears to seek this relief under a tort and worker's compensation theory (references to hazardous working environment, negligence, and worker's compensation); the Family Medical Leave Act ("FMLA") (references to denied sick leave); the United States Constitution (references to 42 U.S.C. §§ 1983 and 1986, and the Fourth, Eighth, and Fourteenth Amendments); an employment discrimination theory (references to the Civil Rights Act and sexual orientation harassment); and breach of an implied contract (referenced on first page). (Amended Comp.). Plaintiff also seeks injunctive relief under the Federal Anti-Injunction Act, 28 U.S.C. § 2283. (Amended Comp., page one & Relief Sought). She names as defendants two supervisors in their individual and official capacities, Catherine Farmer Light and Herbert Tyrone Brandyburg, and the DOI. (Amended Comp. ¶¶ 2-3, 13).

In her Amended Complaint, Plaintiff makes various allegations spread over six counts and thirty numbered paragraphs. She alleges that she has been employed as a Museum Specialist with the DOI at the Tuskegee Institute National Historic Site ("Tuskegee Institute") since October 2002. (Amended Comp. ¶ 13). In her first Count, entitled "Violation of Equal Protection and Hazardous Negligence," Plaintiff claims that she endured "unsafe, unhealthful working environments" when she worked with museum objects "heavily laced with arsenic and lead" and was moved to an office with "mold spores." (Amended Comp. ¶¶ 5-11). She further claims that Defendant Brandyburg knew about the lead "contamination" but failed to warn her of it. (Amended Comp. ¶ 5).

In her second Count, entitled "Violation of Deliberate Indifference to medical well being," Plaintiff complains that she was diagnosed with coronary artery disease, that

- 2 -

she had to take sick leave, and that her supervisor requested "in-depth medical documentation ... in excess of the medical certification required under the Family Medical Leave Act (FMLA)." (Amended Comp. ¶¶ 12-16). She further complains that she developed carpel tunnel syndrome while setting up a museum exhibit, and that her supervisors allowed a hostile work environment to exist for her based on rumors about her sexual orientation or perceived sexual orientation. (Amended Comp. ¶¶ 17-18). Plaintiff's remaining four Counts, entitled "Negligence [sic] Estoppels [sic]," "Violation of 14th Amendment Due Process,""Compensatory Damages," and "Loss of Enjoyment of Life and Suffering of Mental anguish," appear to provide more factual allegations relating to Plaintiff's alleged exposure to hazardous working conditions and her requests to take sick leave. (Amended Comp., Counts III-VI). ¶

Plaintiff lacks any legal or factual basis to recover the damages sought in this lawsuit. First, Plaintiff's negligence and other tort claims can only be asserted against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) & 2671-2680, and Plaintiff has not complied with the FTCA's mandatory administrative exhaustion requirements. Her failure to exhaust deprives this Court of jurisdiction to hear her tort claims. Moreover, Plaintiff cannot recover damages in federal court under the FTCA for any on-the-job injuries because her exclusive remedy for such injuries is the Federal Employees Compensation Act, 5 U.S.C. § 8101 et seq. Second, Plaintiff cannot pursue an FMLA claim regarding Defendant's decisions regarding her sick leave because Congress did not provide full-time federal employees with such a cause of action. Third, Plaintiff's cannot pursue constitutional claims against her employer and

- 3 -

individual supervisors because such claims are barred by sovereign immunity and precluded by the Civil Service Reform Act. Fourth, Plaintiff fails to state a claim for employment discrimination because she did not name the proper party-defendants, fully exhaust her claims, or plead a claim upon which relief can be granted. Fifth, this Court lacks jurisdiction over any breach-of-implied-contract claim. Finally, Plaintiff cannot obtain injunctive relief under the Federal Anti-Injunction Act, 28 U.S.C. § 2283, because it is simply not applicable. In short, for the reasons set forth below, this Court should dismiss all the conceivable claims possibly pled in Plaintiff's Amended Complaint.

## ARGUMENT AND CITATION OF AUTHORITY

This Court should dismiss Plaintiff's claims against Defendants due to lack of subject matter jurisdiction and failure to state claims upon which relief may be granted. When ruling on a Rule 12(b)(1) motion to dismiss for lack of jurisdiction, the Court may consider documents outside the pleadings and make factual findings. See Williamson v. Tucker, 645 F.2d 404, 412-415 (5th Cir. 1981). A court must dismiss a claim when it determines that it lacks subject matter jurisdiction. See Marshall v. Gibson's Products, Inc., 584 F.2d 668, 671-672 (5th Cir. 1978). The party seeking to pursue a claim in federal court bears the burden of showing the existence of subject matter jurisdiction. See Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994). Furthermore, a court should dismiss a complaint for failure to state a claim under Rule 12(b)(6) when, assuming the factual allegations are true, the plaintiff can prove no set of facts entitling him to relief. See Jackson v. Bellsouth Telecommunications, 372 F.3d 1250, 1262 (11th Cir. 2004). Under this standard, a plaintiff cannot rely merely on

- 4 -

"labels and conclusions," but must plead sufficient facts to raise a claim for relief above

the speculative level. See Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007).

**I.    The United States Has Been Substituted as the Exclusive Defendant in Plaintiff's Negligence and other State-law Claims and Her Claims Against All Other Defendants Must Be Dismissed.**

As a preliminary matter, this Court should dismiss Plaintiff's tort and other state-

law claims against Defendants Light and Brandyburg and the DOI. See 28 U.S.C. §

2679(b)(1). The Westfall Act, 28 U.S.C. 2679, provides absolute immunity to federal

employees for common-law torts committed within the scope of their employment. See

S.J. & W. Ranch v. Lehtinen, 913 F.2d 1538, 1540 (11th Cir. 1990), amended, 924 F.2d

1555 (11th Cir. 1991); 28 U.S.C. § 2679(b)(2). The purpose of the Westfall Act is "to

protect federal employees from personal liability for common law torts committed within

the scope of their employment," while also providing an appropriate remedy against the

United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) &

2671-2680. See Lehtinen, 913 F.2d at 1540. Pursuant to the Westfall Act, the United

States Attorney has certified that Defendants Light and Brandyburg were acting within

the scope of their federal employment at the time of the incidents giving rise to Plaintiff's

claims. (See Scope-of-Employment Certification, Exhibit 1 to Notice of Substitution).

The Attorney General's scope-of-employment certification has the immediate

effect of substituting the United States as the sole party defendant on Plaintiffs tort and

other state-law claims.    See 28 U.S.C. 2679 (d)(1).    See also Matsushita Electric

Company v. Zeigler, 158 F.3d 1167, 1168-71 (11th Cir. 1998). Upon this substitution,

Plaintiff's tort and other state-law claims shall proceed exclusively as claims against the

United States under the FTCA, 28 U.S.C. §§ 1346 (b), 2671-2680, and this Court's

- 5 -

subject-matter jurisdiction is circumscribed by the FTCA's jurisdictional limits. See 28 U.S.C. § 2679 (d)(4). See also Mitchell v. Carlson, 896 F.2d 128, 134 (5th Cir. 1990) ("An action against a federal employee who has been certified as acting in the scope of ... employment must proceed exclusively against the United States under the FTCA"); Galvin v. OSHA, 860 F.2d 181, 183 (5th Cir. 1988) ("an FTCA claim against a federal agency or employee as opposed to the United States must be dismissed...").

Furthermore, the absolute immunity of the Westfall Act extends to all civil actions "arising out of or relating to the same subject matter" as the state-law claims in which the United States has been substituted as the defendant, except for constitutional claims and federal statutory claims. See 28 U.S.C. § 2679(b)(2). Plaintiff's claims all arise out of or relate to her alleged treatment while she was employed at the Tuskegee Institute. (Amend. Complaint, generally). Accordingly, Plaintiff's claims against Defendants Light and Brandybury as individuals are precluded by the Westfall Act except for her constitutional and federal statutory claims.[1] See 28 U.S.C. §§ 2679(b)(1) & (2). This Court must thus dismiss Plaintiff's state-law claims against all Defendants except for those against the United States under the FTCA. See Green v. Hill, 954 F.2d 694, 696 (11th Cir. 1992), amended, 968 F.2d 105 (11th Cir. 1992).

---

[1]For the reasons set forth infra, Plaintiff's constitutional and federal statutory claims against Defendants Light and Brandyburg in their individual capacities fail as a matter of law and must be dismissed.

- 6 -

II.    **Plaintiff's FTCA Claims Must Be Dismissed for Lack of Jurisdiction.**

A.    **Plaintiff Failed to Exhaust her FTCA Claims.**

This Court should dismiss Plaintiff's negligence and other tort claims because she

has not complied with the jurisdictional prerequisites of the FTCA.  See McNeil v.

United States, 508 U.S. 106, 111-113 (1993); Suarez v. United States, 22 F.3d 1064,

1065-66 (11th Cir. 1994).  The FTCA, as a limited waiver of sovereign immunity, is

explicit in setting forth the requirements for invoking a court's subject matter jurisdiction

to hear tort claims against the United States.  The FTCA provides, in pertinent part, that:

> An action shall not be instituted upon a claim against the United States for
> money damages or lost property ... caused by the negligent or wrongful
> act ... of an employee of the government while acting within the scope of
> his ... employment unless the claimant shall have first presented the claim
> to the appropriate federal agency and his claim shall have been finally
> denied by the agency in writing....

See 28 U.S.C. 2675(a).  Thus, a plaintiff must present a written administrative claim to

the agency whose activities gave rise to the claim and have the claim finally denied

before filing a lawsuit.  See McNeil, 508 U.S. at 111-113.  The law is clear that "[t]he

FTCA bars claimants from bringing suit in federal court until they have exhausted their

administrative remedies."  See id. at 113.  Failure to comply with the administrative

remedies mandates dismissal.  See 28 U.S.C. § 2679(d)(5).

In Plaintiff's Amended Complaint, Plaintiff does not allege that she filed a claim

administratively with the DOI before filing this lawsuit.  As a result, the DOI reviewed

its records.  The review established that Plaintiff did not file an administrative claim and

has failed to comply with the FTCA's administrative requirements.  (See April 22, 2008,

Declaration of Marcella Gibson, attached as Exhibit 1 to Defendants' Motion to

Dismiss).  Accordingly, this Court lacks jurisdiction to consider Plaintiff's negligence or

- 7 -

other tort claims. See McNeil, 508 U.S. at 111-13; Suarez, 22 F.3d at 1065. See also Singleton v. Burchfield, 362 F. Supp. 2d 1291, 1297 (M.D. Ala. 2005) (dismissing FTCA claim when plaintiff failed to file administrative claim); Ivey v. United States, 873 F. Supp. 663, 669 (N.D. Ga. 1995) (same).

**B.    Plaintiff FTCA Claims are Barred by the Federal Employees Compensation Act.**

Plaintiff's FTCA claims seeking to recover for injuries incurred on-the-job due to hazardous work conditions also fail as a matter of law because the Federal Employees Compensation Act ("FECA"), 5 U.S.C. § 8101 et seq., is the exclusive remedy for federal employees who suffer on the job injuries in the course of their employment. See Noble v. United States, 216 F.3d 1229, 1234 (11th Cir. 2000). Pursuant to FECA, federal employees "are guaranteed the right to receive immediate, fixed benefits, regardless of fault and without the need for litigation, but in return they lose the right to sue the Government." See Lockheed Aircraft Corp. v. United States, 460 U.S. 190, 193-194 (1983). Under the FECA's administrative scheme, the Secretary of Labor is vested with the power to "administer, and decide all questions arising under" FECA, and his decisions are not subject to review in court. See 5 U.S.C. §§ 8128(b), 8145. This exclusive remedy bars any attempt by Plaintiff to sue directly in federal district court for damages related to on-the-job injuries under the FTCA or any other theory.[2] See 5 U.S.C.

---

[2]The language is quite explicit: "[t]he liability of the United States ... with respect to the injury or death of an employee is exclusive and instead of all other liability of the United States ... to the employee, his legal representative, spouse, dependents, next of kin, and any other person otherwise entitled to recover damages from the United States ... because of the injury or death in a direct judicial proceeding, in a civil action, or in admiralty, or bay an administrative or judicial proceeding under a workmen's compensation statute or under a Federal tort liability statute." 5 U.S.C. § 8116.

§ 8116(c); Noble, 216 F.3d at 1234. See also White v. United States, 143 F.3d 232, 234-235 (5th Cir. 1998); Ezekiel v. Michel, 66 F.3d 894, 898 (7th Cir. 1995).

In the present case, Plaintiff's allegations of negligence and allegedly hazardous work conditions relate to her alleged exposure to lead, arsenic, and mold spores, and her alleged development of carpel tunnel syndrome. (Amended Comp. ¶¶ 5-11, 17-18). These injuries allegedly developed while she was working as a Museum Specialist with the DOI at the Tuskegee Institute. (Amended Comp. ¶ 13). Accordingly, they are on-the-job injuries that are covered by FECA and her FTCA claims must be dismissed. See Noble, 216 F.3d at 1234; White, 143 F.3d at 235; Ezekiel, 66 F.3d at 898.

### III.    Plaintiff Has No Private Cause of Action Under the FMLA.

This Court should dismiss Plaintiff's FMLA claims because she does not have a private right of action to enforce the statute in federal court. See Mann v. Haigh, 120 F.3d 34, 37 (4th Cir. 1997). The United States and its agencies, as sovereign, is immune from suit in court except where Congress has specifically waived that immunity.[3] See United States v. Testan, 424 U.S. 392, 399 (1976); United States v. Sherwood, 312 U.S. 584, 586 (1941). See also FDIC v. Meyer, 510 U.S. 471, 475 (1994) ("Absent waiver, sovereign immunity shields the Federal Government and its agencies from suit."). The waiver of sovereign immunity must be unequivocally expressed in statutory text. See Lane v. Pena, 518 U.S. 187, 192 (1996). As set forth below, Congress did not provide a private cause of action for federal employees with more than twelve-months of service

---

[3]A claim against a federal employee in his official capacity is construed as a claim against the United States. See Kentucky v. Graham, 473 U.S. 159, 165-166 (1985); Unimex, Inc. v. United States Dep't of Housing & Urban Dev., 594 F.2d 1060, 1061-1062 (5th cir. 1979) (per curiam).

such as Plaintiff to sue to enforce the FMLA in court, and thus such claims are barred by sovereign immunity. See Mann v. Haigh, 120 F.3d 34, 37 (4th Cir. 1997).

The FMLA grants private and federal employees the right to take leave for family or medical reasons under certain circumstances as set out in the statute. See 5 U.S.C. § 6382(a)(1). Title I of the FMLA applies to private employees and federal employees with less than twelve months of service, while Title II of the FMLA applies to federal employees with more than twelve months of service. See 29 U.S.C. §§ 2601 et seq. (Title I) and 5 U.S.C. §§ 6381 et seq. (Title II).[4] Title I and Title II contain similar substantive provisions regarding leave rights, but they differ fundamentally regarding the remedies available to the covered employees. See Mann, 120 F.3d at 37. Specifically, Congress provided in Title I an express provision allowing the covered employees a private cause of action to enforce their FMLA rights in court whereas Congress did not include such a provision in Title II. See Mann, 120 F.3d at 37. Compare 29 U.S.C. § 2617 (Title I) with 5 U.S.C. §§ 6381-6387 (Title II).

Courts analyzing this explicit statutory framework have consistently held that federal employees covered by Title II of the FMLA do not have a private cause action in federal court to enforce the FMLA. See Russell v. United States Department of the Army, 191 F.3d 1016, 1019 (9th Cir. 1999); Mann, 120 F.3d at 37; Silva v. Porter, 2006 U.S. Dist. LEXIS 46567, at *27 (M.D. Fla. July 10, 2006); Sullivan-Obst v. Powell, 300 F. Supp. 2d 85, 99 (D.D.C. 2004); Keen v. Brown, 958 F. Supp. 70, 74-75 (D. Conn. 1997). See also Carlson v. White, 133 Fed. Appx. 144, 144-145 (5th Cir. 2005) (per

---

[4]The term "employee" is defined in Title II to mean a person appointed to a civil service position in the Executive Branch of the United States who has completed at least 12 months of service as an employee. See 5 U.S.C. §§ 6381(I) (A) & (B) (citing 5 U.S.C. § 6301(2), which in turn cites 5 U.S.C. § 2105(a)(1)(D)).

curiam) ("Federal employees with more than twelve months of service do not have a private cause of action for FMLA violations."). The courts note that the framework established by Congress does not waive the United States' sovereign immunity. See, e.g., Keen, 958 F. Supp. at 74 ("No ... waiver of sovereign immunity is present in the FMLA."). Instead, these courts note that federal employees covered by Title II of the FMLA who wish to challenge agency decisions relating to the FMLA must pursue the administrative scheme set forth in the Civil Service Reform Act ("CSRA"), 5 U.S.C. § 1101 et seq. See Keen, 958 F. Supp. at 75.

Plaintiff admits that she has been a Museum Curator with the United States Department of the Interior since at least 2002. (Amended Comp. ¶ 13). Accordingly, she is a federal employee with more than twelve months of service and she is governed by Title II of the FMLA. See 5 U.S.C. §§ 6381(1) (A) & (B). It follows that her FMLA claims must be dismissed because Congress has not waived the United States sovereign immunity to provide for a private cause of action under the FMLA.[5] See Russell, 191 F.3d at 1019; Mann, 120 F.3d at 37; Sullivan-Obst, 300 F. Supp. 2d at 99.

---

[5]Since there is no private action under the FMLA for federal employees like Plaintiff, the claims against Defendants Light and Brandyburg in their individual capacities fail as a matter of law as well. The claims against Defendants Light and Brandyburg in their individual capacities fail for the additional reason that the FMLA does not allow public employees to sue their supervisors as individuals. See Wascura v. Carver, 169 F.3d 683, 687 (11th Cir. 1999) (holding that supervisor working for non-federal public employer, in individual capacity, was not employer subject to suit under the FMLA and thus such claims against individual supervisors had to be dismissed for lack of subject matter jurisdiction).

**IV.    Plaintiff's Constitutional Claims Fail as a Matter of Law.**

    **A.    Plaintiff's 42 U.S.C. §§ 1983 and 1986 Claims Against Defendants Light and Brandyburg in Their Official Capacities and the DOI Are Barred By Sovereign Immunity.**

The Court should dismiss Plaintiff's 42 U.S.C. §§ 1983 and 1986 claims against Defendants Light and Brandyburg in their official capacities and the DOI because they are barred by sovereign immunity. A claim against a federal employee in his official capacity or against a federal agency is construed as a claim against the United States. See Graham, 473 U.S. at 165-166. The United States has not waived its sovereign immunity to suit under the civil rights statutes such as sections 1983, 1985, and 1986. See United States v. Timmons, 672 F.2d 1373, 1380 (11th Cir. 1982); Unimex, 594 F.2d at 1062. See also Harrison v. Potter, 323 F. Supp. 2d 593, 604 (S.D.N.Y. 2004) ("Because the United States has not waived its sovereign immunity for constitutional tort claims under the Civil Rights Act, this Court dismisses [Plaintiff's] § 1983 ... claims for lack of subject matter jurisdiction").

    **B.    Plaintiff's 42 U.S.C. § 1983 Claims Against Defendants Light and Brandyburg in their Individual Capacities Fail As A Matter of Law.**

Plaintiff's § 1983 claims against Defendants Light and Brandyburg in their individual capacities fail as a matter of law because the statute does not provide a cause of action against federal officials in their individual capacities or against federal agencies.[6] Section 1983 is a civil rights statute that provides a cause of action for damages against any "[p]erson who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory," violates a plaintiff's constitutional rights.

_____

[6]Notably, Plaintiff also erroneously relies on the Fourteenth Amendment and its Equal Protection clause, which do not apply to the Federal government and its officers. See, e.g., District of Columbia v. Carter, 409 U.S. 418, 424-425 (1973).

See 42 U.S.C. § 1983. Section 1983 thus allows plaintiffs to bring actions for damages against defendants acting under "color of state law." See Norton v. McShane, 332 F.2d 855, 862 (5th Cir. 1964) (emphasis added). The statute does not provide a cause of action for plaintiffs to sue federal employees who act under color of federal law. See Wheeldin v. Wheeler, 373 U.S. 647, 650 & n.2 (1963); Mack v. Alexander, 575 F.2d 488, 489 (5th Cir. 1978). The Fifth Circuit has even observed that the statute, by its text, is so plainly limited to actions against state and not federal officials that "no discussion can make it clearer than appears from its reading." See Norton, 332 F.2d at 862.

In the present case, Plaintiff makes allegations against a federal agency and her supervisors who were employed by that federal agency. (Amended Comp., generally). Defendants are thus federal officials operating under color of federal law, and are not state, county, city, or municipality officials, and thus do not act under color of state law. Plaintiff's Section 1983 claims against them, therefore, must be dismissed for lack of subject matter jurisdiction and failure to state claims upon which relief may be granted. See Norton, 332 F.2d at 862; Bernard v. Calejo, 17 F. Supp. 2d 1311, 1314 (S.D. Fla. 1998)("Because federal officials do not act under color of state law, plaintiffs may not ... bring a section 1983 claim against them").

**C.    Plaintiff's 42 U.S.C. § 1986 claims Against Defendants Light and Brandyburg in their Individual Capacities Fail As A Matter of Law.**

This Court should also dismiss Plaintiff's § 1986 claims against Defendants Light and Brandyburg in their individual capacities. Section 1986 provides a cause of action against public officials who fail to prevent conspiracies to violate 42 U.S.C. § 1985. See Park v. City of Atlanta, 120 F.3d 1157, 1159-60 (11th Cir. 1997). Since Plaintiff does not allege a violation of section 1985, her section 1986 claim fails as a matter of law.

See id.; Jensen v. Henderson, 315 F.3d 854, 862 (8th Cir. 2002). See also Zachay v.

Metzger, 967 F. Supp. 398, 401 & n.3 (S.D. Cal. 1997) (dismissing section 1986 claim

when plaintiff lacked section 1983 and 1985 claims).

**D.      Plaintiff's Constitutional and section 1986 Claims are Precluded by
         the Civil Service Reform Act and Fail as Matter of Law.**

Finally, this Court should also dismiss Plaintiff's constitutional claims under the

Fourth, Eighth, and Fourteenth Amendments and her section 1986 claims because there is

no constitutional cause of action available for federal employees to sue their employing

agency or supervisors. See Bush v. Lucas, 462 U.S. 367 (1983). In Bivens v. Six

Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 397 (1971),

the Supreme Court created a limited private cause of action, directly under the United

States Constitution, allowing an individual to recover damages against a federal

employee who, acting under color of federal law, violated a constitutional right. See

Hardison Cohen, 375 F.3d 1262, 1264 (11th Cir. 2004). The Supreme Court, however,

limited such relief to situations when "(1) the plaintiff has no alternative means of

obtaining redress and (2) no 'special factors counseling hesitation' are present." Id.

After Bivens was decided, the Supreme Court applied these factors and specifically

rejected the creation of a Bivens remedy in relation to employment-related claims

asserted by federal employees. See Bush, 462 U.S. at 388-390; Hardison, 375 F.3d at

1264-1265; Stephens v. Dep't of Health and Human Servs., 901 F.2d 1571, 1577 (1990).

In Bush, the Supreme Court held that a federal employee who contests his or her

termination cannot assert a Bivens action against his supervisor for alleged constitutional

violations because civil service regulations give a federal employee ample protection

from arbitrary action by a supervisor. See Bush, 462 U.S. at 388-390. The Court noted

that federal employees are "protected by an elaborate, comprehensive scheme that encompasses substantive provisions forbidding arbitrary action by supervisors and procedures – administrative and judicial – by which improper action may be addressed."[7] Id. at 385. The Supreme Court concluded that, because federal-sector employee claims "arise of out of an employment relationship that is governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States," it would be "inappropriate for [a court] to supplement the regulatory scheme with a new judicial remedy" allowing for damages against individual supervisors for alleged violations of constitutional rights. Id. at 368 (emphasis added).

In other words, the Supreme Court in Bush explicitly "recognized Congress' institutional competence in crafting appropriate relief for aggrieved federal employees as a 'special factor counseling hesitation in the creation of a new remedy' for federal employees directly under the Constitution." See Correctional Service Corp. v. Malesko, 534 U.S. 61, 68 (2001). Consistent with the Supreme Court's decision in Bush, the Eleventh Circuit has made it clear that "the comprehensive statutory scheme established by Congress relating to federal employment (CSRA) precludes the maintenance of job-related Bivens actions by federal employees." See Lee v. Hughes, 145 F.3d 1272, 1275 (11th Cir. 1998) (emphasis added); Stephens, 901 F.2d at 1577; McCollum v. Bolger, 794 F.2d 602, 606-607 (11th Cir. 1986); Wells v. FAA, 755 F.2d 804, 810 (11th Cir. 1985). The comprehensive administrative scheme created by Congress bars Bivens claims even for federal employees who are not afforded administrative remedies under

---

[7]This scheme includes the federal civil service laws, which broadly define prohibited personnel actions and provide administrative remedies for employees. See Leonard, 146 F. Supp. 2d 1227, 1234 (discussing the CSRA and holding a federal employee could not maintain job-related Bivens claims).

the CSRA. See Lee, 145 F.3d at 1272. See also Hardison, 375 F.3d at 1265 (noting creation of Bivens remedy for federal employees would "thwart" the will of Congress).

In this case, Plaintiff's constitutional claims under the Fourth, Eighth, and Fourteenth Amendments arise out of actions allegedly taken by her supervisors during the course of her federal employment. (Amended Comp., generally). As a result, these claims are precluded by the authority of Bush and its progeny. See Hardison, 375 F.3d at 1265; Lee, 145 F.3d at 1272; Leonard, 146 F. Supp. 2d at 1235. Plaintiff's constitutional and section 1986 claims should thus be dismissed for failure to state claims upon which relief may be granted. See Bush, 462 U.S. at 388-390; Hardison, 375 F.3d at 1269; Lee, 145 F.3d at 1275; Stephens, 901 F.2d at 1577; Leonard, 146 F. Supp. 2d at 1235.

## V.    Plaintiff's Employment Discrimination Claims Fail as a Matter of Law.

This Court should dismiss any claims by Plaintiff for alleged disparate treatment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., for failure to state any claims upon which relief may be granted. Settled Supreme Court and Eleventh Circuit precedent establish that Title VII, with its administrative exhaustion requirements, is the "exclusive judicial remedy for claims of discrimination in federal employment." See Brown v. General Serv. Admin., 425 U.S. 820, 824 (1976); Pueschel v. United States, 369 F.3d 345, 353 (4th Cir. 2004); Harrison v. Potter, 323 F. Supp. 2d 593, 605 (S.D.N.Y. 2004). It is preemptive of any other remedy. See Brown, 425 U.S. at 824.[8] To the extent Plaintiff seeks to pursue a disparate treatment claim under Title VII, she fails to state any claim upon which relief may be granted for a number of reasons.

---

[8] Indeed, Title VII precludes any attempt to use sections 1985 and 1986 to challenge alleged discrimination in the workplace. See Great Am. Fed. Sav. & Loan Assoc. v. Novotny, 442 U.S. 366, 375-376 (1979) ("If a violation of Title VII could be asserted through section 1985(3), a complainant could avoid most if not all of these detailed and specific provisions of the law.").

First, Plaintiff cannot, as a matter of law, assert Title VII claims against any Defendant named in this lawsuit. See Canino v. United States EEOC, 707 F.2d 468, 469 (11th Cir. 1983). The plain text of the statute provides that any Title VII action may proceed, if at all, only against the head of the federal agency that employed the plaintiff, in his or her official capacity. See 42 U.S.C. § 2000e-16(c). See also Canino, 707 F.2d at 472 (holding that "the head of the agency involved is the only appropriate defendant in a Title VII action" against a federal employer). Accordingly, a federal employee may not sue individual supervisors or federal agencies under Title VII. See Canino, 707 F.2d at 472. Plaintiff has not named the head of the DOI, in his official capacity, as a defendant.

Second, even if she had named the property party, Plaintiff's Title VII claims fail as a matter of law because Plaintiff failed to exhaust her administrative remedies. See Crawford v. Babbitt, 186 F.3d 1322, 1326 (11th Cir. 1999). Federal employees who wish to pursue discrimination or retaliation claims must first make informal contact with an equal employment counselor within 45 days of the alleged discrimination or retaliation and must comply with all deadlines and cooperate in the administrative process. See Crawford, 186 F.3d at 1326; Puckett v. Potter, 342 F. Supp. 2d 1056, 1063 (M.D. Ala. 2004); Thompson v. West, 883 F. Supp. 1502, 1507-1508 (M.D. Ala. 1995). If a plaintiff fails to timely exhaust her claims prior to filing a lawsuit, then her claims must be dismissed. See Thompson, 883 F. Supp. at 1507-1508. In the present case, Plaintiff has not alleged and cannot show that she exhausted her mandatory administrative remedies.

Finally, even if Plaintiff had named the proper party and exhausted her administrative remedies, her attempt to purse Title VII claims in this lawsuit would still fail as a matter of law. Plaintiff references an alleged hostile work environment based on her sexual orientation. (Amend. Comp. ¶ 18). Title VII prohibits an employer from

- 17 -

discriminating against an employee because of "such individual's race, color, religion, sex, or national origin." See 42 U.S.C. § 2000e-2(a)(1). The statute does not, however, provide a cause of action for alleged discrimination on the basis of a plaintiff's sexual orientation. See, e.g., Vickers v. Fairfield Med. Ctr., 453 F.3d 757, 764-765 (6th Cir. 2006); Medina v. Income Support Div., 413 F.3d 1131, 1135 (10th Cir. 2005); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 259 (1st Cir. 1999). Accordingly, Plaintiff's attempt to sue for sexual orientation harassment fails as a matter of law. See Higgins, 194 F.3d at 259 ("[W]e regard it as settled law that ... Title VII does not proscribe harassment simply because of sexual orientation.").

**VI.    This Court Lacks Jurisdiction Over Any Breach of Implied Contract Claim.**

This Court should dismiss Plaintiff's breach of an implied contract claim because the United States has not waived its sovereign immunity nor conferred jurisdiction for Plaintiff to assert such claims in federal district court.[9]  While the United States has waived its sovereign immunity for "any claim against the United States ... upon any express or implied contract with the United States," it has not conferred jurisdiction upon federal district courts to hear all such claims. See 28 U.S.C. § 1491(a)(1). Instead, pursuant to the Little Tucker Act, Congress has only given federal district courts subject matter jurisdiction to hear contract claims against the United States "not exceeding $10,000 in amount." See 28 U.S.C. § 1346(a)(2) (emphasis added). Congress conferred upon the Court of Federal Claims sole and exclusive jurisdiction over any breach of contract claims against the Federal government that exceed $10,000. See Friedman v. United States, 391 F.3d 1313, 1315 (11th Cir. 2004).

---

[9]Plaintiff provides no facts supporting the existence of any such implied contract, but simply references such a contract on the first page of her Complaint.

In this case, Plaintiff seeks seven million dollars in damages.  (Amended Comp., Relief Sought).  Since Plaintiff's claims relate to an alleged contract and exceed the jurisdictional maximum of this Court set by the Tucker Act, her contract claims against the Federal Defendants must be dismissed due to sovereign immunity and lack of jurisdiction.[10]  See Friedman, 391 F.3d at 1315 ("[T]he Tucker Act ... requires that claims against the United States for amounts in excess of $10,000 founded on contracts ... be brought in the Court of Claims").  In any event, the law is well-established that Federal civil service employees cannot assert implied breach of contract claims against the United States.  See Hauschild v. United States, 53 Fed. Cl. 134, 144 (Ct. Cl. 2002).

**VII.    Plaintiff Has No Claim for Injunctive Relief under 28 U.S.C. § 2283.**

Finally, while Plaintiff requests injunctive relief pursuant to 28 U.S.C. § 2283, this statutory provision is entirely irrelevant to any facts in this complaint.  Section 2283, also known as the Federal Anti-Injunction Act, provides that federal courts cannot enjoin state proceedings unless there exists one of several specifically-defined exceptions.  See Bayshore Ford Truck Sales, Inc. v. Ford Motor Co., 471 F.3d 1233, 1249-1250 (11th Cir. 2006).  Since there is no state action that Plaintiff seeks to enjoin in the Amended Complaint, she has not stated a claim under this statute.  See, e.g., Lowrie v. United States, 558 F. Supp. 1029, 1032 (D. Col. 1983) ("Because there is no state action with which to interfere, this statute is not applicable").

---

[10] Besides the fact that Defendants Light and Brandyburg enjoy absolute immunity on this claim under the Westfall Act, Supreme Court authority clearly provides that federal officials are not individually liable on federal contracts.  See Hodgson v. Dexter, 5 U.S. 345, 355-356 (1803).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant this Motion in its entirety and dismiss all Plaintiff's claims against them.

Respectfully submitted this 29th day of April, 2008.

LEURA G. CANARY

United States Attorney

By: s/James J. DuBois
   JAMES J. DUBOIS
   Assistant United States Attorney
   Georgia Bar No. 231445
   United States Attorney's Office
   Post Office Box 197
   Montgomery, AL 36101-0197
   Telephone: (334) 223-7280
   Facsimile: (334) 223-7418
   E-mail: james.dubois2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and I hereby certify that I have mailed, by United States Postal Service, a copy of same to the following non-CM/ECF participant(s):

Teresa Valencia
6730 Pamela Court
Montgomery, AL 36116

s/James J. DuBois
Assistant United States Attorney

# EXHIBIT A

**Documentation of events Deputy Superintendent Betsy Sherman**

I went over to Horseshoe Bend National Military Park to work on the newsletter while I was there I got a call from Director Stanton's office in Washington D.C. on March 30th requesting four posters of what Superintendent Madison had presented to Congressmen John Lewis. I had no knowledge of what posters Superintendent Madison had presented to Congressmen Lewis (I thought it was the Selma to Montgomery SEMO) that Director Stanton's office was requesting. I called the Tuskegee office and asked to speak with Superintendent Edwards and he was not available then I spoke with Deputy Sherman about the request and asked her if she had any idea of what poster it was she told me "I was not there where did they say it was presented at" I told her I did not know. She suggested that I call Madison that maybe he would know. She told me she did not have the time to send out the posters that nobody was at the office to send the posters out. I suggested that Billie Miller our Job Corpsmen at the time could send the posters out. Deputy Sherman told me I could come back over to Tuskegee and do it myself. I called Madison and asked about the poster and it was the SEMO poster and I told him what Ms. Sherman said.    He told me to call over to the Tuskegee office and tell Deputy Sherman to send the posters out and he would pay for posters with the donation account if they had a problem he would be in on Monday to talk with them. I called Ms. Sherman back and told her that Madison said send the posters out next day delivery she said Fed-ex and I said yes that way they would be there the next day as asked.

We had received a request from Director Stanton's office and Ms. Sherman was my supervisor at the time and I thought that was extremely inappropriate to say to me. I was an hour away from the park and it would have taken me an hour to drive to Tuskegee to accomplish this task and people were at Tuskegee to take care of request.

Superintendent Madison called me at home and told me he was calling a full staff meeting and to call the museum when I got in to find out what there tour schedule was and to call Ranger Christine Biggers and tell her about the meeting.

When I arrived at work, I told Lorraine and she told me Shirley was still off. When I got in I called Superintendent Madison and told him about Shirley and he told me to tell Lorraine to call Shirley or I call her and let her know

2

about the meeting. I reached Christine Biggers and Lee Edwards and they said they would be at the meeting. Madison told me to tell Billie to answer the telephones while we were in the meeting. When I left the office, I told Billie to take messages for Madison and not to transfer any telephone calls.

Later that day I asked Billie to answer the telephones that afternoon because I had to call all the Advisory Council Members and would not be able to answer the telephones. Awhile later Deputy Sherman came in my office and told me that Billie only had about seven more days and Lorraine was trying to teach her travel manager and next time I asked Billie to do anything to go though Lorraine. I told her no problem. She told me if I needed the telephones answered; she would have answered them. Then she told me I needed to work on the way I talked to people that maybe I was under a lot of stress this morning when I spoke with people. I told her no I was not under stress that Madison gave me a job to do and I did it. She told me that the park had enough problems and I did not need to contribute. I said something like I will work on it or I want ask again. I felt she wrongly accused me her own tone and attitude needs work. I was in the military and I was frequently accused of my tone of voice being authority.

I had a hard time communicating with Deputy Sherman with her tone and attitude she displayed toward me. I wonder sometimes if it is a black and white issue because she does not treat me the same way she treated the other administrative staff and they were black. She told me I need to slow down because I talk too fast I told her I could not help that I had been away from the South so long that was just they way that I talk. I felt like she was discriminating against me because of the way I talk.

Mrs. King (a volunteer for the office) had brought Shirley and Lorraine a flower. I saw Shirley's flower and I touched it and made the comment about how pretty it was. Deputy Sherman said something to me about touching the flower. She asked me if I had a lot of acid in my body and I told her I did not think so. She said some people get upset at you for touching their flower you could kill it. I said sorry I did not know that and walked off.

Deputy Superintendent Betsy Sherman was my Supervisor after Superintendent Madison retired. Deputy Superintendent Sherman just tore me down took every bit of confidence I had about my job or me she took away. I took everything she said and never did anything.

Another time Deputy Sherman was at the Xerox machine and I saw a white spot on her face and I told her she had something on her face. She informed me that she was trying to turn white like Michael Jackson. I told her I would not bother being white is not what it cracked up to be. Then she explained to me about a skin condition she had I told her she should go to a dermatologist. I felt extremely uncomfortable with what she said.

When Deputy Sherman first came to the office I was walking everyday at lunch and she walked with me a couple of times. She told me if I continued to walk I had to make up the time by staying late. When I walked I left work around 11:30 and got back around 12:00. While I was warming up my food I would go back to my office and continue to work and answer telephones. After I cooled down from my walk I would change my clothes. I was still doing my job and answering telephones.

She told me I was only supposed to only take a 30 minute lunch if not I had to stay and work later. I told her I was under the impression that if you did not take your breaks you could have an hour lunch she said no that was only for maintenance workers. I began to take 30 minute lunches while the rest of the administrative staff still took their hour lunch breaks and if they went out for food they still took their hour. There were times I did not stop for an actual lunch break because of work commitments and stayed late but did not go over my 30 minutes.

I left everyday at 4:30 because I was told that was my tour of duty but when I left the Administrative staff was still at the office. I do not understand why they have continued to do this; the administrative staff has always stayed past four thirty since I have been here at this office. Only when the Administrative Officer Shirley Streeter has taken the day off then Administrative Assistant Lorraine Thomas would leave at 4:30.

**Documentation of Superintendent Brenda Caldwell/Mobley**
Deputy Superintendent Sherman left and Superintendent Brenda Caldwell/Mobley was our Superintendent. She came in like a steam roller. Every program, conference or partnership Superintendent Madison had created she destroyed.

She intimated the whole park she had meetings all the time and had employees reading books (i.e. who stole my cheese and others to change our

4

attitude). Mr. Edward Wilson was working outside as a Gardner and he was sweating and she immediately brought him in and calls his Maintenance Supervisor L.H. Howard to get this man a physical. Edward Wilson was out in the heat of the day and he was sweating.

She made things so stressful that Chief of Maintenance L. H. Howard started having chest pains and retired before he had a heart attack because of her treatment of him.

Superintendent Caldwell brought in John Bundy from Alaska as Deputy Superintendent. Actually he was her hatchet man. If she wanted anything done to employees she sent him to do it.

Because of Superintendent Mobley/Caldwell's treatment of me I ended up under the care of a Psychiatrist for 32 days. We were in the kitchen one day discussing leave for the Holidays. I was having something like ants in my head and Shirley Streeter as usual was taking advantage of the situation. I went off and said something I do not remember. Superintendent Brenda Caldwell called me in her office and threatened to write me up and what she would do to me. I apologized and she hugged me and said everything will be okay that was on a Friday if I remember correctly.

That night I had a mini stroke and ended up in the hospital. The Doctor recommended that I see a Psychiatrist. I was under the care of a Psychiatrist for 32 days. I was sleeping all the time and extremely depressed. My husband would answer the phone and Shirley Streeter would be calling my home under the pretense of wanting to know how I was doing on a daily basis. They put me under such pressure about when I could return to work I had to get my Psychiatrist wrote a letter explaining my condition. I had a family member taking me to the Psychiatrist everyday for those 32 days while I was out of work.

While I was out of work Superintendent Mobley called my home and demanded that my Husband bring me to her home to discuss my job and what I wanted. I told Superintendent Mobley I did not want to stay at Tuskegee I was hired for Selma to Montgomery NHT and that I wanted to go to Montgomery.

While I was out of the Park Superintendent Mobley hired Catherine F. Light was hired as the Site Manger for SEMO. She told me you can go to Montgomery with Catherine.

I came back to Tuskegee and Superintendent Caldwell called from Casper, Wyoming at approximately 11:30. She asked me what my Doctor said about coming back to full time. I told her I had a psychotherapy appointment on Friday and an appointment with Doctor Jenkins on Thursday. He said if she pushed for five days tell her I can work four days with Friday off.

She said I need you to hit the ground running and put closure to this that this could not go on indefinite. My position was full time and the agency would have to look at my level of pay and grade and reducing both because I am not performing up to my potential and the work I am doing. She had a lot on her plate and I need to be up and running to my potential. I feel threatened for my job so I went back full time.

My Uncle died December 2001 and I took off for his funeral. My family was at the funeral home for his funeral and I looked up and Superintendent Mobley was there. She was not invited she just showed up why?

### Documentation Superintendent Catherine F. Light
I was transferred to Montgomery Alabama to work at RSA Towers with Superintendent Catherine F. Light (Site Manager). I worked with Carl C. Whitfield and Wilbur Willis for approximately two years.

George Washington Carver Museum was over an hour away from my duty station. Deputy Superintendent John Bundy would call me and tell me to come over and to cover the George Washington Carver Museum upon quite a few occasions. I was administrative staff but I was made to go to Museum to cover if they did not have enough staff.

When my Dad died I had problems concentrating on my job and I would start crying for no reason. Site Manager Catherine F. Light got upset at me and told me she could not tolerate that type of behavior and a sad face setting at the front desk. We had open house for our office and I was having problems doing my job and got in all kinds of trouble. I was severely reprimanded by Site Manager Light and was basically told suck it up and get on with your life. She compared her Father's death with my Dad's and how

6

she felt when her Dad died. Deputy Superintendent Bundy came over and severely reprimanded me also for the problems I was having.

### Documentation John Bundy

When we had the Tuskegee Airmen grand opening Carla Whitfield and I showed up at the site at 7:00 a.m. and no other staff was there except for law enforcement. John Bundy made me start parking cars and yelled at me because I had a water bottle and told me to put the water bottle up. It was already extremely hot that day. That same morning I got a call that my sister-in-law was in Columbus Medical Center with a brain aneurism. John Bundy would not let me off and made me work all day. Carla Carl Whitfield can be a witness to that incident and to other incidents that happened that day.

While we were still working in Montgomery my Dad got sick and was in the hospital and ended up being put in Skilled Nursing. He was taken to the emergency room from Skill Nursing and put in ICU and later died. During the time he was in ICU Superintendent Light was going to be travel status I went to the Montgomery office and made sure I did her travel and she had her travel documents on Tuesday my Dad died Wednesday February 9 2002.

All employees from all three Parks are required to attend the Selma to Montgomery Re-enactment March this falls on the first weekend of March. When I was getting reprimanded by John Bundy I told him that I did not want to attend because I was having problems concentrating and my Dad had just died. He suggested that I do logistics and stay in the background. I told him no I couldn't think must less be responsible to drive. I was made to attend jubilee that year event though my Dad had died the month before. No empathy or understanding from the Park.

### Back to Tuskegee

We lost our office in Montgomery and moved back over to TUIN. Carla and I were assigned to TUAI for at least six months by Superintendent Caldwell.

Sometimes not for sure of date Carla C. Whitfield and John Whitfield moved to Selma in a building that maintenance painted and it became a contact office for Selma to Montgomery NHT.

Superintendent Caldwell left and Catherine F. Light became Superintendent for all three parks.

Before SEMO NHT was brought back under Tuskegee Catherine and I traveled down to Selma after a formal memo was sent and she met with me and Carla and explained what she was doing. She informed her as of a certain date the contact station would be closed and she would be moved back to TUIN.

She also told me at the time I would be under Shirley Streeter and I told her of my concerns. She told me she talked to Shirley and there would be no problems.

Superintendent Light assigned Shirley Streeter (Administrative Officer) effective May 2004 as my Supervisor knowing my fears and the past problems Shirley Streeter and I have had. I expressed my concerns and she told me that she has spoken to Shirley Streeter and she told Superintendent Light she felt there would be not problems. Problems started and continued. I have documentation on this also.

If I remember correctly Superintendent Light and I went out to eat lunch that same day as we traveled back to Tuskegee. I expressed my concerns to her. Superintendent Light told me she did not see the need for a Secretary and if it was up to her she would make it a GS3. I expressed my feeling about the way I had been treated since I had been at the Park. She told me I was the Grunt at the Park and I was not valuable for anything. Whenever the GWC Museum ran short of staff I was the only one called upon to go and cover. I asked her the reason why the other Administrative Staff Person Lorraine Tho⁻⁻⁻⁻ could not cover and be fair. She informed me Lorraine was more valu       than me and I was the GRUNT of the park. I told Superintendent Light she did not know me or my qualification she should not pass judgment on me like that. She told me get on the Administrative staff or else.

Superintendent Light decided to combine all three parks. (i.e. Supervisor Chief of Resource and Education all Interpreters under Hubert Brandyburg. Administration Staff under Administrative Office Shirley Streeter (i.e. Lorraine Thomas and Diane May) Chief of Maintenance Andrew Callens all Maintenance Staff). All of Deanna Mitchell's staff was taken away from her she had nobody to supervise. She can testify to this and so can her staff.

8

When I went back to Tuskegee I moved into the office by the kitchen and Carla moved in the office with Lorraine.

Carl and I stayed at TUIN NHS until the new Lowndes County IC opened up. There were problems but we worked through them.   We were both looking forward to the day our new Center would open up and would be a new beginning for both of us.

### Documentation for Lowndes County

Superintendent Catherine Light named requested Tina Smiley for the temporary position of Park Guide GS3. Things seemed okay then in September all the problems started and have continued.  Tina Smiley was working for the Selma Dallas County Chamber of Commerce as an Administrative Assistant full time with benefits.  She took a temporary GS3 Park Guide position with no benefits and weekend work to come to Lowndes County Interpretive Center. I feel that someone had to promise her something to give up her former job and take this position.  I feel that Tina Smiley has been after my job since she has been in the National Park Service.  She has made the Lowndes County Interpretive Center a very hostile work environment to work in and made false accusations against me when I went on leave December 14 through January 4.

I was currently working for the Selma to Montgomery National Historic Trail I was looking forward to the Lowndes County Interpretive Center opening up and trouble is out here now.  I have been on this project since 1998 and to see something open up on the Trail was exciting and to be apart of it.  I feel just because I took up for myself I have this problem now and because somebody else wants my job.  Maybe if I had not said anything everything would be okay but a person gets tired after a while of being mistreated.  I have documentation of that occurrence between Renee Frazier and Tina Smiley and conversation between Superintendent Light, Tina Smiley and myself where Tina threatened me in front of Superintendent Light.

Facility Manager Andrew Callens and I had a good relationship until I confided in Laborer James Rogers that works for the Lowndes County Interpretive Center in September about my concerns of Andrew Callens' use of the government vehicle which he was driving the Selma to Montgomery government car to Tuskegee.  James Rogers went and repeated to Andrew

what I said. I had problems with Andrew since. I have documentation of that conversation and misuse of government vehicle documentation.

In September I reported to Superintendent Light my concerns regarding Andrew Callens misuse of government vehicle. She explained to me when he can and cannot use the government vehicle. She told me she explained to Andrew he could not use the government car for transportation to and from Tuskegee if he continues to let her know. I did not bother notifying her anymore she will do absolutely nothing.

I am now experiencing problems with Andrew because I reported him for misuse of government vehicle and a letter the union drafted for us to sign vote of no confidence in his leadership ability.

**Things that happened once we all moved into Lowndes County IC**
The Site Manager Position at Lowndes County Interpretive Center was in the process of being advertised. Superintendent Light did an acting memo for Interpretive Ranger Carla C. Whitfield as acting until November 19. Carla C. Whitfield does an acting designation for me to be in charge the days she is out of the Park which would be Wednesday-Thursday. I am a GS 6 and Senior Employee which by all regulations is legal. Superintendent Light tells Carla she has a problem with the memo and assigns Chief of Resource Education Tyrone Brandyburg and Facility Manager Andrew Callens to come out during the days Carla is not in the office and be acting.

Tyrone Brandyburg is a GS 12 and Andrew Callens I think is a GS 9 they are from Tuskegee Institute National Historic Site this is a total waste of government resources and time. I could do absolutely nothing as acting but get guidance from Senior Management. I am sure Tina Smiley went to Superintendent Light and complained about the memo when she was given this by Carla C. Whitfield for Superintendent Light to take those steps. You have a new temporary GS3 Park Guide who is writing daily e-mails to Superintendent Catherine Light telling her everything that is going on at the Interpretive Center (witnessed by another employee that worked with Tina) and problems occur and Superintendent Light takes her side and does these extraordinary measures for this new employee. Why would Superintendent Light encourage this new employee to continue these daily e-mails? These types of emails are a misuse of government property and time. If anything Superintendent Light must approved because she did nothing to discourage this employee's actions.

I would like to see if these e-mails can be brought in for evidence if I have a case.

Superintendent Light does an acting designation memo December 12, 2006 designating Andrew Callens the Facility Manager as the Supervisory Park Ranger of Lowndes County Interpretive Center until February 2. I am already having problems with Andrew and Tina now Superintendent Light turns around and puts Andrew as Supervisory Park Ranger at Lowndes County Interpretive Center and back in the Lion's mouth. I was told Tuesday January 9 by Superintendent Light that Andrew is my Supervisor. I have a problem with Andrew because the acting designation memo states Supervisory Park Ranger I am not under Interpretation. When Carla was supervising it was for Renee and Tina she supervised not me I am supervised by Shirley Streeter. I brought my concerns to Superintendent Light at a meeting Tuesday January 9. I expressed my concerns of Andrew Callens being my supervisor and Superintendent Light got very hostile with me in her speech and actions. Ever since Andrew Callens has taken over it has become a more hostile environment. Andrew Callens is a Facility Manager he knows nothing about Interpretation. I asked Superintendent Light why and she states there are so many problems out here she has to have a Manager. We had very capable GS9 Interpretive Rangers that could do this job. The Park Guides get no training with this Supervisor because he knows nothing about Interpretation.

I worked in a hostile work environment. I came in my office everyday and did my job and at the end of the day go home nobody speaks to me. Tina and I do not speak to each other which is fine but we needed a good working environment. There are certain communications that need to be said for both of us to do our jobs. In order to get information out of Tina I had to write Andrew a note and he would return with the information from Tina.

Before I went on leave Teresa urged me to put this letter from the union called a vote of no confidence about Andrew Callens in the mail. I read over the letter and I told her I felt at this time I could not do this. I will supply you a copy of the letter.

While I was out on leave I received a call from Teresa Valencia Union Shop Steward and she told me to put the damn letter in the mail and she told me that I am being investigated for Terrorism I do not know what Terrorism

is other than a buzz word. I put two certified letters in the mail one to Superintendent Light and the other to Regional Director Patricia Hooks. I felt that my job was being threatened by Tina Smiley the new Park Guide and Andrew Callens. I feel that if she gets me out of the way she can have my job.

When we met with Superintendent Light Tina Smiley quoted "you have met you match" I consider that a threat. Superintendent Light did not reply to the threat. I have documentation of that meeting also.

Tuesday January 9
After all employees met in a round table discussion I met with Law Enforcement Officer Kevin Colley and Bobbie Henderson Union Representative. Kevin Colley told me that I had been investigated and it went all way up to the Attorney General. Nothing could be proven so I have no charges against me. He could not tell me who made the complaint but it was witnessed by a third party. Apparently I had made threats when I was on a phone conversation. I asked him what threat he quoted" If they keep messing with my live hood I will take a gun and blow them all away" that is the best to my ability my recognition of the threat. Kevin told me he told Catherine there was nothing he could do legally because nothing could be proven. The matter was turned over to Administration that Catherine would be talking to me.

In the meeting Catherine made the statement about the threat and what would happen to the employee and that a verbal reprimand would be done on the employee.

I told Kevin on Friday December 29 while I was on leave Teresa Valencia called me and told me to put the damn letter in the mail they are coming are you. She told me I had been accused of Terrorism I told him my heart stopped. I was scared to come back to work because I felt he would be coming out arresting me on site. I told him I thought he was coming to arrest me today. He told me I should have called him. He told me the reason I was not questioned is that nothing could be proved. I told him as long as people could walk over me everything was okay and once I stood up for myself this is what happens. I told him I will go back to me letting you walk all over me. He talked to me about the role of Law Enforcement and that Catherine was suppose to talk with me. Kevin Colley told me when he

12

heard the complaint his jaw dropped because he knows me but he had to investigate.

I was scared to death that Catherine was going to do something to me now. I am sick every day I come to work. Andrew is setting in the parking lot when I come to work and when I leave. He is very rude when he speaks with me he watches your every move and even dictates when you can and cannot go to the post office when you can go to lunch and if you walked away from your desk he had to know where you were at all times. I was told to leave my door opened at all times. I am scared to do anything I cannot do my work I feel like they are watching me all the time. Other staff call in to work sick because of the environment.

Since I transferred to the United States Department of Agriculture I was told the other Park Guide has resigned and left because of hostile work conditions and her safety.

Carla C. Whitfield Interpretive Ranger that still works at Lowndes County Interpretive Site sent a memo to Acting Superintendent about her concerns for her safety and asked to be reassigned.

At the time of this writing Superintendent Light was doing a 60 day detail in the Virgin Islands.

Before I left December 14 I had applied for a position with USDA I had completely forgotten about it. When I returned January 4 I got a telephone call was offered a position at USDA. I took the job even though it was a lower grade and $3,000.00 salary cut because of concerns for my safety and what Superintendent Light might do to me and put in my file against me and end my career. Since two people can get together and lie on you that scares me to death. They could destroy you and everything you have accomplished for the past 21 years.

I feel I had to leave the Park Service because of my safety and the hostile work environment I had to work in and Management would not address the problem. I felt threatened everyday I went to work. As a Supervisor, Andrew Callens was extremely hostile to me in his words and actions.

13

**Andrew Callens documentation**

Came in Carla was on my computer and Andrew said something about my door being closed. Every time you close this door I am making a picture of it and sending to Catherine. Carla told him she needed peace and quiet to work he told her to leave the door opened. We ended up closing the door that goes down the hall because of the music that comes from the exhibits. Andrew was hostile in his speech to Carla and me.

Carla and I tried to call Catherine and tell her about the situation but she would not return our calls. I made multiple calls to her cell phone and Carla called Park Headquarters and Catherine never returned our calls.

Thursday January 11
James Rogers 57th birthday.
I said something to Andrew about Tuskegee had a tradition of buying someone lunch for their birthday and he asked me where we were going and how long we would be gone. He quotes "Nobody ever did that for my birthday".
Andrew told James no he could not leave and go to lunch.
I asked Andrew about going to Post Office and he said no James could go.
James and I had lunch together in the break room after all.
I cannot go and get the mail like I use to.
You feel like you are in a prison Andrew is setting up front.

Tuesday January 16
My last day at work.
Very hostile work environment.
Watching every move you take.
Carla and Renee had me a going away party could not relax Andrew and Tina kept setting in the break room as we were setting up. Andrew was constantly on you telling you to finish your lunch and go to work.

Carla and I tried to have a telephone conference call with the union and Andrew shut it down. Stating in a very hostile manner" this was not approved through him". Carla and I had the door closed and Andrew come banging on the door asking us were we having a meeting I told him "yes" we were having a union meeting he went off.

Bobbie Henderson from the union and five other witnesses at the George Washington Carver Museum heard Andrew's hostility in his voice. Carla

14

and I both felt that Andrew was going to hit us that day as hostile as he was to us.

Later on that afternoon that same day Andrew called a meeting and was extremely hostile in his voice and actions toward Carla, Renee and I. He stated they were government doors and they had to remain open. We could not do what we wanted so we were mad. He asked Tina to take notes of the meeting. Andrew stated that employees were disrespectful to managers. Carla stated his hostility in his voice and that Managers had to show respect to employees and Andrew asked Tina and James if they felt he was being hostile and of course they stated no. I told Andrew I had 45 minutes that I could leave early he stated "you can leave now for all I care". His body language and voice was extremely hostile.

When I went to my going away lunch that day I did not log off my computer and I walked back in my office and Andrew was on my computer in my office this is the first time he has ever did anything like that. I stated you need to log off I am on the computer he stated I am logging off. Kept asking me about my password I told him I gave that to the Administrative Officer he was not going to get my password. I was just glad to leave that day.

I was told my Renee Frazier when Carla and I left that day that Andrew called back and talked to Tina and wanted to know what time we left.

When I left every night I checked under my car and my gas tank I felt threatened everyday I worked out there with Andrew Callens.

I have worked for the Government nearly 22 years. I have always had excellent or superior ratings. I have never been threatened to this point for what I consider my life and my job. I have been back stabbed plenty but never to this degree of feeling threatened enough to leave my job.

I have witnesses that will come forth if needed to testify to the hostile work environment and things that were done to me. I also have character witness that is willing to come forward and witness to my character.

My concern is that my name and my reputation have been tarnished and if I have a case I would like to pursue.

I have further documentation if needed.

15

# Exhibit B

# Diane M.

# Testimony on CD

# EXHIBIT C

### Sworn Affidavit

I Wendell J. Echols, Sr. do hereby submit this sworn affidavit as a statement to the disparate treatment of Ms. Teresa Valencia.

Since joining the Employees Union, American Federation of Government Employees Local #110 Ms. Valencia has been treated unfairly and retaliated against for her Union Leadership and trying to make the environment safer and more conducive to a positive workplace. She has been denied Workers Compensation assistance in filing the same, denied Family Medical Leave Act Rights, denied reasonable accommodations, and forced into a hardship by not allowing advanced sick leave or annual leave and practicing medicine by going against the doctor's orders and recommendations.

There have been other occasions that routine request were disapproved while other employees were approved for the same or similar request. Other employees were given the opportunity to work from home, but by her doctors recommendation she was not allowed to work from home. This is just a couple of incidents that I am aware occurred. There was an occasion when a temporary employee by the name of Tina Smiley at the Selma site accused Ms. Valencia at making an inappropriate pass at her. This accusation never transpired and as a result Ms. Valencia was banned from the Selma site thus making her incapable of performing her duties. While none of this was sustained, she was still banned from the Selma site.

I feel that Ms. Valencia has been retaliated against, because she used her right to call OSHA in on issues that were threatening to Ms. Valencia, volunteers, and youth that assisted in the care of museum collections. Prior to OSHA coming in there was no training, no personal protective equipment (PPE), and no Material Safety Data Sheets (MSDS), and no reference in the Automated National Catalog System (ANCS+) concerning toxic exposure from the Carver Collections. There never was a baseline analysis done for the presence of any toxic materials exposure in any employee.

Upon the arrival of the OSHA official, Mr. Tuxberry Suber II, he met with management, the Union and the employees regarding Health and Safety issues. At that time it was told to management that employees were exposed to lead and arsenic. Mold spores were found in the basement of the Carver Museum, and Ms. Valencia's worksite had no accommodations for females to use the restroom. Mr. Suber II expressed his concern for the way Ms. Valencia has been treated and that management should do everything in its power to assist her and to be more compassionate for her needs. Unfortunately this has not been the case. It is as if his bringing attention to this matter has placed roadblocks and obstructions to hinder progress in this matter. Mr. Tyrone Brandyburg began to harass Ms. Valencia after she notified OSHA of the Safety and Health concerns. This harassment started long before her calling OSHA, but increased after the call was made. At that time, the Superintendent, Catherine Farmer Light joined in on the harassment and it escalated to Ms. Valencia suffering poor health. This was magnified by the fact that she received no help administratively, physically or morally in her quest to do the right thing. She was threatened by Tryone Brandyburg on two occasions questioning her doctor's

opinion and recommendations regarding her health and well being. Mr. Brandyburg and Catherine Farmer Light both accused Ms. Valencia of self contamination with lead and arsenic, which is absorbed and degrading to her professional abilities.

Management knew well in advance of the potential of exposure to lead and arsenic and even went as far as to encapsulate the specimens without communicating this to Ms. Valencia. At the time this was done, the proper PPE did not exist in the museum or the Tuskegee Site. She was ordered to purchase PPE and take training on these issues which was after the fact.

Management has suffered Ms. Valencia's physical, emotional, and financial hardship, all of which could have been handled without causing any hardship, but chose not to. Management has no compassion when it comes to doing the right thing. She was harassed by Ms. Shirley Streeter when during a meeting with her. Ms. Streeter refused to call Ms. Light in on an issue that could only be addressed by Ms. Light. She was harassed by Andrew Callens video taping Ms. Valencia's actions before she was relocated to the Carver Museum with less than a weeks notice. She was also harassed by Kevin Colley, who has no compassion by stating that OSHA sided with the National Park Service, which is an untruth. He also said that Ms. Valencia's complaint was a waste of time. All of this was done knowing that Ms. Valencia's health was declining. There are so many violations against Management, but without a signed Contract Agreement the Union is limited to the actions it must take.

If there are any more concerns you may contact me at (334)421-2113.

This affidavit is true to the best of my knowledge.

Respectfully Submitted

Wendell J. Echols, Sr., AFGE Local #110

*Wendell J. Echols Sr.*

# EXHIBIT D

Mary Bomar
Director
National Park Service

Ms. Bomar.

My name is Jeff Thompson, Managing Editor of The Tuskegee News, Tuskegee Ala. I'm writing to inform you of a negative encounter I had recently with Park Superintendent Catherine Light on the afternoon of April 3 at the George Washington Carver Museum.

The incident occurred during a meeting of the parent committee for the Friends of the Tuskegee Airmen National Historic Site attended by several locals volunteering time to assist the Park Service in the grand opening. I love the Airmen and have enjoyed a very open, positive relationship with most NPS employees at Moton Field and Tuskegee Institute for much of the two years I've worked in Macon County. I had no reserves about volunteering myself.

I was assigned to the Public Relations Sub-Committee and the Dignitaries Sub-Committee. If you want my honest opinion, I'm filling a hole in the Dignitaries committee because I don't even own a suit and I stole all my ties from my grandfather. I know next to nothing about impressing somebody important. It's more my job to ask them questions they don't want to answer...

Regardless, I think I can bring a good bit to the table in the PR department, which was the attempt I was making during the April 3 meeting.

Institute Ranger Shirley Baxter and I spent the afternoon of April 2 establishing a direction for the PR committee as it would relate to the grand opening, as we understood at that point, we would be developing much of the media exposure the site would receive between now and October. We scribbled all over a dry-erase board for three or so hours until we had settled on what we all agreed were solid ideas. I left the sketches on the board to present them the next day.

The parent committee meetings give the sub-committees a chance to update the group on progress made. Since Shirley and I had developed a good bit of conceptual work to show to the group, we elected to present last.

Catherine came into the meeting more than two hours after it began and offered nothing to the discussion until the PR committee's presentation. In fact, in all the meetings I've been to I may have seen Catherine twice.

During the presentation, I showed a crude rendering of the thematic concept the PR committee had elected to pursue the day before. The concept took me no more than five minutes to throw together.

When I put them on the screen and said it was the design the PR committee liked and wanted to run with, Catherine waited a moment, and, in a terribly negative overly-smarmy tone, said, "That's it?"

I said yes. It was what we liked. The people who were in the meeting actually working on the event and two original Airmen, Lt. Col. Herbert E. Carter and Mr. William J. Childs, along with Mrs. Mildred Carter (Col. Carter's wife), thought it was a great idea.

Catherine then proceeded to attempt to belittle me in front of the group. It was a matter easily resolved – all she needed to say was that she needed to approve final design work before we moved forward with it. There, see, I did it in one sentence.

Instead she told the group she was a "graphics person" – who graduated with a degree in graphic design – and needed to see at least three concepts. Asked me when the last time was that I had ever presented only one design for a group and said it was the one the group wanted to move forward with.

I said never.

She then explained to the group from her high horse that and Incident Command Team would be here at the end of April to take charge of the PR for the event. They would be handling everything from here on out, essentially informing the PR committee that we and our work so far had been in vain.

Catherine and I continued a dialogue for several minutes during the meeting in front of the group. She was relentless in her attitude, unnecessarily demeaning. She spoke to me as though I were a child for several minutes and turned a very positive meeting into a fiasco.

And maybe I did take it personally, but more for the group's sake than my own. I just don't see how tearing us down when we're the one's trying to make something of this special event, with the Tuskegee Airmen front and center, can possibly help the process.

After the meeting adjourned, I first asked Catherine about the status of the Federal funding the site was anticipating. And after, as I feel I had every right to do, I questioned Catherine as to why she felt the

need to ruin a perfectly good meeting with such hostility. She led me to an unoccupied office where we continued the "conversation."

Already upset at the time, there's no doubt in my mind I drew the argument out too long. She ran in circles, interrupting and berating me constantly. Until then, because I didn't want a negative spin on the work I was trying to do with the Airmen, I had stayed away from some of the question I asked her while we were alone in the office.

I asked her why the money for us to hire an event planner was stalled so long. I asked her why she's contributed next to nothing to our efforts to ready Tuskegee for the event. It was very heated, most unprofessional and drug on for nearly an hour.

I asked why she felt she could attack me after rarely showing her face at our meetings and never contributing.

"It's no business of yours where I am or what I'm doing," she said. "I'm the superintendent of these parks here and I don't report to you."

"Even as a Federal employee being questioned by a member of the media?" I replied.

*Louder, and more forceful*, she said the same thing again -- "It's *no business of yours where I am* or what I'm doing."

Ms. Bomar, I have been witness to Deanna's work at the site and know she cares about the Tuskegee Airmen more than her personal life. More than much else. I consider her a close friend of mine and a better friend of the community and the local media. And because of the respect she exudes for the community I would bend over backward to help her in any way I can. It is a relationship she shares with everyone I've seen her work with in Tuskegee.

Catherine called Deanna into the office where we were talking and belittled her as well. Obviously, Ms. Light does not share the same respect for Deanna that the community does. I watched Catherine speak to A SITE MANAGER like she was the stupidest person to walk the face of the earth.

I will let you know I did take that personally.

I believe this incident has direct correlation with The Tuskegee News printing of Teresa Valencia's lawsuit against Catherine. I believe Catherine retaliated in a most petty manner for me doing my job. I want you to know I spoke with Teresa face-to-face. I've reviewed her evidence. I've heard a tape where Catherine belittles Ranger Christine Biggars to the point of tears, and for what reason?

I have never been around a more unprofessional, petty individual, and, Ms. Bomar, I do hope that Catherine does not try to sabotage any relationship The Tuskegee News has with NPS.

In the days after the meeting, I received calls from almost every person in attendance, all condemning Catherine's attitude. I appreciated that, seeing as how I do too. It appears she garners little -- if any -- respect from anyone who is truly concerned about the Tuskegee Airmen.

That frightens me.

It's likely most sub-committee members will volunteer more than 100 hours of time each to prepare for this event, myself included. I'm asking for no resolutions and no apologies from the Park Service, only that you recognize (and hopefully address) Catherine's attitude and behavior regarding this incident. Though I don't speak for everyone serving in the sub-committees, I would like to be assured we aren't all wasting our time.

Thank you,
**Jeff Thompson**
*Managing Editor*
The Tuskegee News
(334) 727-3020
jeffthomp@bellsouth.net

# EXHIBIT E

*RETURN TO WORK OR SCHOOL*

**FAMILY PRACTICE**
4143 Atlanta Highway
Montgomery, AL 36109
(334) 271-4503

Shepherd A. Odom, M.D., P.C.          Gilberto Sanchez, M.D.
                    J. Juan Chung, M.D.

Date: _1/5/07_

This is to certify that _Teresa Valencia_

has been under my care for the following: _medical reasons_

and is able to return to work / school on _1/12/07_

Remarks: _Please excuse due_
_to illness from 1/1/07_
_to 1/12/07._

Signature: _Dr. Gilberto Sanchez_

*RETURN TO WORK OR SCHOOL*

## FAMILY PRACTICE
4143 Atlanta Highway
Montgomery, AL 36109
(334) 271-4503

Shepherd A. Odom, M.D., P.C.                    Gilberto Sanchez, M.D.
                    J. Juan Chung, M.D.

Date: 1/5/07

This is to certify that _Teresa Valencia_

has been under my care for the following:
_medical reasons_

and is able to return to work / school on _1/12/07_

Remarks: _Please excuse due_
_to illness from 1/1/07_
_to 1/12/07._

Signature: _Dr. Alberto Sanchez_

ph 387-0948
fax 387-0965

# River Region Cardiology
## 114 Mitylene Park Lane
## Montgomery, AL 36117

Patient: Vanesa Valencia    Dx: HTN 401.1    DOB: 01/14/67

Appointment Date: 02/01/07 (Fri)    Appointment Time: 11:00

Please arrive 10 minutes early to file out paperwork.
Please bring all medications with you.

---

☐ Echo    (no special prep required)

☐ Carotid Ultrasound    (no special prep required)

☐ Holter Monitor    ( You will be wearing a heart monitor for 24/48 hours. You will not be able
to shower or bathe until the monitor has been removed. We recommend
that you were pants/skirt and loose comfortable shirt.)

☐ Event Monitor    (You will be wearing a monitor continuously for approximately 30 days.
You will be able to remove the monitor to bathe. The monitor is small
enough to wear under your clothes.) Please do not get monitor wet.

---

☐ GXT (Stress Test)
☐ Dual Isotope Stress Test
☐ Persantine Isotope Stress Test
☐ Cardiolite Stress Test

- Nothing to eat or drink 4 hours before test, except medications with a sip of water, hold diabetic
medications until after the test. No caffeine for 12 hours before test such as coke, chocolate, etc.
Hold breathing medications with theophylline 72 hours (Theo-Dur, Aminophylline, Theophylline,
etc.).
- Wear comfortable clothes and walking shoes. We recommend that you wear separate a top and
bottom. Do not eat or drink anything 4 hours prior to the test, you should take all your morning
meds with sips of water except hold diabetic medications until after the test.
- These tests will take approximately 3 hours to complete, but you will be able to eat a fatty meal
between parts of the test.

Please fax cardiology related records to 481-0480. Thanks!

---

☐ Other Exam _____

Presert or Referral if required _____

DATE: 01/23/09 _____ Physician Signature: _____



 **Baptist** HEALTH

# HOME MEDICATION
# RECORD/ORDER SHEET

| B0701700237  VALENCIA, TERESA L | ...d by: | ☐ No Home Medications | Allergies: |
|---|---|---|---|
| DOB: 01/14/67   Age:40Y   MR#:545869 | | **Height:** | |
| Admit Date/Time: 01/17/07      1816P | | **Weight:** | |
| 2475 GMS, RODRIGUEZMARTIN | | | |

## Reconcile all home medications upon admission, transfer and discharge

## LIST ALL PRESCRIPTION AND NON-PRESCRIPTION (*Over the counter*)* MEDICATIONS BELOW:
* The following list is provided by the patient and/or the patient's family or caregiver based upon their best information and belief.

| LIST ALL MEDICATIONS BY DRUG NAME, DOSE, QUANTITY, FREQUENCY AND LAST DOSE TAKEN | | Dose | Route | Frequency | TIME LAST DOSE TAKEN | ON ADMIT ORDER ✔ | PHYSICIAN ORDER Continue: Yes | No | DISCHARGE MEDICATIONS TO CONTINUE Yes | No |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. | Prearim          (yellow) | | Po | daily | | | | | | |
| 2. | Synthroid | 250ng | Po | daily | | | | | ✓ | |
| 3. | ?          pink Blood pressure | | Po | daily | | | | | | |
| 4. | about last today | | | | | | | | | |
| 5. | Asprin | 8mg | Po | daily | | | | | | |
| 6. | | | | | | | | | | |
| 7. | #3 pt unable to remember name of | | | | | | | | | |
| 8. | HTN meds — | | | | | | | | | |
| 9. | Covunix | 40mg | Po | daily | | | | | ✓ | |
| 10. | Lipitor | 40mg | Po | at night | | | | | ✓ | |
| 11. | Lotrel 5 | | Po | | | | | | ✓ | |
| 12. | Lotrel 5/10mg | 5/10 | Po | daily | | | | | ✓ | |
| 13. | Hydrochlorthiazide | 25mg | Po | daily | | | | | ✓ | |
| 14. | Pin | | | | | | | | | |
| 15. | | | | | | | | | | |
| 16. | | | | | | | | | | |
| 17. | | | | | | | | | | |
| 18. | | | | | | | | | | |
| 19. | | | | | | | | | | |
| 20. | | | | | | | | | | |

**DISPOSITION OF MEDICATIONS**      ☐ Sent home with family member  (Name:_____)
☐ Left with patient   ☐ Secured in Medication Room, Patient Label Attached                    )

**Admission Nurse:** BfWatsen _____   **Discharge Nurse:** _____ , LWK, RN _____

Verbal Order - Doctor_____ / Read Back _____RN/LPN Date:_____Time:_____
**OR**

Physician Signature: _____ Date:_____ Time:_____

Patient Signature of receipt of home medication list: _____ Date/Time: 1/17/07

**Resume your home medications as reported on your Home Medications Record Sheet, attached here to. Do not take any non-listed medications without first checking with your physician.

White Copy - Medical Record      Yellow Copy - Patient      Form # MA 12022  Revised 12/13/06

MA 1200

B0701700237     VALENCIA, TERESA L
DOB: 01/14/67   Age:40Y   MR #:545869
Admit Date/Time: 01/17/07     1816P
2475 GMS, RODRIGUEZ MARTIN

Patient Information



**Baptist HEALTH**

# DISCHARGE INSTRUCTIONS

| Date: | Discharged to: ☒ Home  ☐ Home with Home Health  ☐ Assisted Living  ☐ Other_____ |
|---|---|

Accompanied by _____
Home with equipment: ☐ Wheelchair  ☐ Nebulizer  ☐ Cane  ☐ Walker  ☐ Crutches  ☐ Oxygen  ☐ Other____

## DISCHARGE INSTRUCTIONS:
- Diet: ☐ Regular ☐ Special: _____
- Activity per physician's instructions. Call physician if you have questions, or if your symptoms worsen or do not improve.
- Treatment to continue at home: _____
- CHF Patients: Weigh at the same time in similar clothing. Write down your weight, if you gain 2-3 lbs in 1-2 days, notify your doctor.
- Physician pre-printed instructions reviewed and provided. ☐ Other pre-printed instructions._____

## FOLLOW-UP APPOINTMENT(S):
Dr. _____ Day _____ Date _____ Time _____ ☐ AM ☒ PM
Dr. _____ Day _____ Date _____ Time _____ ☐ AM ☐ PM

| VACCINATIONS     Flu: Declined ☐     Pneumonia: Declined ☐ | TARGET EDUCATION |
|---|---|
| Patient up to date on: <br> ☐ Flu Vaccine (October - March) **If No:** ☐ administered  ☐ contraindicated <br> ☐ Pneumonia Vaccine (within the last 5 years) **If No:**  ☐ administered | ☐ Coumadin  ☐ Insulin  ☐ Low-molecular weight heparin <br> • You should stop smoking. Smoking cessation information is available through our Pulmonary Rehab Program 286-2859 |

### NEW MEDICATIONS
- Take all medications as directed
- Do not skip doses or double up if you miss a dose
- ☐ Prescriptions given (if applicable)

| Drug Name | Dose | Frequency | Prescription Given | Education Provided |
|---|---|---|---|---|
| 1. Protonix | 40 mg | BID | ✓ | |
| 2. Lortab | 5 mg | every 4 hours as needed | | |
| 3. Lasix | 5/100 | 1 daily | ✓ | ✓ |
| 4. Hydrochlorthiazide | 25 mg | 1 daily | | |
| 5. Lipitor | 40 mg | 1 daily | | |
| 6. | | | | |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |

Time of Discharge: _____ ☐ a.m. ☒ p.m.  Method of Discharge: ☒ Wheelchair  ☐ Stretcher  ☐ Carried (Infant) ☐ Other_____

I understand the above instruction(s). I have received my personal belongings, home medication(s), follow-up instructions and prescriptions (if applicable).

Resume your home medications as reported on your Home Medication Record Sheet, attached here to. Do not take any other non-listed medications without first checking with your physician.

Patient/Patient Rep: _____ Date _____
Nurse: _____ RN Date _____

DI 1440

Teresa Valencia
01/23/2007 03:34 PM
CST

To: Catherine Light/TUIN/NPS@NPS
cc: Deanna Mitchell/TUAI/NPS@NPS, Bobby.Henderson@va.gov
Subject: Medical Condition

Hi Catherine:

I just wanted to let you know that I went to my Doctor today and he placed me on light duty. I made sure to give both Deanna Mitchell and Tyrone Brandyburg a copy of my doctor's request. Also, my physician asked me to request the proper paperwork so that I could apply for disability.

When I showed Tyrone my doctors request for light duty Tyrone stated that my position description would need to be re-written. As of this date I do not understand why my position description would need to be re-written for a period of 6 weeks on light duty. It should be noted that I have requested a review of my position description to reflect my job duties and responsibilities to TUIN, TUAI, and SEMO without any success. This was purely in an effort to reflect the proper amount of responsibilities/duties that I was expected to achieve. Now that I am under restrictions from my physician this should be done to reflect all parks that I work for and not only one.

It is my hope that my position description will be re-written to reflect all three parks and the responsibilities I have had working these past 4 years. In closing, I look forward to serving this parks curatorial needs after I have recovered my health.

٦

Light Duty.jpg

**RETURN TO WORK OR SCHOOL**

**FAMILY PRACTICE**
4143 Atlanta Highway
Montgomery, AL 36109
(334) 271-4503

Shepherd A. Odom, M.D., P.C.                Gilberto Sanchez, M.D.
        J. Juan Chung, M.D.

Date: 01/23/07

This is to certify that _Teresa Valencia_

has been under my care for the following: _Medical Reasons_

and is able to return to work / school on 01/23/07

Remarks: *pt is to be on "light duty" for six weeks. -or until further notice-*

Signature: r.o. Dr. G. Sanchez

---

**RETURN TO WORK OR SCHOOL**

**FAMILY PRACTICE**
4143 Atlanta Highway
Montgomery, AL 36109
(334) 271-4503

Shepherd A. Odom, M.D., P.C.                Gilberto Sanchez, M.D.
        J. Juan Chung, M.D.

Date: 01/23/07

This is to certify that _Teresa Valencia_

has been under my care for the following: _Medical visit_

and is able to return to work / school on 01/23/07

Remarks: (*see light duty note*) Medical Reasons

Signature: (r.o. Dr. Sanchez)

**Deanna Mitchell**
01/23/2007 04:21 PM
CST

To: Catherine Light/TUIN/NPS@NPS
cc: Teresa Valencia/TUIN/NPS@NPS, Tyrone
     Brandyburg/TUIN/NPS@NPS, Bobby.Henderson@va.gov
Subject: Fw: Medical Condition

Catherine:

Teresa had already given me a heads-up on this a couple hours ago prior to sending this email to you. I told her that I was going to chat with Tyrone about this and I just spoke with her after getting this email. She indicated that she was just giving you a FYI. Don't worry - I can take care of this matter.

Thanks.
Deanna
----- Forwarded by Deanna Mitchell/TUAI/NPS on 01/23/2007 04:15 PM -----

**Teresa Valencia**
01/23/2007 03:34 PM
CST

To: Catherine Light/TUIN/NPS@NPS
cc: Deanna Mitchell/TUAI/NPS@NPS, Bobby.Henderson@va.gov
Subject: Medical Condition

Hi Catherine:

I just wanted to let you know that I went to my Doctor today and he placed me on light duty. I made sure to give both Deanna Mitchell and Tyrone Brandyburg a copy of my doctor's request. Also, my physician asked me to request the proper paperwork so that I could apply for disability.

When I showed Tyrone my doctors request for light duty Tyrone stated that my position description would need to be re-written. As of this date I do not understand why my position description would need to be re-written for a period of 6 weeks on light duty. It should be noted that I have requested a review of my position description to reflect my job duties and responsibilities to TUIN, TUAI, and SEMO without any success. This was purely in an effort to reflect the proper amount of responsibilities/duties that i was expected to achieve. Now that I am under restrictions from my physician this should be done to reflect all parks that I work for and not only one.

It is my hope that my position description will be re-written to reflect all three parks and the responsibilities I have had working these past 4 years. In closing, I look forward to serving this parks curatorial needs after I have recovered my health.

Light Duty.jpg

**Teresa Valencia**
01/23/2007 03:34 PM
CST

To: Catherine Light/TUIN/NPS@NPS
cc: Deanna Mitchell/TUAI/NPS@NPS, Bobby.Henderson@va.gov
Subject: Medical Condition

Hi Catherine:

I just wanted to let you know that I went to my Doctor today and he placed me on light duty. I made sure to give both Deanna Mitchell and Tyrone Brandyburg a copy of my doctor's request. Also, my physician asked me to request the proper paperwork so that I could apply for disability.

When I showed Tyrone my doctors request for light duty Tyrone stated that my position description would need to be re-written. As of this date I do not understand why my position description would need to be re-written for a period of 6 weeks on light duty. It should be noted that I have requested a review of my position description to reflect my job duties and responsibilities to TUIN, TUAI, and SEMO without any success. This was purely in an effort to reflect the proper amount of responsibilities/duties that I was expected to achieve. Now that I am under restrictions from my physician this should be done to reflect all parks that I work for and not only one.

It is my hope that my position description will be re-written to reflect all three parks and the responsibilities I have had working these past 4 years. In closing, I look forward to serving this parks curatorial needs after I have recovered my health.

ۛ

Light Duty.jpg

*Hr'g Tr. on 30 ot Jen. Instead*

# FAMILY PRACTICE

4143 ATLANTA HIGHWAY
MONTGOMERY, AL 36109
(334) 271-4503

SHEPHERD A. ODOM, M.D.                    GILBERTO SANCHEZ, M.D.

## CONSULTATION REQUEST

RE: _Teresa Valencia_          DATE: _01/23/07_

THANK YOU VERY MUCH FOR YOUR OPINION CONCERNING THE ABOVE A PATIENT. OUR WORKING DIAGNOSIS IS AS FOLLOWS:

_HTN - Thallium GXT_

THE FOLLOWING LABORATORY WORK HAS BEEN DONE AND IS REPORTED HERE FOR YOUR OPINION.

THE FOLLOWING RADIOGRAPHS WERE LIKEWISE DONE AND MAY BE INCLUDED FOR YOUR REVIEW.

PLEASE FORWARD A COMPLETE REPORT TO OUR OFFICE AS SOON AS POSSIBLE. THANK YOU IN ADVANCE FOR YOUR HELP.

SHEPHERD A. ODOM, M.D.                    GILBERTO SANCHEZ, M.D.

APPOINTMENT DATE: _02/02/07_
TIME: _10 11.00_
PHYSICIAN: _River Region Cardi._          ✳ _Instructions_
ADDRESS: _114 mitylone park lane_                _sent c̄ pt._

TELEPHONE: _387-0948_                          _(br)_

 **Catherine Light**
01/25/2007 08:04 AM
AST

To: Teresa Valencia/TUIN/NPS
cc: Tyrone Brandyburg/TUIN/NPS, Bobby.Henderson@va.gov
Subject: Re: Medical Condition☐

Teresa & Tyrone,

Do work on the revision of a PD for Teresa in regards to her normal duties for all sites— Teresa, provide Tyrone with a draft and we will review. I agree with Tyrone that there is no need to redraft a PD for light duty, a memo can be prepared for that. A PD is for permanent or long term temporary positions. PD's has to been sent to the Region and seek various reviews and approvals. Your medical notice is a bases for the light duty automatically for six weeks, but you need to sit down with Tyrone to discuss what that mean in terms of your position and put it in writing (via memo) so there is no confusion.

Catherine Farmer Light
Superintendent, Tuskegee Institute NHS,
Tuskegee Airmen NHS & Selma to Montgomery NHT

The National Park Service cares for special places saved by the American people so that all may experience our heritage!

Teresa Valencia

**Teresa Valencia**
01/23/2007 03:34 PM
CST

To: Catherine Light/TUIN/NPS@NPS
cc: Deanna Mitchell/TUAI/NPS@NPS, Bobby.Henderson@va.gov
Subject: Medical Condition

Hi Catherine:

I just wanted to let you know that I went to my Doctor today and he placed me on light duty. I made sure to give both Deanna Mitchell and Tyrone Brandyburg a copy of my doctor's request. Also, my physician asked me to request the proper paperwork so that I could apply for disability.

When I showed Tyrone my doctors request for light duty Tyrone stated that my position description would need to be re-written. As of this date I do not understand why my position description would need to be re-written for a period of 6 weeks on light duty. It should be noted that I have requested a review of my position description to reflect my job duties and responsibilities to TUIN, TUAI, and SEMO without any success. This was purely in an effort to reflect the proper amount of responsibilities/duties that I was expected to achieve. Now that I am under restrictions from my physician this should be done to reflect all parks that I work for and not only one.

It is my hope that my position description will be re-written to reflect all three parks and the responsibilities I have had working these past 4 years. In closing, I look forward to serving this parks curatorial needs after I have recovered my health.

￼

Light Duty.jpg



**Tyrone Brandyburg**
01/25/2007 09:10 AM
CST

To: Catherine Light/TUIN/NPS@NPS
cc: Teresa Valencia/TUIN/NPS@NPS
Subject: Re: Medical Condition☐

Hi Catherine

Thanks for the clarification.

Teresa

I will be available today and tomorrow to discuss your doctor's term of "light duty" and finalize the memo.

Thanks

H. Tyrone Brandyburg
Chief of Resource Education & Interpretation
Tuskegee Institute National Historic Site
Tuskegee Airmen National Historic Site
Selma to Montgomery National Historic Trail
334-727-6390 Telephone
334-727-4597 Fax
tyrone_brandyburg@nps.gov

---

Catherine Light

**Catherine Light**
01/25/2007 08:04 AM
AST

To: Teresa Valencia/TUIN/NPS
cc: Tyrone Brandyburg/TUIN/NPS, Bobby.Henderson@va.gov
Subject: Re: Medical Condition☐

Teresa & Tyrone,

Do work on the revision of a PD for Teresa in regards to her normal duties for all sites— Teresa, provide Tyrone with a draft and we will review. I agree with Tyrone that there is no need to redraft a PD for light duty, a memo can be prepared for that. A PD is for permanent or long term temporary positions. PD's has to been sent to the Region and seek various reviews and approvals. Your medical notice is a bases for the light duty automatically for six weeks, but you need to sit down with Tyrone to discuss what that mean in terms of your position and put it in writing (via memo) so there is no confusion.

Catherine Farmer Light
Superintendent, Tuskegee Institute NHS,
Tuskegee Airmen NHS & Selma to Montgomery NHT

The National Park Service cares for special places saved by the American people so that all may experience our heritage!

Teresa Valencia

**Teresa Valencia**
01/23/2007 03:34 PM

To: Catherine Light/TUIN/NPS@NPS
cc: Deanna Mitchell/TUAI/NPS@NPS, Bobby.Henderson@va.gov

 **Catherine Light**
01/25/2007 03:37 PM
AST

To: Catherine Light/TUIN/NPS
cc: Bobby.Henderson@va.gov, Teresa Valencia/TUIN/NPS, Tyrone Brandyburg/TUIN/NPS, Shirley Streeter/TUIN/NPS
Subject: Re: Medical Condition☐

Hi,

Just spoke to Shirley, she said that she will check into a PD for the short term 6 week light duty assignment (we might have to have one). In the meantime, please work on doing the memo as soon as possible.

Catherine Farmer Light
Superintendent, Tuskegee Institute NHS,
Tuskegee Airmen NHS & Selma to Montgomery NHT

The National Park Service cares for special places saved by the American people so that all may experience our heritage!

Catherine Light

**Catherine Light**
01/25/2007 08:04 AM
AST

To: Teresa Valencia/TUIN/NPS
cc: Tyrone Brandyburg/TUIN/NPS, Bobby.Henderson@va.gov
Subject: Re: Medical Condition☐

Teresa & Tyrone,

Do work on the revision of a PD for Teresa in regards to her normal duties for all sites— Teresa, provide Tyrone with a draft and we will review. I agree with Tyrone that there is no need to redraft a PD for light duty, a memo can be prepared for that. A PD is for permanent or long term temporary positions. PD's has to been sent to the Region and seek various reviews and approvals. Your medical notice is a bases for the light duty automatically for six weeks, but you need to sit down with Tyrone to discuss what that mean in terms of your position and put it in writing (via memo) so there is no confusion.

Catherine Farmer Light
Superintendent, Tuskegee Institute NHS,
Tuskegee Airmen NHS & Selma to Montgomery NHT

The National Park Service cares for special places saved by the American people so that all may experience our heritage!

Teresa Valencia

**Teresa Valencia**
01/23/2007 03:34 PM
CST

To: Catherine Light/TUIN/NPS@NPS
cc: Deanna Mitchell/TUAI/NPS@NPS, Bobby.Henderson@va.gov
Subject: Medical Condition

Hi Catherine:



<u>American Federation of Government Employees Local 110</u>
P.O. Box 2531
2400 Hospital Rd.
Tuskegee, AL 36083
Telephone: 334-727-0550 Ext 3454
Fax: 334-724-6846

From: Employees of Tuskegee Institute NHS (TUIN)
      Resource Education Division

Subject: No Vote of Confidence Memorandum (Tyrone Brandyburg)

To:   Patricia Hooks, SERO Regional Director
Thru: Catherine Farmer-Light, TUIN Superintendent

1.  This memorandum is submitted on behalf of the employees in the Resource
    Education Division at Tuskegee Institute NHS in an effort to request removal,
    resignation, or reassignment of the Chief of Resource Education (Tyrone
    Brandyburg), due to an official NO VOTE OF CONFIDENCE in his leadership
    abilities and skills of the service.

2.  Since his appointment at Tuskegee Institute, employees have attempted to work
    extremely hard to adjust to his rude and intimidating management system and
    *philosophy. His management system does not allow employees an opportunity to*
    provide constructive feedback without being subjected to harassment, retaliation,
    and demeaning actions from him. As result of this system, it has caused
    extremely low staff morale within the service ranging outside of the immediate
    division. The employees feel this management approach has severely damaged
    the mission of the TUIN and the NPS. Certain employees who have verbally
    spoken out against this management approach have been singled out and this has
    developed into a management vendetta against certain employees.

3.  Therefore, we are requesting the immediate resignation, removal, or reassignment
    of the Chief of Resource Education (Tyrone Brandyburg) in actions that has
    extremely damaged the mission of the NPS and TUIN. Your urgent attention to
    this matter will be appreciated.

TUIN Resource Education Employees

*Shirley K. Baxter*

*Denise L. Osborne*



# United States Department of the Interior

NATIONAL PARK SERVICE
Southeast Regional Office
Atlanta Federal Center
1924 Building
100 Alabama St., SW.
Atlanta, Georgia 30303



In Reply Refer To:
P36 (SERO-HR)

JAN 3 0 2007

Memorandum

To:        Shirley Baxter, Park Ranger, Tuskegee Institute National Historic Site
           Teresa Valencia, Museum Specialist, Tuskegee Institute National Historic Site

From:      Regional Director, Southeast Region

Subject:   No Vote of Confidence (Tyrone Brandyburg)

This memorandum responds to your memorandum received on November 7, 2006, requesting the
removal, resignation, or reassignment of Chief of Resource Education Tyrone Brandyburg due to
an official "No Vote of Confidence" in his leadership abilities and skills.

We have reviewed and considered your December 5, 2006, request. It is our decision to deny
your request in full for the following reasons:

**Removal** – Taking disciplinary action, such as a removal action, against an employee is
appropriate *only* when the employee has engaged in identifiable misconduct adversely affecting
the efficiency of the service. After determining that misconduct occurred and that corrective
action is warranted, discipline should be initiated as soon as practicable after the misconduct
which prompted it and should be effected on a progressive and equitable basis. In this matter, no
specific evidence against Mr. Brandyburg has been submitted to support actionable misconduct,
nor did our review yield any identifiable misconduct in this matter.

Supervisors are responsible for maintaining a safe, productive, supportive and well-ordered work
environment. In addition, supervisors are responsible for advising employees regarding assigned
duties and conduct expectations and observing employee performance and conduct to ensure
compliance with the standards of ethical conduct and other established work requirements.
Supervisors are excluded from the bargaining unit and are subject to the goals of the
organization. To that end, information gathered supports that Mr. Brandyburg is performing in
accordance with applicable conduct standards. However, we will continue to review and take
corrective measures as appropriate on actionable misconduct.



**Reassignment** – An agency tool that occurs when an agency employee is placed into a new position with new duties and responsibilities. In accordance with applicable laws, management has the regulatory right to: 1) hire, assign (reassign), direct, layoff and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees; 2) assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations will be conducted; 3) make selections for appointments from among properly ranked and certified candidates... or [from] other appropriate sources; and 4) take whatever actions may be necessary to carry out the agency mission during emergencies (see 5 USC 7106). In this matter, we find that Mr. Brandyburg has been operating in a manner consistent with this regulation; therefore, we find no valid reason to reassign Mr. Brandyburg to another position.

**Resignation** – A voluntary separation from the service. Mr. Brandyburg has not expressed an interest in resigning from his position, and the National Park Service is not in the business of administering coercive actions. Therefore, a resignation action is outside of the discretionary tools available to management.

We appreciate the great work that the park staff performs daily to ensure that the park is readily available to the general public. Based on the foregoing, we consider this matter closed. If there are any questions regarding the information contained in this letter, please contact the park superintendent or you may contact Anthony (Tony) Stennis at (404) 562-3167 ext. 543.


cc: Bobby Henderson, President AFGE Local 110





## United States Department of the Interior

**National Park Service**
Tuskegee Institute
National Historic Site
1212 West Montgomery Road
Tuskegee Institute, Alabama 36088

IN REPLY REFER TO:

January 31, 2007

To:        Mary Bomar, Director, National Park Service

From:      Teresa Valencia, Museum Specialist, Tuskegee Institute National Historic Site

Subject:   Hostile Work Environment – Emergency Action Requested

I recently read your "NLC Message" and something that caught my attention was a suggestion that you made to NLC members about making this the "Year of the People". So often, organizations overlook the valuable contributions that employees at all levels make. We tend to set our focus primarily on the management teams that are selected to assist parks in moving forward and hopefully those teams consist of visionaries who have the ability or potential to lead.

As a child, I dreamed of the day that I would have the opportunity to wear the green and the grey National Park Service uniform. I always admired National Park Service employees and have always had respect for the uniform and the mission. My dream finally came true and I am currently on my 13th year with the National Park Service. I have had the opportunity to work at 6 National Park Sites as well as serve on several details.

Currently, I am stationed at Tuskegee Institute National Historic Site in Alabama and am the Museum Specialist for Tuskegee Institute NHS, Tuskegee Airmen NHS, and Selma to Montgomery NHT. Being of African American/Latina descent I thought this would be a wonderful opportunity to for me to not only educate the public, but to educate myself as well about African American History. Growing up in rural Wyoming, I was not afforded the opportunity to learn about African Americans in school. I gladly accepted the position at Tuskegee back in 2002 and transferred from Brown v. Board NHS in Topeka, Kansas to Tuskegee, Alabama. When I accepted this position I was hired to work for Tuskegee Institute NHS, but shortly after my arrival I received the responsibility of working for all three sites.

Working at Tuskegee has definitely been challenging. Some of those challenges have been welcomed and others have not. I find Tuskegee Institute to be a prime example of a dysfunctional organization that has cultivated a toxic work environment for its employees.

In 2006, employees at Tuskegee Institute National Historic Site organized a Union and joined the "American Federation for Government Employees". The employees had no one to turn to, not within the park, nor within the Regional Office in Atlanta. Employees at the park were told that we would not have an EEO councilor on-site. Due to past staff experiences with the Regional Office EEO personnel, a lack of confidence has developed in their ability to execute complaints and conduct proper investigations.

Currently, park employees are in a very hostile work environment. There are numerous documented accounts of employees seeking assistance from management without redress and face retaliatory actions. Employees currently have the following issues:



- poor health
- hostile work environment
- harassment
- constructive discharges
- intimidation
- abuse of managerial authority

It is my hope that in writing this letter that an investigation be ordered to address these issues in the near future. We all know that National Parks are a valuable resource as well as the employees that care for them.

I greatly appreciate your time and assistance in addressing this issue.



# United States Department of the Interior



National Park Service
Tuskegee Institute
National Historic Site
1212 West Montgomery Road
Tuskegee Institute, Alabama 36088

IN REPLY REFER TO:

P40 (TUIN)

February 1, 2007

Memorandum

To:        Teresa Valencia, Museum Specialist, Tuskegee Institute National Historic
           Site

From:      Acting Superintendent, Tuskegee Institute National Historic Site

Subject:   Request for Medical Documentation

The purpose of this letter is to request detailed medical documentation to determine your
ability to successfully perform all of the duties of your Museum Specialist position. Your
position is a full time, permanent position. It was established as such because it has been
determined that your duties are essential to this organization and are required on a full-
time basis. Your attendance at work as well as your ability to fully perform the duties of
your position is critical.

On January 23, 3007, you provided a medical document from the Family Practice signed
by Dr. Gilberto Sanchez regarding medical condition. The document states, "This is to
certify that Teresa Valencia has been under my care for the following: Medical Reasons,
and is able to return to work on 01/23/07." The document further states in the remarks
section that, "Patient is to be on "light duty" for six weeks, or until further notice."

After reviewing the medical documentation of January 23, 2007 from Dr. Sanchez, we
have determined that it does not provide enough detailed information to enable us to
make an informed employment decision regarding your position and request for light
duty. To be administratively acceptable, you must have your principal physician furnish
additional medical documentation that includes the following specific information: (1) a
detailed explanation of diagnosis and prognosis of your condition and must outline the
effect of the condition to your ability to perform; (2) clinical findings from the most
recent medical evaluation; (3) an explanation of the impact of the medical condition on

overall health and activities, including the basis for any conclusions and restrictions or accommodations are or are not warranted; (4) an explanation of the medical basis for any conclusion which indicates the likelihood that you are or are not expected to suffer sudden or subtle incapacitation by carrying out, with or without accommodation, the tasks or duties of your position (duration of condition); (5) narrative explanation of the medical basis for any conclusion that the medical condition has or has not become static or well stabilized and the likelihood that you may experience sudden or subtle incapacitation as a result of the medical condition. The medical documentation must be received in this office by Friday, February 16, 2007. You may have the medical documentation faxed to me at 334-727-4597. A copy of your position description is attached so your physician has sufficient information to respond to the items concerning your ability to perform safely and efficiently in your job.

If you fail to provide medical documentation, I will make a decision on the medical documentation that is currently on file. It is important that you understand that LWOP is approved leave and is a privilege that cannot be demanded as a right by an employee. Emergency situations that require your absence from the office and do not qualify for sick leave will be charged to LWOP only with my approval. LWOP will not be approved unless you provide administratively acceptable medical documentation to cover your absence or you request LWOP under the following programs and provide the required documentation: Family and Medical Leave Act (FMLA) or Office of Workers' Compensation Programs (OWCP). You can request additional information on these programs from the Human Resources Office at 404-562-3167. Your failure to provide administratively acceptable medical documentation as indicated above could result in a decision on your request based upon the current medical documentation.

If you have any questions on this matter, please contact me as soon as possible. If your physician has any questions about the information requested, or if additional information regarding the requirements of your job he contact me at 334-727-6390.

Attachments

Copy of current Position Description



**River Region Cardiology**

114 Mitylene Park Lane
Montgomery, AL 36117
334-387-0948
334-387-0955 Fax

| | | |
|---|---|---|
| M. Luqman Ahmed, MD | 19053 | BA2919124 |
| Pervaiz A. Malik, MD | 17259 | BM3959446 |
| Ann Lawford, CRNP | 2257 | |
| Laura Rue, CRNP | 2389 | |
| Michele Jorstad, CRNP | 2552 | |

Name _Teresa Valenta_    Date of Birth _____

Address _____    Date _2/2/07_

Please Label Contents

PRESCRIPTION

| Rx1 | No physical exertion |
|---|---|
| SIG. | until after cardiac eval |
| MG/CC | Completed  Quantity _____  Times Refill 0 1 2 3 4 5 |
| Rx2 | |
| SIG. | |
| MG/CC | Quantity _____  Times Refill 0 1 2 3 4 5 |

_____ MD        _____ MD

Product Substitution Permitted        Dispense as Written

# FAMILY PRACTICE

4143 Atlanta Highway
Montgomery, Alabama 36109

Shepherd A. Odom, M.D., P.C.
Gilbert Sanchez, M.D.

Telephone: (334) 271-4503
Fax: (334) 277-3215

February 2, 2007

Re:    Teresa Valencia
        01/14/1967

To whom it may concern:

The above referenced patient is instructed by myself to restrict her physical activity. Ms. Valencia has undergone numerous medical testing, that proves she has Coronary Artery Disease. Due to this condition it is detrimental to her health that she not return to work until this matter is solved.

Sincerely,

Gilberto Sanchez, MD

CC: file

GS/na

· February 6, 2007

Tyrone Brandyburg
Tuskegee Institute NHS
1212 West Montgomery Road
Tuskegee Institute, Alabama 36088

Dear Mr. Brandyburg:

This letter is in reference to your memorandum dated February 1, 2007 requesting more "Medical Documentation". First, there were no attachments to this memorandum.

Second, I am concerned as to why this information is being requested. I feel that the request for "Medical Documentation" is harassing, abusive, excessive, and is reprisal for my union activities to date. In short, your request for medical documentation is in excess of the medical certification required under the Family Medical Leave Act (FMLA). Further, I feel that the request requires the release of personal and or confidential information in violation of the FMLA guidelines. Nevertheless, I will timely provide written medical certification of my condition to you as soon as possible.

Third, as of February 5, 2007, I have 173 hours of accrued annual leave. Pursuant to the union contract, annual leave is provided to allow employees extended leave for rest and recreation and to provide periods of time off for personal and emergency purposes. Further, the use of annual leave is the absolute right of the employee. My request for leave as a result of a diagnosis of CAD clearly falls under this category. As such I request the use of my accrued annual leave so that I may restrict my physical activity until my medical condition is resolved.

Your over burdensome request has added significant undue stress and has compounded the already pre-existing medical conditions. I appreciate your consideration for these issues addressed above. I know you will show the greatest professionalism and integrity in addressing this matter. I look forward to rectifying this matter so that I may return to work as soon as possible.

Sincerely,


Teresa Valencia


Attachment: Dr. Sanchez, M.D. – Coronary Artery Disease
              Dr. Pervaiz A. Malik, M.D. – Cardiac Evaluation

# FAMILY PRACTICE

4143 Atlanta Highway
Montgomery, Alabama 36109

Shepherd A. Odom, M.D., P.C.
Gilbert Sanchez, M.D.

Telephone: (334) 271-4503
Fax: (334) 277-3215

February 7, 2007

Re:    Teresa Valencia
       01/14/1967

To whom it may concern:

The above referenced patient was seen in my office on January 23, 2007. On this date we scheduled the patient for a stress test. The stress test confirmed Ms. Valencia has Coronary Artery Disease. Ms. Valencia is unable to perform the functions of her position due to the detrimental effect this disease can have on her life. She must see a cardiologist to have this problem resolved. The duration of this condition is unknown at this time.

Sincerely,

Gilberto Sanchez, MD

CC: file

GS/na

## Request for Leave or Approved Absence

| 1.  Name (Last, first, middle) | 2.  Employee or Social Security Number |
|---|---|
| Valencia, Terese Lynn | 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 |

3.  Organization

I 4 I N

| 4. | Type of Leave/Absence | | | | | | 5. | Family and Medical Leave |
|---|---|---|---|---|---|---|---|---|

| Check appropriate box(es) and enter date and time below) | Date | | Time | | Total Hours | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993 (FMLA), please provide the following information: |
|---|---|---|---|---|---|---|
| | From | To | From | To | | |
| ☑ Accrued annual leave | 02/02/2007 | ? | | | | |
| ☐ Restored annual leave | | | | | | |
| ☐ Advance annual leave | | | | | | ☑ I hereby invoke my entitlement to family and medical leave for: |
| ☐ Accrued sick leave | | | | | | |
| ☐ Advance sick leave | | | | | | ☐ Birth/Adoption/Foster care |

**Purpose:**
- ☐ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

☐ Serious health condition of spouse, son, daughter, or parent

☑ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the FMLA. Medical certification of a serious health condition may be required by your agency.*

- ☐ Compensatory time off
- ☐ Other paid absence (specify in remarks)
- ☐ Leave without pay

6.  Remarks

Please see attached Note from Dr. Sanchez dated 02/07/2007

7.  **Certification:** I certify that the leave/absence requested above is for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

| 7a. Employee signature | 7b. Date signed |
|---|---|
| Terese Z. Valencia | Feb. 7, 2007 |

| 8a. Official action on request | ☐ Approved   ☐ Disapproved | *(If disapproved, give reason. If annual leave, initiate action to reschedule.)* |
|---|---|---|

8b. Reason for disapproval

| 8c. Signature | 8d. Date signed |
|---|---|

**Privacy Act Statement**
Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

OPM Form 71
June 2001
Formerly Standard Form (SF) 71



PATIENT INFORMATION



## POST CATHETERIZATION DISCHARGE INSTRUCTION

1. **CALL** your physician if you notice:
   a. Increase in pain at the procedure site
   b. Increase in swelling at the procedure site
   c. Redness or drainage at the procedure site
   d. Numbness, coldness, tingling or cramping in the catheterized leg at rest or while walking

2. If you have bleeding from the procedure site:
   **Lie down, place firm pressure** just **above** the puncture site.
   **Call 911** or your emergency number. **Do not drive yourself to the hospital.**

3. **Avoid** heavy lifting (nothing over 10 lbs), straining, bending or stooping until two days after your procedure, then resume normal activities **unless** otherwise directed by your physician.

4. You may drive and return to work two days after your procedure **unless otherwise instructed by your physician.**

5. You may notice bruising extending down your thigh area, which is dark purple initially, then greenish-yellow. It is normal to have a small marble-size lump at the procedure site for two weeks to a month.

6. Keep the procedure site clean and dry. Leave the bandage over the site until tomorrow. You may take a shower tomorrow morning. *Pat area dry. Use bandaid to cover wound until healed (change daily).*

7. Resume previous medications ~~except as noted below~~ *See Home Med Sheet*

_____

_____

8. Return appointment: *Follow up with primary MD next week Follow up with Dr Malik as needed*

The above instructions have been explained to me prior to discharge.

Patient Signature: X_____    Date: 2-8-07

Nurse Signature: *Angela V Batchelor R*

Person responsible for driving patient home today:
Signature: X_____


DI 1440



**Baptist** HEALTH

# HOME MEDICATION
# RECORD/ORDER SHEET

Patient Information

| DATE : | Information Provided by: | ☐ No Home Medications | Allergies: |
|---|---|---|---|
| | Patient | Height: | N.L |
| TIME: | Other: | Weight: | |

## Reconcile all home medications upon admission, transfer and discharge

### LIST ALL PRESCRIPTION AND NON-PRESCRIPTION (Over the counter)* MEDICATIONS BELOW:
* The following list is provided by the patient and/or the patient's family or caregiver based upon their best information and belief.

| LIST ALL MEDICATIONS BY DRUG NAME, DOSE, QUANTITY, FREQUENCY AND LAST DOSE TAKEN | | | | TIME LAST DOSE | ON ADMIT ORDER | PHYSICIAN ORDER Continue: | | DISCHARGE MEDICATIONS TO CONTINUE | |
|---|---|---|---|---|---|---|---|---|---|
| MEDICATION NAME | Dose | Route | Frequency | ✔ | | Yes | No | Yes | No |
| 1. | | po | daily | | ✔ | ✔ | | | |
| 2. | | po | daily | | | | | | |
| 3. | 40 mg | po | daily | | | ✔ | | | |
| 4. | | po | daily | | | | | | |
| 5. HCTZ | 25 mg | po | daily | | | ✔ | | | |
| 6. | 0.125 mg | po | daily | | | ✔ | | | |
| 7. Pot chloride | | po | daily | | | ✔ | | | |
| 8. ASA | 325 mg | po | daily | | | ✔ | | | |
| 9. | | | | | | | | | |
| 10. | | | | | | | | | |
| 11. | | | | | | | | | |
| 12. | | | | | | | | | |
| 13. | | | | | | | | | |
| 14. | | | | | | | | | |
| 15. | | | | | | | | | |
| 16. | | | | | | | | | |
| 17. | | | | | | | | | |
| 18. | | | | | | | | | |
| 19. | | | | | | | | | |
| 20. | | | | | | | | | |

**DISPOSITION OF MEDICATIONS**   ☐ Sent home with family member  (Name:_____)
☐ Left with patient   ☐ Secured in Medication Room, Patient Label Attached

Admission Nurse: _____   Discharge Nurse: _____

Verbal Order - Doctor_____  Read Back _____ RN/LPN  Date:_____ Time:_____
OR
Physician Signature: _____   Date:_____   Time:_____

Patient Signature of receipt of home medication list: _____ Date/Time:___ _____ _

**Resume your home medications as reported on your Home Medications Record Sheet, attached here to. Do not take any non-listed medications without first checking with your physician.

MA 1200     White Copy - Medical Record     Yellow Copy - Patient    Form # MA 12022  Revised 12/13/06

Patient Name VAlencia, Terest

Procedure Date and Time 2/8 / 07-9t 1³⁰

Diagnosis – Abn stress –

Type of Procedure LHC

Confirmation Number 173/88

Orders written

Orders faxed to 286-3540 (please attach fax confirmation)

Precertification (GEHA)

Patient notified Ufn –

arrive 1130
- nothing to eat/drink
   after midnight
   - take your medications

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Tyrone Brandyburg
Tuskegee Institute NHS
1212 W. Montgomery Rd.
Tuskegee Institute, AL 36088

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)   B. Date of Delivery
Christina Garrett   2/8

C. Signature
X Christina Garrett   ☐ Agent   ☐ Addressee

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered   ☒ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

7005 1820 0002 4350 3594

PS Form 3811, July 1999       Domestic Return Receipt       102595-00-M-0952



**United States Department of the Interior**

National Park Service
Tuskegee Institute
National Historic Site
1212 West Montgomery Road
Tuskegee Institute, Alabama 36088



IN REPLY REFER TO:

P40 (TUIN)


February 9, 2007


Memorandum

To:         Teresa Valencia, Museum Specialist, Tuskegee Institute National Historic
            Site

From:       Acting Superintendent, Tuskegee Institute National Historic Site

Subject:    Request for Medical Documentation, **(Attachments Included)**

The purpose of this letter is to request detailed medical documentation to determine your
ability to successfully perform all of the duties of your Museum Specialist position. Your
position is a full time, permanent position. It was established as such because it has been
determined that your duties are essential to this organization and are required on a full-
time basis. Your attendance at work as well as your ability to fully perform the duties of
your position is critical.

On January 23, 3007, you provided a medical document from the Family Practice signed
by Dr. Gilberto Sanchez regarding medical condition. The document states, "This is to
certify that Teresa Valencia has been under my care for the following: Medical Reasons,
and is able to return to work on 01/23/07." The document further states in the remarks
section that, "Patient is to be on "light duty" for six weeks, or until further notice."

After reviewing the medical documentation of January 23, 2007 from Dr. Sanchez, we
have determined that it does not provide enough detailed information to enable us to
make an informed employment decision regarding your position and request for light
duty. To be administratively acceptable, you must have your <u>principal</u> physician furnish
additional medical documentation that includes the following specific information: (1) a
detailed explanation of diagnosis and prognosis of your condition and must outline the
effect of the condition to your ability to perform; (2) clinical findings from the most
recent medical evaluation; (3) an explanation of the impact of the medical condition on

overall health and activities, including the basis for any conclusions and restrictions or accommodations are or are not warranted; (4) an explanation of the medical basis for any conclusion which indicates the likelihood that you are or are not expected to suffer sudden or subtle incapacitation by carrying out, with or without accommodation, the tasks or duties of your position (duration of condition); (5) narrative explanation of the medical basis for any conclusion that the medical condition has or has not become static or well stabilized and the likelihood that you may experience sudden or subtle incapacitation as a result of the medical condition. The medical documentation must be received in this office by Friday, February 16, 2007. You may have the medical documentation faxed to me at 334-727-4597. A copy of your position description is attached so your physician has sufficient information to respond to the items concerning your ability to perform safely and efficiently in your job. Performance standards are included as a supplement to the position description.

If you fail to provide medical documentation, I will make a decision on the medical documentation that is currently on file. It is important that you understand that LWOP is approved leave and is a privilege that cannot be demanded as a right by an employee. Emergency situations that require your absence from the office and do not qualify for sick leave will be charged to LWOP only with my approval. LWOP will not be approved unless you provide administratively acceptable medical documentation to cover your absence or you request LWOP under the following programs and provide the required documentation: Family and Medical Leave Act (FMLA) or Office of Workers' Compensation Programs (OWCP). You can request additional information on these programs from the Human Resources Office at 404-562-3167. Your failure to provide administratively acceptable medical documentation as indicated above could result in a decision on your request based upon the current medical documentation.

If you have any questions on this matter, please contact me as soon as possible. If your physician has any questions about the information requested, or if additional information regarding the requirements of your job he contact me at 334-727-6390.

H. Dyane Brandyburg

Attachment

Copy of current Position Description
Copy of FY 2007 Performance Standards

# FAMILY PRACTICE

4143 Atlanta Highway
Montgomery, Alabama 36109

Shepherd A. Odom, M.D., P.C.
Gilbert Sanchez, M.D.

Telephone: (334) 271-4503
Fax: (334) 277-3215

February 13, 2007

**Re:    Teresa Valencia**
**DOB – 01/14/1967**

To Whom It May Concern:

Ms. Valencia was seen in my office today to review results of a heart catherization from February 8, 2007. The results of the heart catherization were normal. She is being referred to see a Pulmonologist for further exam. Ms. Valencia is able to return to work at this time with out restriction.

Sincerely,

Gilberto Sanchez, MD

Cc:    file

GS/na

# FAMILY PRACTICE

4143 ATLANTA HIGHWAY
MONTGOMERY, AL 36109
**(334) 271-4503**

SHEPHERD A. ODOM, M.D.                                    GILBERTO SANCHEZ, M.D.

## CONSULTATION REQUEST

RE: _Teresa Valencia_          DATE: _2/13/07_

THANK YOU VERY MUCH FOR YOUR OPINION CONCERNING THE ABOVE A PATIENT. OUR WORKING DIAGNOSIS IS AS FOLLOWS:

_____

_____

THE FOLLOWING LABORATORY WORK HAS BEEN DONE AND IS REPORTED HERE FOR YOUR OPINION.

_____

_____

_____

THE FOLLOWING RADIOGRAPHS WERE LIKEWISE DONE AND MAY BE INCLUDED FOR YOUR REVIEW.

_____

PLEASE FORWARD A COMPLETE REPORT TO OUR OFFICE AS SOON AS POSSIBLE. THANK YOU IN ADVANCE FOR YOUR HELP.

_____          _____
SHEPHERD A. ODOM, M.D.                     GILBERTO SANCHEZ, M.D.

APPOINTMENT DATE: _____

TIME: _____                      Cynthia from
PHYSICIAN: _Dr. Ricky Bajaj_                Dr. Baggio office
ADDRESS: _____                   to call pt on 2/14
_____                            to sch.   na
TELEPHONE: _834-5152_

**Teresa Valencia**

02/15/2007 12:45 PM
CST

To: Tyrone Brandyburg/TUIN/NPS
cc: Bobby.Henderson@va.gov
Subject: Medical Documentation

Dear Mr. Tyrone Brandyburg:

This letter is in reference to your memorandum dated February 9, 2007 requesting more medical documentation. I appreciate the fact that you attached a copy of my position description along with my performance appraisal plan. However, the performance appraisal document was not easily read.

While I have returned to work as of February 14, 2007 I am still interested in the reasons why you requested indepth medical documention when it was not necessarily called for. I find that this request was unnecessarily burdensome at this period of time.

As I mentioned previously I have 173 hours of annual leave. Pursuant to the union contract, annual leave is intended for rest and recreation and to provide periods of time off for personal and emergency purposes. Due to the fact, that this was an emergency situation this should have been treated as annual leave and accorded the respect of such.

Respectfully yours,

Teresa Valencia



Teresa Valencia Documentation.zip

Chief of Resource Education & Interpretation
Tuskegee Institute National Historic Site
Tuskegee Airmen National Historic Site
Selma to Montgomery National Historic Trail
334-727-6390 Telephone
334-727-4597 Fax
tyrone_brandyburg@nps.gov

Teresa Valencia

| | |
|---|---|
| **Teresa Valencia** | **To:** Tyrone Brandyburg/TUIN/NPS@NPS |
| 02/15/2007 01:07 PM | **cc:** Bobby.Henderson@va.gov |
| CST | **Subject: Medical Documentation** |

Dear Mr. Tyrone Brandyburg:

This letter is in reference to your memorandum dated February 9, 2007 requesting more medical documentation. I appreciate the fact that you attached a copy of my position description along with my performance appraisal plan. However, the performance appraisal document was not easily read.

While I have returned to work as of February 14, 2007 I am still interested in the reasons why you requested indepth medical documemtion when it was not necessarily called for. I find that this request was unnecessarily burdensome at this period of time.

As I mentioned previously I have 173 hours of annual leave. Pursuant to the union contract, annual leave is intended for rest and recreation and to provide periods of time off for personal and emergency purposes. Due to the fact, that this was an emergency situation this should have been treated as annual leave and accorded the respect of such.

Respectfully yours,

Teresa Valencia



**Tyrone Brandyburg**
02/26/2007 05:31 PM
CST

To: Teresa Valencia/TUIN/NPS@NPS
cc: Bobby.Henderson@va.gov, Shirley Streeter/TUIN/NPS@NPS,
Catherine Light/TUIN/NPS@NPS
Subject: Re: Medical Documentation



United States Department of the Interior

National Park Service
Tuskegee Institute
National Historic Site
1212 West Montgomery Road
Tuskegee Institute, Alabama 36088



**K18 (TUIN)**

February 26, 2007

Memorandum

To:         Teresa Valencia, Museum Specialist

From:       Chief of Resource Education & Interpretation

Subject:    Requested in-depth medical documentation

In my letter dated February 1, 2007, I informed you that in order to qualify for "light
duty" the following information would be necessary.  According to the Code of
Federal Regulation, [Title 5, Volume 1, Parts 1 to 699] PART 630–(see
attachments) these types of requests require the documentation outlined.   We
have to justify everything we do and that includes granting your request to be
placed in light duty status.   Please remember that you and I live in a bureaucracy
and there are guidelines for Federal employees.

I have attached several documents that we, (NPS) National Park Service and
(DOI) Department of Interior, use as guideline for decisions made regarding
personnel actions.  I have highlighted several sections of regulations that pertain to
your situation.

If you have any other questions pertaining to policy, please check the Code of
Federal Regulation, Department of Interior, and National Park Service policies
websites or contact me.

/s/ H. Tyrone Brandyburg

**From:**    Teresa Valencia/TUIN/NPS
**To:**      Shirley K Baxter/TUIN/NPS@NPS
**Date:**    Tuesday, February 27, 2007 12:38PM
**Subject:** Fw: Medical Documentation

---

Shirley:

Please print this letter out for me. Thanks
----- Forwarded by Teresa Valencia/TUIN/NPS on 02/27/2007 12:38 PM -----

> **Teresa Valencia**
>
> 02/27/2007
> 12:32 PM
> CST
>
> To:    Tyrone Brandyburg/TUIN/NPS@NPS
> cc:    Catherine Light/TUIN/NPS@NPS,
> Bobby.Henderson@va.gov
> Subject:    Re: Medical Documentation

Dear Mr. Brandyburg:

This is in reference to your email letter dated February 26, 2007 concerning in-depth medical documentation. I am in reciept of your attachments concerning the Code of Federal Regulations and as you stated I have reviewed all highlighted areas and acknowledge the applicability of all regulations.

I would like to take this time to remind you that my doctor has returned me to work as of February 14, 2007 with no restrictions. As such I appreciate your care and professionalism in this matter. However, since I have returned to duty with no restrictions this no longer applies to the situation at hand. Should you have any questions or need further information feel free to contact me.

Sincerely,

Teresa Valencia



# United States Department of the Interior

National Park Service
Tuskegee Institute
National Historic Site
1212 West Montgomery Road
Tuskegee Institute, Alabama 36088



IN REPLY REFER TO:
A14 (TUIN, SEMO, TUAI)

March 9, 2007

Memorandum

To:        All Employees, Tuskegee Institute National Historic Site, Selma to Montgomery
           National Historic Trail, and Tuskegee Airmen National Historic Site

From:      Superintendent Catherine F. Light

Subject:   Rotational Assignments

## PLACE IN A PROMINENT PLACE

This document is effective as of the date above. During my absence from the Parks for any reason,
direct all concerns to the following managers according to the schedule below:

| DATES OF ACTING | NAME/TITLE |
| --- | --- |
| March – April | Shirley T. Streeter, Administrative Officer |
| May – July | H. Tyrone Brandyburg, Chief of Interpretation and Resource Education |
| August – October | James H. Heaney, Site Manager, SEMO NHT |
| November – December | Andrew Callens, Facility Manager |
| January – February | Deanna Mitchell, Site Manager, TUAI NHS |

If the acting manager is absent also, direct your concerns to the next one in line. This directive shall
remain in effect until rescinded by me.



# Tuskegee Institute NHS
# Selma to Montgomery NHT
# Tuskegee Airmen NHS

## HANDOUTS

**MARCH 9, 2007**

# SELECTED
# STANDARD OPERATING PROCEDURES

# PRINCIPLES OF ETHICAL CONDUCT

# ROTATIONAL ACTING ASSIGNMENTS

Tuskegee Institute National Historic Site

National Park Service
U.S. Department of the Interior



## STANDARD OPERATING
## PROCEDURES
## (SOP'S)

SOP NUMBER 1

March 8, 2007
DATE (LASTEST UPDATE)

## ADMINISTRATION DIVISION

SUBJECT: Office Hours, Tour of Duty, Telephone, Typing, and Filing

### Office Hours

Office hours are a standard 8-hours; 8:00 a.m. – 4:30 p.m. Someone must be on duty during the length of this time.

### Tour of Duty

All employees are to comply with their scheduled tour of duty by reporting to work and departing in accordance with the approved schedule. Variations, not to exceed 10 minutes, may be allowed by the supervisor occasionally, but if it becomes excessive, a new tour of duty or a form of discipline will be established.

### Telephone

The telephone should be answered on or before the 2nd ring if at all possible.

### Work Schedules

Assignments are to be completed on the same day received unless the volume is too great. In that case, special instructions will be given. All work to be typed is to be approved by the Administrative Officer before typing and returned for proofing.

### Filing

Filing is to be done on a weekly basis.

### Lunch Breaks

Lunch breaks are to be scheduled as part of the Tour of Duty, but is considered the employee's time. (Eating lunch at desk or in the office is not considered working time and cannot be counted as part of the Tour of Duty).

The length of time of your Tour of Duty is expected to be adhered to.

Permitted coffee breaks (one in the morning and one in the afternoon) are permitted.

**Tuskegee Institute National Historic Site**

**National Park Service**
**U.S. Department of the Interior**



SOP NUMBER 2

March 8, 2007
DATE (LATEST UPDATE)

STANDARD OPERATING PROCEDURE

## RESOURCE EDUCATION & INTERPRETATION DIVISIONS

SUBJECT:  Museum Hours – Tour of Duty

### Museum Hours

All Tours of Duty begin between 8:00 a.m. and 8:30 a.m. and end at 4:30 p.m. and 5:00 p.m. The official museum hours are 9:00 a.m. – 4:30 p.m. The museum must have someone on duty during these hours. RANGERS ARE TO ASSURE THAT THE FLAGS ARE FLOWN PROPERLY AT THE MUSEUM AND THE OAKS.

### Tour of Duty

All employees are expected to comply with their scheduled hours of duty by reporting to work and departing in accordance with the approved schedule. While occasional variations, not to exceed 15 minutes, may be allowed by the supervisor, if frequent deviations are necessary, a new scheduled Tour of Duty must be established.

Any change must be approved in advance by the Supervisor.

Tours of Duty are to be maintained by the Supervisor and kept available for review.

### Lunch Breaks

Lunch breaks are scheduled as part of the Tour of Duty and considered the employee's time. (Eating lunch in the Museum is not allowed, except for the designated location, due to the historic nature of the building and collections to deter the establishment of a habitat for bugs, rats and other threats to collections).

Length of lunchtime of your Tour of Duty is expected to be adhered to (30 minutes).

### Coffee Breaks

Permitted coffee breaks (one in the morning and one in afternoon) are Park Service time, not the employee's time, and are held to a maximum of 15 minutes. Unused breaks cannot be added to the lunch time.

### General

Coffee breaks and lunch times are to be staggered in such a way that someone is in the office and/or Division at all times to answer the telephones and carry out the responsibilities of the office.

Supervisors are to consult with the Personnel Officer for guidance in dealing with excessive tardiness and absenteeism.

**Tuskegee Institute National Historic Site**

**National Park Service**
**U.S. Department of the Interior**



SOP NUMBER 3

March 8, 2007
DATE (LAST UPDATED)

STANDARD OPERATING PROCEDURE

**MAINTENANCE DIVISION**
SUBJECT:  Office Hours - Tour Duty

Office Hours

    This office is on standard operating time.  All tours of duty begin at 7:30 a.m. and end at 4:00p.m.
    MAINTENANCE PERSONEL ARE TO ASSURE THAT FLAGS ARE FLOWN PROPERLY AT ALL SITES,
    AND ESPECIFICALLY AT HEADQUARTERS.

Tour of Duty

    All employees are expected to comply with their scheduled hours of duty, reporting to work and departing in
    accordance with the approved schedule.  While occasional variations, supervisor, if frequent deviations are
    necessary, new schedule Tour of Duty must be established.

    Any changes must be approved in advance by the Supervisor.

    Tours of Duty are to be maintained by the Supervisor and kept available for review.  Tours of Duty do not
    begin before 7:30 a.m. and must end by 4:00 p.m.

Lunch Breaks

    Lunch breaks are to be scheduled as part of the Tour of Duty and are considered the employee's time.
    (Eating lunch at the desk is not considered working time and cannot be counted as part of the Tour of Duty).

    Length of lunch time on your Tour of Duty is expected to be adhered to (45 minutes, 11:45 – 12:30).

Coffee Breaks

    Permitted coffee breaks (one in the morning and one in afternoon) are Park Service time, not the employee's
    time, and are to be held to a maximum of 15 minutes, flexible times.

    Unused breaks cannot be added to the lunch time.

General

    Coffee breaks and lunch times are to be staggered in such a way that someone is in the office and /or
    Division at all times to answer the telephones and carry out the responsibilities of the office.

    Supervisors are to consult with Personnel Officer for guidance in dealing with excessive tardiness and
    absenteeism.

**15**

**Tuskegee Institute National Historic Site**

**National Park Service**
**U.S. Department of the Interior**



SOP NUMBER 4

<u>March 8, 2007</u>
DATE (LATEST UPDATE)

STANDARD OPERATING PROCEDURE
PARKWIDE

SUBJECT: <u>**LEAVE**</u>

## <u>Sick Leave</u>

Sick Leave is to be granted for medical, dental or optical examination or treatment and when an employee is incapacitated for the performance of duties by sickness, injury or pregnancy and confinement.

Sick leave is to be granted when it is required to give care and attendance to a member of an employee's immediate family refers to SERO Personnel Handbook.

Employees are to request advance approval of sick leave for medical, dental or optical examinations. In instances when an employee cannot request sick leave in advance, the request is to be made by telephone to the immediate supervisor as soon as possible in the workday.

Sick leave in excess of 3 days must be documented on SF-71 and authenticated by a physician. (See exceptions, SERO Personnel Handbook).

When it is evident to a supervisor that an employee has been abusing sick leave, the supervisor must require the employee to furnish a SF-71, signed by the doctor for each period of illness less than 3 days. The employee must be advised in writing by the supervisor of this requirement in advance.

## <u>Advanced Sick Leave</u>

Advanced Sick Leave may be granted only in cases of serious disability or illness and when required by the exigencies of the situation. An advance of Sick Leave shall be for not less than 1 day nor more that 30 days. A certificate of a physician or practitioner or other appropriate written evidence (SF-71) will be obtained for all periods of Advanced Sick Leave.

The employee's past use of Sick Leave will be reviewed prior to the approval of Advanced Sick Leave. Advanced sick Leave should not be approved if there is evidence of misuse of previously earned Sick Leave. Advanced Sick Leave must be requested on Form 10-796, "Request for Advanced Sick or Annual Leave," and approved by the Field Director.

## <u>Leave without Pay</u>

Leave Without Pay (LWOP) must be approved in advance by the Superintendent. LWOP for more than 30 days must be approved by the Regional Director.

## <u>Maternity Leave</u>

For maternity leave guidance refer to your <u>Leave Policy.</u>

**EXPERIENCE YOUR AMERICA**
The National Park Service cares for special places saved by the American people so that all may experience our heritage.

Tuskegee Institute National Historic Site

**National Park Service**
**U.S. Department of the Interior**



## Administrative Leave

Refer to Your Leave Policy.

## Comp Time

All comp time for work over and above the 40 hours in which comp time is going to be requested, must be documented using forms requested from your supervisor.

Supervisors are to approve in advance work time in which comp time will be taken in lieu of overtime.

Comp time is to be taken during the present or the following pay period after it is accrued. If this is not possible without detriment to the work and extension of up to 6 months can be granted by the supervisor. Supervisors are to approve, in advance, when comp time will be taken. Please adhere to rules and regulations governing who can take comp time.

## Fair Labor Standards Acts (FLSA)

The rate at which you are paid overtime will depend on whether your position is exempt or nonexempt under the FLSA. Positions covered under the FLSA cannot be exempt for it, thus are identified as "nonexempt" positions. Positions that are supervisory, managerial, or administrative in nature are exempt from coverage under the FLSA and are identified as "exempt".

Nonexempt Employees: Computation of overtime under FLSA is based on the employee's "regular" rate of pay. An employee is entitled to an additional one-half of the regular rate of pay for each hour worked beyond 40 hours per week (time-and-a-half). There is no "volunteer" overtime for "nonexempt" employees. All overtime must be compensated.

*Exempt Employees: Employees who are exempt from coverage under the FLSA are covered by the pay regulations established in Title 5, U.S.C. Overtime is paid the same for "exempt" employees as "nonexempt" if their basic rate of pay is below that of GS-10. Under Title 5, overtime is only compensated if it is ordered by your supervisor. "Voluntary" overtime is not compensable.*

## Annual Leave

Annual leave must be requested and approved in advance. When an emergency situation arises precluding a request for leave in advance, the employee should telephone the immediate supervisor with this request as early in the workday as possible. Failure to request approval of annual leave in advance can result in a charge of Absence Without Leave.

A SF-71 is to be completed for all leave. Periods of sick leave in excess of 3 days, should normally be authenticated by a physician.

Leave schedules should be developed at the beginning of the fiscal year (October 1) for planned leave of 40 hours or more or if you are in the use or lose category. All leave must be approved by the supervisor.

The immediate supervisor has the authority to approve or disapprove requests for annual leave. Leave can be revolt at the discursion of the supervisor or the Superintendent

*General*

Supervisors should consult with Personnel Office for guidance in dealing with excessive tardiness and leave abuse.
Further detail concerning leave can be reviewed in SERO Personnel Handbook, Chapter 600.

The National Park Service cares for special places saved by the American people so that all may experience our heritage.

**Tuskegee Institute National Historic Site**

**National Park Service**
**U.S. Department of the Interior**



SOP NUMBER 5

<u>March 8, 2007</u>
DATE (LATEST UPDATE)

STANDARD OPERATING PROCEDURE
PARKWIDE

Subject: **Leave Sharing Program**

The primary purpose of the Leave Sharing Program is to provide for the voluntary transfer of annual leave to employees with medical emergencies.

"Medical Emergency" means an acute medical condition of an employee or a family member of such employee, that is likely to require an employee's absence from duty for a prolonged period of time and results in substantial loss of leave. <u>An absence for maternity reasons or elective medical treatment is ineligible for consideration.</u>

A committee, comprised of an employee from each Directorate, will be appointed on an annual basis to review leave recipient applications. The potential lave recipient will be notified within 10 workdays as to the approval or disapproval of the application. Reasons for any disapproval will be provided and the employee and will be given an opportunity for reconsideration.

**Leave Recipient**

Applications (form attached) for leave sharing should be submitted in writing to the Park's Personnel Officer through supervisory channels for submittal to the Regional Personnel Officer. Applications should include: name, social security number, position title, grade, name of immediate supervisor, reason is needed, physician certification, length of expected absence, authorization to release information to appropriate officials, leave status (including all information on requests and use of advanced leave), the date the leave is *expected to expire, a statement that other employees have expressed an intention to donate annual leave*, and a copy of the approved SF-71.

Applications may be submitted by third parties on behalf of an employee who is unable to apply.

**Leave Donors**

Employees may voluntarily donate their annual leave to an approved leave recipient by submitting the following information to the Servicing Personnel Office (SPO) in writing: name, position title, grade and pay level, organization and duty station name of supervisor, social security number and number of hours of leave to be donated. Leave donations may not be made to an employee's immediate supervisor.

Employees may not donate more that one-half of the amount of annual leave they accrue during the leave year in which the donation is made. Employees may not donate more hours of use-or-lose leave than they are scheduled to work leave than they are scheduled to work at end of that year.

**General**

Leave recipients or their personal representative shall notify the SPO when the medical emergency has ended. Unused donated annual leave will be returned to the donors.

Detailed procedures concerning this program are contained in Personnel Management Bulletin No. 89-46 (630), dated March 1, 1989.

BRIEFING STATEMENT

| | |
|---|---|
| **BUREAU:** | **National Park Service** |
| **ISSUE:** | **Employee Labor Relations** |
| **PARK/PROGRAM:** | **Tuskegee Institute National Historic Site, Tuskegee Airmen National Historic Site, Selma to Montgomery National Historic Site** |

**Key Points:**

- Unfair Labor Practice filed against DOI and NPS-Tuskegee Institute NHS, Tuskegee Airmen NHS and Selma to Montgomery NHT, (Central Alabama Parks) for allegedly "seriously violating the terms and conditions of the parties newly negotiated Master Contract Agreement, and the Statutes by failing and or refusing to honor this Master Contract Agreement, while retaliating and disciplining the rank and file and the National Park Service employees."
- The Agency's position in this matter is that it has not violated the Federal Service Labor Management Relations Statute as alleged and that the allegations in the charge are without merit.

**Background:**

- During the week of January 30, 2006, representatives of the National Park Service and AFGE Local 110 negotiated a collective bargaining agreement. The agreement, although signed on August 29, 2006, by management officials and the American Federation of Government Employees, Local 110, herein after referred to as AFGE L-110, representatives, it was communicated to AFGE L-110 at the negotiations that the signed collective bargaining agreement required final approval by the Department of Interior.
- On August 25, 2006, the collective bargaining agreement between National Park Service and AFGE L-110 was submitted to the Department of Interior for review and final approval.
- By letter dated October 10, 2006, Ms. Marilia Matos, Director of Human Resources, Department of Interior, issued a notice of disapproval to Mr. Jim Gwyn, Labor Relations Officer, National Park Service Washington Office, of the Collective Bargaining Agreement between the National Park Service and AFGE L-110. AFGE Local 110 was provided a copy of the disapproval notice.

**Current Status:**

- The basis for Ms. Matos' decision is because the language contained in Article 13, Section 1 of the collective bargaining agreement is considered non-negotiable as it interferes with management's right to discipline under the Federal Service Labor-Management Relations Statute (see October 10, 2006 disapproval notice). The FLRA has consistently found language committing management to use

progressive discipline as non-negotiable (see 39 FLRA No. 13, 45 FLRA No. 79, 46 FLRA No.67).

- We conclude that the Agency's disapproval decision of October 10, 2006 is justifiable, and consistent with FLRA case law. We fully deny that the Agency has violated the Federal Service Labor Management Relations Statute and retaliated against the bargaining unit employees at the Central Alabama Parks.
- To support the efforts of management, employees and the Union, Southeast Region has provided guidance and information through several Site visits.
- February 16, 2007, SER LE Investigators Johnathan Pierce and Assist. Gregg Pedani came to the parks and met with several employees in regards to their concerns, took statements and is compiling a report.
- February 28, 2007, SER Human Resources officials Gloria Mitchell and Anthony Stennis, came to Tuskegee Institute NHS for an All Hands meeting with employees of all three parks. Two union officials were also in attendance. A presentation was made to all entitled The Federal Labor Management Program. Many points of issue were discussed.
- From this visit, it was determined that Human Resources Specialist Anthony Stennis would come back to the parks the first week in April for one on one meetings with employees. This has been scheduled.
- It was also determined that a CORE workshop would be conducted in April by the SER Human Resources office.
- March 1, 2007, Regional Director Patricia Hooks and Deputy Director Art Frederick visited the parks for an All Hands meeting and meetings with managers.
- Continuous manager and All Hands meetings are being conducted as always, in order to assure all concerns are being met.


Prepared by: Catherine F. Light, DOI/NPS 334-727-6390
Date:        March 16, 2007

Teresa Valencia

03/19/2007 03:10 PM
CDT

To: Catherine Light/TUIN/NPS
cc: Bobby.Henderson@va.gov, Tyrone Brandyburg/TUIN/NPS
Subject: Field Museum - Taxidermy Specimens

Dear Superintendent Catherine Light:

Around 2:30 p.m. yesterday afternoon I recieved a call from Tina Gessler, Conservator, from the Field Museum in Chicago, Illinios. During her visit with us last week she had the opportunity to conduct some tests. One of those tests were conducted on the taxidermy specimens. The test she conducted showed that the specimens were tested positive for lead arsenic.

I spoke with Ms. Tina Gessler again this morning and she read to me the results of her findings, which I have listed:

Rooster
Catalog # 329
0.5 mg per liter of lead arsenic

Chicken
Catalog # 331
3 mg per liter of lead arsenic
(If this particular specimen measured H2'xW1'xD1' that would mean that approximately 130mg of arsenic was used)

Chicken
Catalog # 330
1 mg per liter of lead arsenic

Arsenic can not only be absorbed through the skin, but can also be inhaled. Since there is no documentation in the catalog records it is hard to determine the exact treatment each of the taxidermy specimens received (i.e., lead arsenic, paris green, etc.). Unless we know the exact compound it is hard to determine the level of toxicity. It is imperative that each of our specimens be tested at a lab and a plan be developed for the proper care of such.

From my understanding only two taxidermy specimens in the collection were known to have been tested for arsenic according to the Collection Condition Survey. I spoke with Barbara Cumberland from Harpers Ferry yesterday and asked her if she had conducted any tests. She said that she did not conduct any tests, but either someone had told her that the birds tested positive or that there was a label stating that they were treated with arsenic.

Due to the fact, that I have been working with these specimens off and on for the past 4.5 years there is a possibility that I have been exposed and would like to be tested for precautionary purposes.

Thank you for your time and assistance in this matter.

Respectfully yours,

Teresa Valencia

 **Catherine Light**
03/20/2007 11:58 AM
CDT

To: Teresa Valencia/TUIN/NPS@NPS
cc:
Subject: Re: Field Museum - Taxidermy Specimens

I have asked Tyrone to check into this matter as soon as possible.

Catherine Farmer Light
Superintendent, Tuskegee Institute NHS,
Tuskegee Airmen NHS & Selma to Montgomery NHT

The National Park Service cares for special places saved by the American people so that all may
experience our heritage!

Teresa Valencia

**Teresa Valencia**
03/20/2007 11:22 AM
CDT

To: Catherine Light/TUIN/NPS@NPS
cc: Bobby.Henderson@va.gov, Tyrone Brandyburg/TUIN/NPS@NPS
Subject: Field Museum - Taxidermy Specimens

Dear Superintendent Catherine Light:

Around 2:30 p.m. yesterday afternoon I received a call from Tina Gessler, Conservator, from the Field
Museum in Chicago, Illinois. During her visit with us last week she had the opportunity to conduct some
tests. One of those tests were conducted on the taxidermy specimens. The test she conducted showed
that the specimens were tested positive for lead arsenic.

I spoke with Ms. Tina Gessler again this morning and she read to me the results of her findings, which I
have listed:

Rooster
Catalog # 329
0.5 mg per liter of lead arsenic

Chicken
Catalog # 331
3 mg per liter of lead arsenic
(If this particular specimen measured H2'xW1'xD1' that would mean that approximately 130mg of arsenic
was used)

Chicken
Catalog # 330
1 mg per liter of lead arsenic

Arsenic can not only be absorbed through the skin, but can also be inhaled. Since there is no
documentation in the catalog records it is hard to determine the exact treatment each of the taxidermy
specimens received (i.e., lead arsenic, paris green, etc.). Unless we know the exact compound it is hard
to determine the level of toxicity. It is imperative that each of our specimens be tested at a lab and a plan
be developed for the proper care of such.

From my understanding only two taxidermy specimens in the collection were known to have been tested

Teresa Valencia
03/21/2007 10:46 AM
CDT

To: Tyrone Brandyburg/TUIN/NPS@NPS
cc: Bobby.Henderson@va.gov
Subject: Field Museum – Taxidermy Specimens

Hi Tryone:

By any chance have you found out whether or not I could be tested for occupational exposure to arsenic?
If so, what steps do I need to take?

Thanks



**Tyrone Brandyburg**
03/21/2007 11:46 AM
CST

To: Teresa Valencia/TUIN/NPS@NPS
cc: Shirley Streeter/TUIN/NPS@NPS, Catherine Light/TUIN/NPS@NPS
Subject: Re: Field Museum - Taxidermy Specimens

Hi Teresa

Please be patient, I am working on collection more information and documentation from the Field Museum and SERO.  Once I this information, I will contact you with the next steps in the process.

Thanks

H. Tyrone Brandyburg
Chief of Resource Education & Interpretation
Tuskegee Institute National Historic Site
Tuskegee Airmen National Historic Site
Selma to Montgomery National Historic Trail
334-727-6390 Telephone
334-727-4597 Fax
tyrone_brandyburg@nps.gov

---

Teresa Valencia

Teresa Valencia
03/21/2007 09:46 AM
CST

To: Tyrone Brandyburg/TUIN/NPS@NPS
cc: Bobby.Henderson@va.gov
Subject: Field Museum - Taxidermy Specimens

Hi Tryone:

By any chance have you found out whether or not I could be tested for occupational exposure to arsenic? If so, what steps do I need to take?

Thanks



**Tyrone Brandyburg**
03/21/2007 02:40 PM
CST

To: Teresa Valencia/TUIN/NPS@NPS
cc: Shirley Streeter/TUIN/NPS@NPS, Catherine Light/TUIN/NPS@NPS
Subject: Re: Field Museum - Taxidermy Specimens

Hi Teresa:

If you feel that you have been exposed to lead arsenic or paris green, it is your responsibility to go to the physician of your choice to ascertain whether or not you have been exposed to any poisons.  Please have them provide you with a medical report.  Use the appropriate leave, (i.e. sick leave or annual leave).

Once you return with the report, we will proceed from there. I highly recommend that you do not go back into that environment until the issue has been resolved.

Thanks

H. Tyrone Brandyburg
Chief of Resource Education & Interpretation
Tuskegee Institute National Historic Site
Tuskegee Airmen National Historic Site
Selma to Montgomery National Historic Trail
334-727-6390 Telephone
334-727-4597 Fax
tyrone_brandyburg@nps.gov

Teresa Valencia

**Teresa Valencia**
03/21/2007 09:46 AM
CST

To: Tyrone Brandyburg/TUIN/NPS@NPS
cc: Bobby.Henderson@va.gov
Subject: Field Museum - Taxidermy Specimens

Hi Tryone:

By any chance have you found out whether or not I could be tested for occupational exposure to arsenic? If so, what steps do I need to take?

Thanks



**Tyrone Brandyburg**
03/26/2007 01:28 PM
CST

To: Teresa Valencia/TUIN/NPS@NPS
cc: Catherine Light/TUIN/NPS@NPS
Subject: Re: Field Museum – Taxidermy Specimens

Hi Teresa

The attached file contains the report that was sent from the Field Museum. There are a few other action items that also needs your attention in addition to adding the report to the catalog records. We can discuss at staff meeting on Tuesday.

Thanks



NPS poison testing letter.doc
H. Tyrone Brandyburg
Chief of Resource Education & Interpretation
Tuskegee Institute National Historic Site
Tuskegee Airmen National Historic Site
Selma to Montgomery National Historic Trail
334-727-6390 Telephone
334-727-4597 Fax
tyrone_brandyburg@nps.gov

Teresa Valencia

Teresa Valencia
03/22/2007 12:20 PM
CST

To: Tyrone Brandyburg/TUIN/NPS@NPS
cc: Catherine Light/TUIN/NPS@NPS
Subject: Re: Field Museum – Taxidermy Specimens

Hi Tyrone:

By any chance did the Field Museum send you a report? If so, could I get a copy of it so I can add it to the catalog records under supplemental information? Thank You



"Gessler, Tina"
<tgessler@fieldmuseu
m.org>
03/21/2007 03:08 PM
EST

To: <teresa_valencia@nps.gov>
cc:
Subject: information you requested

Hi Teresa,
The specimens in your collection I got positive results from a spot test for arsenic are TUIN 330,
331/114, and 329/115. The Field Museum's safety officer will be getting in touch with Mr. Brandyburg to
discuss this situation further. He may be able to provide you with more information once they have had a
chance to talk.
Regards,
Tina

Tina Gessler
Assistant Conservator
Field Museum of Natural History
1400 S Lake Shore Dr
Chicago, IL 60605
Tel: 312.665.7876

Tuskegee Institute National Historic Site
Tuskegee Airmen National Historic Site
Selma to Montgomery National Historic Trail
334-727-6390 Telephone
334-727-4597 Fax
tyrone_brandyburg@nps.gov

Teresa Valencia

| Teresa Valencia | To: Tyrone Brandyburg/TUIN/NPS@NPS |
| 03/22/2007 12:20 PM | cc: Catherine Light/TUIN/NPS@NPS |
| CST | Subject: Re: Field Museum - Taxidermy Specimens |

Hi Tyrone:

By any chance did the Field Museum send you a report? If so, could I get a copy of it so I can add it to the
catalog records under supplemental information? Thank You

—— Forwarded by Teresa Valencia/TUIN/NPS on 03/27/2007 09:47 AM ——



**Tyrone Brandyburg**
03/26/2007 01:28 PM
CST

To: Teresa Valencia/TUIN/NPS@NPS
cc: Catherine Light/TUIN/NPS@NPS
Subject: Re: Field Museum - Taxidermy Specimens

Hi Teresa

The attached file contains the report that was sent from the Field Museum.  There are a few other action items that also needs your attention in addition to adding the report to the catalog records.  We can discuss at staff meeting on Tuesday.

Thanks



NPS poison testing letter.doc
H. Tyrone Brandyburg
Chief of Resource Education & Interpretation
Tuskegee Institute National Historic Site
Tuskegee Airmen National Historic Site
Selma to Montgomery National Historic Trail
334-727-6390 Telephone
334-727-4597 Fax
tyrone_brandyburg@nps.gov

Teresa Valencia

**Teresa Valencia**
03/22/2007 12:20 PM
CST

To: Tyrone Brandyburg/TUIN/NPS@NPS
cc: Catherine Light/TUIN/NPS@NPS
Subject: Re: Field Museum - Taxidermy Specimens

Hi Tyrone:

By any chance did the Field Museum send you a report? If so, could I get a copy of it so I can add it to the catalog records under supplemental information? Thank You



The Field
Museum

## CONSERVATION, DEPARTMENT OF ANTHROPOLOGY

### Description of semi-quantitative testing methodology for the presence of arsenic (As$^{3+/5+}$) as utilized for three objects in the collection of Tuskegee Institute National Historic Site

During the week of March 12-16[th], I traveled to the Tuskegee Institute NHS with three other Field Museum employees to evaluate objects for potential inclusion in a traveling exhibit about George Washington Carver. Of the objects viewed, three were taxidermy birds. In the Anthropology Department of the Field Museum, it is standard procedure to perform arsenic spot tests on all artifacts that will be exhibited or otherwise routinely handled. While in Tuskegee, I had over 150 objects to assess for condition. For this reason, I was only able to get samples for poison testing from materials that would be most likely to have been treated with pesticide. Taxidermy animals, such as the birds mentioned above, are very susceptible to insect damage and therefore likely to have been treated with pesticide. It is known that Dr. Carver advocated the use of arsenical pesticides such as lead arsenate and Paris Green (copper (II)-acetoarsenite).[1]

Test and methods used for poison testing of TUIN 329/115, TUIN 330, and TUIN 331/114:

Sampling: A strip of acid-free tissue paper was wrapped around the end of a bamboo skewer as a makeshift swab. The swab was dampened in filtered water and rolled over various representative parts of the object to pick up any possible arsenic powder residue; two sample swabs were prepared from each object. The samples were stored in polyethylene zip-lock bags prior to testing; the swabs for each object were stored in separate bags. A control sample was prepared by dipping a swab in the same filtered water used for the sample swabs; this swab was also placed in a polyethylene bag for storage. All samples were returned to the Field Museum for testing.

Test procedure: Semi-quantitative test for the presence of arsenic (As$^{3+/5+}$) using the Merkoquant 10 026 Arsenic Test Kit (available from EM Science, Gibbstown, NJ).

Testing vessels (13 x 100 mm glass test tubes) were filled with five milliliters of deionized water each. One sample swab from each of the three objects was placed in the water in its own test tube and allowed to soak for 30 minutes, with agitation at 15 minutes. The control sample described above and a known positive control were tested in an identical manner. While the samples were soaking, indicator strips were inserted through ready-made slits in test tube caps. After 30 minutes, the sample solutions were slightly agitated and the swabs removed. One measuring spoon full of Reagent #1, zinc powder, was added to the sample solution in each test tube, which was then agitated to ensure thorough mixing. Ten drops of Reagent #2, 32% hydrochloric acid, were added to each test tube before they were capped with the caps bearing indicator strips. The reaction was left to proceed for 30 minutes, with agitation at 15 minutes. After thirty minutes, the vessels were uncapped, and the reaction zone pad on the indicator strip was compared with the color scale provided with the test kit.

Test Principle: From Odegaard, et al. 2000. *Material Characterization Tests for Objects of Art and Archaeology.* London: Archetype Publications.
Hydrogen gas is formed by reaction of zinc metal with hydrochloric acid. Arsenic compounds, if present in the solution, are reduced to arsine gas by reacting with nascent hydrogen. The arsine gas reacts with the mercury (II) bromide treated paper on the indicator strip, forming colored compounds.

Test Results:
Control sample gathered at Tuskegee: NEGATIVE. The color of the reaction zone on the indicator strip remained unchanged throughout the test.

Taxidermy chicken, TUIN 329/115: POSITIVE. The color of the reaction zone on the indicator strip indicated an amount of 0.5 mg/liter As$^{3+/5+}$ according to this test.

Tina Gessler, Assistant Conservator                                           3/27/2007



The Field Museum

## CONSERVATION, DEPARTMENT OF ANTHROPOLOGY

Taxidermy chicken TUIN 330: POSITIVE. The color of the reaction zone on the indicator strip indicated an amount of 1.0 mg/liter $As^{3+/5+}$ according to this test.

Taxidermy chicken TUIN 331/114: POSITIVE. The color of the reaction zone on the indicator strip indicated an amount of >3 mg/liter $As^{3+/5+}$ according to this test.

The results of arsenic testing were recorded for the Field Museum's records and were communicated by telephone to Teresa Valencia, Museum Specialist at Tuskegee Institute NHS on March 19, 2007.

For example: Bulletin No. 36. Carver, G.W. *How to Grow the Tomato and 115 Ways to Prepare it for the Table.* Tuskegee Institute Press. Second Edition, August 1936. This bulletin recommends the use of lead arsenate to protect tomatoes from worms.

Also, NPS object TUIN 1817, a framed example of the use of arsenical pesticides on plant materials.

Tina Gessler, Assistant Conservator                                                      3/27/2007

conduct the screening. He told me they could run the test, but that it would not be covered under my insurance. I spoke with my physicians nurse today and she told me that the cost for the screening would run around $500.00. My physician here is Dr. Gilberto Sanchez and his nurse is Nicole (334)271-4503.

Tyrone Brandyburg, Chief of Interpretation and Resource Education mentioned to me today that he has some information for me pertaining to hazardous materials that he will be forwarding on to me. As I mentioned in a previous conversation, Mr. Tyrone Brandyburg stated that at one time the taxidermy specimens were encapsulated, but when they were moved from the Carver Museum to the off-site storage facility the encapsulation was removed. Last night, I had the opportunity to speak with the previous Museum Specialist, Michael Jolly, he stated that the whole time he was here the taxidermy collection was never covered. If I remember correctly he worked here approximately 4 or 5 years. Prior to that my current supervisor, Tyrone Brandyburg was the Museum Specialist.

In the Montgomery phonebook I found two doctors that work in County Industrial Medicine their names are E. Arnold Johnson and William D. Sargeant (334)262-2602. I went to grab lunch yesterday and thought I was going to pass out. I don't know if the tests will come out positive or negative, but I want to get to the bottom of this. Something is going on with me and I am extremely concerned.

Thank you for your time and assistance in this matter.

Respectfully yours,

Teresa Valencia
Museum Specialist

—— Forwarded by Teresa Valencia/TUIN/NPS on 03/27/2007 09:47 AM ——



**Tyrone Brandyburg**
03/26/2007 01:28 PM
CST

To: Teresa Valencia/TUIN/NPS@NPS
cc: Catherine Light/TUIN/NPS@NPS
Subject: Re: Field Museum - Taxidermy Specimens

Hi Teresa

The attached file contains the report that was sent from the Field Museum. There are a few other action items that also needs your attention in addition to adding the report to the catalog records. We can discuss at staff meeting on Tuesday.

Thanks



NPS poison testing letter.doc
H. Tyrone Brandyburg
Chief of Resource Education & Interpretation

Edward Perez
03/27/2007 12:24 PM
EDT

To: Teresa Valencia/TUIN/NPS@NPS
cc: Louis Rowe/WASO/NPS@NPS
Subject: Re: Fw: Field Museum - Taxidermy Specimens

Teresa

Thanks for the information you have provided. As I indicated in our telephone conversation I am working through the Region and Federal Occupational Health to identify a clinic or physician that can provide the proper medical testing and exposure assessment for you. As soon as I hear back form FOH I will contact your supervisor and park superintendent and brief them on how to proceed.

Ed

CDR Edward Perez USPHS
Occupational Health Manager
Tel 202-513-7214
FAX -202-371-2226
Teresa Valencia

Teresa Valencia
03/27/2007 10:35 AM
CDT

To: Edward Perez/WASO/NPS@NPS, Louis Rowe/WASO/NPS@NPS
cc:
Subject: Fw: Field Museum - Taxidermy Specimens

Dear Edward Perez and Louis Rowe:

My supervisor, Tyrone Brandyburg forwarded the arsenic report from the Field Museum, which I am forwarding to both of you. I went to see my physician Dr. Gilberto Sanchez yesterday and told him that I needed to get a heavy metals screening and that it was recommended that an Occupational Physician conduct the screening. He told me they could run the test, but that it would not be covered under my insurance. I spoke with my physicians nurse today and she told me that the cost for the screening would run around $500.00. My physician here is Dr. Gilberto Sanchez and his nurse is Nicole (334)271-4503.

Tyrone Brandyburg, Chief of Interpretation and Resource Education mentioned to me today that he has some information for me pertaining to hazardous materials that he will be forwarding on to me. As I mentioned in a previous conversation, Mr. Tyrone Brandyburg stated that at one time the taxidermy specimens were encapsulated, but when they were moved from the Carver Museum to the off-site storage facility the encapsulation was removed. Last night, I had the opportunity to speak with the previous Museum Specialist, Michael Jolly, he stated that the whole time he was here the taxidermy collection was never covered. If I remember correctly he worked here approximately 4 or 5 years. Prior to that my current supervisor, Tyrone Brandyburg was the Museum Specialist.

In the Montgomery phonebook I found two doctors that work in County Industrial Medicine their names are E. Arnold Johnson and William D. Sargeant (334)262-2602. I went to grab lunch yesterday and thought I was going to pass out. I don't know if the tests will come out positive or negative, but I want to get to the bottom of this. Something is going on with me and I am extremely concerned.

Thank you for your time and assistance in this matter.

Respectfully yours,

Teresa Valencia
Museum Specialist

Teresa Valencia
03/28/2007 02:17 PM
CDT

To: Tyrone Brandyburg/TUIN/NPS@NPS
cc: Bobby.Henderson@va.gov
Subject: Re: Field Museum - Taxidermy Specimens

Hi Tyrone:

In your previous email you mentioned that you highly recommended me to stay out of the "environment", but that word is such a broad term. Could you please be more specific? Do you want me to stay out of the building all together or just out of the refrigerated area where the research collection is currently stored? It is not my intention to be difficult, but I would like some clarification.

Thanks

# FAMILY PRACTICE

4143 Atlanta Highway
Montgomery, Alabama 36109

Shepherd A. Odom, M.D., P.C.
Gilbert Sanchez, M.D.

Telephone: (334) 271-4503
Fax: (334) 277-3215

March 30, 2007

Re:     Teresa Valencia
        DOB: 01/14/1967

To Whom It May Concern:

The above referenced patient contacted my office on Tuesday 03/20/2007 and Thursday 03/22/2007 regarding being tested for a heavy metal screening (includes arsenic). Monday 03/26/2007 Ms Valencia called our office to find out about the screenings. I informed the patient the test would not be covered by her insurance and the cost of the test would be approximately five hundred dollars.

Should you need additional information, please do not hesitate to call.

Sincerely,

Gilberto Sanchez, MD

Cc: file

GS/na



# United States Department of the Interior

National Park Service
Tuskegee Institute
National Historic Site
1212 West Montgomery Road
Tuskegee Institute, Alabama 36088



IN REPLY REFER TO:

P4015 (TUIN)

March 30, 2007

**Memorandum**

To:          Teresa Valencia, Museum Specialist, Tuskegee Institute National Historic Site

From:        Superintendent

Subject:     Lab Test for Arsenic Screening

You have been approved for arsenic screening.  A test site has been set up with a Federal Occupational Health (FOH) facility in Atlanta, GA for an arsenic screening.  This test will take place on Tuesday, April 3, 2007 at 11:00 a.m., CDT, 12:00 Noon, EDT.  The testing will consist of drawing of blood and a urine sample. Conditions to adhere to before testing:

- Three (3) days prior to the test, do not eat any bottom-eating fish, shellfish, shrimp, lobster, flounder, catfish, etc.
- They will need your 2nd morning urine
- Test should last about 20 minutes

The test site is located in the **Richard B. Russell Building** on the lower plaza (LP), in the Health Unit, across from the cafeteria/rest rooms.  This is at:

**75 Spring Street, S.W.**
Atlanta, GA  30303

You will need to pick up a Government vehicle on the morning of April 3, 2007.  This is a day trip and a travel authorization will be given to you.  Make sure you have your driver's license or a picture ID with you for entering the Federal Building.

If for some reason you cannot make it, contact me or Sheryl Burton at 404-331-3340.  She is the nurse that will administer the test.

Please contact Shirley Streeter at 334-727-6390 if you have any questions.




## Quest Diagnostics®

QUEST DIAGNOSTICS INCORPORATED
CLIENT SERVICE 800.877.8805

SPECIMEN INFORMATION
SPECIMEN:    AL025902A
REQUISITION: 6272110

COLLECTED: 04/03/2007    11:30 ET
RECEIVED:  04/03/2007    19:23 ET
REPORTED:  04/04/2007    16:38 ET

PATIENT INFORMATION
VALENCIA, TERESA

DOB: 01/14/1967 AGE: 40
GENDER: F FASTING: U

ID:
PHONE:

REPORT STATUS **FINAL**

ORDERING PHYSICIAN
**FED OCC HLTH-Z4G**

CLIENT INFORMATION
A97503594                    QATL022
FED OCC HLTH-Z4G
RUSSELL FFEDERAL BLDG
75 SPRING ST
ATLANTA, GA 30303-3309

| Test Name | In Range | Out of Range | Reference Range | Lab |
|---|---|---|---|---|
| ARSENIC, RANDOM URINE | | | | AMD |

```
********************************
* TEST NOT PERFORMED.          *
* NO URINE RECEIVED FOR THE TEST *
* REQUESTED.                   *
********************************
```

| | | | | |
|---|---|---|---|---|
| * ZINC PROTOPORPHYRIN (ZPP) | 39 | | mcg/dL | AT |

INDUSTRIAL EXPOSURE: <100 MCG/DL
(REFER TO CURRENT OCCUPATIONAL
SAFETY AND HEALTH ADMINISTRATION
(OSHA) REGULATION FOR EXPOSURE CRITERIA)

| | | | | |
|---|---|---|---|---|
| * LEAD, BLOOD (OSHA) | <3 | | mcg/dL | AT |

INDUSTRIAL EXPOSURE:  < 40 MCG/DL
MCG/DL = MCG/100G FOR OSHA
(REFER TO CURRENT GOVERNMENTAL
REGULATIONS FOR EXPOSURE CRITERIA)

PERFORMING LABORATORY INFORMATION
AMD   QUEST DIAGNOSTICS NICHOLS INSTITUTE CHANTILLY VA, 14225 NEWBROOK DRIVE, CHANTILLY, VA  20153
      Laboratory Director: NATHAN SHERMAN, MD, CLIA: 49D0221801

AT    QUEST DIAGNOSTICS-ATLANTA, 1777 MONTREAL CIRCLE, TUCKER, GA  30084, Laboratory Director: WILLIAM M MILLER, MD
      CLIA: 11D0255931

*Will provide additional results.*
*SBURON, RN 404-331-3340*

VALENCIA, TERESA - AL025902A                    Page 1 - End of Report

B0709500195    VALENCIA, TERESA L
DOB: 01/14/67    Age: 40Y    MR #: 545869
Admit Date/Time: 04/05/07    1002A
2328 GUTIERREZ, CARLOS M    F



**Baptist** HEALTH

**ER PRESCRIPTION & DISCHARGE INSTRUCTIONS**
Page 2 of 3

DISCHARGE INSTRUCTIONS - PATIENT COPY

| Weight | Phone | Allergies: | | Location SOUTH |
|---|---|---|---|---|

**MEDICINES PRESCRIBED**    If non, check this box: ☐    VOID IF NOT PRINTED WITH CRANBERRY BACKGROUND

| Name/Strength: | Number | Schedule / Duration | No Refills | Refills |
|---|---|---|---|---|
| 1. Albuterol MDI | 2 puffs QI 4H | | ☐ | |
| 2. | | | ☐ | |
| 3. | | | ☐ | |
| 4. | | | ☐ | |
| 5. | | | ☐ | |

**INSTRUCTION SHEET(S) GIVEN**

Asthma
Back Pain
Cast/ Splint Care

☐ Crutches
☐ Fever
☐ Fracture

☐ Head Injury
☐ Otitis Media
☐ Sprains / Bruises
☐ ST

☐ Threatened Ab
☐ Vomiting / Diarrhea
☐ Wound Care
☐ Other(s)

Return for signs of infection
Increased Redness
Increased Swelling
Increased Drainage
Increased Heat

Additional Instructions: _____

Referred to:
Dr. PCP
Phone: _____
Call on next business day for follow-up appointment
in _____ days / weeks    ☐ Next available

☐ Return to Emergency Dept in _____ hours / days for recheck.
☐ If no improvement or your condition worsens, call your private
physician or return to the Emergency Department for a recheck.
☐ Learning needs assessed   ☐ Instructions Modified_____
☐ Education provided on new Medication_____

I understand that the treatment I have received was rendered on an emergency basis and is not meant to replace complete care from a primary care provider or clinic. Furthermore, I many have been released before all of my medical problems were apparent, diagnosed, and/or treated. If my condition worsens, I have been instructed to call my primary care provider or return to this facility or the nearest emergency center. I understand that I should NOT drive or perform hazardous tasks if my medication or treatment causes drowsiness. I have read and understand the above, received a copy of this form and applicable instruction sheets, and I will arrange for follow-up care. If diagnostic tests indicate a need for modification in therapy, you will be notified at the phone number you provided.

☐ Patient
☐ Relative
☐ Other

_____    Time Released: 7:30 HRS

INSTRUCTED BY: Mornia RN

PHYSICIAN:

**WORK/SCHOOL STATEMENT from the Emergency Department**

PATIENT _____    DATE _____

☐ Patient was seen by Dr. Gutierrez
☐ No athletics / physical education: _____ days
☐ May return to work/school without restrictions
☐ Will require time off work / school. Estimated time: 1 days*
☐ Must be reevaluated by family / occupational physician before
returning to school / work.

☐ May return to restricted duties for _____ days*
Restrictions: _____
_____

☐ _____ was here with relative/child.
☐ Other _____

Time off from school or work longer than three days should be approved by a Personal or Company/Occupational Medicine Physician, unless otherwise stated.


ER 160

FORM # ER 16008  REV. 10/10/06

Teresa Valencia

04/16/2007 11:36 AM
CDT

To: Louis Rowe/WASO/NPS@NPS, Edward Perez/WASO/NPS@NPS
cc:
Subject: Medical Screening

Hi Louis and Edward:

I just wanted to let you know that I will be going back to Atlanta tomorrow to be re-tested. I guess they lost one of my samples. Thanks

Teresa Valencia

04/16/2007 01:00 PM
CDT

To: Louis Rowe/WASO/NPS@NPS, Edward Perez/WASO/NPS@NPS
cc: Bobby.Henderson@va.gov
Subject: Medical Screening Addendum

Today, April 16, 2007, I went into my storage area to check my inventory and I was concerned about the items that had possible arsenic (i.e., taxidermy). I found that all of the taxidermy collections that were in museum cabinet #2 were missing I was not notified of their removal. Could you tell me how to proceed from here?

Teresa Valencia

Teresa Valencia

04/16/2007 03:38 PM
CDT

To:  Allen Bohnert/Atlanta/NPS@NPS, Linda Giles/Atlanta/NPS@NPS,
     Louis Rowe/WASO/NPS@NPS, Edward Perez/WASO/NPS@NPS

cc:

Subject:  Taxidermy Collection

Dear Mr. Allen Bohnert:

As you are aware, the Field Museum from Chicago, Illinios, visited the park about a month ago. They are interested in borrowing some of our collections for an exhibit. While they were here they took a small sample from the taxidermy collections to test for arsenic. The items that they tested all came back positive. The conservator, Tina Gessler, immediately notified me about her findings and told me to take extra precautions, which I did. I secured all of the specimens and placed a sign on the cabinet door that no one is to open that cabinet without written authorization.

Today, while I was doing my walk through through the storage area I looked in my keybox and noticed that the key for the taxidermy specimens was not in it's proper location. I then took the key and checked the cabinet and noticed that all of the taxidermy specimens were missing.

When I discovered this I immediately notified Louis Rowe and Edward Perez and they forwarded my memo on to Linda Giles who is the Safety and Health Manager at the Atlanta Regional Office. She told me to check with my supervisor to see if the items had been loaned out or transferred. When I spoke with Tyrone this afternoon I asked him if we were going to allow the Field Museum to borrow such specimens and he said he didn't think so, because they aren't in good shape. I then asked him if he knew what happened to the taxidermy collection. He told me that under Catherine Lights authority he was told to remove the objects from the collection. I then asked him where they were located and he told me that I didn't need that information.

I find it to be highly irresponsible to remove toxic items from a collection where they have already been secured. I have already been exposed to the arsenic. Why would you then expose another person to a harmful substance unneccesarily?

Respectfully yours,

Teresa Valencia

Witness Statement

On April 16, 2007 at approximately 2:45 p.m. in the Carver Museum, I was attending the
Take Pride in America Volunteer Awards ceremony.  After taking photographs of the
event, I went to the refreshment table where Tyrone Brandyburg was serving soft drinks.
I was talking with Tyrone and Teresa Valencia who was beside me.  I then moved on and
I overheard a conversation between Tyrone and Teresa.  She asked about some
taxidermied animals being removed from the curatorial building.  Tyrone stated that he
had moved them under the direction of Superintendent Catherine Light.  Teresa asked
where the artifacts were being storied and he told her not to worry about it.

To the best of my knowledge this is the conversation that I heard on this day.

*Shirley Baxter* 04/17/07

Shirley Baxter



Cabinet #2 & Cabinet #5 Taxidermy Specimens were removed by Tyrone Beardy bag under Superintendent Catherine Lights authorization. Park docs

*(as approximately 2:15 pm. Tyrone then did he not forward this comment instead of portraying like he response to me. My question is, why then did he not forward this comment instead of portraying like he wrote it. This comment suggests that I am on my own with this matter)*



**Tyrone Brandyburg**
03/21/2007 02:40 PM
CST

To: Teresa Valencia/TUIN/NPS@NPS
cc: Shirley Streeter/TUIN/NPS@NPS, Catherine Light/TUIN/NPS@NPS
Subject: Re: Field Museum - Taxidermy Specimens

Hi Teresa:

If you feel that you have been exposed to lead arsenic or paris green, it is your responsibility to go to the physician of your choice to ascertain whether or not you have been exposed to any poisons. Please have them provide you with a medical report. Use the appropriate leave, (i.e. sick leave or annual leave).

Once you return with the report, we will proceed from there. I highly recommend that you do not go back into that environment until the issue has been resolved.

Thanks

H. Tyrone Brandyburg
Chief of Resource Education & Interpretation
Tuskegee Institute National Historic Site
Tuskegee Airmen National Historic Site
Selma to Montgomery National Historic Trail
334-727-6390 Telephone
334-727-4597 Fax
tyrone_brandyburg@nps.gov

Teresa Valencia

Teresa Valencia
03/21/2007 09:46 AM
CST

To: Tyrone Brandyburg/TUIN/NPS@NPS
cc: Bobby.Henderson@va.gov
Subject: Field Museum - Taxidermy Specimens

Hi Tryone:

By any chance have you found out whether or not I could be tested for occupational exposure to arsenic? If so, what steps do I need to take?

Thanks

A7615 (TUIN)

April 18, 2007

Memorandum

To:                    Teresa Valencia, Museum Specialist (TUIN)

From:                  Chief of Resource Education & Interpretation

Subject:               SAFETY ITEMS

Per conservation and email with the Superintendent, you are to purchase safety equipment only for Curatorial Storage that is not to exceed $2500.00. The following items are mandatory per Conserv-O-Gram 2/19, 11/10 and 2/3:

**Respirator**
**Gloves (Nitrile and neoprene)**
**Apron/lab coat**
**Safety Glasses**
**Arsenic test kit**
**Safety signs**

Use your own discretion when purchasing the other safety items. Please provide me with a DI-1 with a list of items you purchased, proof of purchase, receipts, and confirmation number for orders for my records. All items **must be purchased** before **April 27, 2007.**

If you have any questions, please contact me

April 19, 2007

Memorandum

To:                    Teresa Valencia, Museum Specialist (TUIN)

From:                  Chief of Resource Education & Interpretation

Subject:               Safety Training

Per conservation and email with the Superintendent, you are to enroll through DOI-Lean into the following training classes. This is mandatory training for you in an effort to improve your safety awareness and procedures while you are working with curatorial collections.

**Deadline: May 4, 2007; Safety: Personal Protective Equipment- Course Code: 1413**
**Deadline: May 31, 2007; Safety: Authorities, Roles & Responsibilities- Course Code: 1338**



**Tyrone Brandyburg**
04/18/2007 05:13 PM
CST
Please respond by
04/27/2007

To: Teresa Valencia/TUIN/NPS@NPS
  cc: Shirley Streeter/TUIN/NPS@NPS, Catherine Light/TUIN/NPS@NPS
Subject: SAFETY ITEMS

A7615 (TUIN)

April 18, 2007

Memorandum

To:               Teresa Valencia, Museum Specialist (TUIN)

From:         Chief of Resource Education & Interpretation

Subject:       SAFETY ITEMS

Per conservation and email with the Superintendent, you are to purchase safety equipment only for Curatorial Storage that is not to exceed $2500.00. The following items are mandatory per Conserv-O-Gram 2/19, 11/10 and 2/3:

**Respirator**
**Gloves (Nitrile and neoprene)**
**Apron/lab coat**
**Safety Glasses**
**Arsenic test kit**
**Safety signs**

Use your own discretion when purchasing the other safety items. Please provide me with a DI-1 with a list of items you purchased, proof of purchase, receipts, and confirmation number for orders for my records. All items **must be purchased** before **April 27, 2007.**

If you have any questions, please contact me

H. Tyrone Brandyburg
Chief of Resource Education & Interpretation
Tuskegee Institute National Historic Site
Tuskegee Airmen National Historic Site
Selma to Montgomery National Historic Trail
334-727-6390 Telephone
334-727-4597 Fax
tyrone_brandyburg@nps.gov



**Tyrone Brandyburg**
04/19/2007 10:20 AM
CST
Please respond by
05/04/2007

**To:** Teresa Valencia/TUIN/NPS@NPS
   cc: Catherine Light/TUIN/NPS@NPS, Shirley Streeter/TUIN/NPS@NPS
**Subject:** Safety Training



United States Department of the Interior



National Park Service
Tuskegee Institute
National Historic Site
1212 West Montgomery Road
Tuskegee Institute, Alabama 36088

A7615 (TUIN)

April 19, 2007

Memorandum

To:                     Teresa Valencia, Museum Specialist (TUIN)

From:                 Chief of Resource Education & Interpretation

Subject:             Safety Training

Per conservation and email with the Superintendent, you are to enroll through DOI-Lean into the following training classes. This is mandatory training for you in an effort to improve your safety awareness and procedures while you are working with curatorial collections.

> **Deadline: May 4, 2007; Safety: Personal Protective Equipment- Course Code: 1413**
> **Deadline: May 31, 2007; Safety: Authorities, Roles & Responsibilities- Course Code: 1338**
> **Deadline: June 11, 2007; Safety: USGS Industrial Hygiene Program- Course Code: 1304**

Once you complete the courses, please provide completion certificates to Lorraine and myself.
If you have any questions, please contact me

**H. Tyrone Brandyburg**

**U. S. Department of Labor**
Occupational Safety and Health Administration

## Notice of Alleged Safety or Health Hazards

| | | Complaint Number | |
|---|---|---|---|
| Establishment Name | Tuskegee Institute NHS | | |
| Site Address | 1600 Boy Scout Circle | | |
| | Site Phone (334)727-9321 | Site FAX | |
| Mailing Address | 1212 W. Montgomery Rd., Tuskegee, AL 36088 | | |
| | Mail Phone | Mail FAX | |
| Management Official | Superintendent Catherine Light | Telephone | (334)727-6390 |
| Type of Business | Department of Interior - National Park Service | | |

HAZARD DESCRIPTION/LOCATION. Describe briefly the hazard(s) which you believe exist. Include the approximate number of employees exposed to or threatened by each hazard. Specify the particular building or worksite where the alleged violation exists.

Physical exposure to one employee and assistants to hazardous chemicals including strontium sulfate and Barium Carbonate and other geological specimens at the curatorial storage facility at Tuskegee Institute NHS. Also, major off-gassing of specimens.

Please view attached documentation.

| Has this condition been brought to the attention of: | ☑ Employer ☐ Other Government Agency (specify) |
|---|---|
| Please Indicate Your Desire: | ☐ Do NOT reveal my name to my Employer<br>☑ My name may be revealed to the Employer |
| The Undersigned believes that a violation of an Occupational Safety or Health standard exists which is a job safety or health hazard at the establishment named on this form. | (Mark "X" in ONE box)<br>☑ Employee ☐ Federal Safety and Health Committee<br>☐ Representative of Employees ☐ Other (specify) |

| Complainant Name | Teresa Valencia | | Telephone | 334-868-09__ |
|---|---|---|---|---|
| Address (Street, City, State, Zip) | 6730 Pamela Court Montgomery, AL 36116 | | | |
| Signature | Teresa D. Valencia | Date | | 4-24-07 |

If you are an authorized representative of employees affected by this complaint, please state the name of the organization that you represent and your title:

Organization Name: Your Title: Museum Specialist

2

OSHA-7(Rev. 3/96)

U. S. Department of Labor
Occupational Safety and Health Administration

## Notice of Alleged Safety or Health Hazards

### For the General Public:

This form is provided for the assistance of any complainant and is not intended to constitute the exclusive means by which a complaint may be registered with the U.S. Department of Labor.

Sec 8(f)(1) of the Williams-Steiger Occupational Safety and Health Act, 29 U.S.C. 651, provides as follows: Any employees or representative of employees who believe that a violation of a safety or health standard exists that threatens physical harm, or that an imminent danger exists, may request an inspection by giving notice to the Secretary or his authorized representative of such violation or danger. Any such notice shall be reduced to writing, shall set forth with reasonable particularity the grounds for the notice, and shall be signed by the employee or representative of employees, and a copy shall be provided the employer or his agent no later than at the time of inspection, except that, upon request of the person giving such notice, his name and the names of individual employees referred to therein shall not appear in such copy or on any record published, released, or made available pursuant to subsection (g) of this section. If upon receipt of such notification the Secretary determines there are reasonable grounds to believe that such violation or danger exists, he shall make a special inspection in accordance with the provisions of this section as soon as practicable to determine if such violation or danger exists. If the Secretary determines there are no reasonable grounds to believe that a violation or danger exists, he shall notify the employees or representative of the employees in writing of such determination.

NOTE: Section 11(c) of the Act provides explicit protection for employees exercising their rights, including making safety and health complaints.

### For Federal Employees:

This report format is provided to assist Federal employees or authorized representatives in registering a report of unsafe or unhealthful working conditions with the U.S.Department of Labor.

The Secretary of Labor may conduct unannounced inspection of agency workplaces when deemed necessary if an agency does not have occupational safety and health committees established in accordance with Subpart F, 29 CFR 1960; or in response to the reports of unsafe or unhealthful working conditions upon request of such agency committees under Sec. 1-3, Executive Order 12196; or in the case of a report of imminent danger when such a committee has not responded to the report as required in Sec. 1-201(h).

## INSTRUCTIONS:

Open the form and complete the front page as accurately and completely as possible. Describe each hazard you think exists in as much detail as you can. If the hazards described in your complaint are not all in the same area, please identify where each hazard can be found at the worksite. If there is any particular evidence that supports your suspicion that a hazard exists (for instance, a recent accident or physical symptoms of employees at your site) include the information in your description. If you need more space than is provided on the form, continue on any other sheet of paper.

After you have completed the form, return it to your local OSHA office.

NOTE:    It is unlawful to make any false statement, representation or certification in any document filed pursuant to the Occupational Safety and Health Act of 1970. Violations can be punished by a fine of not more than $10,000. or by imprisonment of not more than six months, or by both. (Section 17(g))

Public reporting burden for this voluntary collection of information is estimated to vary from 15 to 25 minutes per response with an average of 17 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. An Agency may not conduct or sponsor, and persons are not required to respond to the collection of information unless it displays a valid OMB Control Number. Send comment regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to the Directorate of Enforcement Programs, Department of Labor, Room N-3119, 200 Constitution Ave., NW, Washington, DC; 20210.

*OMB Approval# 1218-0064; Expires: 2-29-2008*

Do not send the completed form to this Office.

OSHA-7(Rev. 9/93)

April 19, 2007

OSHA
Mobile Area Office
Attn: Duty Officer
1141 Montlimar Drive
Mobile, Alabama 36609

Dear Duty Officer:

I am writing this letter in order to establish a Formal Complaint against my employer, the Department of Interior-National Park Service, Tuskegee Institute National Historic Site, in Tuskegee, Alabama.

On the week of March 12-16[th], 2007, several individuals (i.e., David Mendez, Mount Maker; Sean Bober, Mountmaker; Susan Blecher, Exhibit Registrar; and Tina Gessler, Conservator) from the Field Museum in Chicago, Illinois, visited Tuskegee Institute NHS in order to prepare for an upcoming exhibit pertaining to George W. Carver. Due to the fact, that I am the sole Museum Specialist for Tuskegee Institute NHS, Tuskegee Airmen NHS, and Selma to Montgomery NHT, I deal with museum collection, which includes: outgoing and incoming loans, conservation and preservation of antiques and historic structures, etc.

During the time the Field Museum was here, the conservator Tina Gessler took several swab samples from the taxidermy collection. Upon her return to the Field Museum, Ms. Tina Gessler conducted a semi-quantitative test for the presence of arsenic. Each sample tested positive for arsenic and one tested extremely high. On March 19, 2007, Ms. Gessler notified me via telephone and told me I needed to take extra precautions when handling those particular specimens. Ms. Gessler suggested that I bag each of the specimens for safety purposes. Once I received her phone call I immediately placed a sign on the museum storage cabinet that stated that the cabinet should not be opened without written authorization.

Once I secured the collection (i.e., locking collection in museum storage cabinet and affixing sign) I emailed Superintendent, Catherine Light, and told her about my conversation with Tina Gessler. In the same email I made a request to be tested for occupational exposure to arsenic. On March 20, 2007, Ms. Light sent a response back to me stating that she would have my Supervisor, Tyrone Brandyburg, check into the matter as soon as possible. On March 21, I emailed Mr. Brandyburg and asked him if he found out any information on whether or not I could be tested for occupational exposure to

arsenic. He later responded and asked me to be patient that he was collecting more information and documentation from the Field Museum and the National Park Service Southeast Regional Office. Later that afternoon, Mr. Brandyburg sent me an email that stated:

If you feel that you have been exposed to lead arsenic or paris green, it is your responsibility to go to the physician of your choice to ascertain whether or not you have been exposed to any poisons. Please have them provide you with a medical report. Use the appropriate leave, (i.e., sick leave or annual leave).

Once you return with the report, we will proceed from there. I highly recommend that you do not go back into that environment until the issue is resolved.

In reading that letter I recognized that I was pretty much on my own. Due to the fact, that I have been suffering from some major health issues I knew there was no way I could afford to pay for the testing myself, since my insurance would not cover it. I then went on-line to http://www.inside.nps.gov and clicked on quick links to research information on the National Park Service's "Safety Management Information Systems". From there I contacted their help line and spoke with a Mary Davis who told me to contact a gentleman by the name of Steve Rosen. Mr. Steve Rosen then told me that the gentlemen I needed to talk with for the National Park Service was Mr. Louis Rowe and Mr. Edward Perez out of Washington, D.C. – both gentlemen deal with health and safety issues for the National Park Service. I left messages on both Mr. Rowe's and Mr. Perez's voice mail. On my way home that day, I received a telephone call from Mr. Louis and I explained my plight to him. He told me to just hold on tight and that both he and Mr. Perez would see to it that I would be tested for occupational exposure at the expense of the National Park Service. I told both of them that I didn't want to get in any trouble for contacting them, but they told me not to worry about it. They said they would contact my Superintendent and speak with her directly, which they did and if I had any problems to contact them and keep them abreast of the situation. They also stated that they would put me in touch with the Southeast Region Safety Officer, Linda Giles.

On April 3, 2007, I was sent to Atlanta to be tested for arsenic exposure at the Richard B. Russell Building in the Health Unit. That building sits next to the Federal Building where the National Park Service Southeast Regional Office is located. Ms. Sheryl Burton, who is a contracted nurse, drew blood samples as well as had me give a urine specimen, which I provided her with two. All of the testing was conducted in their facility located at 75 Spring Street, S.W., Atlanta, Georgia.

On Friday the 13th day of April, 2007, I received a phone call from Ms. Sheryl Burton. She was calling to inform me that my urine specimen had been lost and that I needed to come in and be retested. I told her that she would need to make contact with either my Supervisor or Superintendent. I then gave her their phone number and she told me she would call them right away. About an hour later, the Administrative Officer, Shirley Streeter, telephoned me and asked me if I could go on April 16th or 17th to be retested. Since it was late in the day, it was decided that April 17th would be the best day for me to

be retested. This would provide her with enough time to get my travel authorization completed.

On April 16, 2007, I went to conduct a quick inventory of my collection and noticed that one of my keys was out of order. It was actually the #2 key, which unlocks the museum storage cabinet that contained some of the taxidermy specimens. I immediately took the key and checked the cabinet and noticed that the taxidermy collection was missing. I then went over to cabinet #5 and noticed that the other taxidermy collection was missing. I immediately notified Louis Rowe and Edward Perez. Mr. Louis Rowe then forwarded my email to Linda Giles. Ms. Giles told me to speak with my Supervisor, Tyrone Brandyburg to see whether or not he transferred the taxidermy collection or loaned them to another institution. I spoke with Mr. Brandyburg around 2:45 or 2:50 that afternoon and I asked him three specific questions: **1) Are we going to loan the Field Museum the taxidermy collection? Response: <u>I don't think so because they are not in good shape.</u> 2) Do you know what happened to the taxidermy collection? Response: <u>He told me that under Catherine Lights authority he was told to remove the objects from the collection.</u> 3) Where are they located? Response: <u>You don't need that information.</u>**

After that, I immediately sent an email to the Regional Curator, Allen Bohnert, in Atlanta, which read:

Dear Mr. Allen Bohnert:

As you are aware, the Field Museum from Chicago, Illinios, visited the park about a month ago. They are interested in borrowing some of our collections for an exhibit. While they were here they took a small sample from the taxidermy collections to test for arsenic. The items that they tested all came back positive. The conservator, Tina Gessler, immediately notified me about her findings and told me to take extra precautions, which I did. I secured all of the specimens and placed a sign on the cabinet door that no one is to open that cabinet without written authorization.

Today, while I was doing my walk through the storage area I looked in my keybox and noticed that the key for the taxidermy specimens was not in its proper location. I then took the key and checked the cabinet and noticed that all of the taxidermy specimens were missing.

When I discovered this I immediately notified Louis Rowe and Edward Perez and they forwarded my memo on to Linda Giles who is the Safety and Health Manager at the Atlanta Regional Office. She told me to check with my supervisor to see if the items had been loaned out or transferred. When I spoke with Tyrone this afternoon I asked him if we were going to allow the Field Museum to borrow such specimens and he said he didn't think so, because they aren't in good shape. I then asked him if he knew what happened to the taxidermy collection. He told me that under Catherine Lights authority he was told to remove the objects from the collection. I then asked him where they were located and he told me that I didn't need that information.

I find it to be highly irresponsible to remove toxic items from a collection where they have already been secured. I have already been exposed to the arsenic. Why would you then expose another person to a harmful substance unneccesarily?

*Respectfully yours,*

Teresa Valencia

On April 17, 2007, Linda Giles forwarded a copy of my letter to Superintendent Catherine Light. That was the same day I was in Atlanta being retested. At approximately 2:00 that afternoon, Ms. Light phoned my office and told me that she wanted to meet with me in her office tomorrow afternoon at 2:00 p.m. and to bring my Union Representative with me, that this meeting was in reference to the letter I sent to the Regional Curator, Allen Bohnert, and forwarded it on to Louis Rowe, Edward Perez, and Linda Giles. I told her that I was familiar with that letter and that I would be available to meet with her and that I would have a Union Representative with me.

On April 18, 2007, I went over to the Tuskegee Institute NHS headquarters to meet with Superintendent Catherine Light, my supervisor, Tyrone Brandyburg, and my Union Rep. Wendell Echols. Superintendent Light informed me that I had no business notifying Washington, D.C., about anything pertaining to this park. Both Light and Brandyburg stated that they didn't have any right to know what's going on in this park. She then asked me, "What was the purpose of writing that letter to Allen Bohnert and forwarding it on to the selected individuals?" I told her that I had asked Tyrone Brandyburg the location of the taxidermy specimens and he told me that I didn't need that information. Mr. Tyrone Brandyburg insisted that he told me that the taxidermy collection was still in storage, but that was a false statement. I didn't know that they were in storage until he made that comment. I told him that I was not aware that they were in storage. I told him I checked the designated cabinets and they were not there. He said he moved the collection to a more appropriate cabinet and that he was in possession of the key and I was not getting it. At that point Ms. Catherine Light and Tyrone Brandyburg questioned my professionalism as a Museum Specialist. I told them that it wasn't me who's professionalism needed to be questioned. I informed Superintendent Light that Tryone Brandyburg knew about the contaminated specimens all along, but did absolutely nothing to make others aware of the hazard. Mr. Brandyburg himself stated that at one time the birds were encapsulated, but the encapsulation had been removed. (Note: **Mr. Brandyburg is on his second tour of duty here at Tuskegee Institute NHS as the Chief of Resource Education and Interpretation. Prior to him becoming the Chief of Resource Education and Interpretation, he was the Museum Specialist. A gentleman by the name of Mike Jolly was my predecessor; he was the Museum Specialist after Tyrone Brandyburg.** ) Mr. Brandyburg blamed the removal of the encapsulation on Mike Jolly and I told Mr. Brandyburg that I don't believe Mr. Jolly had anything to do with it. Tyrone Brandyburg then asked how I came up with that basis and I told him that I spoke with Mr. Jolly and he said that they were never encapsulated the whole time he had been here. At that point Superintendent Light interrupted and said that I should have been aware of the arsenic issue. I told her that after being notified by the Field Museum in Chicago I looked in the Collection Condition Survey, which was written in 2002, and noticed that only two items were listed as to containing arsenic. So she said that I knew since 2002 that the taxidermy collections contained arsenic. I told her that I contacted Harpers Ferry, West Virginia, and spoke with the author of the Collection Condition Survey, Barbara Cumberland, and asked her if she had tested any of the other taxidermy specimens. Ms. Cumberland said that she did not, because the park didn't ask her to. She said the only reason she knew about the arsenic is because either someone told her or possibly a tag, but she couldn't recall for sure. At that time Mr. Brandyburg insinuated that I was negligent in the handling of the specimens. I told him that I wore gloves when handling the objects. He said that he spoke with another conservator and

that she said that the only way I could get contaminated with arsenic was if I was shaking the birds up and down or mishandling the object. I told Mr. Brandyburg that I handled the birds correctly and that I wasn't shaking them up and down. From that point Superintendent Light reverted back to the letter that I sent to Mr. Allen Bohnert. She said that by no means did I secure the taxidermy specimens since they were not placed in plastic bags as was suggested in the conserve-o-gram. I told her they were secure, because I am the only one that has access to the storage unit besides her and Tyrone. I also told her that I did not have the proper PPE to handle those types of items. Mr. Wendell Echols, my Union Representative then asked who is responsible for purchasing PPE. Superintendent Light then stated that she has always allowed me the opportunity to purchase whatever I need. Then Mr. Brandyburg stated that he had authorized me to purchase whatever equipment was necessary. I told him that I gave him a list last year of supplies that I needed in order for me to do my job, but he said we ran out of funds and that I would have to wait until the following year. He then mentioned that he just wanted the list and that I should have purchased whatever items I deemed necessary to do my job. The only problem with that is that at that time I was not able to use my Government Credit Card, because we were at the end of the Fiscal Year and the only ones that could make purchases were management. Also, Catherine Light questioned me about the geological specimens and other toxic specimens in the collection and placed the blame on me for not securing them. I told her that they were secure, but the building that I am currently in is inadequate and needs a better ventilation system. I told her I had made an earlier complaint about this with Tyrone Brandyburg and the former Facility Manager, Juan Gomez. Before I completed my statement Ms. Light interrupted and stated that I didn't need to complain, but to take action. Mr. Juan Gomez and I worked jointly, and he immediately notified the Safety Officer at the Southeast Regional Office and listed my concerns. The Regional Office responded promptly and when I told him about some of the toxic items within the collection.

At that point Superintendent Light said that I called her authority into question and that neither she nor Mr. Brandyburg had to tell me anything about the location of the museum collection. She said that this was her park and that the museum collection was her collection. I told her that this park belonged to the American people and that the museum collection belonged to them as well and that I was just trying to keep the park in compliance with the National Park Service's Museum Standards.

Both Catherine Light and Tyrone Brandyburg accused me of being inpatient where it came to getting tested for Occupational Exposure for arsenic. I told her I wasn't being inpatient but trying to stay in the loop to make sure that I would get tested. She told me that Washington, D.C. should have never been brought into this and that Mr. Brandyburg was working on getting me medical attention. I told her according to the email he sent dated March 21, 2007 he pretty much told me that I was on my own in this matter. Superintendent Light and Brandyburg tried to insinuate that I was being impatient, but that Tyrone Brandyburg was working with Linda Giles to get me to a physician. Mr. Brandyburg also stated that he wasn't the one that wrote the letter dated March 21, 2007, but that Mr. Anthony Stennis in the Human Resources Department at the Southeast Regional Office had written it. Truth be known, it wasn't until Washington, D.C.

contacted Superintendent Light that Mr. Tyrone Brandyburg began to vigorously pursue my request to be tested.

From that point, Superintendent Light, asked me what was I trying to accomplish by bring Washington, D.C. into this situation. I reiterated once again that the letter written by Mr. Tyrone Brandyburg basically stated that I was on my own. I told Superintendent Light that I was to keep the gentlemen in Washington, D.C. informed. She said that I was not trying to inform them of anything, but trying to call her authority in to question. I believe that her authority should be called into question, because she allowed another individual to be placed at risk, but as I understand it this was based on a management decision and had nothing to do with health and safety. Again, Superintendent Catherine Light, asked me what I was trying to accomplish. I told her that I didn't trust her or Mr. Brandyburg nor do I trust Anthony Stennis. I told Ms. Light to put herself in my shoes and look at it from my perspective. When I received the call from Sheryl Burton that my urine samples were missing on Friday and then when I came into work Monday my taxidermy collection was missing. Now I find out that Mr. Brandyburg really didn't write that email, but that Anthony Stennis from the Southeast Regional Office had written it and instead of Tyrone Brandyburg just forwarding me the information he either gave Anthony Stennis his password for his Government email or copy and pasted the comment to make it look like he actually wrote it. I find all of this behavior to be suspicious. Catherine Light then told me that she didn't trust me either and that she is tired of people not following the chain of command. At the end of the meeting Superintendent Light told Tyrone Brandyburg to reprimand me. I am currently awaiting documentation pertaining to the reprimand.

On April 19, 2007, I received a telephone call from Allen Bohnert, Regional Curator, and he apologized for not getting back to me sooner. He stated that he had been out of the office. I asked Mr. Allen Bohnert if he had read my email and he said he had. He then asked me what the current situation was and I told him. I told him that I was going to be reprimanded for notifying Washington, D.C. about the arsenic, the missing museum collection, not following the chain of command, and for questioning Superintendent Catherine Light's authority. I told Mr. Bohnert, that they were interfering with me being able to perform my responsibilities as a Museum Specialist. I stated that I believed it was imperative that I brought this to his attention, because now we are out of compliance with the National Park Service Standards for Museum Collections. In speaking with Mr. Allen Bohnert, he stated that the park should have had this information documented years ago and that he did not find fault in what I had done. He said, it's true that Superintendent Catherine Light was ultimately responsible for the collection, but that she needed to be operating within the regulations as well.

On April 18, 2007, Tyrone Brandyburg sent me two email memos with "Safety Items" being one of the subjects and then "Safety Training" being the other subject. The memo read as such:

**Deadline: June 11, 2007; Safety: USGS Industrial Hygiene Program-Course Code: 1304**

Once you complete the courses, please provide completion certificates to Lorraine and myself.

If you have any questions, please contact me

I would like it noted that I have not received this type of Safety Training during the 4.5 years that I have been here in Tuskegee, Alabama. I would also like to state that the whole time I have been here curatorial storage has never had any MSDS sheets. The park should have already had this in place years before my arrival. After I reported everything to Washington, D.C., my Supervisor re-wrote my performance appraisal plan and now I am responsible for MSDS along with other safety related issues such as fire extinguisher inspections and training.

Though Ms. Tina Gessler suggested that I bag all of the specimens I was very hesitant in doing so. The reason being is that I have been extremely sick since I have been here and some of my symptoms could point to possible arsenic exposure. On December 30, 2006, my heart failed and the paramedics and doctors had to intervene. I turned 40 this past January, and I really shouldn't be having all of the health problems that I am experiencing at this time. I believe it would have been highly irresponsible for me to come into contact with the taxidermy collection until I was tested. The other reason is because the park currently does not have the proper PPE for handling arsenic contaminated specimens.

When I contacted Louis Rowe I also made him aware of some of the other hazardous items that are currently in Tuskegee's collection. The majority of this is related to geological specimens:

3488 Strontium Sulfate msc 9c...radiation
2630 Barium Carbonate msc9c...radiation
3194 Barium Sulfate msc 9d...radiation
3198 Sulfarsenide of Cobalt msc 9d...radiation
2660 Copper Arsenic Oxide msc 9b...toxic
2708 Orpiment (arsenic) msc 11c...toxic
2710 Actinolite (asbestos) msc 11a...inhalation
2716 Galena in Calcite and Barite msc 11a...radiation/lead
2696 Galena, Barite, Covelite, Pyrite msc 11a...radiation/lead
2669 Galena, Barite, Covelite, Pyrite msc 9c...radiation/lead
2717 Galena msc 11a...lead
2812 Pyrite, Galena, Iron Disulfides msc 11c...lead
2841 Calcite, Sphalerite, Galena msc 11a...lead
3248 Phosphate of Cerium and Lanthanum msc 9d...radiation
2639 Lead Chlorovanadate msc 9e...lead

I hope this gives you some insight on the situation here at Tuskegee Institute NHS.

Respectfully yours,

Teresa Valencia

**Employee Appraisal Handbook**                                        **Appendix 8**

Part E: **Critical Elements and Performance Standards:** *List below each of the employee's critical elements (at least one, but no more than 5) and their corresponding performance standards. If Benchmark Standards are used, indicate "Benchmark Standards are attached" in the space below, and ensure they are attached to this form.*

| Critical Element 3: | Housekeeping Program: Best method to maintain collections through the housekeeping program. NPS Strategic Plan Goal: IA6 |
|---|---|

| **Performance Standards** | |
|---|---|
| **Exceptional** | |
| **Superior** | |
| **Fully Successful** | |
| **Minimally Successful** | |
| **Unsatisfactory** | |

**Narrative Summary**

Describe the employee's performance for each critical element. A narrative summary must be written for each element assigned a rating of Exceptional, Minimally Successful, or Unsatisfactory.



Rating for Critical Element 3:

☐ Exceptional-5   ☐ Superior-4   ☐ Fully Successful-3   ☐ Minimally Successful-2   ☐ Unsatisfactory-0



&lt;courseware@geolear
ning.com&gt;

04/20/2007 04:51 PM
AST

To: &lt;Teresa_Valencia@nps.gov&gt;
cc: &lt;deanna_mitchell@nps.gov&gt;
Subject: Safety: Authorities, Roles, and Responsibilities Course Completion

This e-mail was sent from a "send-only" account. Do not reply to this email.
This email was automatically generated.

TERESA VALENCIA:

You have successfully completed Safety: Authorities, Roles, and
Responsibilities on 4/20/2007 4:51:56 PM.  A Safety: Authorities, Roles, and
Responsibilities Certificate of Completion link has been added to your "My
Courses."

There is now a link for your Safety: Authorities, Roles, and Responsibilities
certificate added to your "My Courses" page. When you click on this link, you
can print the certificate of completion.

Your supervisor may have been copied on this e-mail. The supervisor can view
this course completion on the student's transcript.

Completion ID:
jcYxw3Y5ESNChhNBshOoq0HxSk7VNxYVhLlVrHxyK23sdOp2MylYD3CLg70tUiWB+z78iAIlrDKI4L
DGuw62h4E2z6/hvSSbyktSJCCQyeFPyrbmgUv7no7UIuVdLBTGUCyyDeS9nv4dDOtfxGnPVi5BtQDr
2JnOy1QRu32n8sNiKxQ4kdGiPcZRBmFWQUuV

 <courseware@geolear ning.com>

04/23/2007 12:27 PM AST

To: <Teresa_Valencia@nps.gov>
cc: <deanna_mitchell@nps.gov>
Subject: Safety: Personal Protective Equipment Course Completion

This e-mail was sent from a "send-only" account. Do not reply to this email. This email was automatically generated.

TERESA VALENCIA:

You have successfully completed Safety: Personal Protective Equipment on 4/23/2007 12:27:39 PM.  A Safety: Personal Protective Equipment Certificate of Completion link has been added to your "My Courses."

There is now a link for your Safety: Personal Protective Equipment certificate added to your "My Courses" page. When you click on this link, you can print the certificate of completion.

Your supervisor may have been copied on this e-mail. The supervisor can view this course completion on the student's transcript.

Completion ID:
jcYxw3Y5ESNChhNBshOoqlnvJJJyOokDlUd6B3bdKlVfJYubc66uXsV49vmlSOLMVO8FM3tBVIGP2c
ArBnJ/7RtlNZjuBCvnDilpQnd8UXvCu/DOxbgm9rqbYrY+NJ5kW9Tt+pFIaPLSWgBf3aSh4KzEwPFa
g8fdOjVIBNZxwjGEprdufa/rfU82yPvoccrm



&lt;courseware@geolear
ning.com&gt;
04/23/2007 04:54 PM
AST

To: &lt;Teresa_Valencia@nps.gov&gt;
cc: &lt;deanna_mitchell@nps.gov&gt;
Subject: Safety: USGS Industrial Hygiene Program Course Completion

This e-mail was sent from a "send-only" account. Do not reply to this email.
This email was automatically generated.

TERESA VALENCIA:

You have successfully completed Safety: USGS Industrial Hygiene Program on
4/23/2007 4:54:30 PM.  A Safety: USGS Industrial Hygiene Program Certificate
of Completion link has been added to your "My Courses."

There is now a link for your Safety: USGS Industrial Hygiene Program
certificate added to your "My Courses" page. When you click on this link, you
can print the certificate of completion.

Your supervisor may have been copied on this e-mail. The supervisor can view
this course completion on the student's transcript.

Completion ID:
jcYxw3Y5ESNChhNBshOoqwemkGRGuf7bsDvfOzPtlVdcpKumlR9bvOnqZzVzhCLQaXJ3Un4PjDF3iZ
v40QxJQRzDM9UnhimPxL21n+oNFokOROVvegIpjby4IV0+QH6XQcIxyhzMOYWNebjvIWz1gf0Gr1cM
oeYlHMC+gqYEXpzHUxEankOsHQ8QG2R8BYUJ



# Certificate of Completion
## for

# Safety: USGS Industrial Hygiene Program

### Is Presented To
## TERESA VALENCIA

This certifies that the person named above has successfully completed the interactive online course through the National Park Service DOI LEARN Management Portal on 04/23/2007.



# Certificate of Completion
### for
## Safety: Authorities, Roles, and Responsibilities

Is Presented To

## TERESA VALENCIA

This certifies that the person named above has successfully completed the interactive online course through the National Park Service DOI LEARN Management Portal on 04/20/2007.



# Certificate of Completion
## for

## Safety: Personal Protective Equipment

Is Presented To
# TERESA VALENCIA

This certifies that the person named above has successfully
completed the interactive online course through the National Park
Service DOI LEARN Management Portal on 04/23/2007.

From: Wendell J. Echols, Chief Steward, AFGE Local #110

To: Whom it may concern

Date: 4-23-07

This letter is a statement requested by Teresa Valencia as to what transpired during a meeting between Catherine Light, Tyrone Brandyburg, Teresa Valencia and myself. This meeting was called by Teresa concerning incidents pertaining to her worksite that needed to be addressed. This issue is the exposure to arsenic and other dangerous exposures.

The items were moved and Teresa asked why and where they were moved and she was told it was by Catherine's direction and she did not need to know where they were. She also stated that she did not have to tell anyone anything concerning this issue.

This meeting started with an employee being concerned about her safety and ended up threatened by disciplinary action. All Federal employees have a right to report safety issues when they become a hazard.

If I can be of any other assistance please feel free to contact me at (334)421-2113.

Wendell J. Echols, Chief Steward, AFGE Local #110

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X _____  ☐ Agent  ☐ Addressee<br>B. Received by ( Printed Name )  C. Date of Delivery  4-26-7 |

1. Article Addressed to:

OSHA
Mobile Area Office
Attn: Duty Officer
1141 Montlimar
Mobile, AL 36609

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)*  ☐ Yes

2. Article
(Transf     7006 0810 0003 7042 0639

PS Form 3811, February 2004     Domestic Return Receipt     102595-02-M-1540

Teresa Valencia                     To: sbarton@psc.gov
04/26/2007 10:18 AM          cc:
CDT                               Subject: Medical Screening

Dear Ms. Sheryl Barton:

I am writing to request information pertaining to my first medical screening on April 3, 2007.

From my understanding my urine sample and blood sample were shipped out at the same time. Would it be possible for you to provide me with a chain of custody to determine where my specimen was lost and who was the last to receive it. According to the document you presented to me from Quest Diagnostic with a report date of 04/04/2007 the document reads as if I had never given a urine specimen, which I provide 2 urine samples on my first medical screening (Document read: Test not performed. No urine received for the test requested) and only one sample on my second screening.

If a chain of custody cannot be provided could I get another form of documentation showing that I did provide the urine specimens, but that they were lost either in transport or on arrival.

Thank you for your time and assistance in this matter.

Respectfully yours,

Teresa Valencia



order-confirm@vwr.co
m

04/26/2007 02:06 PM
AST

To: TERESA_VALENCIA@NPS.GOV
cc:
Subject: VWR International Order 33112117 Acknowledgement for PO
CC/TVALENCIA/04262007

```
VWR International
Federal ID #91-1319190

VWR International Purchase Order Acknowledgement

  - VWR Order#: 33112117
  - Order Date: April 26, 2007
  - Placed by: TERESA VALENCIA, 3347279321

-----------------------------------------------------------------------------

Shipping Information:

  TUSKEGEE INSTITUTE
  1212 W MONTGOMERY RD
  CENTRAL RECEIVING
  PHYSICAL PLANT
  TUSKEGEE INSTITUTE, AL 36088
  Attn: TERESA VALENCIA

-----------------------------------------------------------------------------

Billing Information

  - Purchase Order: CC/TVALENCIA/04262007
  - Payment Method: Credit Card
  - Credit Card Reference Number: CONF# 33112117
  - Attention/Charge Code:

Currency: USD
Payment Terms: IMMEDIATE

-----------------------------------------------------------------------------
VWR                                           Qty  In   Back
Line #   VWR Cat.#            Unit   Price     Ord  Stk  Ord  Subtotal
-----------------------------------------------------------------------------
1        EMD-10026-1           EA    $100.38    1    0    1    $100.38

Description: EM  ARSENIC STRIP EA=PK100
             10026-1

Item Substituted: EM-10026-1
  - Shipping From: ATLANTA
  - Shipping Terms: FOB-ORIGIN FRT PREPAID & ADDED
  - Backordered Shipping Estimate: May 8, 2007

                    Merchandise Total                      : $100.38

                    Special Services/Handling/Fuel Surcharge : $0.00
                    Hazardous Charges                       : $20.00
                    Freight Charges                         : $29.53
                    Estimated Total Tax                     : $0.00
```

```
            Order Total                          : $149.91
---------------------------------------------------------------------

Track the shipping and delivery status of all your orders on-line at VWR.com!
If you place orders with VWR through...
        ...VWR.com directly and have a login,
           go to
https://www.vwrsp.com/myvwr/order/status/index.cgi?order_number=33112117
        ...an e-business application, continue to access VWR through this
           same method and locate the 'Order Status' button near the top
           area of the screen.
        ...Fax or Phone, you can gain access to this feature by creating
           a profile at https://www.vwrsp.com/myvwr/new/index.cgi.

---------------------------------------------------------------------

Unless governed by a separate written agreement, sales are subject to VWR's
standard terms and conditions of sale.  Visit www.vwr.com for complete
details.

---------------------------------------------------------------------

This e-mail was sent from a notification-only address that cannot accept
incoming e-mail.  Please do not reply to this message

---------------------------------------------------------------------

Questions?  Please call 1-800-932-5000, fax us at 866-329-2897, or email
solutions@vwr.com and Reference Order #33112117.

Thank you for shopping with us!
```



&lt;custsvc@labsafety.co
m&gt;

04/26/2007 02:16 PM
EST

To: &lt;Teresa_Valencia@nps.gov&gt;
cc:
Subject: Confirmation Of Your Order: B6BEEB31946142399B416857AF

Teresa Valencia,
Thank you for placing your online order with LSS.com.  This message confirms
that we received your order and are processing it now.  You will receive a
second, more detailed, confirmation once processing is complete.  If you have
any questions in the meantime, contact us by e-mail at
mailto:custsvc@labsafety.com or by telephone at 1-800-356-0783, x5062.

You can view your order detail here:
http://www.labsafety.com/store/receipt.asp?order%5Fid=B6BEEB31946142399B416857
AF

Lab Safety Supply appreciates your business and we look forward to serving you
again soon!

Your Online Customer Support Staff

P.S. Looking for great deals? Be sure to visit the Clearance Zone (
http://www.labsafety.com/clearancezone/) at LSS.com. You'll find great prices
on great products -- but hurry! Stock changes often and these bargains won't
last long!

**Teresa Valencia**
04/27/2007 11:57 AM
CDT

To: sburton@psc.gov
cc:
Subject:

Dear Ms. Sheryl Burton:

I am writing to request information pertaining to my first medical screening on April 3, 2007.

From my understanding my urine sample and blood sample were shipped out at the same time. Would it be possible for you to provide me with a chain of custody to determine where my specimen was lost and who was the last to receive it. According to the document you presented to me from Quest Diagnostic with a report date of 04/04/2007 the document reads as if I had never given a urine specimen, which I provide 2 urine samples on my first medical screening (Document read: Test not performed. No urine received for the test requested) and only one sample on my second screening.

If a chain of custody cannot be provided could I get another form of documentation showing that I did provide the urine specimens, but that they were lost either in transport or on arrival.

Thank you for your time and assistance in this matter.

Respectfully yours,

Teresa Valencia

| Teresa Valencia | To: sburton@psc.gov |
|---|---|
| 04/27/2007 11:59 AM CDT | cc: Subject: |

Hi Sheryl:

I am really glad that you enjoyed the cd. I forget to mention that you can give the doctor my cell phone number as well since it is usually easier to reach me that way. Here is my information:

Teresa Valencia
6730 Pamela Court
Montgomery, Alabama 36116

Cell(334)868-0901
Work(334)727-9321

If you get a chance checkout my websites: www.teresavalencia.com or www.myspace.com/teresavalencia or http://www.cdbaby.com/cd/teresavalencia  Please feel free to leave a comment at cdbaby.com I would truly appreciate it. I will keep you in mind when I get ready to release my next cd next year. Ciao! Valencia

**Teresa Valencia**
04/27/2007 12:02 PM
CDT

To: sburton@psc.gov
cc:
Subject: Re: Doctor

Hi Sheryl:

I haven't received a phone call from the Doctor in California yet. Would it be possible to get his name and phone number?

Thanks

P.S. I guess you didn't get my other messages because I mispelled your last name...sorry.

Teresa Valencia
04/27/2007 12:52 PM
CDT

To: "Burton, Sheryl" <sheryl.burton@psc.hhs.gov>
cc:
Subject: Re: Doctor📄

I'm not feeling to great today to say the least, but I'm here. Hope you have a good weekend. Thanks



"Burton, Sheryl"
<sheryl.burton@psc.hh
s.gov>
04/27/2007 01:22 PM
AST

To: <Teresa_Valencia@nps.gov>
cc:
Subject: Re: Doctor

Give it to next week Teresa, he's a man.
How are you feeling?  Enjoy the week-end and rest your body and your mind.
Sheryl Burton
RNC Z4G
ph. 404.331.3340
sburton@psc.gov

----- Original Message -----
**From:** Teresa_Valencia@nps.gov
**To:** sburton@psc.gov
**Sent:** Friday, April 27, 2007 1:02 PM
**Subject:** Re: Doctor

Hi Sheryl:

*I haven't received a phone call from the Doctor in California yet. Would it
be possible to get his name and phone number?*

Thanks

P.S. I guess you didn't get my other messages because I mispelled your last
name...sorry.

**LSS.com** **Industrial & Safety Supplies**

1·800·356·0783

★ Sign Off | Your Account | Promos | My Cart

Search: **GO**

LAB SAFETY SUPPLY

Sign up free e-newsletters, exclusive offers & more!

| Home | Products | Clearance | Customizeit | Info Library | About Us | Free Catalogs |

**Product Index**

**New Products**

**Clearance**

**Customizeit!**

**Resource Centers**

Bird Flu
Arc Flash Safety
Spill Control
Government
Public Safety .
Water Management
Natural Disasters
West Nile
Eyewear Guide
Calibration
Mold
Canadian
HIPAA
Food Safety & Handling
Clinical Lab

•Track an Order

**Need Assistance?**

Contact Us
How Do I....

• Win a $250 shopping spree!

New drawing every month!

Lab Safety Supply
401 S. Wright Rd.
Janesville, WI 53547-1368

**Thank you for your order!**
**Click Here for a Printer-Friendly Receipt**

Your On-line order number is: C029C12747E741C08C9414AB42.

| Item # | Product | Price | Qty | Total |
|---|---|---|---|---|
| 122852 | 4 SHELF INDUSTRIAL FA CAB | $171.00 | 1 | $171.00 |
| 128934F | Radiation Sign, "CAUTION-RADIATIVE MATERIALS", Fib | $21.80 | 2 | $43.60 |
| 129769F | ANSI Emergency Sign, "First Aid Station.", Fibergl | $22.70 | 1 | $22.70 |
| 16558 | LAB SAFETY SUPPLY® Respirator Storage Bag | $5.70 | 6 | $34.20 |
| 24340 | Official OSHA Safety Handbook | $11.70 | 1 | $11.70 |
| 596-13 | Sign, "Toxic Chemicals", Pkg of 25 | $13.10 | 2 | $26.20 |
| 94425 | NORTH 16-oz. Single Eye Wash Station | $21.30 | 1 | $21.30 |
| 94429 | NORTH 16-oz. Replacement Eyewash Solution | $8.90 | 1 | $8.90 |

Sub-Total: $339.60
Freight: $21.18
Tax: $.00
Order Total: $360.78

**Billing Address**

Tuskegee Institute NHS

1212 West Montgomery Road
Tuskegee, AL 36088
USA
334-727-9321

**Shipping Address**

Attn: Teresa Valencia
Tuskegee Institute NHS

1212 West Montgomery Road
Tuskegee, AL 36088
USA
334-727-9321

**Shipping Options**

UPS: Ground

**Payment Options**

Credit Card
Type: MasterCard
Number: ************4848
Name: Teresa L. Valencia
Expiration Date: 05/2009

*Order Comments*

Save this order as a shopping list 

**Click Here to continue shopping**

**Sign Off**

Get news and information customized for you. Answer a few questions so we can send you special offers and news that are right for you and your job responsibilities. Answering these nine questions will help us better tailor the special offers and news we send you. Go now . . .

Home | Our Guarantee | Privacy Statement | Terms of Access | Trademarks | Contact Us | Sitemap
**Questions and Orders: Call 1-800-356-0783 or Fax 1-800-543-9910**
© 2007 Lab Safety Supply Inc.

1·800·355·0783

**LSS.com. Industrial & Safety Supplies**

LAB SAFETY SUPPLY

★ Sign Off | Your Account | Promos | My Cart

Search: **GO**

Sign up free e-newsletters, exclusive offers & more!

| Home | Products | Clearance | Customizeit | Info Library | About Us | Free Catalogs |

**Product Index**

**New Products**

**Clearance**

**Customizeit!**

**Resource Centers**

Bird Flu
Arc Flash Safety
Spill Control
Government
Public Safety
Water Management
Natural Disasters
West Nile
Eyewear Guide
Calibration
Mold
Canadian
HIPAA
Food Safety & Handling
Clinical Lab

•Track an Order

**Need Assistance?**

Contact Us
How Do I....

**Win a $250 shopping spree!**

*New drawing every month!*

Lab Safety Supply
401 S. Wright Rd.
Janesville, WI 53547-1368

## Thank you for your order!
## Click Here for a Printer-Friendly Receipt

Your On-line order number is: B6BEEB31946142399B416857AF.

| Item # | Product | Price | Qty | Total |
|--------|---------|-------|-----|-------|
| 138480-6 | Mapa® Tri-Lites Clean Process Gloves, Size 6 | $17.50 | 1 | $17.50 |
| 138480-7 | Mapa® Tri-Lites Clean Process Gloves, Size 7 | $17.50 | 1 | $17.50 |
| 138480-8 | Mapa® Tri-Lites Clean Process Gloves, Size 8 | $17.50 | 3 | $52.50 |
| 138480-9 | Mapa® Tri-Lites Clean Process Gloves, Size 9 | $17.50 | 3 | $52.50 |
| 14147 | Poly/Cotton Lab Apron, White | $4.50 | 3 | $13.50 |
| 38021 | 3M N100 Particulate Respirator with Valve | $9.20 | 6 | $55.20 |
| 4077L | LSS Men's White Lab Coat, 100% Cotton, Plastic But | $39.80 | 2 | $79.60 |
| 4077M | LSS Men's White Lab Coat, 100% Cotton, Plastic But | $39.80 | 2 | $79.60 |
| 4077S | LSS Men's White Lab Coat, 100% Cotton, Plastic But | $39.80 | 1 | $39.80 |
| 4077XL | LSS Men's White Lab Coat, 100% Cotton, Plastic But | $48.60 | 1 | $48.60 |
| 54877 | sellstrom® Non Vented Goggles Clear Anti-Fog lens | $3.60 | 6 | $21.60 |

Sub-Total: $477.90
Freight: $22.45
Tax: $.00
Order Total: $500.35

**Billing Address**

Tuskegee Institute NHS

1212 West Montgomery Road
Tuskegee, AL 36088
USA
334-727-9321

**Shipping Options**

UPS: Ground

**Shipping Address**

Attn: Teresa Valencia
Tuskegee Institute NHS

1212 West Montgomery Road
Tuskegee, AL 36088
USA
334-727-9321

**Payment Options**

Credit Card
Type: MasterCard
Number: ************4848
Name: Teresa L. Valencia
Expiration Date: 05/2009

**Order Comments**

Save this order as a shopping list 

**Click Here to continue shopping**

**Sign Off**

Get news and information customized for you. Answer a few questions so we can send you special offers and news that are right for you and your job responsibilities. Answering these nine questions will help us better tailor the special offers and news we send you. Go now . . .

Home | Our Guarantee | Privacy Statement | Terms of Access | Trademarks | Contact Us | Sitemap
Questions and Orders: Call 1-800-356-0783 or Fax 1-800-543-9910
© 2007 Lab Safety Supply Inc.



"Burton, Sheryl"
<sheryl.burton@psc.hh
s.gov>
04/30/2007 03:14 PM
AST

To: <Teresa_Valencia@nps.gov>
cc:
Subject: Re: Doctor

Sure. However I will feel better mailing the results to your home. I have your address. I will
mail today.
Sheryl Burton
RNC Z4G
ph. 404.331.3340
sburton@psc.gov


----- Original Message -----
**From:** Teresa_Valencia@nps.gov
**To:** Burton, Sheryl
**Sent:** Monday, April 30, 2007 2:59 PM
**Subject:** Re: Doctor


Hi Sheryl:

Is there any way that I can get the Doctors name and phone number that is
reviewing my test results? If not, would it be possible to get a faxed copy
of my test results? Thanks

# Fax Transmission Cover Sheet

| | |
|---|---|
| **TO: TERESA VALENCIA** | **- FROM: MARGUERITE PAULSON** |
| | **PHONE: 1800-877-8805 EXT1583**<br><br>**FAX: 1770-621-7595** |
| | **REF: PROTECTED HEALTH INFO** |
| **FAX : 1334-727-1448**<br><br>**PHONE: 1334-727-3200** | **# of Pages including cover: 2** |

## CONFIDENTIALITY NOTICE
### PROTECTED HEALTH INFORMATION

If this FAX message contains medical information then it is confidential medical information, protected by both State and Federal Law. It is unlawful for unauthorized persons to review, copy, disclose, or disseminate confidential medical information. If the reader of this warning is not the intended FAX recipient or the intended recipient's agent, you are hereby notified that you have received this FAX message in error and that review or further disclosure of the information contained in this FAX is strictly prohibited.

This fax transmission contains confidential information, belonging to the sender, which may include proprietary information of Quest Diagnostics. The information is intended only for the use of the individual identified above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this faxed information is strictly prohibited. If you have received this FAX in error, please notify us immediately at the telephone number indicated above and either destroy these documents or return the originals to us by mail.


**Quest Diagnostics**

**REQUEST TO ACCESS**
**PROTECTED HEALTH INFORMATION (PHI)**

Date Received _____
Tracking Number _____
Initials _____

Quest Diagnostics maintains separate records for each patient visit. The information provided on this request form will be used to search our records. To protect your privacy, we will release the protected health information (PHI) only when our records search results in a match with the information you provide on this form.

The PHI maintained by Quest Diagnostics is contained in two types of records—the test result report for medical information and the patient invoice for billing information. In response to this request, Quest Diagnostics will provide copies of the test result report(s) and/or patient invoice(s). This information is also available by contacting your physician and/or your insurance carrier.

Quest Diagnostics relies on information provided by the physician at the time the laboratory test is ordered. The information provided by the physician may not be sufficient to accurately match the information you provide on this Request form. In such cases, Quest Diagnostics will protect our patients' privacy by not releasing results that do not conform to our strict criteria for determining matches. Therefore, although the information you provide in this request will assist us to positively identify your records, there is no guarantee that all of your records will be identified. Failure to provide all information we request may prevent us from identifying some of your records.

---

**Patient's Information:** (BOLD TYPE indicates Required Information. Incomplete requests will be denied.)

**Patient's Name** Teresa    Lynn    Valencia
First Name    Middle Name    Last Name

**Phone Number** (334) 727 - 9321 Daytime
(334) 868 - 0901 Evening

All other Names (nicknames, alternate spellings, maiden name, etc.)
_____

**Gender** ☐ Male ☑ Female     **Records requested** ☐ Invoices ☑ Medical Reports

**Date of Birth** 01 - 14 - 1967
(MM/DD/YYYY)

**Address** (This is the address where the response will be sent.)
**Street** 6730 Pamela Court

Social Security Number 520 - 82 - 4934
(Not required, but may help us to match records)

**City** Montgomery    **State** AL    **ZIP** 36116

Insurance ID# _____
(Not required, but may help us to match records)

---

**Laboratory Information:** (BOLD TYPE indicates Required Information. Incomplete requests will be denied.)

Ordering Physicians' (or Office) Name(s) _____    or Phone Number(s) (___) ___ - ____
_____

Address(es)    Approximate Date(s) of Service (MM/DD/YYYY)
_____
_____
_____

---

**Authorization:** (BOLD TYPE indicates Required Information. Incomplete requests will be denied.)
By signing below you request that Quest Diagnostics search its electronic records and provide you with a copy of the matching PHI maintained on this patient. In certain circumstances, a legal representative of the patient may request information on behalf of the patient. If you are the legal representative of the patient, please provide proof of representation (court order, power of attorney, etc.).

**Printed Name** Teresa Valencia

**Relationship:** (Check One)
☑ Self    ☐ Parent    ☐ Legal Guardian    ☐ Legal Representative
(Provide Proof)    (Provide Proof)

_Teresa L. Odom_    4/30/2007
**Signature**    **Date**

---

**Contact Us:**
Quest Diagnostics generally will respond within 30 days of receipt of this request. Please submit this form (and any proof of representation, if required) to:

Quest Diagnostics Incorporated
1777 Montreal Circle Mail Code AT033
Atlanta, GA 30084

Fax to:
770-621-7595

**Quest Diagnostics**

QUEST DIAGNOSTICS INCORPORATED
CLIENT SERVICE 800.877.9805

| | |
|---|---|
| PATIENT INFORMATION | REPORT STATUS **FINAL** |
| **VALENCIA, TERESA** | |

DOB: 01/14/1967 AGE: 40
GENDER: F FASTING: U

ORDERING PHYSICIAN
**FED OCC HLTH Z4G**

SPECIMEN INFORMATION
SPECIMEN:    AL124259A
REQUISITION: 7132706

ID:
PHONE:

CLIENT INFORMATION
A97503594                        QATL022
FED OCC HLTH-Z4G
RUSSELL FFEDERAL BLDG
75 SPRING ST
ATLANTA, GA 30303-3309

COLLECTED:  04/17/2007   11:26 ET
RECEIVED:   04/17/2007   21:06 ET
REPORTED:   04/22/2007   04:12 ET

| Test Name | In Range | Out of Range | Reference Range | Lab |
|---|---|---|---|---|
| ARSENIC, TOTAL INORGANIC, URINE | | | | EY |
| CREATININE | 781.0 | | mg/L | |
| Reporting Limit: 5.0 mg/L | | | | |
| ACGIH Normal range in adults: | | | | |
| 300 - 3400 mg/L (mean: 1000 mg/L) | | | | |
| [0.3 - 3.4 g/L (mean: 1 g/L)] | | | | |
| 1000 - 1600 mg/day (1.0 - 1.6 g/day). | | | | |
| Analysis by Colorimetry (C) | | | | |
| ARSENIC | | | | |
| (TOTAL INORGANIC) | None Detected | | mcg/L | |
| Reporting Limit: 5.0 mcg/L | | | | |
| Biological Exposure Index (ACGIH): | | | | |
| 35 mcg/L measured in an end of work week specimen. | | | | |
| ARSENIC, TOTAL INORGANIC | | | | |
| (CREATININE CORRECTED) | None Detected | | mcg/g Creat | |
| Reporting Limit: 6.4 mcg/g Creat | | | | |
| Various states require that levels above certain | | | | |
| cutoffs must be reported to the state in which the | | | | |
| patient resides. | | | | |
| Please contact us if you need assistance in supplying | | | | |
| your state with the required information. | | | | |
| Analysis by Inductively Coupled Plasma/Mass | | | | |
| Spectrometry (ICP/MS) | | | | |

**PERFORMING LABORATORY INFORMATION**
EY   NMS LABS, 3701 WELSH ROAD, P.O. BOX 433A, WILLOW GROVE, PA 19090, Laboratory Director: ROBERT A. MIDDLEBERG, PHD
     CLIA: 39D0197698

VALENCIA,TERESA - AL124259A                     Page 1 - End of Report



**Quest Diagnostics**

| | PATIENT INFORMATION | REPORT STATUS **FINAL** |
|---|---|---|
| | VALENCIA, TERESA | |

QUEST DIAGNOSTICS INCORPORATED
CLIENT SERVICE 800.877.8805

DOB: 01/14/1967 AGE: 40
GENDER: F FASTING: U

ORDERING PHYSICIAN
FED OCC HLTH Z4G

SPECIMEN INFORMATION
SPECIMEN:    AL124260A
REQUISITION: 7132746

ID:
PHONE:

CLIENT INFORMATION
A97503594                    QATL022
FED OCC HLTH-Z4G
RUSSELL FFEDERAL BLDG
75 SPRING ST
ATLANTA, GA 30303-3309

COLLECTED: 04/17/2007   11:26 ET
RECEIVED:  04/17/2007   21:10 ET
REPORTED:  04/23/2007   16:33 ET

| Test Name | In Range | Out of Range | Reference Range | Lab |
|---|---|---|---|---|
| ARSENIC, RANDOM URINE | see note | | | AMD |

NONE-DETECTED.  THE LIMIT OF QUANTITATION FOR URINE
ARSENIC ASSAY IS 10 mcg/L.

Reference Range for Arsenic, Random Urine:

2nd Voided AM Urine for Nonexposed Adult:
   50 mcg/g creatinine or less

Biological Exposure Index (end of shift/work week):
   50 mcg/g creatinine or less

| | | | | |
|---|---|---|---|---|
| CREATININE, RANDOM URINE | 74.0 | | 20-320 mg/dL | |

**PERFORMING LABORATORY INFORMATION**

AMD  QUEST DIAGNOSTICS NICHOLS INSTITUTE CHANTILLY VA, 14225 NEWBROOK DRIVE, CHANTILLY, VA  20153
     Laboratory Director: NATHAN SHERMAN, MD, CLIA: 49D0221801

VALENCIA,TERESA - AL124260A                    Page 1 - End of Report





**Tyrone Brandyburg**
05/01/2007 07:53 AM
CST

To: Teresa Valencia/TUIN/NPS@NPS, Robyn Harris/TUIN/NPS@NPS,
    Shirley K Baxter/TUIN/NPS@NPS, John Whitfield/TUIN/NPS@NPS,
    Carla Whitfield/TUIA/NPS@NPS, Tina Smiley/TUIN/NPS@NPS,
cc:
Subject: Mandatory Training

All Staff:

Please complete the following mandatory safety courses on DOI Learn by close of business 31 May 2007:

    - Safety: Office Safety - Course Code 1556
    - DOI Safety and Occupational Health - Course Code 1342

Upon completion, please print certificate and give a copy to Lorraine Thomas and myself.

Thanks

H. Tyrone Brandyburg
Chief of Resource Education & Interpretation
Tuskegee Institute National Historic Site
Tuskegee Airmen National Historic Site
Selma to Montgomery National Historic Trail
334-727-6390 Telephone
334-727-4597 Fax
tyrone_brandyburg@nps.gov



B0712300093   VALENCIA,TERESA L
DOB: 01/14/67   Age:40Y   MR #:545869
Admit Date/Time: 05/03/07   0801A   F
2328 GUTIERREZ,CARLOS M



**Baptist** HEALTH

**ER PRESCRIPTION & DISCHARGE INSTRUCTIONS**
Page 3 of 3

DISCHARGE INSTRUCTIONS - MEDICAL CHART

| Weight | Phone | Allergies | | Location SOUTH |
|---|---|---|---|---|

| MEDICINES PRESCRIBED: | If non, check this box: ☐ | VOID IF NOT PRINTED WITH CRANBERRY BACKGROUND |
|---|---|---|

| Name/Strength: | Number | Schedule / Duration | No Refills | Refills |
|---|---|---|---|---|
| 1. | | | ☐ | |
| 2. | | | ☐ | |
| 3. | | | ☐ | |
| 4. | | | ☐ | |
| 5. | | | ☐ | |

**INSTRUCTION SHEET(S) GIVEN**

☐ Asthma   ☐ Crutches   ☐ Head Injury   ☐ Threatened Ab   Return for signs of infection
☐ Back Pain   ☐ Fever   ☐ Otitis Media   ☐ Vomiting / Diarrhea   Increased Redness
☐ Cast / Splint Care   ☐ Fracture   ☐ Sprains / Bruises   ☐ Wound Care   Increased Swelling
   ☐ ST   ☐ Other(s)   Increased Drainage
Increased Heat

Additional Instructions: ① Meds. as directed
② Rest & ...
③ see primary MD as needed

Referred to:
☐ Dr.
Phone:
☐ Call on next business day for follow-up appointment
in _____ days / weeks   ☐ Next available

☐ Return to Emergency Dept in _____ hours / days for recheck.
☑ If no improvement or your condition worsens, call your private physician or return to the Emergency Department for a recheck.
☐ Learning needs assessed   ☐ Instructions Modified _____
☐ Education provided on new Medication _____

I understand that the treatment I have received was rendered on an emergency basis and is not meant to replace complete care from a primary care provider or clinic. Furthermore, I many have been released before all of my medical problems were apparent, diagnosed, and/or treated. If my condition worsens, I have been instructed call my primary care provider or return to this facility or the nearest emergency center. I understand that I should NOT drive or perform hazardous tasks if my education or treatment causes drowsiness. I have read and understand the above, received a copy of this form and applicable instruction sheets, and I will arrange for follow-up care. If diagnostic tests indicate a need for modification in therapy, you will be notified at the phone number you provided.

☐ Patient
☐ Relative   Time Released: > _____ HRS
☐ Other _____

INSTRUCTED BY: _____   PHYSICIAN: _____

WORK/SCHOOL STATEMENT from the Emergency Department

| PATIENT | DATE |
|---|---|

☐ Patient was seen by Dr _____
☐ No athletics / physical education: _____ days
☐ May return to work/school without restrictions
☑ Will require time off work / school. Estimated time: ___ days*
☐ Must be reevaluated by family / occupational physician before returning to school / work.

☐ May return to restricted duties for _____ days*
Restrictions: _____
☐ _____ was here with relative/child.
☐ Other _____

Time off from school or work longer than three days should be approved by a Personal or Company/Occupational Medicine Physician, unless otherwise stated.



ER 160

FORM # ER 16008  REV. 10/10/06



# Certificate of Completion

## for

## Safety: DOI Safety and Occupational Health Overview

Is Presented To

## TERESA VALENCIA

This certifies that the person named above has successfully completed the interactive online course through the National Park Service DOI LEARN Management Portal on 05/08/2007.



# Certificate of Completion
### for

## Safety: Office Safety

Is Presented To
## TERESA VALENCIA

This certifies that the person named above has successfully
completed the interactive online course through the National Park
Service DOI LEARN Management Portal on 05/08/2007.

 

**Federal Occupational Health**
a component of the US Public Health Service
Department of Health and Human Services

90 Seventh St, 4ᵗʰ Floor W, Ste 4-310
San Francisco, CA 94103

May 4, 2007

Teresa Valencia
6730 Pamela Court
Montgomery AL 36116

Dear Ms. Valencia,

First of all, my apologies for not writing sooner. My excuses are I have been in-and-out of the office three out of the last four weeks, and to boot we moved our entire office staff at the beginning of April. I had managed to make sure your labs were being performed and I have been told you were informed that they did not show an overexposure, so that added to my delay in getting this out to you.

My background is in Internal Medicine and Occupational Health and I have had a fair amount of experience with lead and arsenic testing. At one point I was on the San Francisco DeYoung Museum's Health & Safety Committee, and participated in seminars regarding the health hazards of artists. I certainly can appreciate your concern.

Your blood lead and ZPP results are supportive and consistent with a history of recent lack of exposure to lead. By recent I mean that it is unlikely you had any clinically significant exposure to lead in the past three months- at least. Inorganic arsenic was undetectable in the urine. The organic form of arsenic, which can be ingested with diets that include shellfish, was not measured, for the reason that this can confound results by raising total arsenic levels in the urine. It's the inorganic fraction which is culpable in cases of toxicity and this is the fraction we were concerned about.

Copies of the labs are enclosed for your files.

Altogether, there is no sign or 'smoking gun' of recent exposure to these heavy metals, and I hope you find these results reassuring. If you still have questions, I would recommend that you identify a reputable Occupational Medicine clinic prior to undergoing any further evaluation. I would not recommend pursuing

**healthy bodies**
**sound minds**



**Federal Occupational Health**
a component of the US Public Health Service
Department of Health and Human Services



any further testing at this point, unless recommended you do so by a Board Certified Specialist.

If you still have concerns, the only clinic I would recommend in the State of Georgia would be:

**The Georgia Occupational and Environmental Toxicology Clinic**
Grady Memorial Hospital
80 Jesse Hill Jr. Drive
12th Floor, C Wing
Atlanta, Georgia 30303
Clinic Founded 1990
**AOEC Contact**
Brent W. Morgan, MD
Offices: 404-616-4403
Fax: 404-616-6657

More sites can be found at:  http://www.aoec.org/directory.htm

I hope that this letter finds you well and again, please accept my apologies for the delay.

Sincerely,

Lee Wugofski MD, MPH
Federal Occupational Health Service
Board Certified, Occupational Medicine
Board Certified, Internal Medicine

**healthy bodies
sound minds
a safe place to work**



**OUR NEW ADDRESS as of 4/6/07**
DEPT OF HEALTH & HUMAN SERVICES
Federal Occupational Health
90 7th Street, Suite 4-310
San Francisco CA  94103-6705

FIRST CLASS

UNITED STATES POSTAGE
PITNEY BOWES
02 1A
0004613712          MAY 04 2007
$ 00.39⁰
MAILED FROM ZIP CODE 94102

Teresa Valencia
6730 Pamela Court
Montgomery AL  36116

**CONFIDENTIAL**

36116$2151 R034

.Teresa Valencia
05/07/2007 07:52 AM
CDT

To: "Burton, Sheryl" <sheryl.burton@psc.hhs.gov>
cc:
Subject: Re: Doctor

Dear Ms. Sheryl Burton:

I would like to request a chain of custody for my first urine sample as well as a copy of the release form that I signed. It was my understanding that the release form that I signed was for the Doctor in California...Is that correct? If possible, could you fax a copy of that release form to me to (334)727-1448.

Thank you for your time and assistance in this matter.

Respectfully yours,

Teresa Valencia

May 7, 2007

OSHA
Attn: Tuxberry Suber II
*1141 Montlimar Drive, Suite 1006*
Mobile, Alabama 36609

Dear Mr. Tuxberry Suber II:

I would like to thank you for responding to my complaint in such a prompt manner. As per our conversation, I would like to request a copy of your report in total upon completion. I would also like to request that several copies of your report be sent to the Secretary of the Interior, the Director of the National Park Service, and the Southeast Regional Director.

I believe it is imperative that safety and health issues be brought to the attention of individuals that can enforce issues of compliance. As you have stated all individuals have the right to a safe workplace.

*Again, thank you for your prompt response and I look forward to hearing from you in the near future.*

Sincerely,

Teresa Valencia
Museum Specialist

cc: addresses of officials

Department of Interior
Dirk Kempthorne, Secretary of the Interior
1849 C Street N.W.
Washington, D.C. 20240

Department of Interior
Mary Bomar, Director of the National Park Service
1849 C Street N.W.
Washington, D.C. 20240

National Park Service
Patricia Hooks, Regional Director
100 Alabama Street S.W.
1924 Building
Atlanta, G.A. 30303

May 10, 2007

National Park Service
U. S. Department of the Interior
1212 West Montgomery Road
Tuskegee, Alabama 36088

Dear Superintendent Light,

I have enclosed copies of my business card for documenting my OSHA inspection.
Please distribute a card to Ms. Teresa Valencia and Mr. Wendell Echols, respectively.

I will hold a final closing conference via telephone when the sampling results are
received and calculated.

If you have any questions or concerns, please contact me.

Sincerely,

Tuxberry Suber II
Industrial Hygienist
U. S. Department of Labor / OSHA
Mobile Area Office
1141 Montlimar Drive, Suite 1006
Mobile, Alabama 36609

Cc:
File



**U.S. DEPARTMENT OF LABOR**
OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION

**Tuxberry Suber II**
Industrial Hygienist
Mobile Area Office

1141 Montlimar Drive
Suite 1006
Mobile, AL 36609

Telephone:   (251) 441-6131
                    1 (800) 321-OSHA
Fax:           (251) 441 6396
Website:     www.osha.gov

You can contact ⟶
this gentleman. He is the
one that conducted the
inspection.



**U.S. DEPARTMENT OF LABOR**
OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION

**Tuxberry Suber II**
Industrial Hygienist
Mobile Area Office

1141 Montlimar Drive          Telephone:   (251) 441-6131
Suite 1006                                 1 (800) 321-OSHA
Mobile, AL 36609              Fax:         (251) 441-6396
                             Website:     www.osha.gov

**Teresa Valencia**

05/10/2007 03:25 PM
CDT

To: Tyrone Brandyburg/TUIN/NPS@NPS
cc: Wendell.Echols@va.gov
Subject: Annual and Sick Leave

Dear Mr. Tyrone Brandyburg:

Due to my on-going health issue both my annual leave and sick leave are dwindling down. I would like to know the process of applying for donated leave. If possible, could I set up a meeting with both you and Wendell Echols to discuss this matter further.

Thank you for your time and assistance and I look forward to hearing from you in the near future.

Respectfully yours,

Teresa Valencia

## Return Receipt

| | |
|---|---|
| Your document: | **Annual and Sick Leave** |
| was received by: | **Tyrone Brandyburg/TUIN/NPS** |
| at: | **05/10/2007 03:26:04 PM** |



**Tyrone Brandyburg**
05/10/2007 05:05 PM
CST

To: Teresa Valencia/TUIN/NPS@NPS
cc: Wendell.Echols@va.gov
Subject: Re: Annual and Sick Leave

Teresa:

I am available to discuss this issue with you tomorrow anytime after 12:00pm

Thanks

H. Tyrone Brandyburg
Chief of Resource Education & Interpretation
Tuskegee Institute National Historic Site
Tuskegee Airmen National Historic Site
Selma to Montgomery National Historic Trail
334-727-6390 Telephone
334-727-4597 Fax
tyrone_brandyburg@nps.gov

---

Teresa Valencia

Teresa Valencia
05/10/2007 03:25 PM
CDT

To: Tyrone Brandyburg/TUIN/NPS@NPS
cc: Wendell.Echols@va.gov
Subject: Annual and Sick Leave

Dear Mr. Tyrone Brandyburg:

Due to my on-going health issue both my annual leave and sick leave are dwindling down. I would like to know the process of applying for donated leave. If possible, could I set up a meeting with both you and Wendell Echols to discuss this matter further.

Thank you for your time and assistance and I look forward to hearing from you in the near future.

Respectfully yours,

Teresa Valencia

## Return Receipt

| | |
|---|---|
| Your document: | Re: Annual and Sick Leave |
| was received by: | Tyrone Brandyburg/TUIN/NPS |
| at: | 05/11/2007 10:41:06 AM |



**Tyrone Brandyburg**
05/11/2007 10:42 AM
CST

To: Teresa Valencia/TUIN/NPS@NPS
cc: Wendell.Echols@va.gov
Subject: Re: Annual and Sick Leave

Hi Teresa

How about Friday at 10:00am?

H. Tyrone Brandyburg
Chief of Resource Education & Interpretation
Tuskegee Institute National Historic Site
Tuskegee Airmen National Historic Site
Selma to Montgomery National Historic Trail
334-727-6390 Telephone
334-727-4597 Fax
tyrone_brandyburg@nps.gov

Teresa Valencia

**Teresa Valencia**
05/11/2007 11:16 AM
CDT

To: Tyrone Brandyburg/TUIN/NPS@NPS
cc: Wendell.Echols@va.gov
Subject: Re: Annual and Sick Leave

Hi Tyrone:

Could we schedule for sometime next week? Thanks

Teresa Valencia

05/11/2007 11:16 AM
CDT

To: Tyrone Brandyburg/TUIN/NPS@NPS
cc: Wendell.Echols@va.gov
Subject: Re: Annual and Sick Leave

Hi Tyrone:

Could we schedule for sometime next week? Thanks

**Teresa Valencia**

05/14/2007 01:07 PM
CDT

To: Tyrone Brandyburg/TUIN/NPS@NPS
cc:
Subject: Re: Annual and Sick Leave

Hi Tyrone:

Would it be possible to meet sometime in the afternoon?

Thanks

## Return Receipt

| | |
|---|---|
| Your document: | **Re: Annual and Sick Leave** |
| was received by: | **Tyrone Brandyburg/TUIN/NPS** |
| at: | **05/15/2007 12:02:35 PM** |

May 23, 2007

Tuskegee Institute National Historic Site
Attn: Tyrone Brandyburg
1212 West Montgomery Road
Tuskegee, Alabama 36116

Dear Mr. Tyrone Brandyburg:

I am writing this letter in response to the memorandum you mailed to me dated May 18, 2007.

In your memo you stated that I must exhaust all of my leave and that my medical emergency must be expected to last at least 80 hours. I am requesting that I be placed on the Leave Share Program. If I do not meet the criteria for the Leave Share Program I would like to request that I be allowed to borrow sick leave. I have enclosed a copy of my leave slip for your records.

If further information is needed regarding this matter please feel free to contact me.

Respectfully yours,

Teresa Valencia



**United States Department of the Interior**

National Park Service
Tuskegee Institute
National Historic Site
1212 West Montgomery Road
Tuskegee Institute, Alabama 36088



A6423 (TUIN, SEMO, TUIN)

May 23, 2007

SOP NUMBER 1

__MANAGEMENT__

### A. PURPOSE

*To establish procedures for identifying the Chain of Command, rank and authority at the Tuskegee Institute National Historic Site, Selma to Montgomery National Historic Site and Tuskegee Airmen National Historic Site.*

### B. GENERAL

A Chain of Command shall be maintained within the units of Tuskegee Institute NHS, Tuskegee Airmen NHS and Selma to Montgomery NHT (parks). The Chain of Command will assist in the orderly and effective management of our park units.

### C. DEFINITIONS

**Chain of Command:** The hierarchy, rank and authority in which the employees at the park(s) in each grade follows the chain of command.

### D. CHAIN OF COMMAND

The following constitutes the Chain of Command at the park(s) that must be followed by all employees on the rolls of the Central Alabama Parks:

1.  Superintendent
2.  Site Managers (applicable to individual sites TUAI & SEMO) & Division Chiefs
3.  Work Supervisor(s), when applicable

## E. RESPONSIBILITIES

### Superintendent

1. Provides overall supervision, management and policy direction for each division in the parks (i.e. administrative support, resource management, resource protection, visitor services and interpretation, planning and development, and facility maintenance);

2. Provides direction, leadership, and guidance through staff meetings, conferences, personal interviews, written or verbal orders and instructions;

3. Evaluates the operating efficiency and effectiveness of each division in accomplishing the goals and objectives and provides a general framework of management policy;

4. Classify, recruits, and staff all subordinate Federal Wage System positions and General Schedule positions within the parks;

5. Issue decisions on all disciplinary actions and adverse actions;

6. Encourages and guides a spirit of cooperation and coordination among the various divisions of the parks;

7. Interprets and implements park policy and practices, makes changes, and improvements in park policy, and resolve significant management problems;

8. Ensure employees receive pay for the time worked;

9. Ensure a safe and healthy work site that is free of illegal discrimination;

10. Ensure the right to form, join, and to participate in the Union.

### Site Manager's, Division Chief Roles, and Work Supervisors

1. Provides direction, leadership, and guidance through staff meetings, conferences, personal interviews, written or verbal orders and instructions;

2. Evaluates the operating efficiency and effectiveness of the division in accomplishing the goals and objectives and provides a general framework of management policy;

3. Establishes and maintains a safe, productive, supportive and well-ordered work environment;

4. Issue proposed disciplinary actions and adverse actions;

5. Encourages and guides a spirit of cooperation and coordination in the division or work unit;

6. Interprets and implements park policy and practices, and makes changes as appropriate within discretionary authority and with the Superintendent's approval;

7. Advise employees regarding assigned duties and conduct expectations and observing employees performance and conduct to ensure compliance with the standards of ethical conduct and other established work requirements;

8. Investigate and document circumstances related to incidents of employee misconduct;

9. Effectively use the individual performance management process:
   a. Establish clear expectations for employees
   b. Provide honest and timely feedback
   c. Support employees' growth and development
   d. Recognize and reward desired performance
   e. Correct undesirable performance
   f. Remain focused on helping employees to succeed

5. Provides leadership to employees and to help create a supportive performance management culture;

6. Is fair, reasonable, accountable, consistent, and timely;

7. Communicates honestly and directly;

8. Follow park policies, procedures, and guidelines

All members of these park units must follow the Chain of Command. If you have problems start at the lowest point and work your way up. The Superintendent is the terminus for the park units, the Southeast Regional Office follows if necessary, and then the Washington Office. Constant disregard for Chain of Command will not be tolerated.

As an employee of the National Park Service and the Department, you are required to carry out the announced policies and programs of the National Park Service and the Department and to obey proper requests, directions, or supervisors. While policies related to your work are under consideration, you may express your professional opinions and points of view. However, once a decision has been rendered by those in authority, you are expected to comply with the decision and work to ensure the success of programs or

issues affected by the decision. You will be subject to appropriate disciplinary action, including removal, if you fail to:

(a) Comply with any lawful regulations, orders, or policies; or
(b) Obey the proper requests of supervisors having responsibility for my performance.

In addition, you shall not engage in any conduct or activity which is in excess of your authority, or is otherwise contrary to any law or announced National Park Service or Departmental policy.

*This SOP has been incorporated into our Parks' SOPs located on our \Shareall drive.*
*This SOP is not a substitute for, nor does it address the EEO complaint process.*

Teresa Valencia

05/31/2007 03:48 PM
CDT

To: Tyrone Brandyburg/TUIN/NPS@NPS
cc: Catherine Light/TUIN/NPS@NPS
Subject: Advanced Sick Leave

Dear Mr. Tyrone Brandyburg:

I just wanted to do a follow-up to our conversation in my office this morning. I would like some clarification pertaining to the medical information needed to qualify for advanced sick leave. Is it my understanding that your are in need of my diagnosis, prognosis, and eventual outcome? The only reason I am requesting advanced sick leave is because my physician has been extremely shorthanded and hasn't had time to complete the necessary paperwork. However, if it is necessary to provide you with the same information that is need to be placed on the "leave donor program" then I would prefer to be placed on that program only.

I spoke with Dr. Sanchez's nurse today and she said that she would try and get the necessary paperwork to me by Monday, but explained that they are extremely shorthand at this time.

Thank you for your time and assistance in this matter.

Respectfully yours,

Teresa Valencia

# Return Receipt

| | |
|---|---|
| Your document: | **Advanced Sick Leave** |
| *was received* by: | **Tyrone Brandyburg/TUIN/NPS** |
| at: | **05/31/2007 04:30:41 PM** |

## Return Receipt

| | |
|---|---|
| Your document: | **Advanced Sick Leave** |
| was received by: | **Catherine Light/TUIN/NPS** |
| at: | **05/31/2007 04:45:47 PM** |

Teresa Valencia

06/04/2007 12:07 PM
CDT

To: Tyrone Brandyburg/TUIN/NPS@NPS

cc:

Subject: *Advanced Sick Leave*

Dear Mr. Tyrone Brandyburg:

I am doing a follow-up on my letter that I sent to you on 05/31/2007 concerning medical documentation. Could you please give me some sort of clarification on what type of documentation is necessary?

I have an appointment today with Dr. Gilberto Sanchez, so I want to make sure that I ask him for the proper documentation.

Thank you for your time and assistance in this matter.

Respectfully yours,

Teresa Valencia



Mary A. Bomar,
Director

06/05/2007 03:30 PM
EDT
Please respond to

To: Teresa Valencia/TUIN/NPS@NPS
cc:
Subject: Safety and Health Awareness Week



## United States Department of the Interior

NATIONAL PARK SERVICE
1849 C Street, N.W.
Washington, D.C. 20240

IN REPLY REFER TO:

### * * * VIA ELECTRONIC MAIL ONLY – NO HARD COPY TO FOLLOW * * *

A7615 (2430)

Memorandum

June 5, 2007

To:            All Employees

From:          /s/ Mary A. Bomar
               Director

Subject:       Safety and Health Awareness Week

The Department of the Interior and the National Park Service (NPS) celebrate Safety and Health Awareness Week annually. This year, throughout our NPS field sites, we will celebrate this event from June 4 through June 8. This should be a planned time set aside to focus on the importance of safety and health for our employees and for our visitors.

One of the hardest things I have ever had to do in my life was to take the hands of a grieving widow and tell her how sorry I was that her husband was killed in an accident. And, as I watched the United States flag handed to his widow by the Marine honor guard, I could not help but think how ironic it was that he survived war as a Marine, but died in the uniform of the NPS.

Recently, I was asked why my "trifecta" of goals did not include safety. The answer was easy, we cannot re-engage the American public with their parks if we cannot keep them safe; we cannot rebuild the capacity of the system if we lose funding and people due to injuries; and we cannot prepare a new generation of leaders for our national parks if we cannot keep our people safe and healthy on the job. In short, safety underlies everything we do, and each one of my goals.

Fortunately, there is no need to find a safety system that works, we already have one. Following the practices and procedures of NPSafe can help create a workplace where no lives are lost, no one injured, and unsafe acts are caught and corrected before anyone is injured. For those who know the program, now is always a good time to review it with fresh eyes; for those who are not aware of NPSafe, your life, and the lives of others depend on it.

I have said this before, caring for the special places in America is an awesome responsibility—so is safety. It is not for us alone, but for the 140,000 volunteers and 273 million visitors each year. And, for those in leadership positions within the NPS, I say shame on us if we do not do everything we can to keep our people and visitors safe.

When I ask you to think about safety, I do not ask you to do it for yourself, do it for your employees and coworkers, do it for your loved ones, and do it for me, the person who will take your loved one's hands and tell them how sorry I am that you died. I never want to do that again.

At each NPS unit, I would like superintendents, management teams and employee safety committees to collaboratively plan safety related events and orientations for safety and health awareness week, and I would like you to include as many seasonal employees, interns, and volunteers in the planned events as possible.

To assist in planning, our Division of Risk Management staff have gathered ideas used in parks in previous years, and is making these ideas available to you on the Risk Management website located in InsideNPS. If you have any questions or comments, please contact Richard Powell at 202-513-7218.

Thank you in advance for your close attention to employee and visitor safety.



**Tyrone Brandyburg**
06/05/2007 07:40 PM
CDT

To: Teresa Valencia/TUIN/NPS@NPS
cc: Catherine Light/TUIN/NPS@NPS
Subject: Re: Advance Sick Leave

Hi Teresa

I was able to fax the information to Nicole in Doctor Gilberto Sanchez's office outlining the information we need for proper medical documentation. (See attached letter) This information is needed before we can assist you with receiving advance leave, or being place in the leave share program. The application to "Become a Leave Recipient Under the Volunteer Leave Transfer Program" you gave to me at our staff meeting is unacceptable.

I notice in the application on line # 7 under Nature and Severity of the Medical Emergency and it states that your emergency was "Moderate to Severity Occupational Exposure to Arsenic". According to the preliminary report we received on April 24, 2007 from Dr. Lee Wugofski, he wrote that your urine arsenic results showed (No Inorganic arsenic was detected) and the blood lead and ZPP levels were also within normal (low) levels. Could you please provide me with a copy of your test results that Dr. Sanchez used to make this diagnosis?

If you have any questions, please contact me and I will certainly answer them for you.

Thanks



LETTERHEAD More medical documentationTV 6-5-2007.DOC

H. Tyrone Brandyburg
Chief of Resource Education & Interpretation
Tuskegee Institute National Historic Site
Tuskegee Airmen National Historic Site
Selma to Montgomery National Historic Trail
334-727-6390 Telephone
334-727-4597 Fax
tyrone_brandyburg@nps.gov

Teresa Valencia

**Teresa Valencia**
06/05/2007 03:37 PM
CDT

To: Tyrone Brandyburg/TUIN/NPS@NPS
cc:
Subject: Advance Sick Leave

Hi Tyrone:

Have you found anything from the Regional Office concerning the advancement of sick leave?

Thanks



# United States Department of the Interior



### National Park Service
Tuskegee Institute
National Historic Site
1212 West Montgomery Road
Tuskegee Institute, Alabama 36088

IN REPLY REFER TO:

P36 (247)

June 5, 2007

MEMORANDUM

To:        Teresa Valencia, Museum Specialist, TUIN

From:      Chief of Interpretation, TUIN

Subject:   Request for Medical Documentation

You have requested to be placed on the Voluntary Leave Program and provided a brief statement from your doctor indicating that you cannot return to work.

In order to properly consider your request, I need more detailed medical documentation from your physician concerning your medical condition. Specifically, I need documentation that addresses the items listed below. A new medical examination is not necessary if your doctor can provide current information from his/her records. It is preferable that the documentation is recorded on his/her letterhead stationery and that each item be responded to by the item number. Your doctor should be sure to sign the report. If an item is not applicable, he/she should so indicate.

(a) The history of the specific medical condition(s), including references to findings from previous examinations, treatment, and responses to treatment.

(b) Clinical findings from the most recent medical evaluation, including any of the following which have been obtained: findings of physical examination, results of laboratory tests, and other special evaluations or diagnostic procedures.

(c) Diagnosis, including the current clinical status.

(d) Prognosis, including plans or recommendations for future treatment and an estimate of the expected date of full or partial recovery, if applicable.

(e) An explanation of the impact of the medical condition on overall health and activities, including the basis for any conclusion that restrictions or accommodations are or are not warranted, and where they are warranted, an explanation of their therapeutic risk avoiding value.



(f) An explanation of the medical basis for any conclusion which indicates the likelihood that you are or are not expected to suffer sudden or subtle incapacitation by carrying out, with or without accommodation, the tasks or duties of your position.

(g) Narrative explanation of the medical basis for any conclusion that the medical condition has or has not become static or well stabilized and the likelihood that you may experience sudden or subtle incapacitation as a result of the medical condition.

You are responsible for any costs incurred in connection with obtaining this documentation. So that your physician has sufficient information to respond to the items concerning your ability to perform in your job and accommodations that might be recommended, it is important that you provide him/her with your position description. If your physician has any question about the information being requested, or if he/she needs any additional information regarding the requirements of your job, he/she can telephone me at 334-727-6390.

If you are unable to provide the medical documentation, I will decide on your request based on the limited information you have previously provided to me.

Sincerely,

H. Tyrone Brandyburg

I acknowledge receiving this document. _____

                                        Signature            Date



# FAMILY PRACTICE



4143 Atlanta Hwy
Montgomery, AL 36109
334-271-4503  (Office)
334-277-3215  (Fax)

Dr Shepherd A. Odom
Dr Gilberto Sanchez
Dr J. Juan Chung

Send to: _____     Fax: _____

Re: _____     Date: _____

THIS FACSIMILE IS INTENDED ONLY FOR THE USE OF THE NAMED ADDRESSEE AND MAY CONTAIN INFORMATION THAT IS CONFIDENTIAL OR
PRIVILEGED. IF YOU ARE NOT THE INTENDED RECIPIENT, OR YOU ARE NOT THE EMPLOYEE RESPONSIBLE FOR DELIVERING THE FACSIMILE FOR
THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS FACSIMILE IS STRICTLY
PROHIBITED. IF YOU HAVE RECEIVED THIS FACSIMILE IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY.

COMMENTS:

# fax cover

## Application to Become a Leave Recipient
## Under the Voluntary Leave Transfer Program

| | | |
|---|---|---|
| 1. Applicant's name *(Last, first, middle)* <br> *Valencia Teresa Lynn* | 2. Social Security Number <br> *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* | 3. Employee Number |

| | | |
|---|---|---|
| 4a. Position title <br> *Museum Specialist* | 4b. Pay plan <br> *GS-09/06* | 4c. Grade/pay level <br> *GS-09/06* |

| | |
|---|---|
| 5. Name of organization *(Agency, Department, Office, Division, Branch, etc.)* <br> *Dept. of Interior, National Park Service* <br> *Tuskegee Institute NHS* | 6. Office telephone number <br> *(334) 727-9321* |

7. Nature and severity of the medical emergency  *moderate severity  Occasional Exposure to public*

| 8. Individual affected by medical emergency *(check one)* <br> [✓] Employee <br> [ ] Employee's family member | 9. Date medical emergency began <br> *Approx. 2003* | 10. Date medical emergency ended *(or is expected to end)* <br> *unknown* |
|---|---|---|

11. Name of physician who will verify the medical emergency. *(Attach documentation from the physician (or other appropriate expert) showing the diagnosis, prognosis and duration of illness.)*

*Gilberto Sanchez*

| 12. What is the applicant's annual and sick leave balances as of end of last pay period? <br><br> Annual leave balance ➡ *60*   Sick leave balance ➡ *0* | 13. How many hours of leave without pay have been used for this medical emergency? <br><br> Hours ➡ |
|---|---|

14. Provide a description of the medical emergency to be distributed to servicing personnel offices so that other employees may donate annual leave to the applicant.

[ ] Check box if applicant does not want a description distributed.

[ ] Check box if applicant does not wish to have name used with the description or disclosed to anyone except the supervisor, the supervisory channel and the deciding official, and individuals who maintain the program.

Description of medical emergency

| 15a. Name of individual completing application *(if applying on behalf of the applicant)* | 15b. Relationship to applicant <br> *Self* | 15c. Telephone number (area code) <br> *(334) 868-0901* |
|---|---|---|

| 16a. *I certify that the above statements are true.* <br> *(Signature of applicant or individual applying on behalf of applicant)* <br> *Teresa L. Valencia* | 16b. Date signed <br> *05/23/07* |
|---|---|

**Privacy Act Statement**
Participation in this program is voluntary; however, solicitation of this information is authorized under 5 U.S.C. 6332. The information furnished will be used to identify records properly associated with the transfer of annual leave. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

| 17. First level supervisor's recommendation <br> [ ] Approve   [ ] Disapprove <br> Signature _____   Date signed _____ | 18. Deciding official's decision <br> [ ] Approve   [ ] Disapprove <br> Signature _____   Date signed _____ |
|---|---|

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

OPM 630
June 2001
Formerly Optional Form (OF) 630

Witness Statement

During the staff meeting for the Tuskegee Institute NHS – Resource Education Division on June 6, 2007, Chief of Resource Education Tyrone Brandyburg stated to Teresa Valencia that she was to move her office to the George Washington Carver Museum. She was to do this by Friday (June 8, 2007). He did not give her any explanation or elaborate on the reason for the move.

_Shirley Baxter_      _06/06/07_

Shirley Baxter            Date



"Echols, Wendell J.
CAVHCS"
<Wendell.Echols@va.g
ov>

06/09/2007 07:06 AM
AST

To: <catherine_light@nps.gov>
   cc: <tyrone_brandyberg@nps.gov>, <teresa_valencia@nps.gov>
Subject: FW: Notification of Change

Sent to correct E-Mail address.

**From:** Echols, Wendell J. CAVHCS
**Sent:** Thursday, June 07, 2007 10:11 AM
**To:** 'catherine.light@nps.gov'; 'tyrone.brandyberg@nps.gov'
**Cc:** Lowe, James K. Jr. CAVHCS; Henderson, Bobby L. CAVHCS; 'teresa.valencia@nps.gov'
**Subject:** Notification of Change

Good morning Tyrone,
I am sending this E-Mail in regards to your plans to move Ms Valencia from her present location to the
Carver Museum. She has stated that she was told verbally on Monday that she would be relocated. The
position of the Union is that there should be written communication prior to a change such as this. The
standard time frame for the notification process is 2 weeks, but can be waived by the Employee upon
consent. We are requesting that this be put in writing for documentation purposes. Please contact me to
determine if we need to meet on this subject. You may reach me at 334-421-2113 334-421-2113.

Thanks for your attention to this matter.

                    Wendell J. Echols

Teresa Valencia

06/12/2007 02:34 PM
CDT

To: Robyn Harris/TUIN/NPS@NPS
cc: Catherine Light/TUIN/NPS@NPS, Wendell.Echols@va.gov
Subject: Requesting Meeting with Union Representation

Dear Robyn Harris:

Since you are currently the Chief of Resource Education and Interpretation I would like to request a meeting with you along with my Union Representative. This meeting is to discuss my medical certification from Doctor Gilberto Sanchez. Mr. Tyrone Brandyburg provided me with the application for the "Voluntary Leave Transfer Program." Doctor Gilberto Sanchez completed the form, but Mr. Tyrone Brandyburg stated in his letter dated June 5, 2007 that the information my doctor provided was unacceptable.

I spoke with my physician today and he stated that he has supplied Mr. Tyrone Brandyburg with sufficient information. According to my doctor, providing further documentation would be in violation of HIPA regulations.

This meeting is to assist me in determining other possible options, if any.

Thank you for your time and assistance in this matter.

Respectfully yours,

Teresa Valencia
Museum Specialist

**Teresa Valencia**

06/12/2007 02:37 PM
CDT

To: "Burton, Sheryl" <sheryl.burton@psc.hhs.gov>
cc:
Subject: Heavy Metals Screening

Dear Ms. Sheryl Burton:

On 4/27/2007 and again on 5/7/2007 I made a written request asking for the chain of custody for my first urine and blood sample. I also requested a copy of the release form that I signed for the Doctor in California. If you are unable to give me this information can you direct me to the individual that can?

Any assistance that you could offer would be greatly appreciated.

Sincerely,

Teresa Valencia
Museum Specialist

## Return Receipt

| | |
|---|---|
| Your document: | Requesting Meeting with Union Representation |
| was received by: | Robyn Harris/TUIN/NPS |
| at: | 06/12/2007 03:50:10 PM EDT |

# FAMILY PRACTICE

4143 Atlanta Highway
Montgomery, Alabama 36109

Shepherd A. Odom, M.D., P.C.
Gilbert Sanchez, M.D.

Telephone: (334) 271-4503
Fax: (334) 277-3215

June 12, 2007

Patient: Teresa Lynn Valencia
DOB: 01/14/1967

Diagnosis: Occupational Exposure to Lead Arsenic

Prognosis: It is my determination that Ms. Teresa Valencia's symptoms appear to be due to chronic exposure to lead arsenic.

However, the seriousness of the effects may vary from person to person. A person's reaction depends on several things, including individual health and previous exposure to chemicals.

It is also important to consider the length of the exposure to the chemical. In talking with Ms. Valencia, she explained to me that she has been working in the museum field since the age of 13. She has been diagnosed with Graves Disease and as you are probably aware, Ms. Valencia's illness came out of remission in December causing her to have a thyroid storm in which her TSH levels were extremely elevated. Exposure to arsenic can play a large factor in thyroid diseases.

There are numerous ways one can come into contact with arsenic. It can be inhaled, ingested or absorbed. Arsenic poisoning is difficult to pin down because most of the arsenic leaves the body within three days of exposure. The arsenic which remains is stored in the brain, bones, and tissue, which continues to do serious damage. Some people have no immediate symptoms, but the exposure can cause many types of cancer or diabetes later on. There is new evidence that arsenic may also lead to heart disease or strokes. It may cause long term liver, kidney, and central nervous system damage.

Arsenic exposure, even at low levels, can result in a range of symptoms. Swallowing or inhaling low levels of inorganic arsenic can result in stomach ache, nausea, vomiting and diarrhea. It can also result in decreased production of red and white blood cells which may cause fatigue, abnormal heart rhythm, blood-vessel damage resulting in bruising, and impaired nerve function. One of the early warning signs of arsenic poisoning is a "pins and needle" sensation in hands and feet.

Long-term exposure to inorganic arsenic can cause fluid accumulation (resulting in puffness0 especially around the lower eyelids, face and ankles, diarrhea, garlic breath,

perspiration, excessive salivation, generalized itching, oral inflammation, sore throat, runny nose, excessive tearing, numbness, skin inflammation, hair loss, weakness and loss of appetite. Arsenic can also cause a range of neurological effects, including headaches and vision problems. It can cause noticeable behavioral changes. It can cause noticeable behavioral changes, most commonly aggression or depression/

Duration of Condition: Due to the fact, that Ms. Valencia has had chronic exposure to lead arsenic. I am unable to determine the duration of her condition. It is very probable that she will continue to suffer from this for years to come. I would recommend that Ms. Valencia be reevaluated every six months.

Signature: _____

Physician: Gilberto Sanchez, M.D.

 **Catherine Light**

06/13/2007 09:28 AM
CDT

To: "Echols, Wendell J. CAVHCS" <Wendell.Echols@va.gov>
cc: tyrone_brandyburg@nps.gov, Robyn Harris, teresa_valencia@nps.gov
Subject: Re: Meeting Request

She's approved to go to the meeting. I'm also aware that she and the Union has requested a meeting with the park. I'm available this Friday at 11:00am.

Catherine Farmer Light
Superintendent, Tuskegee Institute NHS,
Tuskegee Airmen NHS & Selma to Montgomery NHT

The National Park Service cares for special places saved by the American people so that all may experience our heritage!

"Echols, Wendell J. CAVHCS" <Wendell.Echols@va.gov>

 "Echols, Wendell J. CAVHCS" <Wendell.Echols@va.gov>

06/13/2007 09:57 AM
AST

To: <catherine_light@nps.gov>
cc: <tyrone_brandyberg@nps.gov>, <teresa_valencia@nps.gov>, "Lowe, James K. Jr. CAVHCS" <James.Lowe@va.gov>, "Henderson, Bobby L. CAVHCS" <Bobby.Henderson@va.gov>
Subject: Meeting Request

We are requesting the presence of Ms Valencia to attend a face to face meeting here at Central Alabama Veterans Health Care System Building 68-1in the Union office today at 2:00 p.m. Please allow her to attend this meeting. If there are any concerns please contact me at 334-421-2113.

Thank you.

Wendell J. Echols, Union Representative, AFGE Local # 110



"Echols, Wendell J.
CAVHCS"
<Wendell.Echols@va.g
ov>

06/13/2007 09:57 AM
AST

To: <catherine_light@nps.gov>
cc: <tyrone_brandyberg@nps.gov>, <teresa_valencia@nps.gov>, "Lowe,
    James K. Jr. CAVHCS" <James.Lowe@va.gov>, "Henderson, Bobby
    L. CAVHCS" <Bobby.Henderson@va.gov>
Subject: Meeting Request

We are requesting the presence of Ms Valencia to attend a face to face meeting here at Central
Alabama Veterans Health Care System Building 68-1in the Union office today at 2:00 p.m. Please allow
her to attend this meeting. If there are any concerns please contact me at 334-421-2113.

Thank you.

Wendell J. Echols, Union Representative, AFGE Local # 110

 **Catherine Light**
06/13/2007 04:24 PM
CDT

To: "Echols, Wendell J. CAVHCS" <Wendell.Echols@va.gov>
cc: teresa_valencia@nps.gov, tyrone_brandyberg@nps.gov,
    shirley_streeter@nps.gov
Subject: Re: FW: Notification of Change 

Attached per request


memo for move.DOC
Catherine Farmer Light
Superintendent, Tuskegee Institute NHS,
Tuskegee Airmen NHS & Selma to Montgomery NHT

The National Park Service cares for special places saved by the American people so that all may experience our heritage!

"Echols, Wendell J. CAVHCS" <Wendell.Echols@va.gov>

"Echols, Wendell J.
CAVHCS"
<Wendell.Echols@va.g
ov>

06/09/2007 07:06 AM
AST

To: <catherine_light@nps.gov>
cc: <tyrone_brandyberg@nps.gov>, <teresa_valencia@nps.gov>
Subject: FW: Notification of Change

Sent to correct E-Mail address.

**From:** Echols, Wendell J. CAVHCS
**Sent:** Thursday, June 07, 2007 10:11 AM
**To:** 'catherine.light@nps.gov'; 'tyrone.brandyberg@nps.gov'
**Cc:** Lowe, James K. Jr. CAVHCS; Henderson, Bobby L. CAVHCS; 'teresa.valencia@nps.gov'
**Subject:** Notification of Change

Good morning Tyrone,
I am sending this E-Mail in regards to your plans to move Ms Valencia from her present location to the Carver Museum. She has stated that she was told verbally on Monday that she would be relocated. The position of the Union is that there should be written communication prior to a change such as this. The standard time frame for the notification process is 2 weeks, but can be waived by the Employee upon consent. We are requesting that this be put in writing for documentation purposes. Please contact me to determine if we need to meet on this subject. You may reach me at 334-421-2113 334-421-2113.

Thanks for your attention to this matter.

Wendell J. Echols



United States Department of the Interior

National Park Service
Tuskegee Institute
National Historic Site
1212 West Montgomery Road
Tuskegee Institute, Alabama 36088



IN REPLY REFER TO:

P4021 (TUIN, SEMO, TUAI)

June 13, 2007

Memorandum

To:          President, AFGE, Local 110

From:        Superintendent, Tuskegee Institute National Historic Site, Selma to Montgomery National
             Historic Trail, Tuskegee Airmen National Historic Site

Subject:     Notification, Move of Employee

This memorandum serves notice that the Union was verbally notified of an employee move to the
employee on June 5, 2007 via the employee herself, who serves as Union Shop Steward. She raised no
objection but indicated she would need assistance. This assistance was provided. An OHSA evaluation
recommended that restroom facilities for this employee be provided. This move is to accommodate that
recommendation for the wellbeing and comfort of the employee.

Sincerely,

/s/ Catherine F. Light
Catherine F. Light
Catherine F. Light, Superintendent



 **Robyn Harris**
06/14/2007 12:11 PM
EDT

To: Teresa Valencia/TUIN/NPS@NPS
cc: Catherine_Light@nps.gov Shirley_Streeter@nps.gov
Subject:

Teresa -

I need a copy of the original faxes you sent me.  Please put them in a blue envelope and put Catherine's name on it.

Thanks
Robyn

June 14, 2007

Memorandum

To: Robyn Harris, Acting Chief of Resource Education and Interpretation

For: Catherine Light, Superintendent

From: Teresa Valencia, Museum Specialist

Subject: Leave Donor Program

I've made both a verbal request as well as a written request to Mr. Tyrone Brandyburg, Chief of Resource Education and Interpretation, to be placed on the "leave donor program" or to be given an advancement of sick leave.

Mr. Tyrone Brandyburg supplied me with a form for the "leave share program" that my physician needed to fill out. When I returned that form to Mr. Brandyburg he said it was unacceptable. I again went to my physician and asked him to write a letter in order to satisfy Mr. Brandyburg's criteria for the "leave share program". However, Mr. Tyrone Brandyburg also requested that I provide him with a copy of my test results from Dr. Sanchez's office at my own expense.

I have enclosed a copy of the letter that Dr. Gilberto Sanchez provided me with in order to be placed on the "leave share program". I find Mr. Tyrone Brandyburg's request for my test results to be inappropriate and in violation of my rights under the Health Information Protection Act (HIPA). I am concerned as to why this information is being requested. I feel that the request for "Medical Documentation" is harassing, abusive, excessive, and is retaliation and reprisal. In short, Mr. Brandyburg's request for medical documentation is in excess of the medical certification required under the Family Medical Leave Act (FMLA). Further I feel that the request requires the release of personal and or confidential information in violation of the FMLA guidelines.

It is my understanding that to qualify for the "leave share program" that I must exhaust all of my sick leave as well as annual leave, which I have at this time. I would also like to note that I invoked my entitlement to the Family Medical Leave Act on February 7, 2007.

I find Mr. Tyrone Brandyburg's request to be burdensome and has added significant undue stress. I appreciate your consideration for these issues addressed above. I believe you will show the greatest professionalism and integrity in addressing this matter.

I find Mr. Tyrone Brandyburg's request to be burdensome and has added significant undue stress. I appreciate your consideration for these issues addressed above. I believe you will show the greatest professionalism and integrity in addressing this matter.

June 15, 2007
11:00 a.m.

**Leave Share Meeting Attendance: Bobby Henderson, Wendell Echols, Robyn Harris, Catherine Light, Teresa Valencia**

This meeting was called by Teresa Valencia in order to discuss her leave. Ms. Teresa Valencia has exhausted all of her leave time.

Ms. Catherine Light, Superintendent, suggested that the Union start the meeting. Mr. Wendell Echols then spoke up and stated that all of us were here to discuss the "leave share." It was stated that Ms. Valencia had applied for the "leave share program," but that her application was refused by Mr. Tyrone Brandyburg, Chief of Resource Education and Interpretation. Ms. Light then entered the conversation and stated that my letter dated 06/14/2007 was incorrect when I wrote that the items Tyrone Brandyburg was requesting was inappropriate and a violation of my rights. She then distributed information on the Family Medical Leave Act in which she highlighted several sections. Ms. Valencia then spoke up and asked why the park needed such in-depth medical documentation. Ms. Valencia stated that she had enacted her FMLA rights back in February of 2007. Ms. Catherine Light stated numerous times that my documentation for FMLA rights was not sufficient evidence to prove that I had a serious health condition even though my doctor stated clearly that I had Coronary Artery Disease and that it would be detrimental for me to return to work at this time until the issue was resolved. It was impossible for my doctor to give her an approximate duration of the condition until after I underwent the procedure for a heart catherization. She then stated that's why I wasn't approved then and that's why I am not approved now. She also stated that she disagreed with my doctor's diagnosis of "Occupational Exposure" to lead and arsenic. Mr. Bobby Henderson then asked, why is Mr. Brandyburg requesting such in-depth medical documentation...he is not a doctor. Ms. Light then stated that that information is sent up to the Human Resources Office in Atlanta, Georgia, for them to make a decision on whether or not to give me an advancement of leave or to place me on the "leave share program." Mr. Bobby Henderson then asked her why Mr. Tyrone Brandyburg has not sat down with Ms. Valencia to assist her. Ms. Light said she didn't know, but that Mr. Brandyburg supplied Ms. Valencia with all the information necessary to get the material from my physician. Towards the end Ms. Catherine Light herself stated that she had the ultimate decision. So again, Mr. Henderson asked her why ...if you know Ms. Valencia is sick are you not trying to assist her. Ms. Light said she would make accommodations for Ms. Valencia when she supplies the appropriate documentation from her physician. Ms. Teresa Valencia's only reply to Ms. Light is that she understood even though she disagrees. Teresa Valencia and Union Officials thanked Ms. Catherine Light for her time at the conclusion of the meeting.

**Union Note: After the meeting I spoke with Mr. Bobby Henderson about our next step. He said he needed to discuss with James Lowe and then forward the information on to the General Council in Atlanta, Georgia, before we proceed.**

Depending on the ruling of the General Council the Union will then distribute this information to the media (i.e., Fox News, CNN, MSNBC, etc.) next week.

Certification of Health Care Provider
(Family and Medical Leave Act of 1993)

**U.S. Department of Labor**
Employment Standards Administration
Wage and Hour Division



| *(When completed, this form goes to the employee, __Not to the Department of Labor.__)* | OMB No.: 1215-0181 Expires: 08-31-2007 |
|---|---|

| 1. Employee's Name | 2. Patient's Name *(If different from employee)* |
|---|---|

3. Page 4 describes what is meant by a **"serious health condition"** under the Family and Medical Leave Act. Does the patient's condition[1] qualify under any of the categories described? If so, please check the applicable category.

(1) _____ (2) _____ (3) _____ (4) _____ (5) _____ (6) _____ , or None of the above _____

4. Describe the **medical facts** which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories:

5. a. State the approximate **date** the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present **incapacity**[2] if different):

   b. Will it be necessary for the employee to take work only **intermittently or to work on a less than full schedule** as a result of the condition (including for treatment described in Item 6 below)?

   If yes, give the probable duration:

   c. If the condition is a **chronic condition** (condition #4) or **pregnancy**, state whether the patient is presently incapacitated[2] and the likely duration and frequency of **episodes of incapacity**[2]:

---

[1] Here and elsewhere on this form, the information sought relates **only** to the condition for which the employee is taking FMLA leave.

[2] "Incapacity," for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom.

Form WH-380
Revised December 1999

6.  a.  If additional **treatments** will be required for the condition, provide an estimate of the probable number of such treatments.

If the patient will be absent from work or other daily activities because of **treatment** on an **intermittent** or **part-time** basis, also provide an estimate of the probable number of and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery if any:

b.  If any of these treatments will be provided by **another provider of health services** (e.g., physical therapist), please state the nature of the treatments:

c.  **If a regimen of continuing treatment** by the patient is required under your supervision, provide a general description of such regimen (*e.g.*, prescription drugs, physical therapy requiring special equipment):

7.  a.  If medical leave is required for the employee's **absence from work** because of the **employee's own condition** (including absences due to pregnancy or a chronic condition), is the employee **unable to perform work** of any kind?

b.  If able to perform some work, *is the employee* **unable to perform any one or more of the essential functions of the employee's job** (the employee or the employer should supply you with information about the essential job functions)? If yes, please list the essential functions the employee is unable to perform:

c.  If neither a. nor b. applies, is it necessary for the employee to be **absent from work for treatment?**

8.  a.  If leave is required to **care for a family member** of the employee with a serious health condition, **does the patient require assistance** for basic medical or personal needs or safety, or for transportation?

b.  If no, would the employee's presence to provide *psychological comfort* be beneficial to the patient or assist in the patient's recovery?

c.  If the patient will need care only **intermittently** or on a part-time basis, please indicate the probable **duration** of this need:

---

| | |
|---|---|
| Signature of Health Care Provider | Type of Practice |
| Address | Telephone Number |
| | Date |

**To be completed by the employee needing family leave to care for a family member:**

State the care you will provide and an estimate of the period during which care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:

| | |
|---|---|
| Employee Signature | Date |

A "Serious Health Condition" means an illness, injury impairment, or physical or mental condition that involves one of the following:

1. Hospital Care

   Inpatient care (*i.e.*, an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity[2] or subsequent treatment in connection with or consequent to such inpatient care.

2. Absence Plus Treatment

   (a) A period of incapacity[2] of **more than three consecutive calendar days** (including any subsequent treatment or period of incapacity[2] relating to the same condition), that also involves:

      (1) **Treatment**[3] **two or more times** by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (*e.g.*, physical therapist) under orders of, or on referral by, a health care provider; or

      (2) **Treatment** by a health care provider on **at least one occasion** which results in a **regimen of continuing treatment**[4] under the supervision of the health care provider.

3. Pregnancy

   Any period of incapacity due to **pregnancy**, or for **prenatal care**.

4. Chronic Conditions Requiring Treatments

   A **chronic condition** which:

      (1) Requires **periodic visits** for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

      (2) Continues over an **extended period of time** (including recurring episodes of a single underlying condition); and

      (3) May cause **episodic** rather than a continuing period of incapacity[2] (*e.g.*, asthma, diabetes, epilepsy, etc.).

5. Permanent/Long-term Conditions Requiring Supervision

   A period of **incapacity**[2] which is **permanent or long-term** due to a condition for which treatment may not be effective. The employee or family member must be **under the continuing supervision of, but need not be receiving active treatment by, a health care provider**. Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.

6. Multiple Treatments (Non-Chronic Conditions)

   Any period of absence to receive **multiple treatments** (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for **restorative surgery** after an accident or other injury, or for a condition that **would likely result in a period of incapacity**[2] **of more than three consecutive calendar days in the absence of medical intervention or treatment**, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), and kidney disease (dialysis).

This optional form may be used by employees to satisfy a mandatory requirement to furnish a medical certification (when requested) from a health care provider, including second or third opinions and recertification (29 CFR 825.306).

*Note:* Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number.

---

[3] Treatment includes examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations.

[4] A regimen of continuing treatment includes, for example, a course of prescription medication (*e.g.*, an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition. A regimen of treatment does not include the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider.

**Public Burden Statement**

We estimate that it will take an average of 20 minutes to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, Department of Labor, Room S-3502, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

*DO NOT SEND THE COMPLETED FORM TO THIS OFFICE; IT GOES TO THE EMPLOYEE.*

*U.S. GPO: 2000-461-954/25505

*6/15/2007*
*Given to me by Supt.*
*Catherine Light during*
*Leave Donor Meeting @ 11:00*
*at her office*

Exhibit 10A

---

### SAMPLE
### LETTER REQUESTING MEDICAL DOCUMENTATION
### FROM AN EMPLOYEE

---

[NOTE: All footnotes and Brackets below contain supervisory instructions and should not be included in the final letter. All letters medical documentation are to be reviewed by an Employee Relations Specialist in the Personnel Office prior to issuance.  See instructions in Chapter 2 regarding supervisory-maintained personnel records.]

To:          Employee Name, Title

From:        Supervisor,

Subject:     Request for Medical Documentation

[Describe the reason you are requesting additional medical documentation from the employee, as in the following examples:]

-    You have submitted a brief statement from your doctor indicating that you cannot operate a drag line because of your foot injury, or

-    You have requested to use extended sick leave, or

-    You have requested that your tour-of-duty to be changed to a part-time because of a medical condition, etc.

In order to properly consider your request, I need [more detailed, or additional] medical documentation from your physician concerning your medical condition.  Specifically, I need documentation that addresses the items listed below.  [Of the following items, include only those that are necessary and relevant.]  A new medical examination is not necessary if your doctor can provide current information from his/her records.  It is preferable that the documentation be recorded on his/her letterhead stationery and that each item be responded to by the item number.  Your doctor should be sure to sign the report.  If an item is not applicable, he/she should so indicate.

   (a) The history of the specific medical condition(s), including references to findings from previous examinations, treatment, and responses to treatment.

   (b) Clinical findings from the most recent medical evaluation, including any of the following which have been obtained: findings of physical examination, results of laboratory tests, X-rays, EKGs and other special evaluations or diagnostic procedures.

   (c) Diagnosis, including the current clinical status.

   (d) Prognosis, including plans or recommendations for future treatment and an estimate of the expected date of full or partial recovery, if applicable.

- 91 -

(e) An explanation of the impact of the medical condition on overall health and activities, including the basis for any conclusion that restrictions or accommodations are or are not warranted, and where they are warranted, an explanation of their therapeutic risk avoiding value.

(f) An explanation of the medical basis for any conclusion which indicates the likelihood that you are or are not expected to suffer sudden or subtle incapacitation by carrying out, with or without accommodation, the tasks or duties of your position.

(g) Narrative explanation of the medical basis for any conclusion that the medical condition has or has not become static or well stabilized and the likelihood that you may experience sudden or subtle incapacitation as a result of the medical condition.

You are responsible for any costs incurred in connection with obtaining this documentation. So that your physician has sufficient information to respond to the items concerning your ability to perform in your job and accommodations that might be recommended, it is important that you provide him/her with your position description. If your physician has any question about the information being requested, or if he/she needs any additional information regarding the requirements of your job, he/she can telephone me at [telephone number].

If you are unable to provide the medical documentation, I will decide on your request based on the limited information you have previously provided to me.

Sincerely,

Mr. Soupy R. Visor

[NOTE: On a copy of the letter the following type for the employee to sign:]

I acknowledge receiving this document.

_____          _____
Signature                          Date

- 92 -

## Return Receipt

| | |
|---|---|
| Your document: | **Re: HVAC** |
| was received by: | **Robyn Harris/TUIN/NPS** |
| at: | **06/15/2007 11:14:17 AM EDT** |

 **Robyn Harris**
06/15/2007 11:03 AM
EDT

To: Teresa Valencia/TUIN/NPS@NPS
cc: Andrew_Callens@nps.gov Catherine_Light@nps.gov
Subject: Re: HVAC

Teresa -

Andrew needs to get into the HVAC area inside curtorial storage, today. Please unlock the door for him.
It is important that we keep all artifacts in a safe and temperature control environment.
Should you have any questions, see me.

Robyn

----Forwarded by Robyn Harris/TUIN/NPS on 06/15/2007 09:58AM ----

To: Teresa Valencia/TUIN/NPS@NPS
From: Andrew Callens/TUIN/NPS
Date: 06/14/2007 12:14PM
cc: Catherine Light/TUIN/NPS@NPS, Robyn Harris/TUIN/NPS@NPS, Tyrone
Brandyburg/TUIN/NPS@NPS
Subject: Re: HVAC

We need to get in, as soon as possible. I don't know how long it's been out. We're working over at the
maintenance shop.

Thanks
*Andrew*

 **Robyn Harris**
06/15/2007 11:44 AM
EDT

To: Teresa Valencia/TUIN/NPS@NPS
cc:
Subject: Re:

Teresa -

Disregard the email...

My only concern is that you and Shirley get whatever you guys need to make sure our area is operational for US.

I will be talking to Catherine today regarding the storage space, professional movers, and a Uhaul. Be patient.....

Thanks
Robyn

Teresa Valencia

06/18/2007 09:53 AM
CDT

To: Bobby.Henderson@va.gov
cc:
Subject: Re: Friday's meeting

Hi Bobby:

On Friday around 3:45 pm Catherine called me and asked me to provide her with the original copy of the form that the doctor gave me for the "Leave Program". I told Catherine that I gave the original to Tyrone Brandyburg. At approximately 9:15 am Ms. Robyn Harris called me and requested the same information. I told her that I had given the original to Tyrone Brandyburg and that I has already had this discussion with Ms. Catherine Light.

Friday, when Supt. Light called she said she needed the information in order to send my material on to Atlanta. One thing that did not sit well with me at that meeting was when she said she had invoked or is going to invoke her FMLA Rights. Both myself and Mr. Ed Wilson have had to jump through all sorts of hoops with these people just to get a little bit of assistance.

Anyway, I just wanted to make you aware that she has requested this information from me. Thanks for your assistance in this matter.

## Application to Become a Leave Recipient
## Under the Voluntary Leave Transfer Program

| 1. Applicant's name (Last, first, middle) | | 2. Social Security Number | 3. Employee Number |
|---|---|---|---|

| 4a. Position title | 4b. Pay plan | 4c. Grade/pay level |
|---|---|---|

| 5. Name of organization (Agency, Department, Office, Division, Branch, etc.) | 6. Office telephone number |
|---|---|

7. Nature and severity of the medical emergency
(Moderate Severity - Occupational Exposure to Lead and Arsenic)Tyrone Brandyburg, Chief of Resource Education and Interpretation - Unacceptable 6/5/07
Catherine Light, Superintendent - Unacceptable 6/15/07; Sandra Owensby, Human Resources SERO - Unacceptable 6/21/07.

| 8. Individual affected by medical emergency (check one) | 9. Date medical emergency began | 10. Date medical emergency ended (or is expected to end) |
|---|---|---|
| ☐ Employee | | |
| ☐ Employee's family member | | |

11. Name of physician who will verify the medical emergency. (Attach documentation from the physician (or other appropriate expert) showing the diagnosis/prognosis and duration of illness.)

Date of medical emergency and duration as well as documentation from Dr. Gilberto Sanchez also unacceptable.

| 12. What is the applicant's annual and sick leave balances as of end of last pay period? | 13. How many hours of leave without pay have been used for this medical emergency? |
|---|---|
| Annual leave balance ➡ [   ]    Sick leave balance ➡ [   ] | Hours ➡ [   ] |

14. Provide a description of the medical emergency to be distributed to servicing personnel offices so that other employees may donate annual leave to the applicant.

Description of medical emergency

☐ Check box if applicant does not want a description distributed.

☐ Check box if applicant does not wish to have name used with the description or disclosed to anyone except the supervisor, the supervisory channel and the deciding official, and individuals who maintain the program.

| 15a. Name of individual completing application (If applying on behalf of the applicant) | 15b. Relationship to applicant | 15c. Telephone number (area code) |
|---|---|---|

| 16a. I certify that the above statements are true. (Signature of applicant or individual applying on behalf of applicant) | 16b. Date signed |
|---|---|

**Privacy Act Statement**
Participation in this program is voluntary; however, solicitation of this information is authorized under 5 U.S.C. 6332. The information furnished will be used to identify records properly associated with the transfer of annual leave. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

| 17. First level supervisor's recommendation | 18. Deciding official's decision |
|---|---|
| ☐ Approve    ☐ Disapprove | ☐ Approve    ☐ Disapprove |
| Signature                Date signed | Signature                Date signed |

 **Lorraine Thomas**
06/21/2007 02:15 PM
CDT

To: Teresa Valencia/TUIN/NPS@NPS
cc: Bobby.Henderson@va.gov, Shirley Streeter/TUIN/NPS@NPS
Subject: Re: Sick Leave

Hi Teresa,

Your should forward your request to my supervisor, Ms. Shirley Streeter. Thanks.

/s/ Lorraine

Lorraine T. Thomas
Administrative Support Assistant
Tuskegee Institute NHS
(334) 727-6390 Office
(334) 727-4597 Fax
lorraine_thomas@nps.gov
Teresa Valencia

**Teresa Valencia**
06/21/2007 12:44 PM
CDT

To: Lorraine Thomas/TUIN/NPS@NPS
cc: Bobby.Henderson@va.gov
Subject: Sick Leave

Dear Lorraine Thomas:

I am writing to formally request a print out of all unpaid leave during my time at Tuskegee Institute National Historic Site to date.

Thank you for your time and assistance.

Respectfully yours,

Teresa Valencia

Teresa Valencia

06/21/2007 12:44 PM
CDT

To: Lorraine Thomas/TUIN/NPS@NPS
cc: Bobby.Henderson@va.gov
Subject: Sick Leave

Dear Lorraine Thomas:

I am writing to formally request a print out of all unpaid leave during my time at Tuskegee Institute National Historic Site to date.

Thank you for your time and assistance.

Respectfully yours,

Teresa Valencia

**Teresa Valencia**
06/22/2007 10:02 AM
CDT

To: Lorraine Thomas/TUIN/NPS@NPS
cc:
Subject: Re: Sick Leave

Sorry Lorraine.

Teresa Valencia

06/22/2007 10:04 AM
CDT

To: Shirley Streeter/TUIN/NPS@NPS
cc: Bobby.Henderson@va.gov
Subject: Sick Leave

Dear Ms. Shirley Streeter:

I am writing to formally request a print out of my unpaid leave to date.

Thank you for your time and assistance.

Respectfully yours,

Teresa Valencia

## Return Receipt

| | |
|---|---|
| Your document: | **Sick Leave** |
| was received by: | **Shirley Streeter/TUIN/NPS** |
| at: | **06/22/2007 10:13:20 AM** |

**Teresa Valencia**

06/26/2007 11:16 AM
CDT

To: Sandra Owensby/Atlanta/NPS@NPS
cc: Bobby.Henderson@va.gov
Subject: Application to Become a Leave Recipient

Dear Ms. Sandra Owensby:

I would like to formally request written documentation as to why my application to "become a leave recipient" was denied.

Thank you for your time and assistance in this matter.

Respectfully yours,

Teresa Valencia

## Return Receipt

| | |
|---|---|
| Your document: | Fw: Sick Leave |
| was received by: | Robyn Harris/TUIN/NPS |
| at: | 06/27/2007 10:03:06 AM |



**Robyn Harris**

06/27/2007 10:07 AM
CDT

To: Teresa Valencia/TUIN/NPS@NPS
cc:
Subject: Re: Fw: Sick Leave



No problem –

Robyn
Teresa Valencia

> **Teresa Valencia**
>
> 06/25/2007 03:50 PM
> CDT
>
> To: Robyn Harris/TUIN/NPS@NPS
> cc:
> Subject: Fw: Sick Leave

----- Forwarded by Teresa Valencia/TUIN/NPS on 06/25/2007 03:49 PM -----

> **Teresa Valencia**
>
> 06/25/2007 03:11 PM
> CDT
>
> To: Robyn Harris/TUIN/NPS@NPS
> cc:
> Subject: Sick Leave

Dear Ms. Robyn Harris:

I am writing to formally request a print out of my unpaid leave to date. Could you please forward my request to Shirley Streeter?

Thank you for your time and assistance in this matter.

Respectfully yours,

Teresa Valencia

## Return Receipt

| | |
|---|---|
| Your document: | **Sick Leave** |
| was received by: | **Robyn Harris/TUIN/NPS** |
| at: | **06/27/2007 10:13:52 AM** |

## Return Receipt

| | |
|---|---|
| Your document: | **Requesting Assistance** |
| was received by: | **Robyn Harris/TUIN/NPS** |
| at: | **06/27/2007 10:08:55 AM** |



**Robyn Harris**
06/27/2007 10:11 AM
CDT

To: Teresa Valencia/TUIN/NPS@NPS
cc:
Subject: Re: Requesting Assistance

*I have forward your request to Andrew.  Give me a date and time.*

Robyn
Teresa Valencia

           **Teresa Valencia**
           06/25/2007 03:16 PM
           CDT

           To: Robyn Harris/TUIN/NPS@NPS
           cc:
           Subject: Requesting Assistance

Dear Ms. Robyn Harris:

I am requesting assistance from the Maintenance Division. I need to pick up a tool box from a former Airman and I will need help. Could you please forward my request to Mr. Andrew Callens? I would like to pick it up sometime this week.

Thank you for your time and assistance in this matter.

Respectfully yours,

Teresa Valencia



&lt;courseware@geolear
ning.com&gt;
06/28/2007 04:46 PM
AST

To: &lt;Teresa_Valencia@nps.gov&gt;
cc: &lt;deanna_mitchell@nps.gov&gt;
Subject: Safety: Exit Routes, Emergency Action Plans and Fire Prevention
Plans Course Completion

This e-mail was sent from a "send-only" account. Do not reply to this email.
This email was automatically generated.

TERESA VALENCIA:

You have successfully completed Safety: Exit Routes, Emergency Action Plans
and Fire Prevention Plans on 6/28/2007 4:46:25 PM. A Safety: Exit Routes,
Emergency Action Plans and Fire Prevention Plans Certificate of Completion
link has been added to your "My Courses."

There is now a link for your Safety: Exit Routes, Emergency Action Plans and
Fire Prevention Plans certificate added to your "My Courses" page. When you
click on this link, you can print the certificate of completion.

Your supervisor may have been copied on this e-mail. The supervisor can view
this course completion on the student's transcript.

Completion ID:
jcYxw3Y5ESNChhNBshOoq+AUkGCO1birpwPkEEfzHPPHfgMp3eesPlDMDYLqahFzXZVe71U7wSsagY
iS+MLMfkAMFEgrqjBywdaySi3wT3ZIzTOiOKJ4Hq4XdwrC2aaxLROMFsUyLwuwTw9Zj8VyLqW2CLIx
lvcbmBJsp/EFQHbBjxMwQ+Js5X3i1QP4DDXJ



# Certificate of Completion
## for

# Safety: Hazard Communication

### Is Presented To
## TERESA VALENCIA

This certifies that the person named above has successfully completed the interactive online course through the National Park Service DOI LEARN Management Portal on 06/28/2007.



<courseware@geolear    To: <Teresa_Valencia@nps.gov>
ning.com>               cc: <deanna_mitchell@nps.gov>
06/28/2007 04:14 PM    Subject: Safety: Hazard Communication Course Completion
AST

This e-mail was sent from a "send-only" account. Do not reply to this email.
This email was automatically generated.

TERESA VALENCIA:

You have successfully completed Safety: Hazard Communication on 6/28/2007
4:14:47 PM.  A Safety: Hazard Communication Certificate of Completion link has
been added to your "My Courses."

There is now a link for your Safety: Hazard Communication certificate added to
your "My Courses" page. When you click on this link, you can print the
certificate of completion.

Your supervisor may have been copied on this e-mail. The supervisor can view
this course completion on the student's transcript.

Completion ID:
jcYxw3Y5ESNChhNBshOoq5QePobsilm/yv2Wtu3PQ8LfSxgmsAJswkXfIgGryEJNXQuEc80hW2lmSX
0TIHjdxssIPY43Pm8plKjSTaMxGYphsNaeAba6PGQBTLyobYBwkTu+sUQHkn/odY/YMiqANWXeoHjz
9EOfzMtxTMITcKEIM/llk+blHuucxOAgC6il



# Certificate of Completion

## for

# Safety: Exit Routes, Emergency Action Plans and Fire Prevention Plans

Is Presented To

## TERESA VALENCIA

This certifies that the person named above has successfully completed the interactive online course through the National Park Service DOI LEARN Management Portal on 06/28/2007.

868-0901

# FAMILY PRACTICE

4143 ATLANTA HIGHWAY
MONTGOMERY, AL 36109
**(334) 271-4503**

*SHEPHERD A. ODOM, M.D.*                                      *GILBERTO SANCHEZ, M.D.*

## CONSULTATION REQUEST

RE: *Teresa Valencia*          DATE: *6/29/07*

THANK YOU VERY MUCH FOR YOUR OPINION CONCERNING THE ABOVE
PATIENT. OUR WORKING DIAGNOSIS IS AS FOLLOWS:

*Graves Disease*

THE FOLLOWING LABORATORY WORK HAS BEEN DONE AND IS REPORTED HERE
FOR YOUR OPINION.

THE FOLLOWING RADIOGRAPHS WERE LIKEWISE DONE AND MAY BE INCLUDED
FOR YOUR REVIEW.

PLEASE FORWARD A COMPLETE REPORT TO OUR OFFICE AS SOON AS POSSIBLE.
THANK YOU IN ADVANCE FOR YOUR HELP.

SHEPHERD A. ODOM, M.D.                    GILBERTO SANCHEZ, M.D.

APPOINTMENT DATE: _____
TIME: _____
PHYSICIAN NAME: *Dr. Mary Casals*
ADDRESS: *316 St. Lukes Dr.*

TELEPHONE NUMBER: *273-1224*

868 0901

# FAMILY PRACTICE

4143 ATLANTA HIGHWAY
MONTGOMERY, AL 36109
(334) 271-4503

SHEPHERD A. ODOM, M.D.                                    GILBERTO SANCHEZ, M.D.

## CONSULTATION REQUEST

RE: _Teresa Valencia_                    DATE: _6/29/07_

THANK YOU VERY MUCH FOR YOUR OPINION CONCERNING THE ABOVE
PATIENT. OUR WORKING DIAGNOSIS IS AS FOLLOWS:

_Graves Disease_

THE FOLLOWING LABORATORY WORK HAS BEEN DONE AND IS REPORTED HERE
FOR YOUR OPINION.

THE FOLLOWING RADIOGRAPHS WERE LIKEWISE DONE AND MAY BE INCLUDED
FOR YOUR REVIEW.

PLEASE FORWARD A COMPLETE REPORT TO OUR OFFICE AS SOON AS POSSIBLE.
THANK YOU IN ADVANCE FOR YOUR HELP.

SHEPHERD A. ODOM, M.D.                    GILBERTO SANCHEZ, M.D.

APPOINTMENT DATE: _____ _July 17, 9:30_
TIME: _____ _Fasting nothing after 12:00 am_
PHYSICIAN NAME: _Dr Bruce Trippe_
ADDRESS: _2030 Chesnutt St_

TELEPHONE NUMBER: _834 2940_

## Return Receipt

Your
document:              **Backlog Cataloging**

was received      **Robyn Harris/TUIN/NPS**
by:

at:                        **06/29/2007 12:17:37 PM**



**Robyn Harris**
06/29/2007 02:28 PM
EDT

To: Teresa Valencia/TUIN/NPS@NPS
cc:
Subject: Fw: Backlog Cataloging

It looks good....I need a copy of the timeline and I will submit on Monday at 10:00 am to Catherine.

*Robyn*

—— Forwarded by Robyn Harris/TUIN/NPS on 06/29/2007 01:27 PM ——

**Teresa Valencia**
06/28/2007 11:38 AM
CDT

To: Robyn Harris/TUIN/NPS@NPS
cc:
Subject: Backlog Cataloging

Robyn:

Please review.

Thanks

CATALOG HIST. OBJECTS.SOW.DOC



**Robyn Harris**
06/29/2007 02:34 PM
CDT

To: Teresa Valencia/TUIN/NPS@NPS
cc:
Subject: Re: NOAA Grant for Carver Exhibit

Will this exhibit be inside our museum or where?  Teresa keep up the good work but, take care of yourself.

Robyn
Teresa Valencia

    **Teresa Valencia**
    06/18/2007 11:33 AM
    CDT

To: Robyn Harris/TUIN/NPS@NPS
cc: Catherine Light/TUIN/NPS@NPS
Subject: NOAA Grant for Carver Exhibit

Just wanted to let you know that the grant I was assisting Doria Grimes with was successful. We will soon have a brand new exhibit pertaining to George Washington Carver as a weather observer.

 **Robyn Harris**
06/29/2007 04:49 PM
EDT

To: Teresa Valencia/TUIN/NPS@NPS
cc:
Subject: Scope of Work

Teresa -

Lets work together on this, after reviewing the Scope of Work for the second time. I thought about some other information we need to put into the scope.

Check your schedule for Tuesday.

Robyn

**Teresa Valencia**

07/02/2007 10:01 AM
CDT

To: Robyn Harris/TUIN/NPS@NPS

cc:

Subject: Re: NOAA Grant for Carver Exhibit

Hey Robyn:

I requested that this be made a traveling exhibit. This is something that we can send to schools throughout the country once we have it completed  and maybe even do some demonstrations or something.

Teresa

| | |
|---|---|
| **Deanna Mitchell** | **To:** Teresa Valencia/TUIN/NPS@NPS |
| 07/02/2007 12:43 PM | cc: |
| CDT | **Subject:** Fw: Leave Share Request |

Teresa:

Here is the email.

Thanks.
Deanna
—— Forwarded by Deanna Mitchell/TUAI/NPS on 07/02/2007 12:42 PM ——



| | |
|---|---|
| **Mary Ann Dooley** | **To:** IMR All Employees, PWR All Employees, SER All Employees |
| 06/29/2007 08:14 AM | cc: |
| EDT | **Subject:** Leave Share Request |

Scottee (Kittrell) Nista, Program Assistant at Cape Cod National Seashore, has been approved to participate as a recipient under the Voluntary Leave Transfer Program. Scottee has been diagnosed with a serious medical condition which will require long term medical treatment.

If you are able to donate annual leave, please complete the attached optional form 630-A, Request to Donate Annual Leave to a Leave Recipient and fax it to (508) 349-9113 (secure fax) or mail to Human Resources Office, Cape Cod National Seashore, 99 Marconi Site Rd. Wellfleet, MA 02667.

On behalf of Scottee your consideration is greatly appreciated.


opm630a.pdf

thank you,

Mary Ann Dooley
Human Resources Specialist
Cape Cod National Seashore
508-349-3785 ext 228

Mary Ann Dooley
Human Resources Specialist
Cape Cod National Seashore
508-349-3785 ext 228

July 8, 2007

OSHA
1141 Montlimar Drive, Suite 1006
Mobile, Alabama 36609

To Whom It May Concern:

I am writing this letter to request a copy of the complete investigative report conducted by Mr. Tuxberry Suber II pertaining to allegations of Occupational Exposure to lead and arsenic at Tuskegee Institute National Historic Site during the month of April, 2007.

My mailing address is:  Teresa Valencia
                        6730 Pamela Court
                        Montgomery, Alabama 36116

If further information is needed, please feel free to contact me at: (334)868-0901 or by email at: valenciaisthe1@yahoo.com. Thank you for your time and assistance in this matter.

Respectfully yours,

*Teresa Valencia*

Teresa Valencia



BO719800437    VALENCIA, TERESA L
DOB: 01/14/67    Age:40Y    MR #:545869
Admit Date/Time: 07/17/07    1128A
3636 ED,PHYSICIAN    · F



**EMERGENCY DEPARTMENT PHYSICIAN'S ORDERS**

Height:_____    Weight:_____

Drug Sensitivities and Allergies    ❑ NKDA    ❑ Yes, list: _____

**New Admissions Only:**
1. Diagnosis:
2. Admit Status:    ❑ Inpatient Admission    ❑ Outpatient Status    ❑ Observation Status

| Date | Time | |
|------|------|--|
| 7/17/07 | 7:41 PM | 1) D/C all IV's |
| | | 2) D/C all meds |
| | | 3) D/C to home |
| | | 4) D/C Dx- 1) TIA 2) Bells Palsy 3) Migrains |
| | | 5) D/C status: stable |
| | | 6) D/C meds: ASA 325 mg PO Q day |
| | | 7) D/C instructions: F/U c PCP |
| | | - Dr. Sanchez. ASAP |
| | | - return to ED if symptom worsen |
| | | 8) D/C activity: as tolerated |
| | | Asad Khan, M.D. |
| | | *UAB General Medical* |

Physician Signature:

ER 160

**The following abbreviations are not to be written or used!**

| Q.O.D., QOD, q.o.d, qod | Trailing zero (X.0 mg) | Lack of leading zero (.X mg) | MS | MSO4 | MgSO4 | U | q.d., QD, qd | IU |
|---|---|---|---|---|---|---|---|---|

Form #ER 16011 Revised 03/27/06

 

**B**
**H**

B0719800437    VALENCIA,TERESA L
DOB: 01/14/67   Age:40Y  MR #:545869
Admit Date/Time: 07/17/07    1128A
3636 ED,PHYSICIAN            F

N &
RUCTIONS

## DISCHARGE INSTRUCTIONS - MEDICAL CHART

| | Phone | | | Location SOUTH |
|---|---|---|---|---|

MEDICINES PRESCRIBED    If non, check this box: ☐    VOID IF NOT PRINTED WITH CRANBERRY BACKGROUND

| Name/Strength; | | Number | Schedule / Duration | No Refills | Refills |
|---|---|---|---|---|---|
| 1. | | | | ☐ | |
| 2. | | | | ☐ | |
| 3. | | | | ☐ | |
| 4. | | | | ☐ | |
| 5. | | | | ☐ | |

INSTRUCTIONS SHEETS GIVEN

| | | ☐ Head Injury | ☐ Threatened Ab | Return for signs of infection |
|---|---|---|---|---|
| ☐ Asthma | ☐ Crutches | ☐ Otitis Media | ☐ Vomiting / Diarrhea | increased Redness |
| ☐ Back Pain | ☐ Fever | ☐ Sprains / Bruises | ☐ Wound Care | Increased Swelling |
| ☐ Cast/ Splint Care | ☐ Fracture | ☐ ST | ☐ Other(s) | Increased Drainage / Increased Heat |

Additional Instructions:

F/U with PCP Dr. Sanchez ASAP

Referred to:
☐ Dr.
Phone:
☐ Call on next business day for follow-up appointment
in _____ days / weeks         ☐ Next available

☐ Return to Emergency Dept in _____ hours / days for recheck.
☐ If no improvement or your condition worsens, call your private
physician or return to the Emergency Department for a recheck.
☐ Learning needs assessed   ☐ Instructions Modified_____
☐ Education provided on new Medication_____

I understand that the treatment I have received was rendered on an emergency basis and is not meant to replace complete care from a primary care provider or clinic. Furthermore, I many have been released before all of my medical problems were apparent, diagnosed, and/or treated. If my condition worsens, I have been instructed to call my primary care provider or return to this facility or the nearest emergency center. I understand that I should NOT drive or perform hazardous tasks if my medication or treatment causes drowsiness. I have read and understand the above, received a copy of this form and applicable instruction sheets, and I will arrange for follow-up care. If diagnostic tests indicate a need for modification in therapy, you will be notified at the phone number you provided.

X _____    ☐ Patient    ☐ Relative    ☐ Other _____    Time Released: > _____ HRS

| INSTRUCTED BY: | PHYSICIAN: |
|---|---|

## WORK/SCHOOL STATEMENT from the Emergency Department

| PATIENT | DATE |
|---|---|

☐ Patient was seen by Dr._____
☐ No athletics / physical education: _____days
☐ May return to work/school without restrictions
☐ Will require time off work / school. Estimated time: __ __days*
☐ Must be reevaluated by family / occupational physician before returning to school / work.

☐ May return to restricted duties for _____days*
Restrictions: _____
☐ _____was here with relative/child.
☐ Other_____

Time off from school or work longer than three days should be approved by a Personal or Company/Occupational Medicine Physician, unless otherwise stated.


**ER 160**

FORM # ER 16008  REV. 10/10/06

# FAMILY PRACTICE

4143 Atlanta Highway
Montgomery, Alabama 36109

Shepherd A. Odom, M.D., P.C.
Gilbert Sanchez, M.D.

Telephone: (334) 271-4503
Fax: (334) 277-3215

July 18, 2007

To Whom It May Concern:

RE: Teresa Valencia
Date of Birth: 01/14/1967

Please be advised due to multiple medical problems that have caused her to seek medical care at our office and at the Emergency Room. Ms. Valencia is incapable of doing her regular duties. She suffers from fatigue, light-headedness, headaches, dizziness and difficulties concentrating. These conditions are harmful to her wellbeing as well as to others. The exact duration of this condition is unknown at this time, but we will keep a follow-up on these conditions on a regular basis. We are also in the process of setting up an appointment with a neurologist and has an appointment scheduled with an epidemiologist on Monday July 23, 2007.

Sincerely

Gilberto Sanchez, M.D.

# FAMILY PRACTICE

4143 ATLANTA HIGHWAY
MONTGOMERY, AL 36109
(334) 271-4503

868- 0901

SHEPHERD A. ODOM, M.D.                                    GILBERTO SANCHEZ, M.D.

## CONSULTATION REQUEST

RE: _TERESA VALENCIA_    DATE: _7/18/07_

THANK YOU VERY MUCH FOR YOUR OPINION CONCERNING THE ABOVE
PATIENT. OUR WORKING DIAGNOSIS IS AS FOLLOWS:

_TIA VS CVA_

THE FOLLOWING LABORATORY WORK HAS BEEN DONE AND IS REPORTED HERE
FOR YOUR OPINION.

THE FOLLOWING RADIOGRAPHS WERE LIKEWISE DONE AND MAY BE INCLUDED
FOR YOUR REVIEW.

PLEASE FORWARD A COMPLETE REPORT TO OUR OFFICE AS SOON AS POSSIBLE.
THANK YOU IN ADVANCE FOR YOUR HELP.

_____        GILBERTO SANCHEZ, M.D.
SHEPHERD A. ODOM, M.D.

APPOINTMENT DATE: _____
TIME: _____
PHYSICIAN NAME: _Dr. Bryan_
ADDRESS: _2010 Normandie Drive_

TELEPHONE NUMBER: _281-7280_

**U.S. Department of Labor**
Occupational Safety and Health Administration
1141 Montlimar Drive, Suite 1006

Mobile, AL 36609
Phone: (251)441-6131  FAX: (251)441-6396



RECEIVED

FEB 26 2007

TUIN I... ..nIS
Parks Hdqtrs.
Tuskegee Institute, AL



# Notice of Unsafe or Unhealthful Working Conditions

**To:**
Department of Interior-National Historic Site
Tuskegee Institute-1600 Boy Scout Circle
Tuskegee, AL 36088

**Inspection Site:**
Tuskegee Institute-1600 Boy Scout Circle
Tuskegee, AL  36088

**Inspection Number:** 310772330
**Inspection Date(s):** 05/04/2007-05/07/2007
**Issuance Date:** 07/20/2007

*The violation(s) described in this Notice is (are) alleged to have occurred on or about the day(s) the inspection was made unless otherwise indicated within the description given below.*

This Notice of Unsafe or Unhealthful Working Conditions (Notice) describes violations of the Occupational Safety and Health Act of 1970, the Executive Order 12196, and 29 CFR 1960, Basic Program Elements for Federal Employee Occupational Safety and Health Programs and Related Matters. You must abate the violations referred to in this Notice by the dates listed unless within 15 working days (excluding weekends and Federal holidays) from your receipt of this Notice you request an Informal Conference with the U.S. Department of Labor Area Office at the address shown above.

**Posting** - The law requires that a copy of this Notice be posted immediately in a prominent place at or near the location of the violation(s) cited herein, or, if it is not practicable because of the nature of the employer's operations, where it will be readily observable by all affected employees. This Notice must remain posted until the violation(s) cited herein has (have) been abated, or for 3 working days (excluding weekends and Federal holidays), whichever is longer.

**Notification of Corrective Action** - You should notify the U.S. Department of Labor Area Office promptly by letter that you have taken appropriate corrective action within the time frame set forth on this Notice. Please inform the Area Office in writing of the abatement steps you have taken and of their dates, together with adequate supporting documentation, e.g., drawings or photographs of corrected conditions, purchase/work orders related to abatement actions, air sampling results, etc.

**Employer Discrimination Unlawful** - The law prohibits discrimination by any person against an employee for filing a complaint or for exercising any rights under this Act. An employee who believes that he/she has been discriminated against may file a complaint with the U.S. Department of Labor Area Office at the address shown above.

DI-3100
November 2004

# .S. DEPARTMENT OF THE INTERIOR
## Employee Performance Appraisal Plan

| Employee Name and Social Security Number:<br>Valencia, Teresa | | Title/Series/Grade:<br>Museum Specialist GS-1016-09 | |
|---|---|---|---|
| Duty Station:<br>Tuskegee Institute National Historic Site | Appraisal Period: | From:<br>October 1, 2005 | To:<br>September 31, 2006 |

**Part A: Notification of Standards:** *Signatures certify that critical elements and performance standards were discussed. Critical elements and performance standards are contained in Part E.*

| Employee:<br>Employee elected not to sign | Rating Official: | Reviewing Official (if applicable*): |
|---|---|---|
| Date: 2/14/06 | Date: 2/14/06 | Date: |

*If determined by Bureau/Office

**Part B: Progress Review:** *Signatures certify that performance was discussed.*

| Employee: | Date: | Rating Official: | Date: |
|---|---|---|---|
| | | | |

**Part C: Summary Rating Determination:** To determine a summary rating, assign one of the numerical rating levels that accurately reflects the employee's performance for each of the critical elements (Use only whole numbers: Exceptional = 5 points; Superior = 4 points, Fully Successful = 3 points, Minimally Successful = 2 points, and Unsatisfactory = 0 points.) *See reverse for complete instructions for assigning a Summary Rating.*

| Element Number | Numerical Rating |
|---|---|
| 1 | 4 |
| 2 | 4 |
| 3 | 4 |
| 4 | 5 |
| 5 | 4 |
| | Total: ~~25~~ 21 |

Total Numerical Rating ~~25~~ 21 ÷ Number of Elements ___5___ = Numeric Summary Rating ~~5.0~~ 4.2

**Part D: Overall Summary Rating:** Use conversion chart below to determine Summary Rating. Check the appropriate box:

| | | |
|---|---|---|
| | Exceptional | 4.6 – 5.00 AND No critical element rated lower than "Superior". |
| X | Superior | 3.6 – 4.59 AND No critical element rated lower than "Fully Successful". |
| | Fully Successful | 3.0 – 3.59 AND No critical element rated lower than "Fully Successful". |
| | Minimally Successful | 2.0 – 2.99 AND No critical element rated lower than "Minimally Successful". |
| | Unsatisfactory | One or more critical elements rated "Unsatisfactory". |

| Employee: | Rating Official: | Reviewing Official: (if applicable): |
|---|---|---|
| Date: 10/31/06 | Date: 10/31/06 | Date: |

Check here if Interim Rating: ☐

Employee's Signature above certifies that the overall summary rating was discussed. Reviewing Official's signature is required for Exceptional, Minimally Successful and Unsatisfactory ratings, and otherwise if determined by Bureau/Office.

1

DI-3100
November 2004

# Instructions for Completing the Employee Performance Appraisal Plan

## Establishing Critical Elements and Performance Standards

Critical elements (at least one, but no more than five) should be established for each employee at the start of the performance year. Through these elements, employees are held accountable for work assignments and responsibilities of their position. A critical element is an assignment or responsibility of such importance that Unsatisfactory performance in that element alone would result in a determination that the employee's overall performance is Unsatisfactory. Please see the Performance Appraisal Handbook for more detailed information.

Performance standards are expressions of the performance threshold(s), requirement(s), or expectation(s) that must be met for each element at a particular level of performance. They must be focused on results and include credible measures. You may use the Benchmark Performance Standards from the Performance Appraisal Handbook (in conjunction with individually established performance standards) to describe, for each element, credible measures such as quality, quantity, timeliness and/or cost effectiveness, for at least the "Fully Successful" level. Rating officials are strongly encouraged to develop performance standards at additional levels, to ensure that the employee has a clear understanding of the level of performance expected.

## Progress Reviews

A progress review should be conducted at approximately mid-way through the rating period. Part B should be completed after the progress review. Any written feedback or recommended training can be noted on a separate sheet and attached to the employee performance appraisal plan.

## Assigning the Summary Rating

A specific rating is required for each critical element to reflect the level of performance demonstrated by the employee throughout the rating period. Only one numerical rating level is assigned for each critical element. Before the rating official assigns a summary rating, he/she should consider all interim summary ratings received for the employee during the annual appraisal period. The summary rating is assigned as follows:

A.    Review the employee performance appraisal plan and assess how the employee performed relative to the described performance standards.

B.    Appropriately document the employee's performance with a narrative summary that describes the employee's achievements for the critical elements as compared to the performance standards. A narrative must be written for each critical element assigned a rating of Exceptional, Minimally Successful, or Unsatisfactory. This narrative should contain examples of the employee's performance that substantiate and explain how the employee's performance falls within the level assigned. There is a block provided for the narrative summary for each critical element.

C.    In Part C of this form, assign one of the numerical rating levels that accurately reflects the employee's performance for each of the critical elements (Use only whole numbers: Exceptional = 5 points, Superior= 4 points, Fully Successful = 3 points, Minimally Successful = 2 points, and Unsatisfactory = 0 points).

D.    Add up the numerical rating levels to get a total.

E.    Divide the total by the number of critical elements to get an average. (Elements that are "not rated" because an employee has not had a chance to perform them during the rating year are not assigned any points and should not be used to determine the average rating.)

F.    Assign the employee a summary rating based on the table in Part D of this form.

**Note:** Whenever an employee is rated **"Unsatisfactory"** on one or more critical elements, the overall rating **must be "Unsatisfactory"** (regardless of total points). **The rating official should immediately contact the servicing human resources office.**

2

DI-3100
November 2004

**Part E:  Critical Elements and Performance Standards:** *List below each of the employee's critical elements (at least one, but no more than 5) and their corresponding performance standards.  If Benchmark Standards are used, indicate "Benchmark Standards are attached" in the space below, and ensure they are attached to this form.*

| Critical Element 1: | Applicable preservation and protection standards for park museum collections are met.  Employee provides technical assistance and consultation for the perservation and stablization treatments on historic structures and landscapes in compliance with applicable recommendations, regulations, and NPS policies.<br><br>NPS Strategic Plan Goals Ia5, Ia6, Ia7 |
|---|---|

| Performance Standards | |
|---|---|
| Exceptional | Refer to attached benchmark and in addition: Employee meet "Superior" rating and in addition exceeds GPRA goal Ia6 exceeds by 10% for TUIN, TUAI and SEMO.  Employee completes preservation and stabilization treatments that closely follow the Secretary of the Interior's Standards and DO 28.  Employee proactively researches and evaluates the most effective preservation options for each preservation project and discusses appropriate options with supervisor before and during the project.  The employee is continually aware of the historic sensitivity of the park and demonstrates that awareness through careful project planning.  Employee always ensures documentation for each project is completed before, during, and after the work.   Employee provides invaluable advice to park managers and maintenance staff.  Employee masterly inventories museum storage area and removes of all items that do not relate to the site.  Employee rehouse  museum artifacts after removal and develop an extraordinary museum education program to develop awareness to prevent damage.<br><br>*Develops MOU Tuskegee Fire department- collection protection, resource protection<br>* Works w/Fire Department to provide quarterly fire system inspection, and bi-annual fire extinguisher training.<br>*Researches and develops Park Wide IPM Plan and incorporate collections into Plan. |
| Superior | Refer to attached benchmark and in addition: Employee meets "Fully Successful" rating and in addition exceeds GPRA goal Ia6 exceeds by 5% for TUIN, TUAI and SEMO.  Employee completes preservation and stabilization treatments that closely follow the Secretary of the Interior's Standards and DO 28.  Employee proactively researches and evaluates the most effective preservation options for each preservation project and discusses appropriate options with supervisor before and during the project.  The employee is extremely aware of the historic sensitivity of the park and demonstrates that awareness through careful project planning.  Employee provides sound advice to park managers and maintenance staff.  Employee skillfully inventories museum storage area and removal of all items that do not relate to the site.  Employee rehouse  museum artifacts after removal and develops a magnificent museum education program to develop awareness to prevent damage.<br>* Purchases a UV meter, replace UV film on windows and establishes monitoring program.<br>*Works with Fire Department to provide bi- annual fire system inspection, and annual fire extinguisher training.<br>* Develops Park Wide IPM Plan and incorporates collections into Plan. |

| Fully Successful | Refer to attached benchmark and in addition: Employee meets "Fully Successful" rating and in addition GPRA goal Ia6 is met for TUIN. Employee completes preservation and stabilization treatments which are in tune with the Secretary of the Interior's standards and other NPS policies. Employee discusses preservation projects and proposed treatments with supervisor prior to beginning work or prior to changing work plans. Employee is aware of the historic sensitivity of the park and usually demonstrates that awareness through project planning. Employee provides good advice to park managers and maintenance staff. Employee inventory museum storage area and removal of all items that do not relate to the site. Employee rehouses museum artifacts after removal and develops a museum education program to develop awareness to prevent damage.

\* Purchase a UV meter, replace UV film on windows and establish monitoring program.
\*Work with Fire Department to provide annual fire system inspection and annual fire extinguisher training.
\* Develops Park Wide IPM Plan and incorporates collections into Plan. |
|---|---|
| Minimally Successful | Refer to attached benchmark and in addition: GPRA goal Ia6 is not met (by 1%) for TUIN museum collections are met. This includes but is not limited to inventorying museum storage area and the removal of 3 items that do not relate to the site. Rehousing of museum artifacts, placing barrier in front of objects on display to prevent damage. Establishing monitoring program. Fire department is aware of collections, reviewing of fire system and provides fire extinguisher training. Incorporates collections into Park wide IPM Plan once it becomes available. |
| Unsatisfactory | Refer to attached benchmark and in addition: GPRA goal is not met (by 10%) for TUIN museum collections. Employee rarely follows the Secretary of the Interior's standards and other NPS standards during historic preservation projects. Employee rarely discusses preservation projects and proposed treatments with supervisor prior to beginning work or prior to modifying work plans. Employee rarely demonstrates an awareness of the historic sensitivity of the park and rarely ensures that documentation for each project is completed.
This includes but is not limited to Inventorying museum storage area and object not relate to the site are in storage. Museum objects are stored in a location other than assigned by catalog record. Museum objects on display and in danger contain no barrier in front. A monitoring program is not established that includes Environmental, Fire and Security. Staff does not know how to use fire extinguisher. Fire department does not knows collections needs. Collections are not considered for incorporation into Park wide IPM Plan. |

### Narrative Summary

Describe the employee's performance for each critical element. A narrative summary must be written for each element assigned a rating of Exceptional, Minimally Successful, or Unsatisfactory.

"See Attachment"

**Rating for Critical Element 1:**

☐ Exceptional-5    ☒ Superior-4    ☐ Fully Successful-3    ☐ Minimally Successful-2    ☐ Unsatisfactory-0

4

DI-3100
November 2004

**Part E: Critical Elements and Performance Standards:** *List below each of the employee's critical elements (at least one, but no more than 5) and their corresponding performance standards. If Benchmark Standards are used, indicate "Benchmark Standards are attached" in the space below, and ensure they are attached to this form.*

| Critical Element 2: | Conservation Program: Best method to maintain collections through the conservation program<br><br>NPS Strategic Plan Goals Ia6 |
|---|---|

| Performance Standards | |
|---|---|
| **Exceptional** | Refer to attached benchmark and in addition: Employee meets "Superior" rating and in addition maintains constant and careful observation over natural, cultural and historical resources in order to identify present threats or correct inconsistent activities. Is consistently able to identify threats or inconsistent activities when they occur. Very seldom, if ever, fails to identify and report or correct, as appropriate, inconsistent activities, changes to resources or dangers or threats. Reports include the provision of a detailed analysis of the threat or change. Within scope of authority, continuously takes the correct and appropriate action to mitigate threats or inconsistent activities, or where immediate corrective action is not possible or appropriate, or beyond scope of incumbent's knowledge or ability, notifies appropriate officials and supervisor in a prompt manner. Employee develops a timeline for artifacts in danger of deteriorating for TUIN, TUAI and SEMO. Develops a conservation plan and program base on the Collection Condition Survey. Constantly updates PMIS statements for the conservation of collection or other project statements that include funding sources for the preservation of collections. |
| **Superior** | Refer to attached benchmark and in addition: Employee meets "Fully Successful" rating and in addition maintains regular and careful observation over natural, cultural and historical resources in order to identify present threats or correct inconsistent activities. Is steadily able to identify threats or inconsistent activities when they occur. Seldom, fails to identify and report or correct, as appropriate, inconsistent activities, changes to resources or dangers or threats. Reports include the provision of a detailed analysis of the threat or change. Within scope of authority, frequently takes the correct and appropriate action to mitigate threats or inconsistent activities, or where immediate corrective action is not possible or appropriate, or beyond scope of incumbent's knowledge or ability, notifies appropriate officials and supervisor in a prompt manner. Employee develops a timeline for artifacts in danger of deteriorating for TUIN and TUAI. Develops a conservation plan and program base on the Collection Condition Survey. Constantly updates PMIS statements for the conservation of collection or other project statements that include funding sources for the preservation of collections. |

DI-3100
November 2004

| Fully Successful | Refer to attached benchmark and in addition: Is usually observant to changes in, threats to or inconsistent use of resources under scope of authority. Is generally able to identify changes, threats or inconsistent activities, and very seldom fails to identify threats, changes or activities which should be obvious to someone in incumbent's position. Very seldom fails to correct or report observed resources problems, as appropriate. Takes the correct mitigative or reporting action in most instances, and consistently reports or corrects serious resources changes, threats or inconsistent activities in accordance with policy. Employee provides the occasional update of a timeline for artifacts in danger of deteriorating for TUIN. This conservation plan and program base on the Collection Condition Survey. Occasionally develops and/or updates PMIS statements for the conservation of collection or other project statements that include funding sources for the preservation of collections. |
|---|---|
| Minimally Successful | Refer to attached benchmark and in addition: Seldom develops and/or update a timeline for artifacts in danger of deteriorating for TUIN. This conservation plan and program base on the Collection Condition Survey. Seldom develop and/or update of PMIS statement for the conservation of collection or other project statements that include funding sources for the preservation of collections. |
| Unsatisfactory | Refer to attached benchmark and in addition: May frequently fail to identify changes in, threats to, or inconsistent use of resources within scope of authority and responsibility. May frequently fail to take appropriate corrective action to mitigate observed resources problems or may frequently fail to report resources problems to appropriate officials and supervisor in a timely manner. May frequently take action to mitigate observed resources problems which prove inconsistent with resources management plans or established procedures, are inconsistent with scope of delegated authority or which fail to alleviate observed threat problems. Rarely reviews and updates of a timeline for artifacts in danger of deteriorating for TUIN. Rarely reviews conservation plans based on the Collection Condition Survey. Rarely write PMIS statement for the conservation of collection or other project statements that include funding sources for the preservation of collections. |

### Narrative Summary

Describe the employee's performance for each critical element. A narrative summary must be written for each element assigned a rating of Exceptional, Minimally Successful, or Unsatisfactory.

"See Attachment"

---

**Rating for Critical Element 2:**

☐ Exceptional-5  ☑ Superior-4  ☐ Fully Successful-3  ☐ Minimally Successful-2  ☐ Unsatisfactory-0

6

DI-3100
November 2004

**Part E: Critical Elements and Performance Standards:** *List below each of the employee's critical elements (at least one, but no more then 5) and their corresponding performance standards. If Benchmark Standards are used, indicate "Benchmark Standards are attached" in the space below, and ensure they are attached to this form.*

| Critical Element 3: | Housekeeping Program and environmental control: Best method to maintain collections through the housekeeping program, and maintain the levels of relative humidity and temperature in storage and exhibit space.<br><br>NPS Strategic Plan Goals Ia6 |
|---|---|
| **Performance Standards** ||
| Exceptional | Refer to attached benchmark and in addition:  The historic structures are constantly cleaned using new and innovative curatorial methods on a  daily, schedule.  Park visitors are constantly informed of the collection needs and preservation efforts of the park for better understanding and appreciation of the park's natural and cultural resources.    Humidity and temperature is constantly monitored on a daily bases for the Oaks and Carver Museum.  A record of daily observation of unusually exterior climatic conditions is  kept on a constant basis.  Visible spectrum of light is masterly monitored and recorded for illuminance level and duration as required by museum regulations, including annual seasonal variations.  UV filtering materials are exceptionally monitored to ensure its continued effectiveness in meeting the standard in the NPS Museum Handbook, Part I. |
| Superior | Refer to attached benchmark and in addition:  The historic structures are frequently cleaned using new and above average curatorial methods on a twice week schedule.  Park visitors are frequently informed of the collection needs and preservation efforts of the park for better understanding and appreciation of the park's natural and cultural resources.  Humidity and temperature is frequently monitored on a daily basis for the Oaks and Carver Museum.  A record of weekly observation of unusually exterior climatic conditions is  keep on a frequent basis.  Visible spectrum of light is constantly monitored and recorded for illuminance level and duration as required by museum regulations, including annual seasonal variations.  UV filtering materials is frequently monitored to ensure it's continued effectiveness in meeting the standard in the NPS Museum Handbook, Part I. |
| Fully Successful | Refer to attached benchmark and in addition:  The historic structures are cleaned using average curatorial methods on a  weekly schedule.  Park visitors are informed of the collection needs and preservation efforts of the park for better understanding and appreciation of the park's natural and cultural resources.  Humidity and temperature are monitored on a daily basis for the Oaks and Carver Museum.  A record of bi-weekly observation of unusually exterior climatic conditions is  kept on daily.  Visible spectrum of light is monitored and recorded for illuminance level and duration as required by museum regulations, including annual seasonal variations.  UV filtering materials is monitored to ensure it's continued effectiveness in meeting the standard in the NPS Museum Handbook, Part I. |

| Minimally Successful | Refer to attached benchmark and in addition:  The historic structures are seldom cleaned using curatorial methods on a every two weeks schedule.  Park visitors are seldom informed of the collection needs and preservation efforts of the park for better understanding and appreciation of the park's natural and cultural resources.  Humidity and temperature is seldom monitored on for the Oaks and Carver Museum.  A record of observation of unusually exterior climatic conditions is seldom kept .  Visible spectrum of light is seldom monitored and recorded for illuminance level and duration as required by museum regulations, including annual seasonal variations.  UV filtering materials are seldom monitored to ensure it's continued effectiveness in meeting the standard in the NPS Museum Handbook, Part I. |
|---|---|
| Unsatisfactory | Refer to attached benchmark and in addition:  The historic structures are not cleaned constantly using new and innovative curatorial methods on monthly schedule.  Park visitors are rarely informed of the collection needs and preservation efforts of the park for better understanding and appreciation of the park's natural and cultural resources.   Humidity and temperature is not constantly monitored bases for the Oaks and Carver Museum.  A record of observation of unusually exterior climatic conditions is not kept on a constant basis.  Visible spectrum of light is not constantly monitored and recorded for illuminance level and duration as required by museum regulations, including annual seasonal variations.  UV filtering materials is not constantly monitored to ensure it's continued effectiveness in meeting the standard in the NPS Museum Handbook, Part I. |

## Narrative Summary

Describe the employee's performance for each critical element.  A narrative summary must be written for each element assigned a rating of Exceptional, Minimally Successful, or Unsatisfactory.

"See Attachment"

**Rating for Critical Element 3:**

☐ Exceptional-5     ☒ Superior-4     ☐ Fully Successful-3     ☐ Minimally Successful-2     ☐ Unsatisfactory-0

8

DI-3100
November 2004

**Part E: Critical Elements and Performance Standards:** *List below each of the employee's critical elements (at least one, but no more than 5) and their corresponding performance standards. If Benchmark Standards are used, indicate "Benchmark Standards are attached" in the space below, and ensure they are attached to this form.*

| Critical Element 4: | Accession and Catalog Records Programs: The number of Tuskegee Institute National Historic Site museum objects cataloged and submitted to the National Catalog |
|---|---|
| | NPS Strategic Plan Goals Ib2d |

| Performance Standards | |
|---|---|
| **Exceptional** | Refer to attached benchmark and in addition: Employee meets "Superior" rating and in addition, constantly exceeds GPRA goal Ib2D (by 10%). The number of Tuskegee Institute National Historic Site, Tuskegee Airmen National Historic Site and Selma to Montgomery National Historic Trail museum objects cataloged and submitted to the National Catalog. |
| **Superior** | Refer to attached benchmark and in addition: Employee meets "Fully Successful" rating and in addition, exceeds GPRA goal Ib2d (by 5%). The number of Tuskegee Institute National Historic Site and Tuskegee Airmen National Historic Site museum objects cataloged and submitted to the National Catalog. |
| **Fully Successful** | Refer to attached benchmark and in addition: GPRA goal Ib2D is met for the number of Tuskegee Institute National Historic Site museum objects cataloged and submitted to the National Catalog. |
| **Minimally Successful** | Refer to attached benchmark and in addition: GPRA goal Ib2D is not met (less than 1%) for the number of Tuskegee Institute National Historic Site museum objects cataloged and submitted to the National Catalog. |
| **Unsatisfactory** | Refer to attached benchmark and in addition: GPRA goal Ib2D is not met (less than 10%) for the number of Tuskegee Institute National Historic Site museum objects cataloged and submitted to the National Catalog. |

| Narrative Summary |
|---|

Describe the employee's performance for each critical element. A narrative summary must be written for each element assigned a rating of Exceptional, Minimally Successful, or Unsatisfactory.

*"See Attachment"*

**Rating for Critical Element 4:**

☒ Exceptional-5    ☐ Superior-4    ☐ Fully Successful-3    ☐ Minimally Successful-2    ☐ Unsatisfactory-0

9

**Part E: Critical Elements and Performance Standards:** *List below each of the employee's critical elements (at least one, but no more than 5) and their corresponding performance standards. If Benchmark Standards are used, indicate "Benchmark Standards are attached" in the space below, and ensure they are attached to this form.*

| **Critical Element 5:** | Works with supervisor to manage park education/curatorial/interpretive programs in the most efficient manner possible. Coordinates and participates in special projects, as assigned by supervisor, in an efficient and timely manner. Performs interpretive writing for brochures, bulletin boards and exhibits incorporating professional interpretive writing principles including multiple points of view and tangible/intangible/universals. Provides graphics to develop exhibits and wayside exhibits. Seeks input on written materials before project completion and incorporates edits. Identifies, initiates and completes special projects that improve operation. Pays close attention to details; record keeping is accurate and complete. Efficiently uses work time and complete projects and tasks within deadlines. Administrative responsibilities are prioritized in conjunction with supervisor and completed in a timely and accurate fashion. Identifies and corrects problems regarding operations/facilities whenever possible. Takes initiative in making improvements in operation coordinating with supervisor when necessary. GPRA Goals IIa, IIb, Ia, IVa, IIa.I |
|---|---|

**Performance Standards**

| **Exceptional** | Refer to attached benchmark and in addition: Meets all requirements of the "Superior" level and in addition demonstrates excellent performance in exhibit development. Design, implement and maintain quarterly exhibits (temporary) and provide program Newsletter. Composes documents or correspondence involving complex or technical information, and adapts writing to the audience's level of knowledge. Proofreads or edits complex or technical writing of others. Coordinates group's work efforts and monitors progress toward attaining team goals. Facilitates or leads group discussions, and information sharing. Encourages and facilitates cooperation and open communication and promotes team work at all levels of a major organization; cooperates with staff, top management, peers, multiple internal and external customers and stakeholders in other agencies/corporations or countries to accomplish agency/corporate goals. Masterly writes exhibit text. |
|---|---|
| **Superior** | Refer to attached benchmark and in addition: Meets all requirements of "Fully Successful" rating and in addition, coordinate bi-annual exhibits (temporary) and Newsletter. Composes documents or correspondence involving complex or technical information, and adapts writing to the audience's level of knowledge. Proofreads or edits complex or technical writing of others. Encourages and facilitates cooperation and open communication and promotes team work at all levels in part of a major organization; cooperates with peers, staff, higher-level executives within the agency/corporation, peers, multiple internal and external customers and stakeholders to accomplish agency/corporate goals. Brilliantly writes exhibits text. |

| Fully Successful | Refer to attached benchmark and in addition:Coordinates yearly exhibits (temporary) and newsletter. Composes documents or correspondence involving non-technical information. Proofreads or edits brief, non-technical writing of others. Cooperates with others to establish priorities and develop work plans. Contributes to group discussions, and information sharing.  Encourages and facilitates cooperation and open communication and promotes team work at all levels within an organization; cooperates with staff, higher-level management, peers, internal and external customers and stakeholders to accomplish the organization's goals.   Writes exhibit text. |
|---|---|
| Minimally Successful | Refer to attached benchmark and in addition: Participate in the yearly exhibit (temporary) and newsletter development.   Composes documents or correspondence involving simple or routine information. Proofreads own work. Cooperates with others to complete routine tasks. Attends team meetings, and shares information when asked.  Encourages and facilitates cooperation and open communication; promotes team work at all levels within an organizational unit; cooperates with staff, higher-level managers, peers, administrative staff of other organizational units, internal and external customers of a localized function, and local stakeholder groups to accomplish the organization's goals. |
| Unsatisfactory | Refer to attached benchmark and in addition: No exhibit design projects and no newsletter.   Composes documents or correspondence involving simple or routine information is done without participation. Others proofread work exclusively. Supervisors have to request cooperation with others to complete routine tasks. Supervisor has to request attendance in team meetings, and the sharing of information.  Supervisor has to encourage facilitation, cooperation, open communication, and the promotion of teamwork. |

## Narrative Summary

Describe the employee's performance for each critical element.  A narrative summary must be written for each element assigned a rating of Exceptional, Minimally Successful, or Unsatisfactory.

"See Attachment "

**Rating for Critical Element 5:**

☐ Exceptional-5    ☒ Superior-4    ☐ Fully Successful-3    ☐ Minimally Successful-2    ☐ Unsatisfactory-0

11

DI-3100
Nov 2005 (previous edition obsolete)

**Benchmark Employee Performance Standards**

**Exceptional:**

Employee demonstrates particularly excellent performance that is of such high quality that organizational goals have been achieved that would not have been otherwise. The employee demonstrates mastery of technical skills and a thorough understanding of the mission of the organization and has a fundamental impact on the completion of program objectives.

The employee exerts a major positive influence on management practices, operating procedures and/or program implementation, which contributes substantially to organizational growth and recognition. The employee plans for the unexpected and uses alternate ways of reaching goals. Difficult assignments are handled intelligently and effectively. The employee has produced an exceptional quantity of work, often ahead of established schedules and with little supervision.

The employee's oral and written communications are exceptionally clear and effective. He/she improves cooperation among participants in the workplace and prevents misunderstandings. Complicated or controversial subjects are presented or explained effectively to a variety of audiences so that desired outcomes are achieved.

**Superior:**

Employee demonstrates unusually good performance that exceeds expectations in critical areas and exhibits a sustained support of organizational goals. The employee shows a comprehensive understanding of the objectives of the job and the procedures for meeting them.

Effective planning by the employee improves the quality of management practices, operating procedures, task assignments and/or program activities. The employee develops and/or implements workable and cost-effective approaches to meeting organizational goals.
The employee demonstrates an ability to get the job done well in more than one way while handling difficult and unpredicted problems. The employee produces a high quantity of work, often ahead of established schedules with less than normal supervision.

The employee writes and speaks clearly on difficult subjects to a wide range of audiences and works effectively with others to accomplish organizational objectives.

**Fully Successful:**

The employee demonstrates good, sound performance that meets organizational goals. All critical activities are generally completed in a timely manner and supervisor is kept informed of work issues, alterations and status. The employee effectively applies technical skills and organizational knowledge to get the job done. The employee successfully carries out regular duties while also handling any difficult special assignments. The employee plans and performs work according to organizational priorities and schedules. The employee communicates clearly and effectively.

**Minimally Successful:**

The employee's performance shows serious deficiencies that requires correction. The employee's work frequently needs revision or adjustments to meet a minimally successful level. All assignments are completed, but often require assistance from supervisor and/or peers. Organizational goals and objectives are met only as a result of close supervision. On one or more occasions, important work requires unusually close supervision to meet organizational goals or needs so much revision that deadlines were missed or imperiled.

Employee shows a lack of awareness of policy implications or assignments; inappropriate or incomplete use of programs or services; circumvention of established procedures, resulting in unnecessary expenditure of time or money; reluctance to accept responsibility; disorganization in carrying out assignments; incomplete understanding of one or more important areas of the field of work; unreliable methods for completing assignments; lack of clarity in writing and speaking; and/or failure to promote team spirit.

**Unsatisfactory:**

The employee's performance is unsatisfactory. The quality and quantity of the employee's work are not adequate for the position. Work products do not meet the minimum requirements expected.

The employee demonstrates little or no contribution to organizational goals; failure to meet work objectives; inattention to organizational priorities and administrative requirements; poor work habits resulting in missed deadlines and/or incomplete work products; strained work relationships; failure to respond to client needs; and/or lack of response to supervisor's corrective efforts.

9

## Employee Annual Narrative Performance Report

**Employee Name:** Teresa Valencia
**Park Unit:** TUIN, TUAI, SEMO
**Title:** Museum Specialist
**Date:** October 31, 2006

**Critical Element #1:**  Applicable preservation and protection standards for park museum collections are met.  *Employee provides technical assistance and consultation for the perservation and stablization treatments on historic structures and landscapes in compliance with applicable recommendations, regulations, and NPS policies.*

NPS Strategic Plan Goals Ia5, Ia6▮▮▮

*Superior*

**Results:  Superior** Refer to attached benchmark and in addition: Employee meets "Fully Successful" rating and in addition exceeds GPRA goal Ia6 exceeds by 5% for TUIN, TUAI and SEMO.  Employee completes preservation and stabilization treatments that closely follow the Secretary of the Interior's Standards and DO 28.  Employee pro-actively researches and evaluates the most effective preservation options for each preservation project and discusses appropriate options with supervisor before and during the project.  The employee is extremely aware of the historic sensitivity of the park and demonstrates that awareness through careful project planning.  Employee provides sound advice to park managers and maintenance staff.  Employee skillfully inventory museum storage area and removal of all items that do not relate to the site.  Employee rehouse  museum artifacts after removal and develop a magnificent museum education program to develop awareness to prevent damage.
* Purchase a UV meter, replace UV film on windows and establish monitoring program.
*Work with Fire Department to provide bi- annual fire system inspection, and annual fire extinguisher training.
* Develops Park Wide IPM Plan and Incorporate collections into Plan.

**Justification:** UV meter was purchased and UV film has been replaced on windows and a monitoring program has been established. In collaboration with the Tuskegee Fire Department the park has established and annual fire extinguisher training program. (Note: Due to Fire Marshall Willie Smith's workload I was unable to schedule a bi-annual fire system inspection. However, I will be meeting with him and conducting a walk through of the park to address museum collection needs and to establish an MOU with the local fire department). I have developed an IPM plan for Tuskegee Institute National Historic Site.
* *MOU  (drafted)*
**Critical Element #2:**  Conservation Program: Best method to maintain collections through the conservation program

NPS Strategic Plan Goals Ia6
*"Superior "*

**Results:** ~~Acceptable~~ Refer to attached benchmark and in addition:  Employee meet "Superior" rating and in addition mmaintains constant and careful observation over natural, cultural and historical resources in order to identify present threats or correct inconsistent activities. Is consistently able to identify threats or inconsistent activities when they occur. *Very seldom, if ever fails to identify and report or correct, as appropriate, inconsistent* activities, changes to resources or dangers or threats. Reports include the provision of a detailed analysis of the threat or change. Within scope of authority, continuously takes the correct and appropriate action to mitigate threats or inconsistent activities, or where

immediate corrective action is not possible or appropriate, or beyond scope of incumbent's knowledge or ability, notifies appropriate officials and supervisor in a prompt manner. Employee develops a timeline for artifacts in danger of deteriorating for TUIN, TUAI and SEMO. Develops a conservation plan and program base on the Collection Condition Survey. Constantly updates PMIS statements for the conservation of collection or other project statements that include funding sources for the preservation of collections.

**Justification:** I developed a timeline for the removal of objects from exhibit for TUIN. At this time, I don't have an adequate number of storage cabinets nor adequate space to remove some items that are currently on exhibit. PMIS statements will be submitted to address this particular issue.

Prior to the opening of SEMO's new interpretive center, I worked closely with HFC conservators to ensure that proper treatment was conducted on the objects that were going on exhibit as well as in storage. I conducted the proper research which guided all of my decisions prior to authorizing specific treatments. (For example: The green shoes that belonged to Lucille Times were originally white in color. When the item was given to SEMO it was apparent that the shoes had been painted green. Prior to the green paint they were painted purple. I contacted Ms. Times to determine the shoes original color. Ms. Times stated that the shoes were originally white. I had to determine whether or not to leave the shoes green or return them to there natural color. I asked the conservator that was working on that specific item to conduct a spot test to determine the level of difficulty of removing the several layers of paint. At that point I gave my approval to return the shoes to there original color.) All objects for SEMO were prepped for both exhibition purposes as well as storage purposes.

Museum objects belonging to TUAI aren't in current danger.

**Critical Element #3:** Housekeeping Program and environmental control: Best method to maintain collections through the housekeeping program. And maintain the levels of relative humidity and temperature in storage and exhibit space.

NPS Strategic Plan Goals Ia6

**Results: Exceptional** Refer to attached benchmark and in addition: The historic structures are constantly cleaned using new and innovative curatorial methods on a daily, schedule. Park visitors are constantly informed of the collection needs and preservation efforts of the park for better understanding and appreciation of the park's natural and cultural resources. Humidity and temperature is constantly monitored on a daily bases for the Oaks and Carver Museum. A record of four times daily observation of unusually exterior climatic conditions is kept on a constant basis. Visible spectrum of light is masterly monitored and recorded for illuminance level and duration as required by museum regulations, including annual seasonal variations. UV filtering materials are exceptionally monitored to ensure its continued effectiveness in meeting the standard in the NPS Museum Handbook, Part I.

**Justification:** I conducted a daily walk through of both the storage units as well as exhibit areas to check and monitor light and climatic readings. Due to the fact, that readings are monitored 24 hours a day utilizing dataloggers I conducted a physical walk through to ensure that the heating and air units in all of the facilities were working properly. Also, historic *housekeeping was conducted on a daily basis and humidifiers were dumped on schedule.* I routinely conduct a daily walk through of exhibits to also inspect for any adverse or inherent vices which could lead to the deterioration or destruction of the collection (i.e., vermin, insects, off-gassing).

**Critical Element #4:**  Accession and Catalog Records Programs:  The number of Tuskegee Institute National Historic Site museum objects cataloged and submitted to the National Catalog

NPS Strategic Plan Goals Ib2d

**Results:  Exceptional** Refer to attached benchmark and in addition:  Employee meets "Superior" rating and in addition, constantly well exceeds GPRA goal Ib2D (by 10%).  The number of Tuskegee Institute National Historic Site, Tuskegee Airmen National Historic Site and Selma to Montgomery National Historic Trail museum objects cataloged and submitted to the National Catalog.

**Justification:** Catalog records submitted for Tuskegee Institute was 290; Tuskegee Airmen was 800; Selma to Montgomery was 347. The SEMO collection was inventoried and properly stored according to NPS Museum Handbook Standards. Also, I picked up and inventoried the Tuskegee Airmen oral history project and placed those items in environmentally controlled storage. I also made minor corrections to over 1598 catalog records (misuse of certain categories).

**Critical Element #5:**  Works with supervisor to manage park education/curatorial/interpretive programs in the most efficient manner possible. Coordinates and participates in special projects, as assigned by supervisor, in an efficient and timely manner. Performs interpretive writing for brochures, bulletin boards and exhibits incorporating professional interpretive writing principles including multiple points of view and tangible/intangible/universals. Provides graphics to develop exhibits and wayside exhibits. Seeks input on written materials before project completion and incorporates edits. Identifies, initiates and completes special projects that improve operation. Pays close attention to details; record keeping is accurate and complete. Efficiently uses work time and complete projects and tasks within deadlines. Administrative responsibilities are prioritized in conjunction with supervisor and completed in a timely and accurate fashion. Identifies and corrects problems regarding operations/facilities whenever possible. Takes initiative in making improvements in operation coordinating with supervisor when necessary. GPRA Goals IIa, IIb, Ia, IVa, IIa.I

**Results:  Superior** Refer to attached benchmark and in addition: Meets all requirements of "Fully Successful" rating and in addition, coordinate bi-annual exhibits (temporary) and Newsletter. Composes documents or correspondence involving complex or technical information, and adapts writing to the audience's level of knowledge. Proofreads or edits complex or technical writing of others.  Encourages and facilitates cooperation and open communication and promotes team work at all levels in part of a major organization; cooperates with peers, staff, higher-level executives within the agency/corporation, peers, multiple internal and external customers and stakeholders to accomplish agency/corporate goals. Brilliantly writes exhibits text and educational programs.

**Justification:**  I completed three exhibits this year two of which pertained to George Washington Carver and one pertaining to the book "Pre-War Days at Tuskegee" by Scipio. I also assisted the contractors working on the SEMO exhibit with installation and conducted follow-ups with possible donors for future interpretive centers. I assisted Tuskegee Airmen exhibit contractors in researching information; conducting follow-ups with Airmen; and researching and conducting a museum collection call (on-going process). Developed a park newsletter encompassing the collection of the "Central

Alabama Parks" at Superintendents request. Assist both internal and external customers on a continual basis (i.e., technical assistance, Special Use Permits, exhibits, loans, etc.). Also, John Whitfield and I developed "Tuskegee Echo" the new 6 page park newspaper utilizing the "Quark" program.

## OSHA's Form 300A
# Summary of Work-Related Injuries and Illnesses

**Year:** 2006

part 1904 must complete this summary page, even if no work related injuries or illnesses occurred during the year. Remember to review the log to verify that the entries are complete and accurate before completing the summary.

Using the log, count the individual entries you made for each category. Then write the totals below, making sure you've added the entries from every page of the log. If you've had no cases write "0." Employees, former employees and their representatives have the right to review the OSHA Form 300 in its entirety. They also have limited access to the OSHA Form 301 or its equivalent. See 29 CFR Part 1904.35, in OSHA's recordkeeping rule, for further details on access provisions of these forms.

### Number of Cases

| Total number of deaths | Total number of cases with days away from work | Total number of cases with job transfer or restr | Total number of other recordable cases |
|---|---|---|---|
| 0 | 0 | 0 | 0 |
| (G) | (H) | (I) | (J) |

### Number of Days

| Total number of days away from work | Total number of days of job transfer or restriction |
|---|---|
| (K) | (L) |

### Injury and Illness Types
Total Number of...
(M)

| (1) Injuries | 0 | (4) Poisonings | 0 |
|---|---|---|---|
| (2) Skin Disorders | 0 | (5) Hearing Loss | 0 |
| (3) Respiratory Condition | 0 | (6) All Other Illnesses | 0 |

Post this Summary page from February 1 to April 30 of the year following the year covered by the form.

### Establishment Information

**Establishment Name:** tuin

**Street** 1212 Old Montgomery Rd

**City** Tuskegee    **State** al    **Zip** 36088

Industry Description (e.g. manufacture of motor truck trailers)

Government

Standard Industrial Classification

___ ___ ___ ___

OR

North American Industrial Classification

___ ___ ___ ___ ___

### Employment Information
Annual Average Number of Employees **24**

Total Hours Worked by all employees last year **44288**

**Sign Here** _Marvin T. Brown_
Knowingly falsifying this document may result in a fine.

I certify that I have examined this document and that to the best of my knowledge the entries are true, accurate and complete.

_Acting Superintendent_
Company Executive Title

_334-727-6390_
Phone

Date _7-26-2007_

**U.S. Department of Labor**
Occupational Safety and Health Administration



Company Name:  Department of Interior-National Historic Site
Inspection #:  310772330

## NOTICE OF CORRECTIVE ACTION

CORRECTIVE ACTION TAKEN FOR EACH STANDARD VIOLATED SHOULD BE
SUBMITTED TO THIS OFFICE ON OR BEFORE THE DATE BY WHICH VIOLATION(S)
MUST BE ABATED AS INDICATED IN THE "CITATION AND NOTIFICATION OF
PENALTY".

THIS INFORMATION MAY BE WRITTEN BELOW, ON THE REVERSE SIDE OR ON
ATTACHED PAGES IF NECESSARY.

| CITATION NO. | ITEM NO. | CORRECTIVE ACTION TAKEN | DATE COMPLETED |
|---|---|---|---|
| | | | |

**NAME OF COMPANY OFFICIAL**                    **DATE**

**TITLE**

**NOTE:**     **29 USC 666.(g):** Whoever knowingly makes any false statements, representation or certification in any application,
record, plan or other documents filed or required to be maintained pursuant to the Act shall, upon conviction, be punished by a fine of
not more that $10,000, or by imprisonment for not more than six months or both.
**POSTING:**  A copy of the completed Corrective Action Worksheet should be posted for employee review.

ABATEMENT CERTIFICATION

Ken Nishiyama-Atha, Area Director
U.S. Department of Labor - OSHA
1141 Montlimar Drive, Suite 1006

Mobile, AL   36609
Phone:  (251)441-6131

Department of Interior-National Historic Site
Tuskegee Institute-1600 Boy Scout Circle
Tuskegee, AL   36088

The hazard referenced in Inspection Number _____ for the violation identified as
Citation _____ and Item _____ was corrected on _____
by _____.

The hazard referenced in Inspection Number _____ for the violation identified as
Citation _____ and Item _____ was corrected on _____
by _____.

The hazard referenced in Inspection Number _____ for the violation identified as
Citation _____ and Item _____ was corrected on _____
by _____.

The hazard referenced in Inspection Number _____ for the violation identified as
Citation _____ and Item _____ was corrected on _____
by _____.

The hazard referenced in Inspection Number _____ for the violation identified as
Citation _____ and Item _____ was corrected on _____
by _____.

I attest that the information contained in this document is accurate and that the affected employees and their representatives have been
informed of the abatement activities described in this certification.

_____
Signature

_____
Typed or Printed Name

Notice of Unsafe or Unhealthful Working Conditions          Page 4 of 9                              OSHA-2H(Rev. 9/93)

**U.S. Department of Labor**
Occupational Safety and Health Administration

 

# NOTICE TO EMPLOYEES

An informal conference has been scheduled with the Occupational Safety and Health

Administration (OSHA) to discuss the Notice of Unsafe or Unhealthful Working Conditions

(Notice) issued on 07/20/2007.  The conference will be held at the OSHA office located at 1141

Montlimar Drive, Suite 1006, , Mobile, AL, 36609 on _____ at _____.

Employees and/or representatives of employees have a right to attend an informal conference.

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number:** 310772330
**Inspection Dates:** 05/04/2007 - 05/07/2007
**Issuance Date:**      07/20/2007

Notice of Unsafe or Unhealthful Working Conditions

**Company Name:**    Department of Interior-National Historic Site
**Inspection Site:**   Tuskegee Institute-1600 Boy Scout Circle, Tuskegee, AL  36088

---

Citation 1 Item 1 Type of Violation:  **Serious**

29 CFR 1910.141(b)(1)(i):  Potable water was not provided in all places of employment, for drinking, washing of the person, cooking, washing of foods, washing of cooking or eating utensils, washing of food preparation or processing premises, and personal service rooms:

   (a)     Maintenance Shed:  Employees were not provided drinking water when mowing, trimming, cutting, cultivating, maintaining equipment and grounds.

   Date By Which Violation Must be Abated:                08/02/2007

Citation 1 Item 2 Type of Violation:  **Serious**

29 CFR 1910.141(d)(2)(iii):  Lavatories were not provided with hand soap or similar cleansing agent:

   (a)     Basement of G.W. Carver Museum:  Employer did not provide hand soap for employees performing maintenance of museum displays and keeping the museum clean.

   Date By Which Violation Must be Abated:                08/01/2007

Citation 1 Item 3 Type of Violation:  **Serious**

29 CFR 1910.1018(e)(2):  Initial monitoring was not performed for each workplace, or work operation covered by this section to accurately determine the airborne concentration of inorganic arsenic to which employees may be exposed:

   (a)     G.W.Carver Museum:  Employer failed to conduct exposure measurements to ascertain the levels of arsenic for employees arranging, disassembling, rearranging, shipping, and receiving taxidermed artifacts.

   Date By Which Violation Must be Abated:                08/08/2007

---

See pages 1 through 5 of this Notice for information on employer and employee rights and responsibilities.

**U.S. Department of Labor**
Occupational Safety and Health Administration

Inspection Number: 310772330
Inspection Dates: 05/04/2007 - 05/07/2007
Issuance Date:        07/20/2007



## Notice of Unsafe or Unhealthful Working Conditions

**Company Name:**     Department of Interior-National Historic Site
**Inspection Site:**     Tuskegee Institute-1600 Boy Scout Circle, Tuskegee, AL  36088

---

Citation 1 Item 4  Type of Violation:  **Serious**

29 CFR 1910.1025(d)(3)(i):  The initial determination for lead was not based on employee exposure monitoring results and other relevant considerations listed in (A), (B) and (C) of this paragraph:

    (a)    G.W.Carver Museum: Employer failed to provide exposure measurements to ascertain the levels of lead for employees arranging, disassembling, rearranging, shipping, and receiving taxidermed artifacts.

    Date By Which Violation Must be Abated:        08/02/2007

The alleged violations below have been grouped because they involve similar or related hazards that may increase the potential for illness.

Citation 1 Item 5a  Type of Violation:  **Serious**

29 CFR 1910.1025(l)(1)(i):  Employee(s) working in an area where there was potential exposure to airborne lead at any level were not informed of the content of Appendices A and B of this regulation:

    (a)    G.W. Carver Museum: Employees were not informed of the proper methods of personal protection, personal hygiene, and medical surveillance while arranging, disassembling, rearranging, shipping and receiving taxidermed artifacts in displays containing lead.

    Date By Which Violation Must be Abated:        08/08/2007

---

See pages 1 through 5 of this Notice for information on employer and employee rights and responsibilities.

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number:** 310772330
**Inspection Dates:** 05/04/2007 - 05/07/2007
**Issuance Date:**      07/20/2007



## Notice of Unsafe or Unhealthful Working Conditions

**Company Name:**   Department of Interior-National Historic Site
**Inspection Site:**   Tuskegee Institute-1600 Boy Scout Circle, Tuskegee, AL  36088

---

Citation 1 Item 5b  Type of Violation:   **Serious**

29CFR 1910.1200(h)(1): Employer did not provide employees with effective information and training on hazardous chemicals in their work area at the time of their initial assignment, and whenever a new physical or health hazard the employees have not previously been trained about is introduced into their work area. Information and training may be designed to cover categories of hazards (e.g., flammability, carcinogenicity) or specific chemicals. Chemical-specific information must always be available through labels and material safety data sheets.

  (a)    Artifact Storage Department: Employer failed to provide adequate training for employees handling taxidermed artifacts containing hazardous chemicals such as, but not limited to, arsenic, compounds, with health effects, such as, but not limited to, skin disorders, digestive and respiratory system disorders.

  Date By Which Violation Must be Abated:                    08/02/2007

Citation 1 Item 6  Type of Violation:   **Serious**

29 CFR 1910.1200(g)(8):  The employer did not maintain copies of the required material safety data sheets for each hazardous chemical in the workplace:

  (a)    Artifact Storage Department: Employer failed to provide material safety data sheets for employees handling taxidermed artifacts containing hazardous chemicals, such as, but not limited to, arsenic and lead, with health effects, such as, but not limited to, central nervous system, reproductive, and renal disorders.

  Date By Which Violation Must be Abated:                    08/02/2007

---

See pages 1 through 5 of this Notice for information on employer and employee rights and responsibilities.

Notice of Unsafe or Unhealthful Working Conditions          Page 8 of 9                    OSHA-2H (Rev. 9/93)

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number:** 310772330
**Inspection Dates:** 05/04/2007 - 05/07/2007
**Issuance Date:**      07/20/2007



Notice of Unsafe or Unhealthful Working Conditions

**Company Name:**    Department of Interior-National Historic Site
**Inspection Site:**    Tuskegee Institute-1600 Boy Scout Circle, Tuskegee, AL  36088

---

Citation 2 Item 1 Type of Violation:  **Other**

29 CFR 1904.32(b)(3): The Summary of Work-Related Injuries and Illnesses (OSHA Form 300A or equivalent) was not properly certified:

   (a)   The OSHA 300A for the year 2003 not certified by the highest officer at the establishment.

ABATEMENT NOTE: The company executive that certifies the 300A must be one of the following:  owner of the company, officer of the corporation, or the highest ranking company official at the establishment.

Date By Which Violation Must be Abated:                    07/26/2007

Ken Nishiyama-Atha
Area Director

---

*See pages 1 through 5 of this Notice for information on employer and employee rights and responsibilities.*

Notice of Unsafe or Unhealthful Working Conditions           Page 9 of 9                    OSHA-2H (Rev. 9/93)

**RETURN TO WORK *OR* SCHOOL**

## FAMILY PRACTICE

4143 Atlanta Highway
Montgomery, AL 36109
(334) 271-4503

Shepherd A. Odom, M.D., P.C.                    Gilberto Sanchez, M.D.

Date: 7/27/07

This is to certify that Teresa Valencia

has been under my care for the following:

Medical care

and is able to return to work / school on 7/27/07

Remarks: _____

_____

_____

Signature: G. Sanchez, M.D. (PB)

**RETURN TO WORK OR SCHOOL**

## FAMILY PRACTICE

4143 Atlanta Highway
Montgomery, AL 36109
(334) 271-4503

Shepherd A. Odom, M.D., P.C.          Gilberto Sanchez, M.D.

Date: 7/31/07

This is to certify that _Teresa Valencia_

has been under my care for the following:

Neck Pain

Hip Pain

Low Back Pain

and is able to return to work / school on   8/1/07

Remarks:

F/u appt. on

8/9/07

Signature: _Dr. Gilberto Sanchez_

*RETURN TO WORK OR SCHOOL*

**FAMILY PRACTICE**
4143 Atlanta Highway
Montgomery, AL 36109
(334) 271-4503

Shepherd A. Odom, M.D., P.C.                          Gilberto Sanchez, M.D.

*Dr. Chung*                          Date: 8/9/07

This is to certify that _Teresa Valencia_

has been under my care for the following:
_medical reason_
_Dizziness_
_LBP_          _Neck pain_

and is able to return to work /school on _8/15/07_

Remarks: _Next Appt._
_Thursday 9/6/07 10:00 a.m._
_(Dr.)_

Signature: _Dr. J. Juan Chung/td_

Patients: Please bring this order with you when you have your exam/procedure. To reduce your registration wait time please call Admission Planning at 528-4266 or 1-877-624-2308 during normal office hours. If you need to reschedule a procedure please call 528-1215.

**Location of Exam**

Procedure
- [X] EAMC
- [X] ADI
- [ ] Rehab Works

# EAMC OUTPATIENT PHYSICIAN ORDERS

**Physician Office Staff:** Call Central Scheduling at 528-1215 **and** fax this order and supporting documentation to Fax Central at 528-3262 (528-EAMC).

east alabama medical center

Patient Name _Teresa Valencia_ SS# _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_ DOB _1-14-67_ SEX _F_

Daytime Contact Phone Numbers (need 2) _868-0901_ and _334-356-5867_

Insurance: ___ Medicare ___ Medicaid ___ BC/BS ___ Self Pay _X_ Other: _Governent Employees Hospital Assoc_

Ordering Physician Signature: _Michael B. Williams_ Date _8-7-07_

Ordering Physician Printed Name: _M. B. William_

Interpreting/Performing Physician: _R. Ingram_

Cc Reports to: _Gilberto Sanchez_

Physician: It is mandatory to list a reason for ordering tests. This should include diagnosis, signs and symptoms. Do not use "rule out", "suspect", or "possible". Please check for medical necessity.

## Cardiology 528-1715

Reason for ordering test-diagnosis, (1) _Syncope_  Appt. Date / Time: _Tues. Aug 14, 2007 @ 7:00_

signs and symptoms (2) _Chest pain_  *(Report to Outpatient Admissions)*

### Non-Invasive Cardiology

- ___ 12 Lead EKG
- ___ 24 hour holter monitor
- ___ 48 hour holter monitor
- ___ MUGA scan
- ___ Graded Exercise Test (GXT)
- ___ Nuclear Cardiovascular Stress Test
- ___ Nuclear Pharmacological Stress Test
- ___ Echocardiogram
- ___ Stress Echo
- ___ Dobutamine Stress Echo
- ___ Transesophageal Echo (TEE)
- ___ Dobutamine Stress TEE
- ___ Outpatient Cardiac Rehab
- ___ Smoking Cessation
- ___ Risk Factor Prevention Class

### Invasive Cardiology

- ___ Left Heart Cath
- ___ PTCA/PCI/Stent
- ___ Right Heart Cath
- ___ Device Procedure
(Specify Procedure)

- ___ Possible PCI/Stent
- [X] Tilt Table
- ___ Cardioversion
- ___ Arteriogram
(Specify Vessel)
- ___ Other: (Specify)

## Endoscopy 528-1183

Reason for ordering test-diagnosis, (1) _____  Appt. Date / Time: _____

signs and symptoms (2) _____  *(Report to the Surgery Center)*

- ___ Diagnostic Colonoscopy
- ___ Screening Colonoscopy (High Risk) G0105
- ___ Screening Colonoscopy (Non High Risk) G0121
- ___ Other:
- ___ Polypectomy
- ___ EGD ___ PEG ___ PEGJ
- ___ Esophageal Dilation
- ___ PEG Change
- ___ Flexible Sigmoidoscopy
- ___ Motility Study
- ___ STRETTA Procedure

## Pain Management Services 528-2400

Reason for ordering test-diagnosis, (1) _____  Appt. Date / Time: _____

signs and symptoms (2) _____  *(Report to Outpatient Admissions)*

**Blood Thinner** Y   N   Name of Med. _____

Procedure _____   Other _____

## Physical Rehabilitation - RehabWorks 528-1964

Reason for ordering test-diagnosis, (1) _____  Appt. Date / Time: _____

signs and symptoms (2) _____  *(Report to Rehab Works)*

- ___ Physical Therapy
- ___ Evaluate and Treat
- ___ Occupational Therapy
- ___ Other _____
- ___ Speech Therapy
- ___ Limitations _____

## Respiratory/Neurology 528-3790

Reason for ordering test-diagnosis, (1) _____  Appt. Date / Time: _____

signs and symptoms (2) _____  *(Report to Outpatient Admissions, except Bronchoscopy Report to Surgery Center)*

Pulmonary Function Test ___ Basic ___ Complete ___ DLCO   ___ Aerosol Treatment   Medication: _____
- ___ Pulmonary GXT
- ___ Bronchoscopy
- ___ Arterial Blood Gas
- ___ Other: _____

___ EEG Awake ___ EEG Asleep ___ EEG Sleep Deprived   ___ EMG/NCV Site: ___



**Shirley Streeter**
08/09/2007 11:19 AM
CDT

To: Teresa Valencia/TUIN/NPS@NPS
cc: Tyrone Brandyburg/TUIN/NPS@NPS, Robyn Harris/TUIN/NPS@NPS
Subject: Re: Your CA-1 Claim(s)

Teresa,

Please give me a call so that we can set up a time to discuss your CA-1 claims. There is conflicting information in the claim(s) that are in SMIS.

We also need to discuss your submitted doctor's statement. This needs to be done as soon as possible so that payment will not be delayed for your claim(s).

Thanks.

Shirley Streeter
Administrative Officer
Tuskegee Institute National Historic Site
Phone: 334-727-6390
Fax:    334-727-4597
Email:   Shirley_Streeter@nps.gov

 **Shirley Streeter**
08/09/2007 11:20 AM
CDT

To: Teresa Valencia/TUIN/NPS@NPS
cc:
Subject: Fw: Your CA-1 Claim(s)

Shirley Streeter
Administrative Officer
Tuskegee Institute National Historic Site
Phone: 334-727-6390
Fax:    334-727-4597
Email:   Shirley_Streeter@nps.gov
—— Forwarded by Shirley Streeter/TUIN/NPS on 08/09/2007 11:20 AM ——

**Shirley Streeter**
08/09/2007 11:19 AM
CDT

To: Teresa Valencia/TUIN/NPS@NPS
cc: Tyrone Brandyburg/TUIN/NPS@NPS, Robyn Harris/TUIN/NPS@NPS
Subject: Re: Your CA-1 Claim(s)

Teresa,

Please give me a call so that we can set up a time to discuss your CA-1 claims. There is conflicting information in the claim(s) that are in SMIS.

We also need to discuss your submitted doctor's statement. This needs to be done as soon as possible so that payment will not be delayed for your claim(s).

Thanks.

Shirley Streeter
Administrative Officer
Tuskegee Institute National Historic Site
Phone: 334-727-6390
Fax:    334-727-4597
Email:   Shirley_Streeter@nps.gov



Attractive Card for ugly credit

Netflix Try for Free!
Online Degree Programs
6.3% 30yr fix* Estimate savings
Degrees in as Fast as 2 years

**Date:** Fri, 10 Aug 2007 07:44:15 -0700 (PDT)

**From:** "Teresa Valencia" <valenciaisthe1@yahoo.com> View Contact Details Add Mobile Alert

**Subject:** Fwd: Teresa Valencia

**To:** Greg_Hindsley@nps.gov

Dear Mr. Greg Hindsley:

This letter pertains to the faxed documentation that Shirley Baxter sent to your office on August 7, 2007. In reviewing my letter I noticed that I forgot to give your office my contact number, which is: (334)868-0901. Also, I am forwarding a message that I sent to my Supervisor, Tyrone Brandyburg yesterday evening along with documentation from my physician. I am still waiting for a response from him and I will forward that on to you as well.

I truly hope that I will be able to find some resolution and relief to this whole situation. Your assistance in this matter is greatly appreciated and I look forward to hearing from you in the near future.

Respectfully yours,

Teresa Valencia

Note: forwarded message attached.

Park yourself in front of a world of choices in alternative vehicles.
Visit the Yahoo! Auto Green Center.

**Forwarded Message** [ Download File ]

**Date:** Thu, 9 Aug 2007 17:44:57 -0700 (PDT)

**From:** "Teresa Valencia" <valenciaisthe1@yahoo.com>

**Subject:** Teresa Valencia

**To:** Tyrone_Brandyburg@nps.gov, Bobby.Henderson@va.gov, James.Lowe@va.gov

**HTML Attachment** [ Scan and Save to Computer ]

Dear Mr. Tyrone Brandyburg:

You might not be aware that I sustained an injury on July 30, 2007. While conducting my

regular daily routine, due to my dizziness and numbness I collapsed in the Oak's while going down the stairs. On the date in question I was informed to submit a CA-1, which I have. Due to the fall, I sustained neck, back, and hip injuries (i.e., spasms, joint stiffness, and bruises). The physician's request that I take one day with medication to assist with the soreness and asked me to return August 9, 2007 for a follow-up visit. Diagnosis are as stated per physician (see attachment). Prognosis, due to other medical testing I was asked to return on August 15, 2007. Testing includes MRI, intense CAT Scanning, and Tilt Table Testing.

My concerns are the remainder of the time needed for testing. Would you submit another CA-1 for the following dates? I have been asked to follow-up with management when there are concerns about my health situation before anything can be approved and I am asking you to follow-up with this request.

If there are any questions, please feel free to contact me by cell (334)868-0901or via email.

Respectfully yours,

Teresa Valencia

Looking for a deal? Find great prices on flights and hotels with Yahoo! FareChase.

**Attachments**    Attachment scanning provided by: **Norton AntiVirus**

Photos:

Scan and Save to Computer

Doctor_Injury.jpg (643k) [View]

Delete | Reply | Forward | Move...

Previous | Next | Back to Messages          Save Message Text | Full Headers

Check Mail | Compose          Search Mail | Search the Web

Copyright © 1994-2007 Yahoo! Inc. All rights reserved Terms of Service · Copyright/IP Policy · Guidelines
NOTICE: We collect personal information on this site.
To learn more about how we use your information, see our Privacy Policy

**RETURN TO WORK OR SCHOOL**
## FAMILY PRACTICE
4143 Atlanta Highway
Montgomery, AL 36109
(334) 271-4503

Shepherd A. Odom, M.D., P.C.          Gilberto Sanchez, M.D.

Dr. Chang                    Date: 8/9/07

This is to certify that  Teresa Valencia

has been under my care for the following:

medical reasons
Dizziness
CBP          Neck Pain

and is able to return to work / school on  8/15/07

Remarks:

Next Appt.
Thursday 9/6/07 10:00 a.m.
(Dr.)

Signature: Dr. J. Juan Chang / Dr.

---

**RETURN TO WORK OR SCHOOL**
## FAMILY PRACTICE
4143 Atlanta Highway
Montgomery, AL 36109
(334) 271-4503

Shepherd A. Odom, M.D., P.C.          Gilberto Sanchez, M.D.

Date: 7/31/07

This is to certify that  Teresa Valencia

has been under my care for the following:

Neck Pain
Hip Pain
Low Back Pain

and is able to return to work / school on  8/1/07

Remarks:

F/u appt. on
8/9/07

Signature: Dr. Gilberto Sanchez / Dr.

---

## FAMILY PRACTICE
4143 Atlanta Highway • Montgomery, AL 36109
(334) 271-4503

J. Juan Chang, M.D.
BS 4677754 (00019309)

For Teresa Valencia          Date 8/9/07
Address

Rx

Ultram ER / 100
#30
Sig: 1 P 30

Refill
Substitution Permitted          Dispense As Written
                                M.D.
                                M.D.



Yahoo! My Yahoo! Mail Tutorials More Make Y! your home page Welcome, valenciaisthe1 Sign Out Help

YAHOO! MAIL Search: Web Search

Qwest

Mail Addresses Calendar Notepad Mail For Mobile - Mail Upgrades - Options

Check Mail Compose Search Mail Search the Web

Attractive Card for ugly credit

Folders [Add - Edit]
Inbox (493)
Draft
Sent
Bulk (132) [Empty]
Trash [Empty]
My Folders [Hide]
Business Inform... (11)
DuShawn (1)
Go Daddy! (4)
Music Business (2)
NPS (1)
Penpal (4)
The System Within

Search Shortcuts
My Photos
My Attachments

Netflix Try for Free!
Online Degree Programs
6.3% 30yr fix* Estimate savings
Degrees in as Fast as 2 years

Previous | Next | Back to Messages

Delete Reply Forward Move...

This message is not flagged. [ Flag Message - Mark as Unread ] Printable View

**Date:** Fri, 10 Aug 2007 07:44:15 -0700 (PDT)

**From:** "Teresa Valencia" <valenciaisthe1@yahoo.com> View Contact Details Add Mobile Alert

**Subject:** Fwd: Teresa Valencia

**To:** Greg_Hindsley@nps.gov

Dear Mr. Greg Hindsley:

This letter pertains to the faxed documentation that Shirley Baxter sent to your office on August 7, 2007. In reviewing my letter I noticed that I forgot to give your office my contact number, which is: (334)868-0901. Also, I am forwarding a message that I sent to my Supervisor, Tyrone Brandyburg yesterday evening along with documentation from my physician. I am still waiting for a response from him and I will forward that on to you as well.

I truly hope that I will be able to find some resolution and relief to this whole situation. Your assistance in this matter is greatly appreciated and I look forward to hearing from you in the near future.

Respectfully yours,

Teresa Valencia

Note: forwarded message attached.

Park yourself in front of a world of choices in alternative vehicles.
Visit the Yahoo! Auto Green Center.

**Forwarded Message** [ Download File ]

**Date:** Thu, 9 Aug 2007 17:44:57 -0700 (PDT)

**From:** "Teresa Valencia" <valenciaisthe1@yahoo.com>

**Subject:** Teresa Valencia

**To:** Tyrone_Brandyburg@nps.gov, Bobby.Henderson@va.gov, James.Lowe@va.gov

**HTML Attachment** [ Scan and Save to Computer ]

Dear Mr. Tyrone Brandyburg:

You might not be aware that I sustained an injury on July 30, 2007. While conducting my

Received at 10:52 am on Aug. 15, 2007

**RETURN TO WORK OR SCHOOL**

**FAMILY PRACTICE**

4143 Atlanta Highway
Montgomery, AL 36109
(334) 271-4503

Shepherd A. Odom, M.D., P.C.          Gilberto Sanchez, M.D.

Date: 7/31/07

This is to certify that *Teresa Valencia*

has been under my care for the following:

Neck Pain
Hip Pain
Low Back Pain

and is able to return to work / school on  8/1/07

Remarks:

F/u appt. on
8/9/07

Signature: Dr. Gilberto Sanchez

---

**RETURN TO WORK OR SCHOOL**

**FAMILY PRACTICE**

4143 Atlanta Highway
Montgomery, AL 36109
(334) 271-4503

Shepherd A. Odom, M.D., P.C.          Gilberto Sanchez, M.D.

Dr. Chung          Date: 8/9/07

This is to certify that *Teresa Valencia*

has been under my care for the following:

medical reason
dizziness
LBP          Neck Pain

and is able to return to work / school on  8/15/07

Remarks:

Next Appt.
Thursday 9/6/07 10:00 am (Dr.)

Signature: Dr. J. Juan Chung



**Shirley K Baxter**
08/15/2007 08:35 AM
CST

To: Teresa Valencia/TUIN/NPS@NPS
cc:
Subject: Fw: water fountain

—— Forwarded by Shirley K Baxter/TUIN/NPS on 08/15/2007 08:34 AM ——



**Shirley K Baxter**
08/07/2007 08:16 AM
CST

To: Robyn Harris/TUIN/NPS@NPS
cc:
Subject: water fountain

Robyn—

I appreciate your assistance so far on the lack of a water fountain with cool water in the Carver Museum. The water fountain on the upper level does not have cold water and we have had people asking about water several times. This is the hottest part of the year and people who visit us are expecting a water fountain that works. Do you know what the hold up is in getting the water fountain installed?

Thanks again

Shirley

 **Shirley K Baxter**
08/15/2007 01:45 PM
EDT

To: Shirley Streeter/TUIN/NPS@NPS
cc: Teresa Valencia/TUIN/NPS@NPS
Subject: safety question

Shirley S.--

Not sure this went out, so decided to send it again.

Shirley B.
----Forwarded by Shirley K Baxter/TUIN/NPS on 08/15/2007 12:43PM ----

To: Shirley Streeter/TUIN/NPS@NPS
From: Shirley K Baxter/TUIN/NPS
Date: 08/15/2007 12:41PM
cc: teresa_valenica@nps.gov
Subject: safety question

Shirley S.--
Teresa was leaving for a doctor's appointment and asked me to ask you if the contractors stripping the floors in the restrooms need to be wearing PPE and is there adequate ventilation for them in that confimed area. There is a strong chemical odor coming from the restroom area.
Thanks



**Shirley K Baxter**
08/15/2007 04:02 PM
CST

To: Teresa Valencia/TUIN/NPS@NPS
cc:
Subject: Fw: safety question

----- Forwarded by Shirley K Baxter/TUIN/NPS on 08/15/2007 04:02 PM -----



**Shirley Streeter**
08/15/2007 01:54 PM
CDT

To: Shirley K Baxter/TUIN/NPS@NPS
cc: teresa_valenica@nps.gov, Andrew Callens/TUIN/NPS@NPS, Kevin Colley/TUAI/NPS@NPS, Catherine Light/TUIN/NPS@NPS, Tyrone Brandyburg/TUIN/NPS@NPS, Kevin Colley/TUAI/NPS@NPS
Subject: Re: safety question 📄

Shirley,

I spoke with Andrew and he indicated everything was in order.  Tyrone will be coming over shortly to assess the situation.

Shirley Streeter
Administrative Officer
Tuskegee Institute National Historic Site
Phone: 334-727-6390
Fax:    334-727-4597
Email:   Shirley_Streeter@nps.gov
Shirley K Baxter



**Shirley K Baxter**
08/15/2007 01:41 PM
EDT

To: Shirley Streeter/TUIN/NPS@NPS
cc: teresa_valenica@nps.gov
Subject: safety question

Shirley S.—

Teresa was leaving for a doctor's appointment and asked me to ask you if the contractors stripping the floors in the restrooms need to be wearing PPE and is there adequate ventilation for them in that confimed area. There is a strong chemical odor coming from the restroom area.

Thanks

 **Shirley K Baxter**
08/15/2007 01:43 PM
EDT

To: Shirley Streeter/TUIN/NPS
cc: Teresa Valencia/TUIN/NPS
Subject: safety question

Shirley S.—

Teresa was leaving for a doctor's appointment and asked me to ask you if the contractors stripping the floors in the restrooms need to be wearing PPE and is there adequate ventilation for them in that confined area. There is a strong chemical odor coming from the restroom area.

Thanks

# MATERIAL SAFETY DATA SHEET

**FILE NAME: MS002a**

MSDS DATE: 11/07/2006

## SECTION 1: PRODUCT AND COMPANY IDENTIFICATION

**PRODUCT NAME:** MEX SEAL
**DESCRIPTION:** TOPICAL SEALER

**MANUFACTURER:** SPARKS SOUTHWEST, INC.
**ADDRESS:** 1804 INDUSTRIAL BLVD.
COLLEYVILLE, TX. 76034

**PHONE:** (817)488-6585
**FAX:** (817)488-3466

**EMERGENCY PHONE:**
CHEMTREC: 1-800-424-9300

**DOT SHIPPING \ LABEL NAME**
Flammable liquid N.O.S.(naptha), 3 , UN/1993, PGII

**HAZARD RATING:**
(Least = 0, Slight = 1, Moderate = 3, High = 4, Extreme = 5)

**HEALTH = 2     FIRE = 3     REACTIVITY = 0**

## SECTION 2: COMPOSITION / INFORMATION ON INGREDIENTS

| NO. | HAZARDOUS INGREDIENT | % WT | ACGIH/TLV | OSHA/PEL | CAS |
|---|---|---|---|---|---|
| | | | EXPOSURE LIMITS | | |
| 8052-41-3 | Petroleum Distillate (mixture) | ~75% | 100ppm | 100ppm | |
| *1330-20-7 | * XYLENE | <1% | 100ppm | 100ppm | |

**NOTE** – Ingredients preceeded by a * indicate a toxic chemical subject to reporting requirements of SARA Title III Section 313 ( 40 CFR 372 )

## SECTION 3: PHYSICAL AND CHEMICAL PROPERTIES

**Boiling Point:** 127° F     **Evaporation Rate:** slow     **Percent Volitile:** >77     **Vapor Pressure:** 8.2 mm-Hg @ 20° F

**pH:** N.A.     **Vapor Density:** 3.1     **Flash Point:** 52° F     **V.O.C.:** <600 g/l

**Specific Gravity:** 0.858     **Appearance:** nearly clear     **Odor:** typical

## SECTION 4: FIRE AND EXPLOSION HAZARD INFORMATION

**Flammability Class:** 1B     **Flash Point:** * 52° F     **LEL / UEL:** 2.5 – 12.8
* **NOTE: Based upon lowest constituent.**
**EXTINGUISHING MEDIA:** NFPA Class B extinguishers (CO-2 or foam) for Class 1B liquid fires

**SPECIAL FIREFIGHTING PROCEDURES:**  Water spray may be ineffective on fire but can protect fire fighters and cool containers. Use fog nozzles if water is used.  Do not enter confined fire space without full bunker gear (helmet with full face shield, bunker coats, gloves, and rubber boots. Use a NIOSH approved positive pressure self-contained breathing apparatus.

**UNUSUAL FIRE AND EXPLOSION HAZARDS:**  Flammable! Keep containers tightly closed.  Isolate from sources of ignition such as: Oxidizers, heat, sparks, flame, electrical equipment.  Empty container is very hazardous.  Continue all label precautions.

## SECTION 5: HEALTH HAZARD INFORMATION

**INHALATION:** Anesthetic.  Respiratory irritant.  Breathing high concentrations of vapors or mist may cause irritation of the nose And throat.  Remove to fresh air.  If symptoms persist seek medical attention.  Administer oxygen if breathing is difficult.  Administer artificial respiration if not breathing (CPR).

**EYE CONTACT:**  Primary eye irritant.  Causes stinging, tearing, redness and swelling.  Flush eyes for 15 minutes and seek medical attention.

**SKIN CONTACT:**  Primary skin irritant.  Can cause defatting; dermatitis.  Flush with water.  If irritation or redness persist, seek medical attention.

**INGESTION:**  Unlikely route of exposure.  Harmful or fatal if swallowed.  Can cause abdominal irritation, nausea, vomiting and diarrhea. CALL PHYSICIAN IMMEDIATELY!  Do not induce vomiting.  Have person lie down, keep warm and calm.  Vomiting may lead to aspiration *into lungs causing pneumonitis which may be fatal.  Do not leave unattended.*

This PDF was created using the Sonic PDF Creator.
To restore this watermark, please license this product at www.investintech.com

# MATERIAL SAFETY DATA SHEET

**MSDS DATE:** 11/07/2006

**FILE NAME: MS002a**

---

**SECTION 6:  REACTIVITY INFORMATION**

**STABILITY:** Stable          **HAZARDOUS POLYMERIZATION:** Will not occur          **INCOMPATABILITY:** Oxidizers

**CONDITIONS TO AVOID:** Heat, sparks, electrical equipment and open flame

**HAZARDOUS DECOMPOSITION PRODUCTS:** Carbon monoxide, carbon dioxide from burning

**SECTION 7:  SPILL OR LEAK PROCEDURES**

**STEPS TO TAKE IF SPILLED OR RELEASED (SMALL):** Mop up with absorbent material. **(LARGE):** Isolate from sources of ignition. Keep people clear of area that are without protective clothing.

**WASTE DISPOSAL: (SMALL)** Evaporate until all vapors are gone.  Dispose of remainder by legally applicable methods.  **(LARGE)** Recycle or incinerate observing local, state and federal regulations.

**SECTION 8:  SPECIAL PROTECTION INFORMATION**

**RESPIRATORY PROTECTION:** Wear organic respirator when working with large amounts or an extended length of time

**VENTILATION:** Necessary.  Ventilate with fresh air.

**PROTECTIVE CLOTHING:** Chemical resistant gloves, aprons and shoes.

**EYE PROTECTION:** Goggles or face shield.

**SECTION 9:  SPECIAL PRECAUTIONS**

**STORAGE AND HANDLING:** Store away from possible sources of ignition or extreme heat.

**OTHER PRECAUTIONS:** Empty containers are still hazardous.  Continue precautions as though still containing product.

Index of abbreviations:

| | |
|---|---|
| **ACGIH** | -American Conference of Governmental Industrial Hygenists |
| **TLV** | -Threshold Limit Value |
| **OSHA** | -Occupational Safety and Health Administration |
| **PEL** | -Permissable Exposure Limit |
| **N/A** | -Not applicable |
| **N.A.** | -Not available |
| **N.E.** | -Not established |

All information herein is based on studies and opinions of qualified experts. Sparks Southwest, Inc. makes no warranty as to the accuracy of the data herein or to the results obtained from the use of this product.  Sellers of this product are urged to keep on file a copy of this MSDS and to provide copies along with the sale of this product.

This PDF was created using the Sonic PDF Creator.
To remove this watermark, please license this product at www.investintech.com

# MATERIAL SAFETY DATA SHEET
**MSDS DATE: 11/07/2006**

FILE NAME: SG002a

## SECTION 1: PRODUCT AND COMPANY IDENTIFICATION

**PRODUCT NAME:** STONE GLAMOR
**DESCRIPTION:** PENETRANT / TOPICAL SEALER

**EMERGENCY PHONE:**
CHEMTREC: 1-800-424-9300

**MANUFACTURER:** SPARKS SOUTHWEST, INC.
**ADDRESS:** 1804 INDUSTRIAL BLVD.
COLLEYVILLE, TX. 76034

**DOT SHIPPING \ LABEL NAME**
Flammable liquid N.O.S.(naptha), 3 , UN/1993, PGII

**HAZARD RATING:**
(Least = 0, Slight = 1, Moderate = 3, High = 4, Extreme = 5)

**PHONE:** (817)488-6585
**FAX:** (817)488-3466

**HEALTH = 1    FIRE = 4    REACTIVITY = 0**

## SECTION 2: COMPOSITION / INFORMATION ON INGREDIENTS

| | | | EXPOSURE LIMITS | |
|---|---|---|---|---|
| **CAS NO.** | **HAZARDOUS INGREDIENT** | **% WT** | **ACGIH/TLV** | **OSHA/PEL** |
| 8052-41-3 | Petroleum Distillate (mixture) | ~75% | 100ppm | 100ppm |
| *1330-20-7 | * XYLENE | <1% | 100ppm | 100ppm |

**NOTE** – Ingredients preceeded by a * indicate a toxic chemical subject to reporting requirements of SARA Title III, Section 313  ( 40 CFR 372 )

## SECTION 3: PHYSICAL AND CHEMICAL PROPERTIES

| | | | |
|---|---|---|---|
| **Boiling Point:** 127` F | **Evaporation Rate:** slow | **Percent Volitile:** >77 | **Vapor Pressure:** 8.2 mm-Hg @ 20` F |
| **pH:** N.A. | **Vapor Density:** 2.0 | **Flash Point:** 52` F | **V.O.C:** <600 g/l |
| **Specific Gravity:** 0.802 | **Appearance:** nearly clear | **Odor:** typical | |

## SECTION 4: FIRE AND EXPLOSION HAZARD INFORMATION

**Flammability Class:** 1B
**\* NOTE: Based upon lowest constituent.**
**EXTINGUISHING MEDIA:** NFPA Class B extinguishers (CO-2 or foam) for Class 1B liquid fires

**Flash Point:** *52` F

**LEL / UEL:** 2.5 – 12.8

**SPECIAL FIREFIGHTING PROCEDURES:**  Water spray may be ineffective on fire but can protect fire fighters and cool containers. Use fog nozzles if water is used.  Do not enter confined fire space without full bunker gear (helmet with full face shield, bunker coats, gloves, and rubber boots. Use a NIOSH approved positive pressure self-contained breathing apparatus.

**UNUSUAL FIRE AND EXPLOSION HAZARDS:**  Flammable!  Keep containers tightly closed.  Isolate from sources of ignition such as: Oxidizers, heat, sparks, flame, electrical equipment.  Empty container is very hazardous. Continue all label precautions.

## SECTION 5: HEALTH HAZARD INFORMATION

**INHALATION:** Anesthetic.  Respiratory irritant. Breathing high concentrations of vapors or mist may cause irritation of the nose And throat.  Remove to fresh air.  If symptoms persist seek medical attention.  Administer oxygen if breathing is difficult.  Administer artificial respiration if not breathing (CPR).

**EYE CONTACT:**  Primary eye irritant.  Causes stinging, tearing, redness and swelling.  Flush eyes for 15 minutes and seek medical attention.

**SKIN CONTACT:**  Primary skin irritant.  Can cause defatting; dermatitis.  Flush with water.  If irritation or redness persist, seek medical attention.

**INGESTION:**  Unlikely route of exposure.  Harmful or fatal if swallowed.  Can cause abdominal irritation, nausea, vomiting and diarrhea.  CALL PHYSICIAN IMMEDIATELY!  Do not induce vomiting.  Have person lie down, keep warm and calm.  Vomiting may lead to aspiration into lungs causing pneumonitis which may be fatal.  Do not leave unattended.

. PAGE 1 OF 2

This PDF was created using the Sonic PDF Creator.
To remove this watermark, please license this product at www.investintech.com

# MATERIAL SAFETY DATA SHEET

**FILE NAME: SG002a**

MSDS DATE: 11/07/2006

## SECTION 6: REACTIVITY INFORMATION

**STABILITY:** Stable    **HAZARDOUS POLYMERIZATION:** Will not occur    **INCOMPATABILITY:** Oxidizers

**CONDITIONS TO AVOID:** Heat, sparks, electrical equipment and open flame

**HAZARDOUS DECOMPOSITION PRODUCTS:** Carbon monoxide, carbon dioxide from burning

## SECTION 7: SPILL OR LEAK PROCEDURES

**STEPS TO TAKE IF SPILLED OR RELEASED (SMALL):** Mop up with absorbent material. **(LARGE):** Isolate from sources of ignition. Keep people clear of area that are without protective clothing.

**WASTE DISPOSAL: (SMALL)** Evaporate until all vapors are gone. Dispose of remainder by legally applicable methods. **(LARGE)** Recycle or incinerate observing local, state and federal regulations.

## SECTION 8: SPECIAL PROTECTION INFORMATION

**RESPIRATORY PROTECTION:** Wear organic respirator when working with large amounts or an extended length of time

**VENTILATION:** Necessary. Ventilate with fresh air.

**PROTECTIVE CLOTHING:** Chemical resistant gloves, aprons and shoes.

**EYE PROTECTION:** Goggles or face shield.

## SECTION 9: SPECIAL PRECAUTIONS

**STORAGE AND HANDLING:** Store away from possible sources of ignition or extreme heat.

**OTHER PRECAUTIONS:** Empty containers are still hazardous. Continue precautions as though still containing product.

**Index of abbreviations:**

| | |
|---|---|
| **ACGIH** | -American Conference of Governmental Industrial Hygenists |
| **TLV** | -Threshold Limit Value |
| **OSHA** | -Occupational Safety and Health Administration |
| **PEL** | -Permissable Exposure Limit |
| **N/A** | -Not applicable |
| **N.A.** | -Not available |
| **N.E.** | -Not established |

All information herein is based on studies and opinions of qualified experts. Sparks Southwest, Inc. makes no warranty as to the accuracy of the data herein or to the results obtained from the use of this product. Sellers of this product are urged to keep on file a copy of this MSDS and to provide copies along with the sale of this product.

This PDF was created using the **Sonic PDF Creator.**
To remove this watermark, please license this product at www.investintech.com









Moderate ... [illegible]

HEALTH ... FIRE = ... REACTIVITY

## ... INFORMATION ON INGREDIENTS

| CAS NO. | ... | ... | EXPOSURE LIMITS ACGIH/TLV | OSHA/PEL |
|---|---|---|---|---|
| [illegible] | | | 200ppm | 100ppm |
| [illegible] | | | 100ppm | 100ppm |

NOTE ... reporting requirements of SARA Title I...

## PHYSICAL AND CHEMICAL PROPERTIES

Boiling Point ... Evaporation Rate ... Percent Volatile ... Vapor Pressure: ...

pH ... Vapor Density ... Flash Point 52 F V.O.C. ...

Specific Gravity ... Appearance ... Odor ...

## SECTION 4: FIRE AND EXPLOSION HAZARD INFORMATION

Flammability Class 1B Flash Point: 52 F LEL / UEL: ...

*** NOTE: Based upon lowest constituent.**

**EXTINGUISHING MEDIA** NFPA Class B extinguishers (CO-2 or foam) for Class 1B liquid fires

**SPECIAL FIREFIGHTING PROCEDURES:** Water spray may be ineffective on fire but can protect fire fighters ... Use fog nozzles if water is used. Do not enter confined fire space without full bunker gear (helmet with face ... gloves, and rubber boots. Use a NIOSH approved positive pressure self-contained breathing apparatus ...

# MATERIAL SAFETY DATA SHEET
**MSDS DATE:** 11 07 2006

FILE NAME: **MS002B**

## SECTION 1: PRODUCT AND COMPANY IDENTIFICATION

**PRODUCT NAME:** MEX SEAL
**DESCRIPTION:** TOPICAL SEALER

**MANUFACTURER:** SPARKS SOUTHWEST
**ADDRESS:** 1234 INDUSTRIAL DR
COLLEYVILLE TX

**PHONE:** 817 488 6565
**FAX:** 817 488 3406

DOT SHIPPING  LABEL NAME
Flammable liquid N.O.S (naptha), 3 , UN 1993, PGII

HAZARD RATING:
(0 Slight , 1 Moderate , 3 High , 4 Extreme , 5)

HEALTH = 2    FIRE = 3    REACTIVITY = 0

## SECTION 2: COMPOSITION / INFORMATION ON INGREDIENTS

|  |  |  | EXPOSURE LIMITS |  |  |
|---|---|---|---|---|---|
| **NO.** | **HAZARDOUS INGREDIENT** | **% WT** | **ACGIH TLV** | **OSHA PEL** | **CAS** |
| 8052 41 3 | Petroleum Distillate (mixture) |  | 100ppm | 100ppm |  |
| 1330 20 7 | * XYLENE |  | 100ppm | 100ppm |  |

**NOTE** – Ingredients preceeded by a * indicate a toxic chemical subject to reporting requirements of SARA Title III Section 313 ( 40 CFR 372 )

## SECTION 3: PHYSICAL AND CHEMICAL PROPERTIES

**Boiling Point:** 127 F    **Evaporation Rate:** slow    **Percent Volitile:** >77    **Vapor Pressure:** 8.2 mm Hg @ 20 F

**pH:** N.A.    **Vapor Density:** 3.1    **Flash Point:** 52 F    **V.O.C:** <800 g/l



**National Park Service**
**U.S. Department of the Interior**

Tuskegee Institute National
Historic Site

1212 West Montgomery Rd
Tuskegee, Al 36088

334-727-3200 phone
334-727-1448 fax

# Division of Resource Education & Interpretation   Fax

**To:**              Greg Hindsley

**Fax number:**   202-208-7881

**From:**           Teresa Valencia

**Date:**           08/16/2007

**Pages to follow:**   21

**Comments:**

I have attached my letter to Director Bomar as well as the Formal OSHA Complaint and a copy of OSHA
Citations.

August 7, 2007

Dear Director Mary Bomar:

This letter is in regards to an unsafe working environment that has been condoned by park administration officials through either out right indifference and or negligence.

On April 19, 2007, I contacted OSHA on regards to exposure of lead and arsenic in the Museum Collection. I was showing symptoms of lead and arsenic exposure (i.e., headaches, light headedness, insomnia, irregular heartbeat, dizziness, fainting spells, lethargic, tremors, memory loss, anxiety, depression, difficulties concentrating, joint pain, muscle soreness, nausea, numbness, and diarrhea/constipation). I have been requesting from Superintendent Catherine Light and the Chief of Resource Education and Interpretation the right to be placed on the leave share program list or to be given an advancement of sick leave. Also, I have tried repeatedly to invoke my Family Medical Leave Act (FMLA) rights and on each occasion my requests have been denied. My finances are becoming negatively impacted by my superior's decisions and my treatment has been compromised.

I have been under the treatment of Dr. Gilberto Sanchez for the treatment of the above symptoms. The park Superintendent, Catherine Light and Chief of Resource Education and Interpretation, Tyrone Brandyburg have requested documentation above the normal in such similar circumstances. The information requested is a violation of the Health Information Protection Act (HIPA). My doctors have been willing to provide much of the information that they have requested, but I have been told repeatedly that the documentation provided is unacceptable.

*I felt compelled to go to OSHA with my complaint concerned with exposure limits to lead and* arsenic. After a number of OSHA inspections the park was cited with 6 violations, which are listed below:

**Citation 1 Item 1 Type of Violation: Serious**

29 CFR 1910.141(b)(1)(i): Potable water was not provided in all places of employment, for drinking, washing of the person, cooking, washing of foods, washing of cooking or eating utensils, washing of food preparation or processing premises, and personal service rooms:

   (a) Maintenance Shed: Employees were not provided drinking water when mowing, trimming, cutting, cultivating, and maintaining equipment and grounds.

Date by Which Violation Must be Abated: 08/02/2007

**Citation 1 Item 2 Type of Violation: Serious**

29 CFR 1910.141(d)(2)(iii): Lavoratories were not provided with hand soap or similar cleansing agent:

   (a) Basement of G.W. Carver Museum: Employer did not provide hand soap for employees performing maintenance of museum displays and keeping the museum clean.

Date by Which Violation Must be Abated: 08/01/2007

**Citation 1 Item 3 Type of Violation: Serious**

29 CFR 1910.1018(e)(2): Initial monitoring was not performed for each workplace, or work operation covered by this section to accurately determine the airborne concentration of inorganic arsenic to which employees may be exposed:

    (a) G.W. Carver Museum: Employer failed to conduct exposure measurements to ascertain the levels of arsenic for employees arranging, disassembling, rearranging, shipping, and receiving taxidermied artifacts.

Date by Which Violation Must be Abated: 08/08/2007

**Citation 1 Item 4 Type of Violation: Serious**

29 CFR 1910.1025(d)(3)(i): The initial determination for lead was not based on employee exposure monitoring results and other relevant considerations listed in (A), (B) and (C) of this paragraph:

    (a) G.W. Carver Museum: Employer failed to provide exposure measurements to ascertain the levels of lead for employees arranging, disassembling, rearranging, shipping, and receiving taxidermied artifacts.

Date by Which Violation Must be Abated: 08/02/2007

**The alleged violations below have been grouped because they involve similar or related hazards that may increase the potential for illness.**

**Citation 1 Item 5a Type of Violation: Serious**

29 CFR 1910.1025 (1)(1)(i): Employee(s) working in an area where there was potential exposure to airborne lead at any level were not informed of the content of Appendices A and B of this regulation:

    (a) G.W. Carver Museum: Employees were not informed of the proper methods of personal protection, personal hygiene, and medical surveillance while arranging, disassembling, rearranging, shipping, and receiving taxidermied artifacts in displays containing lead.

Date by Which Violation Must be Abated: 08/08/2007

**Citation 1 Item 5b Type of Violation: Serious**

29 CFR 1910.1200(h)(1): Employer did not provide employees with effective information and training on hazardous chemicals in their work area at the time of their initial assignment, and wherever a new physical or health hazard the employees have not previously been trained about is introduced into their work area. Information and training may be designed to cover categories of hazards (e.g., flammability, carcinogenicity) or specific chemicals. Chemical-specific information must always be available through labels and material safety data sheets.

    (a) Artifact Storage Department: Employer failed to provide adequate training for employees handling taxidermied artifacts containing hazardous chemicals such as, but not limited to, arsenic, compounds, with health effects, such as, but not limited to, skin disorders, digestive and respiratory system disorders.

Date By Which Violation Must be Abated: 08/02/2007

**Citation 1 Item 6 Type of Violation: Serious**

29 CFR 1910.1200(g)(8): The employer did not maintain copies of the required material safety data sheets for each hazardous chemical in the workplace:

(a) Artifact Storage Department: Employer failed to provide material safety data sheets for employees handling
taxidermied artifacts containing hazardous chemicals, such as, but not limited to, arsenic and lead, with health effects, such as, but not limited to, central nervous system, reproductive, and renal disorders.

Date by Which Violation Must be Abated: 08/02/2007

Given the fact that the park has been cited for these violations and have continually thwarted my efforts to be placed on the leave share recipient list, advanced sick leave, and the right to invoke my Family Medical Leave Act (FMLA) Rights, I would like to request a telephone conference with you concerning this issue with the hope that you might be able to assist me with this situation.

I have served this organization loyally and with skill for 14.5 years and as such I am writing this letter with a great deal of concern. In the place of overwhelming evidence the park has been unwilling to offer any form of assistance.

Thank you for your time and consideration in this matter.

Respectfully yours,


Teresa Valencia

April 19, 2007

OSHA
Mobile Area Office
Attn: Duty Officer
1141 Montlimar Drive
Mobile, Alabama 36609

Dear Duty Officer:

I am writing this letter in order to establish a Formal Complaint against my employer, the Department of Interior-National Park Service, Tuskegee Institute National Historic Site, in Tuskegee, Alabama.

On the week of March 12-16[th], 2007, several individuals (i.e., David Mendez, Mount Maker; Sean Bober, Mountmaker; Susan Blecher, Exhibit Registrar; and Tina Gessler, Conservator) from the Field Museum in Chicago, Illinois, visited Tuskegee Institute NHS in order to prepare for an upcoming exhibit pertaining to George W. Carver. Due to the fact, that I am the sole Museum Specialist for Tuskegee Institute NHS, Tuskegee Airmen NHS, and Selma to Montgomery NHT, I deal with museum collection, which includes: outgoing and incoming loans, conservation and preservation of antiques and historic structures, etc.

During the time the Field Museum was here, the conservator Tina Gessler took several swab samples from the taxidermy collection. Upon her return to the Field Museum, Ms. Tina Gessler conducted a semi-quantitative test for the presence of arsenic. Each sample tested positive for arsenic and one tested extremely high. On March 19, 2007, Ms. Gessler notified me via telephone and told me I needed to take extra precautions when handling those particular specimens. Ms. Gessler suggested that I bag each of the specimens for safety purposes. Once I received her phone call I immediately placed a sign on the museum storage cabinet that stated that the cabinet should not be opened without written authorization.

Once I secured the collection (i.e., locking collection is museum storage cabinet and affixing sign) I emailed Superintendent, Catherine Light, and told her about my conversation with Tina Gessler. In the same email I made a request to be tested for occupational exposure to arsenic. On March 20, 2007, Ms. Light sent a response back to me stating that she would have my Supervisor, Tyrone Brandyburg, check into the matter as soon as possible. On March 21, I emailed Mr. Brandyburg and asked him if he found out any information on whether or not I could be tested for occupational exposure to

arsenic. He later responded and asked me to be patient that he was collecting more information and documentation from the Field Museum and the National Park Service Southeast Regional Office. Later that afternoon, Mr. Brandyburg sent me and email that stated:

If you feel that you have been exposed to lead arsenic or paris green, it is your responsibility to go to the physician of your choice to ascertain whether or not you have been exposed to any poisons. Please have them provide you with a medical report. Use the appropriate leave, (i.e., sick leave or annual leave).

Once you return with the report, we will proceed from there. I highly recommend that you do not go back into that environment until the issue is resolved.

In reading that letter I recognized that I was pretty much on my own. Due to the fact, that I have been suffering from some major health issues I knew there was no way I could afford to pay for the testing myself, since my insurance would not cover it. I then went on-line to http://www.inside.nps.gov and clicked on quick links to research information on the National Park Service's "Safety Management Information Systems". From there I contacted their help line and spoke with a Mary Davis who told me to contact a gentleman by the name of Steve Rosen. Mr. Steve Rosen then told me that the gentlemen I need to talk to for the National Park Service was Mr. Louis Rowe and Mr. Edward Perez out of Washington, D.C. – I left messages on both Mr. Rowe's and Mr. Perez's voice mail. On my way home that day, I received a telephone call from Mr. Louis and I explained my plight to him. He told me to just hold on tight and that both he and Mr. Perez would see to it that I would be tested for occupational exposure at the expense of the National Park Service. I told both of them that I didn't want to get in any trouble for contacting them, but they told me not to worry about it. They said they would contact my Superintendent and speak with her directly, which they did and if I had any problems to contact them and keep the abreast of the situation. They also stated that they would put me in touch with the Southeast Regions Safety Officer, Linda Giles.

On April 3, 2007, I was sent to Atlanta to be tested for arsenic exposure at the Richard B. Russell Building in the Health Unit. That building sits next to the Federal Building where the National Park Service Southeast Regional Office is located. Ms. Sheryl Burton, who is a contracted nurse, drew blood samples as well as had me give a urine specimen, which I provided her with two. All of the testing was conducted in their facility located at 75 Spring Street, S.W., Atlanta, Georgia.

On Friday the 13th day of April, 2007, I received a phone call from Ms. Sheryl Burton. She was calling to inform me that my urine specimen had been lost and that I needed to come in and be retested. I told her that she would need to make contact with either my Supervisor or Superintendent. I then gave her their phone number and she told me she would call them right away. About an hour later, the Administrative Officer, Shirley Streeter, telephoned me and asked me if I could go on April 16th or 17th to be retested. Since it was late in the day, it was decided that April 17th would be the best day for me to

be retested. This would provide her with enough time to get my travel authorization completed.

On April 16, 2007, I went to conduct a quick inventory of my collection and noticed that one of my keys was out of order. It was actually the #2 key, which unlocks the museum storage cabinet that contained some of the taxidermy specimens. I immediately took the key and check the cabinet and notice that the taxidermy collection was missing. I then went over to cabinet #5 and noticed that the other taxidermy collection was missing. I immediately notified Louis Rowe and Edward Perez. Mr. Louis Rowe then forwarded my email to Linda Giles. Ms. Giles told me to speak with my Supervisor, Tyrone Brandyburg to see whether or not he transferred the taxidermy collection or loaned them to another institution. I spoke with Mr. Brandyburg around 2:45 or 2:50 that afternoon and I asked him three specific questions: **1) Are we going to loan the Field Museum the taxidermy collection? Response: <u>I don't think so because they are not in good shape.</u> 2) Do you know what happened to the taxidermy collection? Response: <u>He told me that under Catherine Lights authority he was told to remove the objects from the collection.</u> 3) Where are they located? Response: <u>You don't need that information.</u>**

After that, I immediately sent an email to the Regional Curator, Allen Bohnert, in Atlanta, which read:

Dear Mr. Allen Bohnert:

As you are aware, the Field Museum from Chicago, Illinios, visited the park about a month ago. They are interested in borrowing some of our collections for an exhibit. While they were here they took a small sample from the taxidermy collections to test for arsenic. The items that they tested all came back positive. The conservator, Tina Gessler, immediately notified me about her findings and told me to take extra precautions, which I did. I secured all of the specimens and placed a sign on the cabinet door that no one is to open that cabinet without written authorization.

Today, while I was doing my walk through through the storage area I looked in my keybox and noticed that the key for the taxidermy specimens was not in its proper location. I then took the key and checked the cabinet and noticed that all of the taxidermy specimens were missing.

When I discovered this I immediately notified Louis Rowe and Edward Perez and they forwarded my memo on to Linda Giles who is the Safety and Health Manager at the Atlanta Regional Office. She told me to check with my supervisor to see if the items had been loaned out or transferred. When I spoke with Tyrone this afternoon I asked him if we were going to allow the Field Museum to borrow such specimens and he said he didn't think so, because they aren't in good shape. I then asked him if he knew what happened to the taxidermy collection. He told me that under Catherine Lights authority he was told to remove the objects from the collection. I then asked him where they were located and he told me that I didn't need that information.

I find it to be highly irresponsible to remove toxic items from a collection where they have already been secured. I have already been exposed to the arsenic. Why would you then expose another person to a harmful substance unneccesarily?

Respectfully yours,

Teresa Valencia

On April 17, 2007, *Linda Giles forwarded a copy of my letter to Superintendent*
Catherine Light. That was the same day I was in Atlanta being retested. At approximately
2:00 that afternoon, Ms. Light phoned my office and told me that she wanted to meet
with me in her office tomorrow afternoon at 2:00 p.m. and to bring my Union
Representative with me, that this meeting was in reference to the letter I sent to the
Regional Curator, Allen Bohnert, and forwarded it on to Louis Rowe, Edward Perez, and
Linda Giles. I told her that I was familiar with that letter and that I would be available to
meet with her and that I would have a Union Representative with me.

On April 18, 2007, I went over to the Tuskegee Institute NHS headquarters to meet with
Superintendent Catherine Light, my supervisor, Tyrone Brandyburg, and my Union Rep.
Wendell Echoes. Superintendent Light informed me that I had no business notifying
Washington, D.C., about anything pertaining to this park. Both Light and Brandyburg
stated that they didn't have any right to know what's going on in this park. She then
asked me, "What was the purpose of writing that letter to Allen Bohnert and forwarding it
on to the selected individuals?" I told her that I had asked Tyrone Brandyburg the
location of the taxidermy specimens and he told me that I didn't need that information.
Mr. Tyrone Brandyburg insisted that he told me that the taxidermy collection was still in
storage, but that was a false statement. I didn't know that they were in storage until he
made that comment. I told him that I was not aware that they were in storage. I told him I
checked the designated cabinets and they were not there. He said he moved the collection
to a more appropriate cabinet and that he was in possession of the key and I was not
getting it. At that point Ms. Catherine Light and Tyrone Brandyburg questioned my
professionalism as a Museum Specialist. I told them that it wasn't me who's
professionalism needed to be questioned. I informed Superintendent Light that Tryone
Brandyburg knew about the contaminated specimens all along, but did absolutely nothing
to make others aware of the hazard. Mr. Brandyburg himself stated that at one time the
birds were encapsulated, but the encapsulation had been removed. **(Note: Mr. Brandyburg**
**is on his second tour of duty here at Tuskegee Institute NHS as the Chief of Resource Education and**
**Interpretation. Prior to him becoming the Chief of Resource Education and Interpretation, he was**
**the Museum Specialist. A gentleman by the name of Mike Jolly was my predecessor; he was the**
**Museum Specialist after Tyrone Brandyburg. )** Mr. Brandyburg blamed the removal of the
encapsulation on Mike Jolly and I told Mr. Brandyburg that I don't believe Mr. Jolly had
anything to do with it. Tyrone Brandyburg then asked how I came up with that basis and I
told him that I spoke with Mr. Jolly and he said that they were never encapsulated the
whole time he had been here. At that point Superintendent Light interrupted and said that
I should have been aware of the arsenic issue. I told her that after being notified by the
Field Museum in Chicago I looked in the Collection Condition Survey, which was
written in 2002, and notice that only two items were listed as to containing arsenic. So
she said that I knew since 2002 that the taxidermy collections contained arsenic. I told her
that I contacted Harpers Ferry, West Virginia, and spoke with the author of the Collection
Condition Survey, Barbara Cumberland, and asked her if she had tested any of the other
taxidermy specimens. Ms. Cumberland said that she did not, because the park didn't ask
her to. She said the only reason she knew about the arsenic is because either someone
told her or possibly a tag, but she couldn't recall for sure. At that time Mr. Brandyburg
insinuated that I was negligent in the handling of the specimens. I told him that I wore
gloves when handling the objects. He said that he spoke with another conservator and

that she said that the only way I could get contaminated with arsenic was if I was shaking the birds up and down or mishandling the object. I told Mr. Brandyburg that I handled the birds correctly and that I wasn't shaking them up and down. From that point Superintendent Light reverted back to the letter that I sent to Mr. Allen Bohnert. She said that by no means did I secure the taxidermy specimens since they were not placed in plastic bags as was suggested in the conserve-o-gram. I told her they were secure, because I am the only one that has access to the storage unit besides her and Tyrone. I also told her that I did not have the proper PPE to handle those types of items. Mr. Wendell Echoes, my Union Representative then asked who is responsible for purchasing PPE. Superintendent Light then stated that she has always allowed me the opportunity to purchase whatever I need. Then Mr. Brandyburg stated that he had authorized me to purchase whatever equipment was necessary. I told him that I gave him a list last year of supplies that I needed in order for me to do my job, but he said we ran out of funds and that I would have to wait until the following year. He then mentioned that he just wanted the list and that I should have purchased whatever items I deemed necessary to do my job. The only problem with that is that at that time I was not able to use my Government Credit Card, because we were at the end of the Fiscal Year and the only ones that could make purchases were management. Also, Catherine Light questioned me about the geological specimens and other toxic specimens in the collection and placed the blame on me for not securing them. I told her that they were secure, but the building that I am currently in is inadequate and needs a better ventilation system. I told her I had made an earlier complaint about this with Tyrone Brandyburg and the former Facility Manager, Juan Gomez. Before I completed my statement Ms. Light interrupted and stated that I didn't need to complain, but to take action. Mr. Juan Gomez and I worked jointly, and he immediately notified the Safety Officer at the Southeast Regional Office and listed my concerns. The Regional Office responded promptly and when I told him about some of the toxic items within the collection.

At that point Superintendent Light said that I called her authority into question and that neither she nor Mr. Brandyburg had to tell me anything about the location of the museum collection. She said that this was her park and that the museum collection was her collection. I told her that this park belonged to the American people and that the museum collection belonged to them as well and that I was just trying to keep the park in compliance with the National Park Service's Museum Standards.

Both Catherine Light and Tyrone Brandyburg accused me of being inpatient where it came to getting tested for Occupational Exposure for arsenic. I told her I wasn't being inpatient but trying to stay in the loop to make sure that I would get tested. She told me that Washington, D.C. should have never been brought into this and that Mr. Brandyburg was working on getting me medical attention. I told her according to the email he sent dated March 21, 2007 he pretty much told me that I was on my own in this matter. Superintendent Light and Brandyburg tried to insinuate that I was being impatient, but that Tyrone Brandyburg was working with Linda Giles to get me to a physician. Mr. Brandyburg also stated that he wasn't the one that wrote the letter dated March 21, 2007, but that Mr. Anthony Stennis in the Human Resources Department at the Southeast Regional Office had written it. Truth be known, it wasn't until Washington, D.C.

contacted Superintendent Light that Mr. Tyrone Brandyburg began to vigorously pursue my request to be tested.

From that point, Superintendent Light, asked me what was I trying to accomplish by bring Washington, D.C. into this situation. I reiterated once again that the letter written by Mr. Tyrone Brandyburg basically stated that I was on my own. I told Superintendent Light that I was to keep the gentlemen in Washington, D.C. informed. She said that I was not trying to inform them of anything, but trying to call her authority in to question. I believe that her authority should be called into question, because she allowed another individual to be placed at risk, but as I understand it this was based on a management decision and had nothing to do with health and safety. Again, Superintendent Catherine Light, asked me what I was trying to accomplish. I told her that I didn't trust her or Mr. Brandyburg nor do I trust Anthony Stennis. I told Ms. Light to put herself in my shoes and look at it from my perspective. When I received the call from Sheryl Burton that my urine samples were missing on Friday and then when I came into work Monday my taxidermy collection was missing. Now I find out that Mr. Brandyburg really didn't write that email, but that Anthony Stennis from the Southeast Regional Office had written it and instead of Tyrone Brandyburg just forwarding me the information he either gave Anthony Stennis his password for his Government email or copy and pasted the comment to make it look like he actually wrote it. I find all of this behavior to be suspicious. Catherine Light then told me that she didn't trust me either and that she is tired of people not following the chain of command. At the end of the meeting Superintendent Light told Tyrone Brandyburg to reprimand me. I am currently awaiting documentation pertaining to the reprimand.

On April 19, 2007, I received a telephone call from Allen Bohnert, Regional Curator, and he apologized for not getting back to me sooner. He stated that he had been out of the office. I asked Mr. Allen Bohnert if he had read my email and he said he had. He then asked me what the current situation was and I told him. I told him that I was going to be reprimanded for notifying Washington, D.C. about the arsenic, the missing museum collection, not following the chain of command, and for questioning Superintendent Catherine Light's authority. I told Mr. Bohnert, that they were interfering with me being able to perform my responsibilities as a Museum Specialist. I stated that I believed it was imperative that I brought this to his attention, because now we are out of compliance with the National Park Service Standards for Museum Collections. In speaking with Mr. Allen Bohnert, he stated that the park should have had this information documented years ago and that he did not find fault in what I had done. He said, it's true that Superintendent Catherine Light was ultimately responsible for the collection, but that she needed to be operating within the regulations as well.

On April 18, 2007, Tyrone Brandyburg sent me two email memos with "Safety Items" being one of the subjects and then "Safety Training" being the other subject. The memoa read as such:

A7615 (TUIN)

April 18, 2007

Memorandum

To:             Teresa Valencia, Museum Specialist (TUIN)

From:           Chief of Resource Education & Interpretation

Subject:        SAFETY ITEMS

Per conservation and email with the Superintendent, you are to purchase safety equipment only for Curatorial Storage that is not to exceed $2500.00. The following items are mandatory per Conserv-O-Gram 2/19, 11/10 and 2/3:

**Respirator**
**Gloves (Nitrile and neoprene)**
**Apron/lab coat**
**Safety Glasses**
**Arsenic test kit**
**Safety signs**

Use your own discretion when purchasing the other safety items. Please provide me with a DI-1 with a list of items you purchased, proof of purchase, receipts, and confirmation number for orders for my records. All items **must be purchased** before **April 27, 2007**.

If you have any questions, please contact me

April 19, 2007

Memorandum

To:             Teresa Valencia, Museum Specialist (TUIN)

From:           Chief of Resource Education & Interpretation

Subject:        Safety Training

Per conservation and email with the Superintendent, you are to enroll through DOI-Lean into the following training classes. This is mandatory training for you in an effort to improve your safety awareness and procedures while you are working with curatorial collections.

**Deadline: May 4, 2007; Safety: Personal Protective Equipment- Course Code: 1413**
**Deadline: May 31, 2007; Safety: Authorities, Roles & Responsibilities- Course Code: 1338**

**Deadline: June 11, 2007; Safety: USGS Industrial Hygiene Program-
Course Code: 1304**

Once you complete the courses, please provide completion certificates to Lorraine
and myself.

If you have any questions, please contact me

I would like it noted that I have not received this type of Safety Training during the 4.5
years that I have been here in Tuskegee, Alabama. I would also like to state that the
whole time I have been here curatorial storage has never had any MSDS sheets. The park
should have already had this in place years before my arrival. After I reported everything
to Washington, D.C., my Supervisor re-wrote my performance appraisal plan and now I
am responsible for MSDS along with other safety related issues such as fire extinguisher
inspections and training.

Though Ms. Tina Gessler suggested that I bag all of the specimens I was very hesitant in
doing so. The reason being is that I have been extremely sick since I have been here and
some of my symptoms could point to possible arsenic exposure. On December 30, 2006,
my heart failed me and the paramedics and doctors had to intervene. I turned 40 this past
January, and I really shouldn't be having all of the health problems that I am
experiencing at this time. I believe it would have been highly irresponsible for me to
come into contact with the taxidermy collection until I was tested. The other reason is
because the park currently does not have the proper PPE for handling arsenic
contaminated specimens.

When I contacted Louis Rowe I also made him aware of some of the other hazardous
items that are currently in Tuskegee's collection. The majority of this is related to
geological specimens:

**3488 Strontium Sulfate msc 9c...radiation**
**2630 Barium Carbonate msc9c...radiation**
**3194 Barium Sulfate msc 9d...radiation**
**3198 Sulfarsenide of Cobalt msc 9d...radiation**
**2660 Copper Arsenic Oxide msc 9b...toxic**
**2708 Orpiment (arsenic) msc 11c...toxic**
**2710 Actinolite (asbestos) msc 11a...inhalation**
**2716 Galena in Calcite and Barite msc 11a...radiation/lead**
**2696 Galena, Barite, Covelite, Pyrite msc 11a...radiation/lead**
**2669 Galena, Barite, Covelite, Pyrite msc 9c...radiation/lead**
**2717 Galena msc 11a...lead**
**2812 Pyrite, Galena, Iron Disulfides msc 11c...lead**
**2841 Calcite, Sphalerite, Galena msc 11a...lead**
**3248 Phosphate of Cerium and Lanthanum msc 9d...radiation**
**2639 Lead Chlorovanadate msc 9e...lead**

I hope this gives you some insight on the situation here at Tuskegee Institute NHS.

Respectfully yours,

Teresa Valencia

**U.S. Department of Labor**
Occupational Safety and Health Administration
1141 Montlimar Drive, Suite 1006

Mobile, AL 36609
Phone: (251)441-6131  FAX: (251)441-6396

RECEIVED 

JUL 26 2007

TUIN (. ...niS
Parks Hdqtrs.
Tuskegee Institute, AL

---

# Notice of Unsafe or Unhealthful Working Conditions

---

**To:**
Department of Interior-National Historic Site
Tuskegee Institute-1600 Boy Scout Circle
Tuskegee, AL 36088

**Inspection Number:** 310772330
**Inspection Date(s):**  05/04/2007-05/07/2007
**Issuance Date:**  07/20/2007

*The violation(s) described in this Notice is (are) alleged to have occurred on or about the day(s) the inspection was made unless otherwise indicated within the description given below.*

**Inspection Site:**
Tuskegee Institute-1600 Boy Scout Circle
Tuskegee, AL  36088

---

This Notice of Unsafe or Unhealthful Working Conditions (Notice) describes violations of the Occupational Safety and Health Act of 1970, the Executive Order 12196, and 29 CFR 1960, Basic Program Elements for Federal Employee Occupational Safety and Health Programs and Related Matters. You must abate the violations referred to in this Notice by the dates listed unless within 15 working days (excluding weekends and Federal holidays) from your receipt of this Notice you request an Informal Conference with the U.S. Department of Labor Area Office at the address shown above.

**Posting** - The law requires that a copy of this Notice be posted immediately in a prominent place at or near the location of the violation(s) cited herein, or, if it is not practicable because of the nature of the employer's operations, where it will be readily observable by all affected employees. This Notice must remain posted until the violation(s) cited herein has (have) been abated, or for 3 working days (excluding weekends and Federal holidays), whichever is longer.

**Notification of Corrective Action** - You should notify the U.S. Department of Labor Area Office promptly by letter that you have taken appropriate corrective action within the time frame set forth on this Notice. Please inform the Area Office in writing of the abatement steps you have taken and of their dates, together with adequate supporting documentation, e.g., drawings or photographs of corrected conditions, purchase/work orders related to abatement actions, air sampling results, etc.

**Employer Discrimination Unlawful** - The law prohibits discrimination by any person against an employee for filing a complaint or for exercising any rights under this Act. An employee who believes that he/she has been discriminated against may file a complaint with the U.S. Department of Labor Area Office at the address shown above.

---

**Informal Conference** - An informal conference is not required. However, if you wish to have such a conference you may request one with the Area Director within 15 working days after receipt of this Notice. As soon as the time, date, and place of the informal conference have been determined please complete the enclosed "Notice to Employees" and post it where the Notice is posted. During such an informal conference you may present any evidence or views which you believe would support an adjustment to the Notice. In addition, bring to the conference any and all supporting documentation of existing conditions as well as any abatement steps taken thus far.

**Notification of Corrective Action** - For **each** violation which you do not contest, you are required by 29 CFR 1903.19 to submit an Abatement Certification to the Area Director of the OSHA office issuing the citation and identified above. The certification **must** be sent by you within **10 calendar days** of the abatement date indicated on the citation. For **Willful** and **Repeat** violations, documents (examples: photos, copies of receipts, training records, etc.) demonstrating that abatement is complete must accompany the certification. Where the citation is classified as **Serious** and the citations states that abatement documentation is required, documents such as those described above are required to be submitted along with the abatement certificate. If the citation indicates that the violation was corrected during the inspection, no abatement certification is required for that item.

**All abatement verification documents must contain the following information: 1)** Your name and address; **2)** the inspection number (found on the front page); **3)** the citation and citation item number(s) to which the submission relates; **4)** a statement that the information is accurate; **5)** the signature of the employer or employer's authorized representative; **6)** the date the hazard was corrected; **7)** a brief statement of how the hazard was corrected; and **8)** a statement that affected employees and their representatives have been informed of the abatement.

The law also requires a copy of all abatement verification documents, required by 29 CFR 1903.19 to be sent to OSHA, also be posted at the location where the violation appeared and the corrective action took place.

**Inspection Activity Data** - You should be aware that OSHA publishes information on its inspection and citation activity on the Internet under the provisions of the Electronic Freedom of Information Act. The information related to your inspection will be available 30 calendar days after the Citation Issuance Date. You are encouraged to review the information concerning your establishment at WWW.OSHA.GOV. If you have any dispute with the accuracy of the information displayed, please contact this office.

**U.S. Department of Labor**
*Occupational Safety and Health Administration*



Company Name: Department of Interior-National Historic Site
Inspection #: 310772330

## NOTICE OF CORRECTIVE ACTION

CORRECTIVE ACTION TAKEN FOR EACH STANDARD VIOLATED SHOULD BE SUBMITTED TO THIS OFFICE ON OR BEFORE THE DATE BY WHICH VIOLATION(S) MUST BE ABATED AS INDICATED IN THE "CITATION AND NOTIFICATION OF PENALTY".

THIS INFORMATION MAY BE WRITTEN BELOW, ON THE REVERSE SIDE OR ON ATTACHED PAGES IF NECESSARY.

| CITATION NO. | ITEM NO. | CORRECTIVE ACTION TAKEN | DATE COMPLETED |
| --- | --- | --- | --- |

**NAME OF COMPANY OFFICIAL**　　　　　**DATE**

**TITLE**

**NOTE:**　**29 USC 666.(g):** Whoever knowingly makes any false statements, representation or certification in any application, record, plan or other documents filed or required to be maintained pursuant to the Act shall, upon conviction, be punished by a fine of not more that $10,000, or by imprisonment for not more than six months or both.
**POSTING:**　A copy of the completed Corrective Action Worksheet should be posted for employee review.

ABATEMENT CERTIFICATION

Ken Nishiyama-Atha, Area Director
U.S. Department of Labor - OSHA
1141 Montlimar Drive, Suite 1006

Mobile, AL   36609
Phone:  (251)441-6131

Department of Interior-National Historic Site
Tuskegee Institute-1600 Boy Scout Circle
Tuskegee, AL   36088

The hazard referenced in Inspection Number _____ for the violation identified as
Citation _____ and Item _____ was corrected on _____ _____
by _____ _____ _____ ___ ____ _____ _____ _____ _____ ____.

The hazard referenced in Inspection Number _____ for the violation identified as
Citation _____ and Item _____ was corrected on _____ _____
by ____ _____ ___ _____ _____ ____ _____ _____ _____ ____ _____ _____.

The hazard referenced in Inspection Number _____ for the violation identified as
Citation _____ and Item _____ was corrected on _____ _____
by _____ ____ _____ _____ _____ _____ ____ _____ _____ ___ _____ _.

The hazard referenced in Inspection Number _____ for the violation identified as
Citation _____ and Item _____ was corrected on _____ _____
by _____ _____ _____ ____ _____ _____ _____ _____ _____ _.

The hazard referenced in Inspection Number _____ for the violation identified as
Citation _____ and Item _____ was corrected on _____ _____
by _____ _____ _____ ____ _____ _____ _____ _____ _____ _.

I attest that the information contained in this document is accurate and that the affected employees and their representatives have been
informed of the abatement activities described in this certification.

_____
Signature

_____
Typed or Printed Name

Notice of Unsafe or Unhealthful Working Conditions          Page 4 of 9                      OSHA-2H(Rev. 9/93)

**U.S. Department of Labor**
*Occupational Safety and Health Administration*

 

# NOTICE TO EMPLOYEES

An informal conference has been scheduled with the Occupational Safety and Health

Administration (OSHA) *to discuss the Notice of Unsafe or Unhealthful Working Conditions*

(Notice) issued on 07/20/2007.  The conference will be held at the OSHA office located at 1141

Montlimar Drive, Suite 1006, , Mobile, AL, 36609 on _____ at _____.

*Employees and/or representatives of employees have a right to attend an informal conference.*

**U.S. Department of Labor**
Occupational Safety and Health Administration

Inspection Number: 310772330
Inspection Dates: 05/04/2007 - 05/07/2007
Issuance Date:     07/20/2007



## Notice of Unsafe or Unhealthful Working Conditions

**Company Name:**   Department of Interior-National Historic Site
**Inspection Site:**   Tuskegee Institute-1600 Boy Scout Circle, Tuskegee, AL  36088

---

## Citation 1 Item 1 Type of Violation:   **Serious**

29 CFR 1910.141(b)(1)(i):  Potable water was not provided in all places of employment, for drinking, washing of the person, cooking, washing of foods, washing of cooking or eating utensils, washing of food preparation or processing premises, and personal service rooms:

    (a)    Maintenance Shed:  Employees were not provided drinking water when mowing, trimming, cutting, cultivating, maintaining equipment and grounds.

Date By Which Violation Must be Abated:                                    08/02/2007

## Citation 1 Item 2 Type of Violation:   **Serious**

29 CFR 1910.141(d)(2)(iii):  Lavatories were not provided with hand soap or similar cleansing agent:

    (a)    Basement of G.W. Carver Museum: Employer did not provide hand soap for employees performing maintenance of museum displays and keeping the museum clean.

Date By Which Violation Must be Abated:                                    08/01/2007

## Citation 1 Item 3 Type of Violation:   **Serious**

29 CFR 1910.1018(e)(2):  Initial monitoring was not performed for each workplace, or work operation covered by this section to accurately determine the airborne concentration of inorganic arsenic to which employees may be exposed:

    (a)    G.W. Carver Museum: Employer failed to conduct exposure measurements to ascertain the levels of arsenic for employees arranging, disassembling, rearranging, shipping, and receiving taxidermed artifacts.

Date By Which Violation Must be Abated:                                    08/08/2007

---

See pages 1 through 5 of this Notice for information on employer and employee rights and responsibilities.

**U.S. Department of Labor**
*Occupational Safety and Health Administration*

Inspection Number:  310772330
*Inspection Dates:* 05/04/2007 - 05/07/2007
Issuance Date:        07/20/2007



## Notice of Unsafe or Unhealthful Working Conditions

**Company Name:**    Department of Interior-National Historic Site
**Inspection Site:**   Tuskegee Institute-1600 Boy Scout Circle, Tuskegee, AL  36088

---

### Citation 1 Item 4 Type of Violation:  **Serious**

29 CFR 1910.1025(d)(3)(i):  The initial determination for lead was not based on employee exposure monitoring results and other relevant considerations listed in (A), (B) and (C) of this paragraph:

  (a)    G.W.Carver Museum: Employer failed to provide exposure measurements to ascertain the levels of lead for employees arranging, disassembling, rearranging, shipping, and receiving taxidermed artifacts.

Date By Which Violation Must be Abated:                    08/02/2007

The alleged violations below have been grouped because they involve similar or related hazards that may increase the potential for illness.

### Citation 1 Item 5a Type of Violation:  **Serious**

29 CFR 1910.1025(l)(1)(i):  Employee(s) working in an area where there was potential exposure to airborne lead at any level were not informed of the content of Appendices A and B of this regulation:

  (a)    G.W. Carver Museum: Employees were not informed of the proper methods of personal protection, personal hygiene, and medical surveillance while arranging, disassembling, rearranging, shipping and receiving taxidermed artifacts in displays containing lead.

Date By Which Violation Must be Abated:                    08/08/2007

---

See pages 1 through 5 of this Notice for information on employer and employee rights and responsibilities.

**U.S. Department of Labor**
*Occupational Safety and Health Administration*

Inspection Number: 310772330
Inspection Dates: 05/04/2007 - 05/07/2007
**Issuance Date:**       07/20/2007



## Notice of Unsafe or Unhealthful Working Conditions

**Company Name:**    Department of Interior-National Historic Site
**Inspection Site:**     Tuskegee Institute-1600 Boy Scout Circle, Tuskegee, AL  36088

---

## Citation 1 Item 5b  Type of Violation:  **Serious**

29CFR 1910.1200(h)(1):Employer did not provide employees with effective information and training on hazardous chemicals in their work area at the time of their initial assignment, and whenever a new physical or health hazard the employees have not previously been trained about is introduced into their work area. Information and training may be designed to cover categories of hazards (e.g., flammability, carcinogenicity) or specific chemicals. Chemical-specific information must always be available through labels and material safety data sheets.

    (a)    Artifact Storage Department: Employer failed to provide adequate training for employees handling taxidermed artifacts containing hazardous chemicals such as, but not limited to, arsenic, compounds, with health effects, such as, but not limited to, skin disorders, digestive and respiratory system disorders.

Date By Which Violation Must be Abated:                                                 08/02/2007

## Citation 1 Item 6  Type of Violation:  **Serious**

29 CFR 1910.1200(g)(8):  The employer did not maintain copies of the required material safety data sheets for each hazardous chemical in the workplace:

    (a)    Artifact Storage Department: Employer failed to provide material safety data sheets for employees handling taxidermed artifacts containing hazardous chemicals, such as, but not limited to, arsenic and lead, with health effects, such as, but not limited to, central nervous system, reproductive, and renal disorders.

Date By Which Violation Must be Abated:                                                 08/02/2007

---

See pages 1 through 5 of this Notice for information on employer and employee rights and responsibilities.

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number:** 310772330
**Inspection Dates:** 05/04/2007 - 05/07/2007
**Issuance Date:**      07/20/2007



## Notice of Unsafe or Unhealthful Working Conditions

**Company Name:**     Department of Interior-National Historic Site
**Inspection Site:**     Tuskegee Institute-1600 Boy Scout Circle, Tuskegee, AL  36088

---

Citation 2 Item 1 Type of Violation:  **Other**

29 CFR 1904.32(b)(3): The Summary of Work-Related Injuries and Illnesses (OSHA Form 300A or equivalent) was not properly certified:

  (a)     The OSHA 300A for the year 2003 not certified by the highest officer at the establishment.

ABATEMENT NOTE:  The company executive that certifies the 300A must be one of the following:  owner of the company, officer of the corporation, or the highest ranking company official at the establishment.

Date By Which Violation Must be Abated:                          07/26/2007

Ken Nishiyama-Atha
Area Director

---

See pages 1 through 5 of this Notice for information on employer and employee rights and responsibilities.

Notice of Unsafe or Unhealthful Working Conditions            Page 9 of 9                          OSHA-2H (Rev. 9/93)

JEFF SESSIONS
ALABAMA

COMMITTEES:
ARMED SERVICES
JUDICIARY
ENERGY AND NATURAL RESOURCES
BUDGET

# United States Senate

WASHINGTON, DC 20510–0104

September 24, 2007

Ms. Teresa Valencia
6730 Pamela Court
Montgomery, Alabama 36116

Dear Ms. Valencia:

Thank you for your recent email regarding the management of the Department of Interior National Park Service at Tuskegee Institute National Historic Site. I appreciate that you have taken the time to contact me on this issue, and I am pleased to have the opportunity to assist you.

I understand your concern regarding the management of the Tuskegee Institute National Historic Site. I believe that it is important that the proper officials at the Department of the Interior National Park Service have the opportunity to review your comments, and, to ensure this is accomplished, I have taken the liberty of forwarding your letter to Elaine Hackett, Congressional Liaison at the National Park Service, on your behalf. I have asked Ms. Hackett to make note of your concerns, address them in a direct response to you, and to provide me with a copy of that response. I am confident that your concerns will be given appropriate consideration, and I look forward to Ms. Hackett's reply.

Thank you for allowing me to assist you in this matter. I hope you will not hesitate to contact me if you have questions or comments in the future.

Very truly yours,

Jeff Sessions
United States Senator

JS:np



# United States Department of the Interior

NATIONAL PARK SERVICE
Southeast Regional Office
Atlanta Federal Center
1924 Building
100 Alabama St., S.W.
Atlanta, Georgia 30303

IN REPLY REFER TO:
SER-D

**OCT 1 9 2007**

Ms. Teresa Valencia
6730 Pamela Court
Montgomery, Alabama 36116

Dear Ms. Valencia:

Thank you for your September 9, 2007, e-mail to Senator Jeff Sessions regarding the management of the Tuskegee Institute National Historic Site in Tuskegee, Alabama. Senator Sessions asked the National Park Service to respond to you directly.

We understand your concerns, and we take pride in providing a safe and secure workplace. It is the policy of the U.S. National Park Service (Service) to provide employees with a work environment that is free from harassment of all kinds. The Service prohibits employment-related harassment on the basis of race, color, religion, age, disability, national origin, reprisal, sex (whether or not of a sexual nature) or sexual orientation, and genetic information. We fully support Director's Order 16D, which is the National Park Service's policy on Equal Opportunity and Zero Tolerance of Discrimination.

We are committed to developing and maintaining a work environment that is strengthened by the contributions each of us make, and we expect each employee to respect the rights of fellow employees and the public we serve. Managers and supervisors are expected to promote this policy through exemplary personal conduct. They are also responsible for employee education on equal opportunity and discrimination, responding quickly to employee complaints, and taking appropriate actions to address improper or illegal behavior.

Individuals who believe they have been discriminated against, or believe they are being retaliated against for having participated in prior EEO activity, must consult an EEO counselor within 45 calendar days of the alleged discriminatory act. Your e-mail provides no specific allegations regarding "gross mismanagement," threats, or harassment. The No FEAR Act reaffirms the strong public policy commitment to ensure that all Federal employees feel free to come forward with allegations of discrimination, wrongdoing, or misconduct by making sure that Federal employees are aware of their



rights. Therefore, if you have specific details regarding your allegations, please come forward with them, with No FEAR. For further information regarding the No FEAR Act and Department of the Interior implementation of it, please see http://www.doi.gov/diversity/rights.

Additional information regarding Federal anti-discrimination whistleblower protection and retaliation laws can be found at the EEOC Website: http://www.eeoc.gov and the OSC Website: http://www.osc.gov.

We hope this information is helpful and appreciate your interest in Tuskegee Institute National Historic Site.

Sincerely,

FOR---Art Frederick
Acting Regional Director
Southeast Region

cc: Senator Jeff Sessions



United States Department of the Interior

National Park Service
Tuskegee Institute
National Historic Site
1212 West Montgomery Road
Tuskegee Institute, Alabama 36088



P40 (TUIN)

October 23, 2007

Memorandum

To:        Teresa Valencia, Museum Specialist, Tuskegee Institute National Historic Site

From:      Superintendent, Tuskegee Institute National Historic Site

Subject:   Request for Medical Documentation (**Attachments Included**)

The purpose of this letter is to request medical documentation to determine your ability to perform the essential duties of your position. Your position is a full time, permanent position. It was established as such because it has been determined that your duties are essential to this organization and are required on a full-time basis. Your attendance at work as well as your ability to fully perform the duties of your position is critical.

On July 18, 2007, you provided a letter signed by Dr. Gilberto Sanchez at the Family Practice, Montgomery, Alabama. Dr. Sanchez advised, "Ms. Valencia is incapable of doing her regular duties. She suffers from fatigue, light-headedness, headaches, dizziness and difficulties concentrating. These conditions are harmful to her wellbeing as well as to others. The exact duration of this condition is unknown at this time, but we will keep a follow-up on these conditions on a regular basis."

In addition, you stated via email dated August 9, 2007, that on July 30, 2007, while conducting your regular daily routine, due to your dizziness and numbness, you collapsed in the Oak's while going down the stairs. You were informed to submit a CA-1 and later submitted the form. On July 31, 2007, you submitted a "return to work or school" medical form signed by Dr. Gilberto Sanchez, M.D. of the Family Practice, in Montgomery, AL. On that form is written, "This is to certify that Teresa Valencia has been under my care for the following: neck pain, hip pain, and lower back pain and is able to return to work on 8/1/2007. Follow-up (F/U) appt. on August 9, 2007."

As a result of your follow-up on August 9, 2007, you submitted a "return to work or school" medical form dated August 9, 2007, from Dr. Chung. On the form is written, "This is to certify that Teresa Valencia has been under my care for the following: medical reasons, dizziness, LBP, neck pain and is able to return to work on August 15, 2007. In the remarks section is written, "Next appt. Thursday, 9/6/2007, at 10:00 a.m." Accompanying this form is a written prescription for medication dated August 9, 2007.



Later in August 2007, you submitted a statement from the Alabama Neurological Clinic signed by Dr. Stephen R. Bryan, M.D. On that document is written, "no driving until further notice. Please accommodate to work at home."

In reviewing your medical information described above, we conclude that it does not provide enough information to enable me to make a decision regarding your status. To be administratively acceptable, you must have your principal physician furnish medical documentation that includes the following specific information:

(1) A detailed explanation of diagnosis and prognosis of your condition and must outline the effect of the condition to your ability to perform;

(2) Address whether or not there are *any* work restrictions or limitations that would prohibit you from safely and efficiently returning to your Museum Specialist position and performing the full range of essential duties required for the position

(3) Take into account your medication requirements necessary to control the symptoms of your chronic, on-going medical condition(s), as well as *any other* medications you are required to take. This information is necessary to ensure that there are no drug side effects, drug reactions, drug-drug interactions, drug-environment interactions, etc., that are likely to adversely affect your ability to safely and efficiently work in an office setting utilizing office equipment, as required by the essential duties of your position, and

(4) Take into account the following essential duties and responsibilities (position description attached) that contains the full range of duties and responsibilities):

Some specific duties for preservation and conservation of museum collection include:

- Catalog records, Data entry
- Accessioning new items, by sitting, standing and counting
- Crating and shipping
- Packing of artifacts for loans, etc.
- Cleaning of historic buildings and artifacts
- Monitoring humidity and temperature
- Inventory of collections to ensure the security
- Developing exhibits
- Conducts specialized interpretive tours and lectures to professional, historical and educational groups as well as the general public

The medical documentation must be received in this office by November 9, 2007. You may fax the medical documentation to me at 334-727-4597.

If you fail to provide medical documentation, I will make a decision on the medical documentation that is currently on file. It is important that you understand that LWOP is approved leave and is a privilege that cannot be demanded as of right by an employee. Emergency situations that require your absence from the office and do not qualify for sick leave will be charged to LWOP only with my approval. LWOP will not be approved unless you provide administratively acceptable medical documentation to cover your absence or you request LWOP under the following programs and provide the required documentation: Family and Medical Leave Act (FMLA) or Office of Workers' Compensation

Programs (OWCP). You can request additional information on these programs from the Human Resources Office at 404-562-3167. Your failure to provide administratively acceptable medical documentation as indicated above may result in your absence being considered unapproved and will be charged as AWOL. AWOL may provide a basis for disciplinary action up to and including removal from the Service.

If you have any questions on this matter, please contact me as soon as possible. If your physician has any questions about the information requested, or if additional information regarding the requirements of your job he contact me at 334-727-6390.


Attachments

Copy of Position Description
Copy of FY 2007 Performance Standards

**Alabama Neurological Clinic**
2010 Normandie Drive • Montgomery, AL 36111
Office: (334) 281-7280 • Fax: (334) 281-0042 • Rx: (334) 281-6622

| Hamp H. Greene, M.D. AG6486085 • 6886 | Stephen R. Bryan, M.D. AB7086780 • 7365 | W. Joe Lauschke, M.D. AL770238 • 7966 | Leah O. Sanchez, M.D. BS4696636 • 22710 | Joey Boisar, M.D. BB7553135 • 24342 | Pamela A. Pacquiao, M.D. BP8567743 • 25552 |
|---|---|---|---|---|---|

For _Teresa Valencia_ Date ____

℞  _NO Driving until_
_further notice - please_
_accommodate to work at_
_home if possible_

☐ Label

Refill _____ Times

_____ M.D.

Product Selection Permitted                    Dispense As Written

_____ M.D.
Rev. 4/04

JOT COPY CENTER (334) 277-3668

DI-3100
Nov 2005 (previous edition obsolete)

## U.S. DEPARTMENT OF THE INTERIOR
### Employee Performance Appraisal Plan

| Employee Name and Social Security Number: Valencia, Teresa | | Title/Series/Grade: Museum Specialist GS-1016-09 | |
|---|---|---|---|
| Duty Station: Tuskegee Institute National Historic Site | Appraisal Period: | From: October 1,2006 | To: September 30,2007 |

**Part A: Notification of Standards:** *Signatures certify that critical elements and performance standards were discussed. Critical elements and performance standards are contained in Part E.*

| Employee: | Rating Official: | Reviewing Official (if applicable*): |
|---|---|---|
| Date: | Date: | Date: |

*If determined by Bureau/Office

**Part B: Progress Review:** *Signatures certify that performance was discussed.*

| Employee: | Date: | Rating Official: | Date: |
|---|---|---|---|
| | | | |

**Part C: Summary Rating Determination:** To determine a summary rating, assign one of the numerical rating levels that accurately reflects the employee's performance for each of the critical elements (Use only whole numbers: **Exceptional = 5 points; Superior = 4 points, Fully Successful = 3 points, Minimally Successful = 2 points, and Unsatisfactory = 0 points.**) *See reverse for complete instructions for assigning a Summary Rating.*

| Element Number | Numerical Rating |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| Total: | |

Total Numerical Rating _____ + Number of Elements _____ = Numeric Summary Rating _____

**Part D: Overall Summary Rating:** Use conversion chart below to determine Summary Rating. Check the appropriate box:

| | |
|---|---|
| **Exceptional** | 4.6 – 5.00 AND No critical element rated lower than "Superior". |
| **Superior** | 3.6 – 4.59 AND No critical element rated lower than "Fully Successful". |
| **Fully Successful** | 3.0 – 3.59 AND No critical element rated lower than "Fully Successful". |
| **Minimally Successful** | 2.0 – 2.99 AND No critical element rated lower than "Minimally Successful". |
| **Unsatisfactory** | One or more critical elements rated "Unsatisfactory". |

| Employee: | Rating Official: | Reviewing Official: (if applicable): |
|---|---|---|
| Date: | Date: | Date: |

Check here if Interim Rating: ☐     Performance Award: ☐ Cash ☐ QSI ☐ Time Off

Performance Award:  QSI ☐     Cash: $ _____ or _____% of pay     Time Off ☐

Employee's Signature above certifies that the overall summary rating was discussed. Reviewing Official's signature is required for Exceptional, Minimally Successful and Unsatisfactory ratings, and otherwise if determined by Bureau/Office.

1

DI-3100
Nov 2005 (previous edition obsolete)

# Instructions for Completing the Employee Performance Appraisal Plan

**Establishing Critical Elements and Performance Standards**

Critical elements (at least one, but no more than five) should be established for each employee at the start of the performance year. Through these elements, employees are held accountable for work assignments and responsibilities of their position. A critical element is an assignment or responsibility of such importance that Unsatisfactory performance in that element alone would result in a determination that the employee's overall performance is Unsatisfactory. Please see the Performance Appraisal Handbook for more detailed information.

Performance standards are expressions of the performance threshold(s), requirement(s), or expectation(s) that must be met for each element at a particular level of performance. They must be focused on results and include credible measures. You may use the Benchmark Performance Standards from the Performance Appraisal Handbook (in conjunction with individually established performance standards) to describe, for each element, credible measures such as quality, quantity, timeliness and/or cost effectiveness, for at least the "Fully Successful" level. Rating officials are strongly encouraged to develop performance standards at additional levels, to ensure that the employee has a clear understanding of the level of performance expected. *At least one, and preferably all, critical elements must show how the element is linked to strategic goals, such as Government Performance Results Act (GPRA) or mission related goals of the organization. These goals should be aligned throughout the organization (i.e., show how the strategic goal cascades from the SES down to the lowest non-supervisory levels.) The employee should be able to clearly understand how the results they are held responsible for are linked to the results that those in their supervisory/managerial chain are held responsible for.*

**Progress Reviews**

A progress review should be conducted at approximately mid-way through the rating period. Part B should be completed after the progress review. Any written feedback or recommended training can be noted on a separate sheet and attached to the employee performance appraisal plan.

**Assigning the Summary Rating**

A specific rating is required for each critical element to reflect the level of performance demonstrated by the employee throughout the rating period. Only one numerical rating level is assigned for each critical element. Before the rating official assigns a summary rating, he/she should consider all interim summary ratings received for the employee during the annual appraisal period. The summary rating is assigned as follows:

A.  Review the employee performance appraisal plan and assess how the employee performed relative to the described performance standards.

B.  Appropriately document the employee's performance with a narrative summary that describes the employee's achievements for the critical elements as compared to the performance standards. A narrative must be written for each critical element assigned a rating of Exceptional, Minimally Successful, or Unsatisfactory. This narrative should contain examples of the employee's performance that substantiate and explain how the employee's performance falls within the level assigned. There is a block provided for the narrative summary for each critical element.

C.  In Part C of this form, assign one of the numerical rating levels that accurately reflects the employee's performance for each of the critical elements (Use only whole numbers: Exceptional = 5 points, Superior= 4 points, Fully Successful = 3 points, Minimally Successful = 2 points, and Unsatisfactory = 0 points).

D.  Add up the numerical rating levels to get a total.

E.  Divide the total by the number of critical elements to get an average. (Elements that are "not rated" because an employee has not had a chance to perform them during the rating year are not assigned any points and should not be used to determine the average rating.)

F.  Assign the employee a summary rating based on the table in Part D of this form.

**Note: Whenever an employee is rated "Unsatisfactory" on one or more critical elements, the overall rating must be "Unsatisfactory" (regardless of total points). The rating official should immediately contact the servicing human resources office.** Whenever an employee is rated **"Minimally Successful"** on one or more critical elements, the overall rating may not be higher than **"Minimally Successful"** (regardless of total points).

2

DI-3100
Nov 2005 (previous edition obsolete)

**Part E:  Critical Elements and Performance Standards:**  *List below each of the employee's critical elements (at least one, but no more than 5) and their corresponding performance standards.  If Benchmark Standards are used, indicate "Benchmark Standards are attached" in the space below, and ensure they are attached to this form. Identify the GPRA/strategic/mission goal that the critical element supports.  At a minimum, measurable criteria must be identified at the Fully Successful  level.*

| Critical Element 1: | GPRA/Strategic Goal: |
|---|---|
| | **Performance Measure:** |
| | Applicable preservation and protection standards for park museum collections are met.  Employee provides technical assistance and consultation for the preservation and stabilization treatments on historic structures and landscapes in compliance with applicable recommendations, regulations, and NPS policies. |
| | NPS Strategic Plan: Goals Ia5, Ia6, Ia7 |

| Performance Standards |
|---|

| Exceptional | Refer to attached benchmark and in addition: Employee meet "Superior" rating and in addition exceeds GPRA goal Ia6 exceeds by 10% for TUIN, TUAI and SEMO. Employee completes preservation and stabilization treatments that closely follow the Secretary of the Interior's Standards and DO 28.  Employee proactively researches and evaluates the most effective preservation options for each preservation project and discusses appropriate options with supervisor before and during the project.  The employee is continually aware of the historic sensitivity of the park and only demonstrates that awareness through careful project planning.  Employee always rehouses museum artifacts after removal and develops an extraordinary museum education program to develop awareness to prevent damage. Employee proactively inventories museum storage area and removal of all items that do not relate to the site.  Employee rehouse  museum artifacts after removal and develop an extraordinary museum education program to develop awareness to prevent damage. |
| | • Develops MOU Tuskegee Fire department collection protection, rehouse protection |
| | • Works w/Fire Department to provide quarterly fire system inspection, and biannual fire extinguisher training |
| | • Replenished and develops Park Wide IPM Plan and incorporates collections into Plan. |

| Superior | Refer to attached benchmark and in addition: Employee meets "Fully Successful" rating and in addition exceeds GPRA goal Ia6 exceeds by 5% for TUIN, TUAI and SEMO.  Employee completes preservation and stabilization treatments that closely follow the Secretary of the Interior's Standards and DO 28.  Employee proactively researches and evaluates the most effective preservation options for each preservation project and discusses appropriate options with supervisor before and during the project.  The employee is extremely aware of the historic sensitivity of the park and demonstrates that awareness through careful project planning.  Employee provides sound advice to park managers and maintenance staff.  Employee skillfully inventories museum storage area and removal of all items that do not relate to the site.  Employee rehouse  museum artifacts after removal and develops a magnificent museum education program to develop awareness to prevent damage. • Works with Fire Department to provide bi- annual fire system inspection, and annual fire extinguisher training. • Develops Park Wide IPM Plan and incorporates collections into Plan. |

| Fully Successful | **(Must describe measurable, results-oriented criteria)** |
| | Refer to attached benchmark and in addition: Employee meets "Fully Successful" rating and in addition GPRA goal Ia6 is met for TUIN. Employee completes preservation and stabilization treatments which are in tune with the Secretary of the Interior's standards and other NPS policies.  Employee is aware of the historic sensitivity of the park prior to beginning work or prior to changing work plans.  Employee is aware of the historic sensitivity of the park and visually demonstrates that awareness through project planning. Employee provides good advice to park managers and maintenance staff.  Employee inventory museum storage area and removal of all items that do not relate to the site.  Employee rehouses museum artifacts after removal and develops a museum education program to develop awareness to prevent damage. |
| | • Work with Fire Department to provide annual fire system inspection and annual fire extinguisher training. |
| | • Develops Park Wide IPM Plan and incorporates collections into Plan. |

| Minimally Successful | Refer to attached benchmark and in addition: GPRA goal Ia6 is not met (by 1%) for TUIN museum collections are met.  This includes but is not limited to inventorying museum storage area and the removal of 3 items that do not relate to the site. Rehousing of museum artifacts, placing barrier in front of objects on display to prevent damage. Establishing monitoring program.  Fire department is aware of collections, reviewing of fire system and provides fire extinguisher training. Incorporates collections into Park wide IPM Plan once it becomes available. |

| Unsatisfactory | Refer to attached benchmark and in addition: GPRA goal is not met (by 10%) for TUIN museum collections.  Employee rarely follows the Secretary of the Interior's standards and other NPS standards during historic preservation projects.  Employee rarely discusses preservation projects and proposed treatments with supervisor prior to beginning work or prior to modifying work plans.  Employee rarely demonstrates an awareness of the historic sensitivity of the park and rarely ensures that documentation for each project is completed. This includes but is not limited to inventorying museum storage area and object not relate to the site are in storage.  Museum objects are stored in a location other then assigned by catalog record.  Museum objects on display and in danger contain no barrier in front.  A monitoring program is not established that includes Environmental, Fire and Security.  Staff does not know how to use  fire extinguisher.  Fire department does not knows collections needs.  Collections are not considered for incorporation into Park wide IPM Plan. |

| Narrative Summary |
|---|

Describe the employee's performance for each critical element.  A narrative summary must be written for each element assigned a rating of Exceptional, Minimally Successful, or Unsatisfactory.

**Rating for Critical Element 1:**

[] Exceptional-5      [] Superior-4      [] Fully Successful-3      [] Minimally Successful-2      [] Unsatisfactory-0

3

DI-3100
Nov 2005 (previous edition obsolete)

**Part E: Critical Elements and Performance Standards:** *List below each of the employee's critical elements (at least one, but no more than 5) and their corresponding performance standards. If Benchmark Standards are used, indicate "Benchmark Standards are attached" in the space below, and ensure they are attached to this form. Identify the GPRA/strategic/mission goal that the critical element supports. At a minimum, measurable criteria must be identified at the Fully Successful level.*

| Critical Element 2: | GPRA/Strategic Goal:<br>Performance Measure:<br><br>Conservation Program: Best method to maintain collections through the conservation program<br><br>NPS Strategic Plan Goals Ia6 |
|---|---|

### Performance Standards

| | |
|---|---|
| **Exceptional** | Refer to attached benchmark and in addition: Employee meets "Superior" rating and in addition maintains constant and careful observation over natural, cultural and historical resources in order to broadly prevent threats or correct inconsistent activities. Is constantly able to identify threats or inconsistent activities when they occur. Very seldom, if ever, fails to identify and report or correct, as appropriate, inconsistent activities, changes to resources or dangers or threats. Reports include the provision of a detailed analysis of the threat or change. Within scope of authority, continuously takes the correct and appropriate action to mitigate threats or inconsistent activities, or where immediate corrective action is not possible or appropriate, or beyond scope of incumbent's knowledge or ability, notifies appropriate officials and supervisor in a prompt manner. Employee develops a timeline for artifacts in danger of deteriorating for TUIN, TUAI and SEMO. Develops a conservation plan and program base on the Collection Condition Survey. Constantly updates PMIS statements for the conservation of collection or other project statements that include funding sources for the preservation of collections. |
| **Superior** | Refer to attached benchmark and in addition: Employee meets "Fully Successful" rating and in addition maintains regular and careful observation over natural, cultural and historical resources in order to identify present threats or correct inconsistent activities. Is steadily able to identify threats or inconsistent activities when they occur. Seldom, fails to identify and report or correct, as appropriate, inconsistent activities, changes to resources or dangers or threats. Reports include the provision of a detailed analysis of the threat or change. Within scope of authority, frequently takes the correct and appropriate action to mitigate threats or inconsistent activities, or where immediate corrective action is not possible or appropriate, or beyond scope of incumbent's knowledge or ability, notifies appropriate officials and supervisor in a prompt manner. Employee develops a timeline for artifacts in danger of deteriorating for TUIN and TUAI. Develops a conservation plan and program base on the Collection Condition Survey. Constantly updates PMIS statements for the conservation of collection or other project statements that include funding sources for the preservation of collections. |
| **Fully Successful** | (Must describe measurable, results-oriented criteria)<br><br>Refer to attached benchmark and in addition: Is usually observant to changes in, threats to or inconsistent use of resources under scope of authority. Is generally able to identify changes, threats or inconsistent activities, and very seldom fails to identify threats, changes or activities which should be obvious to someone in incumbent's position. Very seldom fails to correct or report observed resource changes, as appropriate. Takes the correct mitigative or reporting action in most instances, and consistently reports or corrects serious resource changes, threats or inconsistent activities in accordance with policy. Employee provides the occasional update of a timeline for artifacts in danger of deteriorating for TUIN. This conservation plan and program base on the Collection Condition Survey. Occasionally develops and/or updates PMIS statements for the conservation of collection or other project statements that include funding sources for the preservation of collections. |
| **Minimally Successful** | Refer to attached benchmark and in addition: Seldom develops and/or update a timeline for artifacts in danger of deteriorating for TUIN. This conservation plan and program base on the Collection Condition Survey. Seldom develop and/or update of PMIS statement for the conservation of collection or other project statements that include funding sources for the preservation of collections. |
| **Unsatisfactory** | Refer to attached benchmark and in addition: May frequently fail to identify changes in, threats to, or inconsistent use of resources within scope of authority and responsibility. May frequently fail to take appropriate corrective action to mitigate observed resources problems or may frequently fail to report resources problems to appropriate officials and supervisor in a timely manner. May frequently take action to mitigate observed resources problems which prove inconsistent with resources management plans or established procedures, are inconsistent with scope of delegated authority or which fail to alleviate observed threat problems. Rarely reviews and updates of a timeline for artifacts in danger of deteriorating for TUIN. Rarely reviews conservation plans based on the Collection Condition Survey. Rarely write PMIS statement for the conservation of collection or other project statements that include funding sources for the preservation of collections. |

### Narrative Summary

Describe the employee's performance for each critical element. A narrative summary must be written for each element assigned a rating of Exceptional, Minimally Successful, or Unsatisfactory.

**Rating for Critical Element 2:**

[ ] Exceptional-5    [ ] Superior-4    [ ] Fully Successful-3    [ ] Minimally Successful-2    [ ] Unsatisfactory-0

4

DI-3100

Nov 2005 (previous edition obsolete)

**Part E: Critical Elements and Performance Standards:** *List below each of the employee's critical elements (at least one, but no more than 5) and their corresponding performance standards. If Benchmark Standards are used, indicate "Benchmark Standards are attached" in the space below, and ensure they are attached to this form. Identify the GPRA/strategic/mission goal that the critical element supports. At a minimum, measurable criteria must be identified at the Fully Successful level.*

| Critical Element 3: | GPRA/Strategic Goal: |
|---|---|
| | **Performance Measure:** |
| | Housekeeping Program and environmental control: Best method to maintain collections through the housekeeping program, and maintain the levels of relative humidity and temperature in storage and exhibit space.<br><br>NPS Strategic Plan Goals Ia6 |

| **Performance Standards** | |
|---|---|
| **Exceptional** | Refer to attached benchmark and in addition: The historic structures are constantly cleaned using new and innovative curatorial methods on a daily, schedule. Park visitors are constantly informed of the collection needs and preservation efforts of the park for better understanding and appreciation of the park's natural and cultural resources. Humidity and temperature is constantly monitored on a daily bases for the Oaks and Carver Museum. A record of daily observation of unusually exterior climatic conditions is kept on a constant basis. Visible spectrum of light is mostarly monitored and recorded for illuminance level and duration as required by museum regulations, including annual seasonal variations. UV filtering materials are exceptionally monitored to ensure its continued effectiveness in meeting the standard in the NPS Museum Handbook, Part I. |
| **Superior** | Refer to attached benchmark and in addition: The historic structures are frequently cleaned using new and above average curatorial methods on a twice week schedule. Park visitors are frequently informed of the collection needs and preservation efforts of the park for better understanding and appreciation of the park's natural and cultural resources. Humidity and temperature is frequently monitored on a daily bases for the Oaks and Carver Museum. A record of weekly observation of unusually exterior climatic conditions is kept on a frequent basis. Visible spectrum of light is constantly monitored and recorded for illuminance level and duration as required by museum regulations, including annual seasonal variations. UV filtering materials is frequently monitored to ensure it's continued effectiveness in meeting the standard in the NPS Museum Handbook, Part I. |
| **Fully Successful** | **(Must describe measurable, results-oriented criteria)**<br>Refer to attached benchmark and in addition: The historic structures are cleaned using average curatorial methods on a weekly schedule. Park visitors are informed of the collection needs and preservation efforts of the park for better understanding and appreciation of the park's natural and cultural resources. Humidity and temperature is monitored on a daily basis for the Oaks and Carver Museum. A record of bi-weekly observation of unusually exterior climatic conditions is kept on daily. Visible spectrum of light is monitored and recorded for illuminance level and duration as required by museum regulations, including annual seasonal variations. UV filtering materials is monitored to ensure it's continued effectiveness in meeting the standard in the NPS Museum Handbook, Part I. |
| **Minimally Successful** | Refer to attached benchmark and in addition: The historic structures are seldom cleaned using curatorial methods on a every two weeks schedule. Park visitors are seldom informed of the collection needs and preservation efforts of the park for better understanding and appreciation of the park's natural and cultural resources. Humidity and temperature is seldom monitored on for the Oaks and Carver Museum. A record of observation of unusually exterior climatic conditions is seldom kept . Visible spectrum of light is seldom monitored and recorded for illuminance level and duration as required by museum regulations, including annual seasonal variations. UV filtering materials are seldom monitored to ensure it's continued effectiveness in meeting the standard in the NPS Museum Handbook, Part I. |
| **Unsatisfactory** | Refer to attached benchmark and in addition: The historic structures are not cleaned constantly using new and innovative curatorial methods on monthly schedule. Park visitors are rarely informed of the collection needs and preservation efforts of the park for better understanding and appreciation of the park's natural and cultural resources. Humidity and temperature is not constantly monitored bases for the Oaks and Carver Museum. A record of observation of unusually exterior climatic conditions is not kept on a constant basis. Visible spectrum of light is not constantly monitored and recorded for illuminance level and duration as required by museum regulations, including annual seasonal variations. UV filtering materials is not constantly monitored to ensure it's continued effectiveness in meeting the standard in the NPS Museum Handbook, Part I. |

| **Narrative Summary** |
|---|

Describe the employee's performance for each critical element. A narrative summary must be written for each element assigned a rating of Exceptional, Minimally Successful, or Unsatisfactory.

Rating for Critical Element 3:

[ ] Exceptional-5     [ ] Superior-4     [ ] Fully Successful-3     [ ] Minimally Successful-2     [ ] Unsatisfactory-0

5

DI-3100
Nov 2005 (previous edition obsolete)

**Part E: Critical Elements and Performance Standards:** *List below each of the employee's critical elements (at least one, but no more than 5) and their corresponding performance standards. If Benchmark Standards are used, indicate "Benchmark Standards are attached" in the space below, and ensure they are attached to this form. Identify the GPRA/strategic/mission goal that the critical element supports. At a minimum, measurable criteria must be identified at the Fully Successful level.*

| Critical Element 4: | GPRA/Strategic Goal: |
|---|---|
| | **Performance Measure:** |
| | Accession and Catalog Records Programs: The number of Tuskegee Institute National Historic Site museum objects cataloged and submitted to the National Catalog |
| | NPS Strategic Plan Goals Ib2d |

| Performance Standards | |
|---|---|
| **Exceptional** | Refer to attached benchmark and in addition: Employee meets "Superior" rating and in addition, constantly exceeds GPRA goal Ib2D (by 15%). The number of Tuskegee Institute National Historic Site, Tuskegee Airmen National Historic Site and Selma to Montgomery National Historic Trail museum objects cataloged and submitted to the National Catalog. |
| **Superior** | Refer to attached benchmark and in addition: Employee meets "Fully Successful" rating and in addition, exceeds GPRA goal Ib2D (by 10%). The number of Tuskegee Institute National Historic Site and Tuskegee Airmen National Historic Site museum objects cataloged and submitted to the National Catalog. |
| **Fully Successful** | (Must describe measurable, results-oriented criteria) |
| | Refer to attached benchmark and in addition: GPRA goal Ib2D is met for the number of Tuskegee Institute National Historic Site museum objects cataloged and submitted to the National Catalog. |
| **Minimally Successful** | Refer to attached benchmark and in addition: GPRA goal Ib2D is not met (less than 1%) for the number of Tuskegee Institute National Historic Site museum objects cataloged and submitted to the National Catalog. |
| **Unsatisfactory** | Refer to attached benchmark and in addition: GPRA goal Ib2D is not met (less than 10%) for the number of Tuskegee Institute National Historic Site museum objects cataloged and submitted to the National Catalog. |

**Narrative Summary**

Describe the employee's performance for each critical element. A narrative summary must be written for each element assigned a rating of Exceptional, Minimally Successful, or Unsatisfactory.

Rating for Critical Element 4:

[] Exceptional-5    [] Superior-4    [] Fully Successful-3    [] Minimally Successful-2    [] Unsatisfactory-0

6

DI-3100

Nov 2005 (previous edition obsolete)

**Part E: Critical Elements and Performance Standards:** *List below each of the employee's critical elements (at least one, but no more than 5) and their corresponding performance standards. If Benchmark Standards are used, indicate "Benchmark Standards are attached" in the space below, and ensure they are attached to this form. Identify the GPRA/strategic/mission goal that the critical element supports. At a minimum, measurable criteria must be identified at the Fully Successful level.*

| Critical Element 5: | GPRA/Strategic Goal:<br>Performance Measure: |
|---|---|
| | Works with supervisor to manage park education/curatorial/interpretive programs in the most efficient manner possible. Coordinates and participates in special projects, as assigned by supervisor, in an efficient and timely manner. Performs interpretive writing for brochures, bulletin boards and exhibits incorporating professional interpretive writing principles including multiple points of view and tangible/intangible/universals. Provides graphics to develop exhibits and wayside exhibits. Seeks input on written materials before project completion and incorporates edits, identifies, inhibits and completes special projects that improve operation. Pays close attention to statistic record keeping to accurate and complete. Efficiently uses work time and complete projects and tasks within deadlines. Administrative responsibilities are prioritized in conjunction with supervisor and completed in a timely and accurate fashion. Identifies and corrects problems regarding operations/facilities whenever possible. Takes initiative in making improvements in operation coordinating with supervisor when necessary. GPRA Goals IIa, IIb, Ia, IVa, Ila.1 |

| Performance Standards |
|---|

| **Exceptional** | Refer to attached benchmark and in addition: Meets all requirements of the "Superior" level and in addition demonstrates excellent performance in exhibit development. Design, implement and maintain quarterly exhibits (temporary) and provide program Newsletter. Composes documents or correspondence involving complex or technical information, and adapts writing to the audience's level of knowledge. Proofreads or edits complex or technical writing of others. Coordinates group's work efforts and monitors progress toward attaining team goals. Facilitates or leads group discussions, and information sharing. Encourages and facilitates cooperation and open communication and promotes team work at all levels of a major organization; cooperates with staff, top management, peers, multiple internal and external customers and stakeholders in other agencies/corporations or countries to accomplish agency/corporate goals. Masterly writes exhibit text. |
|---|---|
| **Superior** | Refer to attached benchmark and in addition: Meets all requirements of "Fully Successful" rating and in addition, coordinate bi-annual exhibits (temporary) and Newsletter. Composes documents or correspondence involving complex or technical information, and adapts writing to the audience's level of knowledge. Proofreads or edits complex or technical writing of others. Encourages and facilitates cooperation and open communication and promotes team work at all levels in part of a major organization; cooperates with peers, staff, higher-level executives within the agency/corporation, peers, multiple internal and external customers and stakeholders to accomplish agency/corporate goals. Brilliantly writes exhibits text. |
| **Fully Successful** | (Must describe measurable, results-oriented criteria)<br><br>Refer to attached benchmark and in addition:Coordinates yearly exhibits (temporary) and newsletter. Composes documents or correspondence involving non-technical information. Proofreads or edits brief, non-technical writing of others. Cooperates with others to establish priorities and develop work plans. Contributes to group discussions, and information sharing. Encourages and facilitates cooperation and open communication and promotes team work at all levels within an organization; cooperates with staff, higher-level management, peers, internal and external customers and stakeholders to accomplish the organization's goals.  Writes exhibit text. |
| **Minimally Successful** | Refer to attached benchmark and in addition: Participate in the yearly exhibit (temporary) and newsletter development. Composes documents or correspondence involving simple or routine information. Proofreads own work. Cooperates with others to complete routine tasks. Attends team meetings, and shares information when asked.  Encourages and facilitates cooperation and open communication; promotes team work at all levels within an organizational unit; cooperates with staff, higher-level managers, peers, administrative staff of other organizational units, internal and external customers of a localized function, and local stakeholder groups to accomplish the organization's goals. |
| **Unsatisfactory** | Refer to attached benchmark and in addition: No exhibit design projects and no newsletter.    Composes documents or correspondence involving simple or routine information is done without participation. Others proofread work exclusively. Supervisors have to request cooperation with others to complete routine tasks. Supervisor has to request attendance in team meetings, and the sharing of information. Supervisor has to encourage facilitation, cooperation, open communication, and the promotion of teamwork. |

| Narrative Summary |
|---|

Describe the employee's performance for each critical element.  A narrative summary must be written for each element assigned a rating of Exceptional, Minimally Successful, or Unsatisfactory.

**Rating for Critical Element 5:**

[ ] Exceptional-5     [ ] Superior-4     [ ] Fully Successful-3     [ ] Minimally Successful-2     [ ] Unsatisfactory-0

7

DI-3100
Nov 2005 (previous edition obsolete)

**Privacy Act Notice:** Chapter 43 of Title 5, U.S.C., authorizes collection of this information. The primary use of this information is by management and your servicing human resources office to issue and record your performance rating. Additional disclosures of this information may be: To MSPB, Office of Special Counsel, EEOC, the FLRA, or an arbitrator in connection with administrative proceedings; to the Department of Justice or other Federal agency, courts, or party to litigation when the Government is a party to or has an interest in the judicial or administrative proceeding; to a congressional office in response to an inquiry made on behalf of an individual; to the appropriate Federal, State, or local government agency investigating potential violations of civil or criminal law or regulation; and to Federal State, local and professional licensing boards in determining qualifications of individuals seeking to be licensed.

Collection of your Social Security Number is authorized by Executive Order 9397. Furnishing your Social Security Number is mandatory, failure to provide this information will prohibit data collection required by the Office of Personnel Management.

If your agency used the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

8

DI-3100
Nov 2005 (previous edition obsolete)

## Benchmark Employee Performance Standards

### Exceptional:

Employee demonstrates particularly excellent performance that is of such high quality that organizational goals have been achieved that would not have been otherwise. The employee demonstrates mastery of technical skills and a thorough understanding of the mission of the organization and has a fundamental impact on the completion of program objectives.

The employee exerts a major positive influence on management practices, operating procedures and/or program implementation, which contributes substantially to organizational growth and recognition. The employee plans for the unexpected and uses alternate ways of reaching goals. Difficult assignments are handled intelligently and effectively. The employee has produced an exceptional quantity of work, often ahead of established schedules and with little supervision.

The employee's oral and written communications are exceptionally clear and effective. He/she improves cooperation among participants in the workplace and prevents misunderstandings. Complicated or controversial subjects are presented or explained effectively to a variety of audiences so that desired outcomes are achieved.

### Superior:

Employee demonstrates unusually good performance that exceeds expectations in critical areas and exhibits a sustained support of organizational goals. The employee shows a comprehensive understanding of the objectives of the job and the procedures for meeting them.

Effective planning by the employee improves the quality of management practices, operating procedures, task assignments and/or program activities. The employee develops and/or implements workable and cost-effective approaches to meeting organizational goals.
The employee demonstrates an ability to get the job done well in more than one way while handling difficult and unpredicted problems. The employee produces a high quantity of work, often ahead of established schedules with less than normal supervision.

The employee writes and speaks clearly on difficult subjects to a wide range of audiences and works effectively with others to accomplish organizational objectives.

### Fully Successful:

The employee demonstrates good, sound performance that meets organizational goals. All critical activities are generally completed in a timely manner and supervisor is kept informed of work issues, alterations and status. The employee effectively applies technical skills and organizational knowledge to get the job done. The employee successfully carries out regular duties while also handling any difficult special assignments. The employee plans and performs work according to organizational priorities and schedules. The employee communicates clearly and effectively.

### Minimally Successful:

The employee's performance shows serious deficiencies that requires correction. The employee's work frequently needs revision or adjustments to meet a minimally successful level. All assignments are completed, but often require assistance from supervisor and/or peers. Organizational goals and objectives are met only as a result of close supervision. On one or more occasions, important work requires unusually close supervision to meet organizational goals or needs so much revision that deadlines were missed or imperiled.

Employee shows a lack of awareness of policy implications or assignments; inappropriate or incomplete use of programs or services; circumvention of established procedures, resulting in unnecessary expenditure of time or money; reluctance to accept responsibility; disorganization in carrying out assignments; incomplete understanding of one or more important areas of the field of work; unreliable methods for completing assignments; lack of clarity in writing and speaking; and/or failure to promote team spirit.

### Unsatisfactory:

The employee's performance is unsatisfactory. The quality and quantity of the employee's work are not adequate for the position. Work products do not meet the minimum requirements expected.

The employee demonstrates little or no contribution to organizational goals; failure to meet work objectives; inattention to organizational priorities and administrative requirements; poor work habits resulting in missed deadlines and/or incomplete work products; strained work relationships; failure to respond to client needs; and/or lack of response to supervisor's corrective efforts.

9

**POSITION DESCRIPTION** *(Please Read Instruction on the Back)* **ORGANIZATION BUILD** 5680-00011

| 2. Reason of Submission | | 3. Service | | 4. Employing Office Location | 5. Duty Station | 6. OPM Certification No. |
|---|---|---|---|---|---|---|
| Redescription | New | Hdqrs. | X Field | TUSKEGEE, ALABAMA | TUSKEGEE INSTITUTE NHS | |
| ...shment | X Other | | | | | |

| 7. Fair Labor Standards Act | 8. Financial Statements Required | | 9. Subject to IA Action |
|---|---|---|---|
| Exempt  X Nonexempt | Executive Personnel Financial Disclosure | Employment and Financial Interests | Yes  X No |

E...  ..t *(Show any positions replaced)*
I   -TIME IN LIEU OF SUBJECT-TO-
FU..OUGH
FROM POSITION #5680-00100
   TO POSITION #5680-00011

| 10. Position Status | 11. Position is: | 12. Sensitivity | 13. Competitive Level Code |
|---|---|---|---|
| X Competitive | Supervisory  X | 1- Non Sensitive | 3- Critical Sensitive | |
| Excepted *(Specify in Remarks)* | Managerial | | 14. Agency Use |
| SES (Gen.)   SES (CR) | X Neither | 2- Noncritical Sensitive | 4- Special Sensitive | |

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | | | | | | |
| c. Second Level Review | | | | | | |
| d. First Level Review | MUSEUM SPECIALIST | GS | 1016 | 09 | | |
| e. Recommended by Supervisor or Initiating Office | MUSEUM SPECIALIST | GS | 1016 | 09 | | |

| 16. Organizational Title of Position *(if different from official title)* | 17. Name of Employee *(if vacant, specify)* |
|---|---|
| MUSEUM SPECIALIST | MICHAEL HUBERT JOLLY |

| 18. Department, Agency, or Establishment | c. Third Subdivision |
|---|---|
| DEPARTMENT OF THE INTERIOR | TUSKEGEE INSTITUTE NATIONAL HISTORIC SITE |

| a. First Subdivision | d. Fourth Subdivision |
|---|---|
| NATIONAL PARK SERVICE | |

| b. Second Subdivision | e. Fifth Subdivision |
|---|---|
| SOUTHEAST REGION | |

19.     ...ee Review--This is an accurate description of the major duties and
        abilities of my position.

Signature of Employee *(optional)*

2.      ...ervisory Certification.  *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the*  knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.

| a. Typed Name and Title of Immediate Supervisor | b. Typed Name and Title of Higher-Level Supervisor or Manager *(optional)* |
|---|---|
| L.H. HOWARD (acting) DEPUTY SUPERINTENDENT | WILLIE C. MADISON SUPERINTENDENT |
| Signature                     Date  8/31/00 | Signature                     Date  8/31/00 |

21. Classification/Job Grading Certification. *I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management, or, if no published standards apply directly, consistently with the most applicable published standards.*

22. Position Classification Standards Used in Classifying/Grading Position

OPM PCS 1016

Typed Name and Title of Official Taking Action
BETTY G. CLARK
PERSONNEL MANAGEMENT SPECIALIST
Signature                           Date  9-26-00

Information for Employees. The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee *(optional)* | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. C   ...r | | | | | | | | | | |

24:     ...s
PE..MANENT FULL-TIME IN LIEU OF PERMANENT SUBJECT-TO-FURLOUGH
..   . POSITION NUMBER:  5680-000011
M...S CHANGE OF ALL FURLOUGH POSITIONS AT TUIN TO FULL TIME AS A RESULT OF
INCREASED WORKLOADS.

25. Description of Major Duties and Responsibilities  *(See Attached)*

| NSN 7540-00-634-4265 | Previous Edition Usable | 5008-106 | OF 8 (Rev. 1-85) U.S. Office of Personnel Management FPM Chapter 295 |

## MUSEUM SPECIALIST

### GS-1016-09

**INTRODUCTION** - This position is located at Tuskegee Institute National Historic Site in the Division of Interpretation and Visitor Services. The incumbent conducts a program of collection maintenance and historic house and museum object preservation and rehabilitation including such items as rugs, paintings, prints, lighting fixtures, furniture, glassware, ceramics, photographs, and documents. The position is one of five permanent positions reporting directly to the Chief of Interpretation and Visitor Services.

### MAJOR DUTIES

The incumbent directly manages the Museum collection at the Site, including the exhibit areas at The Carver Museum and The Oaks, and the collection storage facilities at the Site. The Incumbent is responsible for the acquisition, storage, preservation, records, loans, packing, and security of the museum collection. In addition, the incumbent is responsible for conservation programs involving extremely valuable objects.

The incumbent carries out scholarly research on objects in the collection, and makes information available to the division to use in interpretive programs at the Site.

The incumbent develops work programs and standards, prepares budgets and operating programs, and tracks expenditures against programmed amounts. Purchases are approved and priorities for programs are set by supervisor. The incumbent initiates administrative processes necessary to obtain operating resources such as personnel, uniforms, equipment, and supplies. This position is subject to the Procurement Integrity Requirements.

The incumbent monitors and maintains museum records to ensure that the established procedures are being implemented and maintained. Records include accession books, accession files, source of accession files, catalog cards, catalog folders, inventories, loans, deaccession records, and computer records on the automated catalog system.

Conducts interpretive tours and lectures to professional, historical, educational and other groups, as well as the general public.

Participates in the development of the Site's planning document.

## SUPERVISORY CONTROLS

Incumbent carries out the majority of the above assignments and responsibilities independently. The Chief of Interpretation and Visitor Services provides general instructions and guidance on new programs or unusual assignments, but the incumbent has considerable latitude for independent action and judgement to manage a well established and stable museum collection.

## OTHER SIGNIFICANT FACTS

Education or experience required includes:

- --Good knowledge of area legislation, National Park Service policies, regulations and objectives.

- --Extensive knowledge of administrative processes and organizational alignment.

- --Extensive knowledge of subject matter relating to Tuskegee Institute National Historic Site Theme (African American History, Civil War and Reconstruction, Natural History.

- --Ability to communicate both orally and in writing; must be able to write general plans and guidelines for the management of the museum collection.

- --Knowledge of exhibit design and maintenance.

- --Must possess a thorough mastery of related museum operating procedures.

# RESIDUAL FUNCTIONAL CAPACITY QUESTIONNAIRE

| Patient: **Teresa Valencia** | SSN: ▮▮▮▮▮▮ |
|---|---|

Please answer the following questions concerning your patient's impairments. Attach all relevant treatment notes, laboratory and test results.

1. Nature, frequency & length of contact *Light Headedness, Dizziness X 4 mos.*

2. Diagnosis: *TIA VS. CVA ; Fatigue*

3. Prognosis: *Unknown*

4. Identify all of your patient's symptoms (including pain, dizziness & fatigue) *light headedness; dizziness; fatigue; ® leg Mass; chest pain; Neck Pain; CBP; Hip Pain*

5. Clinical Findings (all laboratory & test results which show your patient's medical impairments): *Hida Scan - gallbladder dyskinesia*

6. Have your patient's impairments lasted or can they be expected to last at least 12 months? ☑ Yes ☐ No

7. How often are your patient's symptoms associated with this illness severe enough to interfere with attention & concentration required to perform simple work-related tasks?
   ☐ Never  ☐ Seldom  ☐ Often  ☐ Frequently  ☑ Constantly

8. Identify the side effects of any medications which may impact their capacity for work, i.e. dizziness, drowsiness, stomach upset, etc.: *dizziness; fatigue; HA ; GI Upset; confusion; hypotension; Seizures (aura)*

9. As a result of your patient's impairments, estimate your patient's functional limitations if your patient were placed in a competitive work situation on an ongoing basis:

   a. How many city blocks can your patient walk without rest or severe pain? *2-3*

   b. Based on the objective medical, clinical and laboratory findings in the medical record and your experience with this patient, how many hours does this patient need to sit in a recliner or lie down during an 8 hour workday?

   **LIE OR RECLINE:** 0  1  2  3  4  5 ⑥ 7  8

   c. Please circle the number of minutes that your patient can sit and stand/walk at one time:

   **SIT:** 0  5  10  15  20 ㉚ 45  60      **STAND/WALK:** 0  5  10 ⑮ 20  30  45  60

   d. Please indicate the total number of hours your patient can sit and stand/walk in an 8 hour workday:

   **SIT:** 0 ① 2  3  4  5  6  7  8      **STAND/WALK:** ⓪ 1  2  3  4  5  6  7  8

   e. Does your patient need a job which permits shifting positions at will from sitting, standing or walking? ☑ Yes  ☐ No

f. Will your patient need to take unscheduled breaks or include periods of walking around during an 8-hour workday?  ☑Yes  ☐No

   If yes,  1) How often do you think this will happen? *during 8 hr wk day: 4-5 times*
           2) How long will each break last before returning to work?  *1-2 hours*

g. How many pounds can your patient lift and carry in a competitive work situation? ("Occasionally" means less than 1/3 of the working day; "Frequently" means 1/3 - 2/3 of the working day)

| | Never | Occasionally | Frequently |
|---|---|---|---|
| Less than 10 lbs. | ✓ | | |
| 10 lbs. | ✓ | | |
| 20 lbs. | ✓ | | |
| 50 lbs. | ✓ | | |

h. Does your patient have significant limitation in doing repetitive reaching, handling or fingering?  ☐ Yes  ☑No
   If yes, please indicate the percentage of time during an 8 hour working day during which your patient can use hands/fingers/arms for the following activities:

| | HANDS: grasp, turn, twist objects | FINGERS: Fine manipulation | ARMS: Reaching |
|---|---|---|---|
| Right: | _____ % | _____ % | _____ % |
| Left: | _____ % | _____ % | _____ % |

10. Please state the percentage of time during an 8-hour working day that your patient can stoop and crouch?    Stoop _____%    Crouch _____%

11. Please estimate, based upon your experience with the patient, and based upon objective medical, clinical, and laboratory findings, how often your patient is likely to be absent from work as a result of the impairments or treatments:
   _____ Never
   _____ Once or twice a month
   _____ Three or four times a month
   ✓ More than four times a month

12. Are your patient's impairments (physical impairments plus any emotional impairments) reasonably consistent with the symptoms and functional limitations described in this evaluation?  ✓ Yes ___ No
   If no, please explain: _____

13. Please describe any other limitations (such as psychological limitations, limited vision, difficulty hearing, etc.) that would affect your patient's ability to work at a regular job on a sustained basis: *blurred vision* _____

*9/7/07*
Date

Doctor's Signature

Printed Name: *Gilberto Sanchez, M.D.*
Address: *4143 Atlanta Hwy*
*Montg, Az 36109*

# Onset date Questionnaire

| Patient: Teresa Valencia | SSN: ███████ |
|---|---|

I have treated Teresa since *March 2003*. It is my opinion that Teresa has had the limitations and restrictions outlined in the Residual Functional Capacity Questionnaire since *June 2007*.

My opinion is based on:

| | |
|---|---|
| ✓ Direct Observation/Treatment | _____ Imaging Studies |
| ✓ Physical Examination | _____ Surgical Finding |
| ✓ Historical Medical Records | _____ Laboratory Results |
| _____ Clinical Testing | _____ Psychological/Psychiatric Evaluation |
| _____ Patient Report | _____ Counseling/Therapy Records |
| _____ Functional Testing | _____ Other:_____ |
| _____ My Own Experience & Background | _____ Other:_____ |

*9/7/07*
Date

_____
Doctor's Signature

Printed Name: *Gilberto Sanchez, M.D.*

Address: *4143 Atlanta Hwy*
*Montg., AZ 36209*

ALAN J. BERLIN, M.D.
GENERAL, BARIATRIC AND VASCULAR SURGERY   DIPLOMATE, AMERICAN BOARD OF SURERY
214 MITYLENE PARK DRIVE   MONTGOMERY, ALABAMA 36117
(334) 244-SURG (7874)          FAX (334) 274-0174

SCANNED

OUTPATIENT SURGERY / A.M. ADMISSION

NAME _Teresa Valencia_

AGE _40_

SSN _520824934_

HOSPITAL _Baptist Medical Center East_

DOB _1/14/67_

PHONE _356-5867_

DATE OF SURGERY _Tuesday, September 25, 2007_          TIME _12:30_   AM/**PM**

_Back_          ARRIVE AT THE HOSPITAL BY          _10:30_     **AM**/PM

## ORDERS TO THE HOSPITAL:

1. Obtain Operative Permit for: <u>LAPAROSCOPIC CHOLECYSTECTOMY WITH  CHOLANGIOGRAM</u>

2. Obtain old chart and current dictations from medical records.

3. Pre-op medications: <u>PER ANESTHESIA</u>

4. Pre-op studies: <u>CBC, CHEM 12, U/A, CXR, EKG</u>

5. Anesthesia & Pre-op studies Appointment: _Thursday September 21, 2007 @ 10:30am_
§ front _@ Baptist Medical Center East_

6. Other Pre-op & Prep orders: <u>MEFOXIN 2 gm IV ON CALL TO OR; SED's & TED's</u>

### PHYSICIAN INSTRUCTIONS FOR PATIENT PRIOR TO ARRIVAL:

1. Do not eat solid food after  **12 MIDNIGHT** _Monday_

2. Do not drink anything after  **12 MIDNIGHT** _Monday_

3. **CARRY ALL CURRENT MEDICATIONS WITH YOU TO THE HOSPITAL.**

4. You should bring a family member/friend with you to drive you home following surgery.

5. **DON'T TAKE ANY ASPIRIN UNTIL AFTER SURGERY**, Stop _ASA today 9/18/07_

6. **TAKE NORMAL RX'S WITH A SIP OF WATER**

7. **TAKE THREE (3) DULCOLAX TABLETS BY MOUTH** _Monday_ @ 11A.M.

ALAN J. BERLIN, M.D.

_9/18/07_
DATE

December 4, 2007

Catherine Light, Superintendent
Tuskegee Institute National Historic Site
1212 West Montgomery Road
Tuskegee, Alabama 36088

Dear Superintendent Light:

In reference to your email of November 29, 2007, regarding the on-line Performance
Management Training and work plan.

As you are aware in the month of August 2007, I talked to Mr. Tyrone Brandyburg
concerning accommodations for possible telecommuting from home. This was
occasioned by the fact that my doctor prohibited me from driving due to illness. During
that conversation, Mr. Brandyburg informed me that he spoke with you and that you said
there was no accommodations possible.

If, at this time there were "no accommodations" possible, what if anything has changed?
Also, is it your intention that I should complete this training at home on my own time or
will I be paid for the time? Had accommodations been made previously the financial
impact of my illness would have been considerably lessened.

Respectfully yours,

Teresa Valencia

December 10, 2007

Patricia Head, Program Assistant
Office of Safety and Health Administration
1141 Montlimar Drive, Suite 1006
Mobile, Alabama 36609

Dear Ms. Patricia Head,

This letter is in reference to my complaint against the Department of Interior/National
Park Service – Tuskegee Institute National Historic Site, in Tuskegee, Alabama
(inspection no. 310772330).

I am writing to formally request a copy of the full and complete report regarding the
above mentioned complaint.

Thank you for your time and assistance in this matter. I look forward to hearing from you
in the near future.

Respectfully yours,

Teresa Valencia



# United States Department of the Interior
## OFFICE OF THE SOLICITOR
### Southeast Regional Office
### Richard B. Russell Federal Building
### 75 Spring Street, S.W., Suite 304
### Atlanta, Georgia 30303-3311

**Isaiah D. Delemar**
**404-331-4447, ext. 237**
**IDD NPS.SE.2542**
**P-405, PM-15**

## MEMORANDUM

**TO:**      Teresa Valencia – 334-727-4597

**FROM:**    Attorney-Advisor - Southeast

**DATE:**    December 10, 2007

**SUBJECT:**  <u>Shirley Baxter v. U.S. Department of the Interior, National Park Service</u> EEOC
No. 420-2007-00111X, Agency No. FNP-2006-100.

---

I am writing to notify you that Administrative Judge Perry N. Martin has *tentatively* approved you to testify as a witness in the above-referenced EEOC case. He has scheduled a hearing at **8:30 a.m. on Thursday, February 7, 2008 and Friday, February 8, 2008**. It will be held at the Drury Hotel in Montgomery, Alabama. An agency official will contact you at a later date regarding the specific location in the Drury Hotel and the approximate time of your testimony.

The Administrative Judge has advised me that he expects to conduct the hearing as scheduled, without delay, and has determined that all witnesses must personally appear at the hearing. Therefore, it is imperative that you make any necessary arrangements to ensure your presence at the hearing. As a Department employee, you are required to cooperate fully in the processing of the referenced EEOC matter, including testify at the hearing.

If you have any question regarding this matter, please contact me immediately at (404) 331-4447, ext. 237.



## United States Department of the Interior

OFFICE OF THE SOLICITOR
Southeast Regional Office
Richard B. Russell Federal Building
75 Spring Street, S.W., Suite 304
Atlanta, Georgia 30303



IN REPLY REFER TO:

January 16, 2008

Ms. Teresa Valencia
6730 Pamela Court
Montgomery, Alabama 36116

      Re: Complaint of Breach of Implied Contract, etc.

Dear Ms. Valencia:

This office received your complaint, as referenced above, on January 11, 2008. Because the complaint raises employment discrimination and other claims that are more appropriately handled administratively, it has been forwarded to the Park Service's Regional Office. The Regional Office will notify you of what action will be taken regarding the complaint. In the meantime, however, if you have questions as to this office's actions concerning this matter, I can be reached at (404) 331-4447, ext. 225.

                Sincerely,

                Horace G. Clark
                Regional Solicitor

January 28, 2008

Horace G. Clark, Regional Solicitor
OFFICE OF THE SOLICITOR
Southeast Regional Office
Richard B. Russell Federal Building
75 Spring Street, S.W., Suite 304
Atlanta, Georgia 30303

Dear Mr. Horace Clark:

In reference to your letter dated January 16, 2008, concerning my complaint of "Breach of Implied Contract.

Your response to my complaint brought up the issue of employment discrimination. My complaint is being based on the "Breach of Implied Contract," not employment discrimination nor civil rights violations. A "Breach of Implied Contract" and employment discrimination are two seperate issues.

Your response to my complaint brought up the issue of employment discrimination. My complaint is being based on the "Breach of Implied Contract," not employment discrimination nor civil rights violations. A "Breach of Implied Contract" and employment discrimination are two seperate issues.

I thank you for your time and consideration in this matter. However, I disagree with your statement that this can be handled administratively. The National Park Services non-responsive behavior has forced me to investigate other remedies.

Respectfully yours,

Teresa L. Valencia



*American Federation of Government Employees Local 110*
P.O. Box 2531
2400 Hospital Rd.
Tuskegee, AL 36083
Telephone: 334-727-0550 Ext 3454
 Fax: 334-724-6846

**To:  Whom it may concern**
**From:** President, AFGE Local #110
**Date:**  January 17, 2008
**Subject:** Financial Hardship, Teresa Valencia

   This letter serves as verification that Ms Teresa Valencia is currently undergoing severe financial hardship due to her inability to perform her duties with the National Park Service located in Tuskegee Alabama. She has experienced severe medical episodes on several occasions over the last 3 years or so. She has exhausted all means of sick and annual leave which Employees normally use to offset their pay during extended illness or injury.
   Ms Valencia has applied for Disability Retirement and is awaiting a decision from the Department of Interior. She is also awaiting compensation from the Office of Workman's Compensation and Pensions. We are at this time requesting that all financial obligations incurred prior to her hardship be placed on hold until her situation is resolved and her pay is reimbursed.
   If there are any concerns please contact me at 334-727-0550 Ext 3454.

Respectfully,

James K. Lowe, President, AFGE Local #110

# EXHIBIT

# F

Images of Mold
Spores, Missing
Taxidomy Specimen
MSDs sheets,
etc
on
CD