IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| TERESA VALENCIA (Pro'Se) ) | |
| Plaintiff, ) | |
| ) | |
| V. ) | CIVIL ACTION NO.: |
| ) | 3:08-CV-069-WKW |
| ) | JUDGE TERRY F. MOORER |
| ) | |
| DEPARTMENT OF INTERIOR ) | |
| WASHINGTON, D.C.; ) | |
| CATHERINE FARMER LIGHT, ) | |
| SUPERINTENDENT, IN HER ) | |
| INDIVIDUAL CAPACITY ) | |
| AND OFFICIAL CAPACITY; AND ) | |
| HERBERT TYRONE BRANDYBURG, ) | |
| SUPERINTENDENT, IN HIS ) | |
| INDIVIDUAL CAPACITY AND ) | |
| OFFICIAL CAPACITY, ) | |
| ) | |
| Defendants, ) | |

**Amend Motion for Judgment as a Matter of Law, pursuant to FED Rules of Civil Procedure, Rule 50(a)(2)**

COMES NOW, Teresa Valencia, in want of counsel and submit's the, "Motion for Judgment as a Matter of Law, pursuant to FED Rules of civil procedure, Rule 50(a)(2).....

Please attach exhibit G to the above filing exhibits. (Note: Ref. Doc. Entry Text #37)

Respectfully submitted this 4th day of August, 2008.

Teresa L. Valencia, Pro Se
8239 Inverness Green
Buena Park, CA 90621
Telephone: (334)868-0901

# EXHIBIT G

# Complaint

Case 3:08-cv-00069-WKW-TFM   Document 40   Filed 08/07/2008   Page 2 of 12

# U. S. Department of Labor
Occupational Safety and Health Administration

## Notice of Alleged Safety or Health Hazards

### For the General Public:

This form is provided for the assistance of any complainant and is not intended to constitute the exclusive means by which a complaint may be registered with the U.S. Department of Labor.

Sec. 8(f)(1) of the Williams-Steiger Occupational Safety and Health Act, 29 U.S.C. 651, provides as follows: Any employees or representative of employees who believe that a violation of a safety or health standard exists that threatens physical harm, or that an imminent danger exists, may request an inspection by giving notice to the Secretary or his authorized representative of such violation or danger. Any such notice shall be reduced to writing, shall set forth with reasonable particularity the grounds for the notice, and shall be signed by the employee or representative of employees, and a copy shall be provided the employer or his agent no later than at the time of inspection, except that, upon request of the person giving such notice, his name and the names of individual employees referred to therein shall not appear in such copy or on any record published, released, or made available pursuant to subsection (g) of this section. If upon receipt of such notification the Secretary determines there are reasonable grounds to believe that such violation or danger exists, he shall make a special inspection in accordance with the provisions of this section as soon as practicable to determine if such violation or danger exists. If the Secretary determines there are no reasonable grounds to believe that a violation or danger exists, he shall notify the employees or representative of the employees in writing of such determination.

NOTE: Section 11(c) of the Act provides explicit protection for employees exercising their rights, including making safety and health complaints.

### For Federal Employees:

This report format is provided to assist Federal employees or authorized representatives in registering a report of unsafe or unhealthful working conditions with the U.S. Department of Labor.

The Secretary of Labor may conduct unannounced inspection of agency workplaces when deemed necessary if an agency does not have occupational safety and health committees established in accordance with Subpart F, 29 CFR 1960; or in response to the reports of unsafe or unhealthful working conditions upon request of such agency committees under Sec. 1-3, Executive Order 12196; or in the case of a report of imminent danger when such a committee has not responded to the report as required in Sec. 1-201(h).

### INSTRUCTIONS:

Open the form and complete the front page as accurately and completely as possible. Describe each hazard you think exists in as much detail as you can. If the hazards described in your complaint are not all in the same area, please identify where each hazard can be found at the worksite. If there is any particular evidence that supports your suspicion that a hazard exists (for instance, a recent accident or physical symptoms of employees at your site) include the information in your description. If you need more space than is provided on the form, continue on any other sheet of paper.

After you have completed the form, return it to your local OSHA office.

NOTE: It is unlawful to make any false statement, representation or certification in any document filed pursuant to the Occupational Safety and Health Act of 1970. Violations can be punished by a fine of not more than $10,000. or by imprisonment of not more than six months, or by both. (Section 17(g))

Public reporting burden for this voluntary collection of information is estimated to vary from 15 to 25 minutes per response with an average of 17 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. An Agency may not conduct or sponsor, and persons are not required to respond to the collection of information unless it displays a valid OMB Control Number. Send comment regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to the Directorate of Enforcement Programs, Department of Labor, Room N-3119, 200 Constitution Ave., NW, Washington, DC; 20210.

*OMB Approval# 1218-0064; Expires: 2-29-2008*

Do not send the completed form to this Office.

OSHA-7(Rev. 9/93)

April 19, 2007

OSHA
Mobile Area Office
Attn: Duty Officer
1141 Montlimar Drive
Mobile, Alabama 36609

Dear Duty Officer:

I am writing this letter in order to establish a Formal Complaint against my employer, the Department of Interior-National Park Service, Tuskegee Institute National Historic Site, in Tuskegee, Alabama.

On the week of March 12-16th, 2007, several individuals (i.e., David Mendez, Mount Maker; Sean Bober, Mountmaker; Susan Blecher, Exhibit Registrar; and Tina Gessler, Conservator) from the Field Museum in Chicago, Illinois, visited Tuskegee Institute NHS in order to prepare for an upcoming exhibit pertaining to George W. Carver. Due to the fact, that I am the sole Museum Specialist for Tuskegee Institute NHS, Tuskegee Airmen NHS, and Selma to Montgomery NHT, I deal with museum collection, which includes: outgoing and incoming loans, conservation and preservation of antiques and historic structures, etc.

During the time the Field Museum was here, the conservator Tina Gessler took several swab samples from the taxidermy collection. Upon her return to the Field Museum, Ms. Tina Gessler conducted a semi-quantitative test for the presence of arsenic. Each sample tested positive for arsenic and one tested extremely high. On March 19, 2007, Ms. Gessler notified me via telephone and told me I needed to take extra precautions when handling those particular specimens. Ms. Gessler suggested that I bag each of the specimens for safety purposes. Once I received her phone call I immediately placed a sign on the museum storage cabinet that stated that the cabinet should not be opened without written authorization.

Once I secured the collection (i.e., locking collection in museum storage cabinet and affixing sign) I emailed Superintendent, Catherine Light, and told her about my conversation with Tina Gessler. In the same email I made a request to be tested for occupational exposure to arsenic. On March 20, 2007, Ms. Light sent a response back to me stating that she would have my Supervisor, Tyrone Brandyburg, check into the matter as soon as possible. On March 21, I emailed Mr. Brandyburg and asked him if he found out any information on whether or not I could be tested for occupational exposure to

arsenic. He later responded and asked me to be patient that he was collecting more information and documentation from the Field Museum and the National Park Service Southeast Regional Office. Later that afternoon, Mr. Brandyburg sent me an email that stated:

If you feel that you have been exposed to lead arsenic or paris green, it is your responsibility to go to the physician of your choice to ascertain whether or not you have been exposed to any poisons. Please have them provide you with a medical report. Use the appropriate leave, (i.e., sick leave or annual leave).

Once you return with the report, we will proceed from there. I highly recommend that you do not go back into that environment until the issue is resolved.

In reading that letter I recognized that I was pretty much on my own. Due to the fact, that I have been suffering from some major health issues I knew there was no way I could afford to pay for the testing myself, since my insurance would not cover it. I then went on-line to http://www.inside.nps.gov and clicked on quick links to research information on the National Park Service's "Safety Management Information Systems". From there I contacted their help line and spoke with a Mary Davis who told me to contact a gentleman by the name of Steve Rosen. Mr. Steve Rosen then told me that the gentlemen I needed to talk with for the National Park Service was Mr. Louis Rowe and Mr. Edward Perez out of Washington, D.C. – both gentlemen deal with health and safety issues for the National Park Service. I left messages on both Mr. Rowe's and Mr. Perez's voice mail. On my way home that day, I received a telephone call from Mr. Louis and I explained my plight to him. He told me to just hold on tight and that both he and Mr. Perez would see to it that I would be tested for occupational exposure at the expense of the National Park Service. I told both of them that I didn't want to get in any trouble for contacting them, but they told me not to worry about it. They said they would contact my Superintendent and speak with her directly, which they did and if I had any problems to contact them and keep them abreast of the situation. They also stated that they would put me in touch with the Southeast Region Safety Officer, Linda Giles.

On April 3, 2007, I was sent to Atlanta to be tested for arsenic exposure at the Richard B. Russell Building in the Health Unit. That building sits next to the Federal Building where the National Park Service Southeast Regional Office is located. Ms. Sheryl Burton, who is a contracted nurse, drew blood samples as well as had me give a urine specimen, which I provided her with two. All of the testing was conducted in their facility located at 75 Spring Street, S.W., Atlanta, Georgia.

On Friday the 13th day of April, 2007, I received a phone call from Ms. Sheryl Burton. She was calling to inform me that my urine specimen had been lost and that I needed to come in and be retested. I told her that she would need to make contact with either my Supervisor or Superintendent. I then gave her their phone number and she told me she would call them right away. About an hour later, the Administrative Officer, Shirley Streeter, telephoned me and asked me if I could go on April 16th or 17th to be retested. Since it was late in the day, it was decided that April 17th would be the best day for me to

be retested. This would provide her with enough time to get my travel authorization completed.

On April 16, 2007, I went to conduct a quick inventory of my collection and noticed that one of my keys was out of order. It was actually the #2 key, which unlocks the museum storage cabinet that contained some of the taxidermy specimens. I immediately took the key and checked the cabinet and noticed that the taxidermy collection was missing. I then went over to cabinet #5 and noticed that the other taxidermy collection was missing. I immediately notified Louis Rowe and Edward Perez. Mr. Louis Rowe then forwarded my email to Linda Giles. Ms. Giles told me to speak with my Supervisor, Tyrone Brandyburg to see whether or not he transferred the taxidermy collection or loaned them to another institution. I spoke with Mr. Brandyburg around 2:45 or 2:50 that afternoon and I asked him three specific questions: **1) Are we going to loan the Field Museum the taxidermy collection? Response: <u>I don't think so because they are not in good shape.</u> 2) Do you know what happened to the taxidermy collection? Response: <u>He told me that under Catherine Lights authority he was told to remove the objects from the collection.</u> 3) Where are they located? Response: <u>You don't need that information.</u>**

After that, I immediately sent an email to the Regional Curator, Allen Bohnert, in Atlanta, which read:

Dear Mr. Allen Bohnert:

As you are aware, the Field Museum from Chicago, Illinios, visited the park about a month ago. They are interested in borrowing some of our collections for an exhibit. While they were here they took a small sample from the taxidermy collections to test for arsenic. The items that they tested all came back positive. The conservator, Tina Gessler, immediately notified me about her findings and told me to take extra precautions, which I did. I secured all of the specimens and placed a sign on the cabinet door that no one is to open that cabinet without written authorization.

Today, while I was doing my walk through the storage area I looked in my keybox and noticed that the key for the taxidermy specimens was not in its proper location. I then took the key and checked the cabinet and noticed that all of the taxidermy specimens were missing.

When I discovered this I immediately notified Louis Rowe and Edward Perez and they forwarded my memo on to Linda Giles who is the Safety and Health Manager at the Atlanta Regional Office. She told me to check with my supervisor to see if the items had been loaned out or transferred. When I spoke with Tyrone this afternoon I asked him if we were going to allow the Field Museum to borrow such specimens and he said he didn't think so, because they aren't in good shape. I then asked him if he knew what happened to the taxidermy collection. He told me that under Catherine Lights authority he was told to remove the objects from the collection. I then asked him where they were located and he told me that I didn't need that information.

I find it to be highly irresponsible to remove toxic items from a collection where they have already been secured. I have already been exposed to the arsenic. Why would you then expose another person to a harmful substance unneccesarily?

Respectfully yours,

Teresa Valencia

On April 17, 2007, Linda Giles forwarded a copy of my letter to Superintendent Catherine Light. That was the same day I was in Atlanta being retested. At approximately 2:00 that afternoon, Ms. Light phoned my office and told me that she wanted to meet with me in her office tomorrow afternoon at 2:00 p.m. and to bring my Union Representative with me, that this meeting was in reference to the letter I sent to the Regional Curator, Allen Bohnert, and forwarded it on to Louis Rowe, Edward Perez, and Linda Giles. I told her that I was familiar with that letter and that I would be available to meet with her and that I would have a Union Representative with me.

On April 18, 2007, I went over to the Tuskegee Institute NHS headquarters to meet with Superintendent Catherine Light, my supervisor, Tyrone Brandyburg, and my Union Rep. Wendell Echols. Superintendent Light informed me that I had no business notifying Washington, D.C., about anything pertaining to this park. Both Light and Brandyburg stated that they didn't have any right to know what's going on in this park. She then asked me, "What was the purpose of writing that letter to Allen Bohnert and forwarding it on to the selected individuals?" I told her that I had asked Tyrone Brandyburg the location of the taxidermy specimens and he told me that I didn't need that information. Mr. Tyrone Brandyburg insisted that he told me that the taxidermy collection was still in storage, but that was a false statement. I didn't know that they were in storage until he made that comment. I told him that I was not aware that they were in storage. I told him I checked the designated cabinets and they were not there. He said he moved the collection to a more appropriate cabinet and that he was in possession of the key and I was not getting it. At that point Ms. Catherine Light and Tyrone Brandyburg questioned my professionalism as a Museum Specialist. I told them that it wasn't me who's professionalism needed to be questioned. I informed Superintendent Light that Tryone Brandyburg knew about the contaminated specimens all along, but did absolutely nothing to make others aware of the hazard. Mr. Brandyburg himself stated that at one time the birds were encapsulated, but the encapsulation had been removed. (Note: **Mr. Brandyburg is on his second tour of duty here at Tuskegee Institute NHS as the Chief of Resource Education and Interpretation. Prior to him becoming the Chief of Resource Education and Interpretation, he was the Museum Specialist. A gentleman by the name of Mike Jolly was my predecessor; he was the Museum Specialist after Tyrone Brandyburg.**) Mr. Brandyburg blamed the removal of the encapsulation on Mike Jolly and I told Mr. Brandyburg that I don't believe Mr. Jolly had anything to do with it. Tyrone Brandyburg then asked how I came up with that basis and I told him that I spoke with Mr. Jolly and he said that they were never encapsulated the whole time he had been here. At that point Superintendent Light interrupted and said that I should have been aware of the arsenic issue. I told her that after being notified by the Field Museum in Chicago I looked in the Collection Condition Survey, which was written in 2002, and noticed that only two items were listed as to containing arsenic. So she said that I knew since 2002 that the taxidermy collections contained arsenic. I told her that I contacted Harpers Ferry, West Virginia, and spoke with the author of the Collection Condition Survey, Barbara Cumberland, and asked her if she had tested any of the other taxidermy specimens. Ms. Cumberland said that she did not, because the park didn't ask her to. She said the only reason she knew about the arsenic is because either someone told her or possibly a tag, but she couldn't recall for sure. At that time Mr. Brandyburg insinuated that I was negligent in the handling of the specimens. I told him that I wore gloves when handling the objects. He said that he spoke with another conservator and

that she said that the only way I could get contaminated with arsenic was if I was shaking the birds up and down or mishandling the object. I told Mr. Brandyburg that I handled the birds correctly and that I wasn't shaking them up and down. From that point Superintendent Light reverted back to the letter that I sent to Mr. Allen Bohnert. She said that by no means did I secure the taxidermy specimens since they were not placed in plastic bags as was suggested in the conserve-o-gram. I told her they were secure, because I am the only one that has access to the storage unit besides her and Tyrone. I also told her that I did not have the proper PPE to handle those types of items. Mr. Wendell Echols, my Union Representative then asked who is responsible for purchasing PPE. Superintendent Light then stated that she has always allowed me the opportunity to purchase whatever I need. Then Mr. Brandyburg stated that he had authorized me to purchase whatever equipment was necessary. I told him that I gave him a list last year of supplies that I needed in order for me to do my job, but he said we ran out of funds and that I would have to wait until the following year. He then mentioned that he just wanted the list and that I should have purchased whatever items I deemed necessary to do my job. The only problem with that is that at that time I was not able to use my Government Credit Card, because we were at the end of the Fiscal Year and the only ones that could make purchases were management. Also, Catherine Light questioned me about the geological specimens and other toxic specimens in the collection and placed the blame on me for not securing them. I told her that they were secure, but the building that I am currently in is inadequate and needs a better ventilation system. I told her I had made an earlier complaint about this with Tyrone Brandyburg and the former Facility Manager, Juan Gomez. Before I completed my statement Ms. Light interrupted and stated that I didn't need to complain, but to take action. Mr. Juan Gomez and I worked jointly, and he immediately notified the Safety Officer at the Southeast Regional Office and listed my concerns. The Regional Office responded promptly and when I told him about some of the toxic items within the collection.

At that point Superintendent Light said that I called her authority into question and that neither she nor Mr. Brandyburg had to tell me anything about the location of the museum collection. She said that this was her park and that the museum collection was her collection. I told her that this park belonged to the American people and that the museum collection belonged to them as well and that I was just trying to keep the park in compliance with the National Park Service's Museum Standards.

Both Catherine Light and Tyrone Brandyburg accused me of being inpatient where it came to getting tested for Occupational Exposure for arsenic. I told her I wasn't being inpatient but trying to stay in the loop to make sure that I would get tested. She told me that Washington, D.C. should have never been brought into this and that Mr. Brandyburg was working on getting me medical attention. I told her according to the email he sent dated March 21, 2007 he pretty much told me that I was on my own in this matter. Superintendent Light and Brandyburg tried to insinuate that I was being impatient, but that Tyrone Brandyburg was working with Linda Giles to get me to a physician. Mr. Brandyburg also stated that he wasn't the one that wrote the letter dated March 21, 2007, but that Mr. Anthony Stennis in the Human Resources Department at the Southeast Regional Office had written it. Truth be known, it wasn't until Washington, D.C.

contacted Superintendent Light that Mr. Tyrone Brandyburg began to vigorously pursue my request to be tested.

From that point, Superintendent Light, asked me what was I trying to accomplish by bring Washington, D.C. into this situation. I reiterated once again that the letter written by Mr. Tyrone Brandyburg basically stated that I was <u>on my own</u>. I told Superintendent Light that I was to keep the gentlemen in Washington, D.C. informed. She said that I was not trying to inform them of anything, but trying to call her authority in to question. I believe that her authority should be called into question, because she allowed another individual to be placed at risk, but as I understand it this was based on a management decision and had nothing to do with health and safety. Again, Superintendent Catherine Light, asked me what I was trying to accomplish. I told her that I didn't trust her or Mr. Brandyburg nor do I trust Anthony Stennis. I told Ms. Light to put herself in my shoes and look at it from my perspective. When I received the call from Sheryl Burton that my urine samples were missing on Friday and then when I came into work Monday my taxidermy collection was missing. Now I find out that Mr. Brandyburg really didn't write that email, but that Anthony Stennis from the Southeast Regional Office had written it and instead of Tyrone Brandyburg just forwarding me the information he either gave Anthony Stennis his password for his Government email or copy and pasted the comment to make it look like he actually wrote it. I find all of this behavior to be suspicious. Catherine Light then told me that she didn't trust me either and that she is tired of people not following the chain of command. At the end of the meeting Superintendent Light told Tyrone Brandyburg to reprimand me. I am currently awaiting documentation pertaining to the reprimand.

On April 19, 2007, I received a telephone call from Allen Bohnert, Regional Curator, and he apologized for not getting back to me sooner. He stated that he had been out of the office. I asked Mr. Allen Bohnert if he had read my email and he said he had. He then asked me what the current situation was and I told him. I told him that I was going to be reprimanded for notifying Washington, D.C. about the arsenic, the missing museum collection, not following the chain of command, and for questioning Superintendent Catherine Light's authority. I told Mr. Bohnert, that they were interfering with me being able to perform my responsibilities as a Museum Specialist. I stated that I believed it was imperative that I brought this to his attention, because now we are out of compliance with the National Park Service Standards for Museum Collections. In speaking with Mr. Allen Bohnert, he stated that the park should have had this information documented years ago and that he did not find fault in what I had done. He said, it's true that Superintendent Catherine Light was ultimately responsible for the collection, but that she needed to be operating within the regulations as well.

On April 18, 2007, Tyrone Brandyburg sent me two email memos with "Safety Items" being one of the subjects and then "Safety Training" being the other subject. The memo read as such:

**Deadline: June 11, 2007; Safety: USGS Industrial Hygiene Program- Course Code: 1304**

Once you complete the courses, please provide completion certificates to Lorraine and myself.

If you have any questions, please contact me

I would like it noted that I have not received this type of Safety Training during the 4.5 years that I have been here in Tuskegee, Alabama. I would also like to state that the whole time I have been here curatorial storage has never had any MSDS sheets. The park should have already had this in place years before my arrival. After I reported everything to Washington, D.C., my Supervisor re-wrote my performance appraisal plan and now I am responsible for MSDS along with other safety related issues such as fire extinguisher inspections and training.

Though Ms. Tina Gessler suggested that I bag all of the specimens I was very hesitant in doing so. The reason being is that I have been extremely sick since I have been here and some of my symptoms could point to possible arsenic exposure. On December 30, 2006, my heart failed and the paramedics and doctors had to intervene. I turned 40 this past January, and I really shouldn't be having all of the health problems that I am experiencing at this time. I believe it would have been highly irresponsible for me to come into contact with the taxidermy collection until I was tested. The other reason is because the park currently does not have the proper PPE for handling arsenic contaminated specimens.

When I contacted Louis Rowe I also made him aware of some of the other hazardous items that are currently in Tuskegee's collection. The majority of this is related to geological specimens:

**3488 Strontium Sulfate msc 9c...radiation**
**2630 Barium Carbonate msc9c...radiation**
**3194 Barium Sulfate msc 9d...radiation**
**3198 Sulfarsenide of Cobalt msc 9d...radiation**
**2660 Copper Arsenic Oxide msc 9b...toxic**
**2708 Orpiment (arsenic) msc 11c...toxic**
**2710 Actinolite (asbestos) msc 11a...inhalation**
**2716 Galena in Calcite and Barite msc 11a...radiation/lead**
**2696 Galena, Barite, Covelite, Pyrite msc 11a...radiation/lead**
**2669 Galena, Barite, Covelite, Pyrite msc 9c...radiation/lead**
**2717 Galena msc 11a...lead**
**2812 Pyrite, Galena, Iron Disulfides msc 11c...lead**
**2841 Calcite, Sphalerite, Galena msc 11a...lead**
**3248 Phosphate of Cerium and Lanthanum msc 9d...radiation**
**2639 Lead Chlorovanadate msc 9e...lead**

I hope this gives you some insight on the situation here at Tuskegee Institute NHS.

Respectfully yours,

*[signature: Teresa Valencia]*

Teresa Valencia

IN THE DISTRICT COURT OF THE
UNITED STATES FOR THE MIDDLE DISTRICT
OF ALABAMA
EASTERN DIVISION

Teresa Valencia vs Department of Interior, Washington, D.C.

Civil No:

3:08-cv-069-WKW

## Certificate of Service

Please Take Notice Teresa Valencia, in want of counsel, and cause the following to be served on the clerk & Defendants Attorney the Address:

Leura G. Canary
United States Attorney
James J. DuBois
Assistant U.S. Attorney
Georgia Bar No. 281445
U.S. Attorney's Office
P.O. Box 197
Montgomery, AL 36101-0197

Date

Aug. 4, 2008

Respectfully Submitted

_Teresa Valencia_, Pro Se
Teresa Valencia

IN THE DISTRICT COURT OF THE
UNITED STATES FOR THE MIDDLE DISTRICT
OF ALABAMA
EASTERN DIVISION

Civil No:

3:08-cv-069-WKW

Teresa Valencia vs Department of Interior, Washington, D.C.


**Notice of Filing**

Please Take Notice
Come Now, Teresa Valencia, in want of counsel, and cause the following to be served on the court (1) copy to the clerk, and (1) copy to the Defendants Attorney. (Note: Ref. Doc. Entry Text #37. Please add to existing exhibits.

Leura G. Canary
United States Attorney
James J. DuBois
Assistant U.S. Attorney
Georgia Bar No. 281445
U.S. Attorney's Office
P.O. Box 197
Montgomery, AL 36101-0197


Date                                                Respectfully Submitted

Aug. 4, 2008                                        Teresa Valencia, Pro Se